ROBBINS GELLER RUDMAN
    & DOWD LLP
DANIEL S. DROSMAN (200643)
W. MARK CONOVER (236090)
JENNIFER N. CARINGAL (286197)
SARAH A. FALLON (345821)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
ddrosman@rgrdlaw.com
mconover@rgrdlaw.com
jcaringal@rgrdlaw.com
sfallon@rgrdlaw.com

Lead Counsel for Lead Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re DEXCOM, INC. CLASS ACTION SECURITIES LITIGATION | Lead Case No. 24-cv-1485-RSH-VET |
| CHARLENE ALONZO, Individually and on Behalf of All Others Similarly Situated,<br><br>              Plaintiff,<br><br>    vs.<br><br>DEXCOM INC., KEVIN R. SAYER, JEREME M. SYLVAIN, and TERI LAWVER,<br><br>              Defendants. | LEAD PLAINTIFF'S CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><br><br><br><br>DEMAND FOR JURY TRIAL |

4921-5040-2578.v1

# TABLE OF CONTENTS

                                                                              **Page**

I.      INTRODUCTION ............................................................................ 1

II.     JURISDICTION AND VENUE ...................................................... 5

III.    PARTIES ........................................................................................ 6

        A.      Plaintiff ................................................................................ 6

        B.      Defendants .......................................................................... 6

IV.     BACKGROUND ............................................................................ 7

        A.      Diabetes and Its Management .......................................... 7

        B.      Continuous Glucose Monitors ......................................... 9

        C.      The CGM Market in the United States Has Been Dominated by Two Companies: Abbott and Dexcom ........................... 9

        D.      Endocrinologists and PCPs Prescribe CGMs to Different Patient Populations ......................................................... 10

        E.      CGMs Are Sold Through Two Primary Channels: Pharmacy and DME Suppliers ........................................................ 11

        F.      CGM Insurance Coverage ............................................... 11

        G.      Prior to the Class Period, Abbott Dominated the Type 2 Basal Market .................................................................. 12

        H.      In April 2023, CMS Expanded Coverage to Type 2 Basal Patients ............................................................................ 14

V.      SUMMARY OF DEFENDANTS' FRAUD ................................. 14

        A.      At the Start of the Class Period, Defendants Misled Investors, Claiming They Were Well-Positioned to Take Advantage of the CGM Coverage Expansion ................. 14

        B.      Defendants Falsely Claimed They Were Succeeding Despite Lagging Basal Sales ........................................................ 16

        C.      Defendants Recognized They Were Losing the Basal Wars and Decided to Revamp Their Sales Force in 2023 but Continued to Mislead Investors ..................................................... 17

        D.      Defendants Raised Guidance and Touted a Sales Expansion ............. 18

        E.      At the End of the Class Period, Investors Finally Learned that Dexcom Was Underperforming in the Type 2 Basal Market ............ 20

1

2                                                                                              **Page**

3
4

VI.    DEFENDANTS' CLASS PERIOD FALSE AND MISLEADING
STATEMENTS AND OMISSIONS UNDER RULE 10b-5(b) .................. 21

A.    April 27, 2023 Q1 2023 Earnings Call ................................................. 21

B.    June 7, 2023 William Blair Growth Stock Conference ..................... 30

C.    June 23, 2023 Investor Day ................................................................. 33

D.    September 6, 2023 Wells Fargo Healthcare Conference ................... 40

E.    October 26, 2023 Q3 2023 Earnings Call .......................................... 42

F.    January 8, 2024 JPMorgan Healthcare Conference .......................... 44

G.    February 8, 2024 Q4 2023 Earnings Call .......................................... 47

H.    April 25, 2024 Q1 2024 Earnings Call .............................................. 50

I.    June 5, 2024 William Blair Growth Stock Conference ..................... 56

VII.   DEFENDANTS STUN THE MARKET BY DISCLOSING ANEMIC
PERFORMANCE IN THE TYPE 2 BASAL MARKET ....................... 59

VIII.  ADDITIONAL ALLEGATIONS OF SCIENTER ................................. 62

A.    Defendants Spoke Frequently Regarding the Impact of the
Medicare Coverage Expansion on Their Core Business,
Expressing Personal Involvement and Knowledge .......................... 62

B.    Defendants Admitted They Had Script-Level Data and Assured
Analysts that Dexcom Was "Winning" Market Share in the
Basal Space ........................................................................................ 65

C.    Defendants' Admissions Affirm Their Contemporaneous
Knowledge of, or Deliberate Recklessness Regarding,
Information Undermining Their Public Statements .......................... 67

D.    The Proximity Between Defendants' Misstatements and the
Emergence of the Relevant Truth Further Establishes a Strong
Inference of Scienter .......................................................................... 69

E.    Lawver's Suspiciously-Timed Departure Supports a Strong
Inference of Her Scienter .................................................................. 70

F.    Defendants Were Motivated to Mislead Investors as to
Dexcom's True Prospects .................................................................. 71

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

4921-5040-2578.v1

Page

   1. Defendants Had a Motive to Conceal the Bad News in the Hope that They Might Be Able to Right the Ship and Avoid Disclosure Entirely ......................................................... 71

   2. Defendants' Suspicious Insider Sales Support Scienter ........... 72

   3. Dexcom's Incentive Pay Structure Provides Additional Motive to Inflate Dexcom's Stock Price ................................. 75

  G. Corporate Scienter ................................................................................. 75

IX. LOSS CAUSATION ................................................................................. 76

X. APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND THE FRAUD-ON-THE-MARKET DOCTRINE ........................................ 80

XI. NO SAFE HARBOR ................................................................................. 81

XII. CLASS ACTION ALLEGATIONS ............................................................ 81

XIII. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ........................ 83

4921-5040-2578.v1

Lead Plaintiff National Elevator Industry Pension Fund ("Plaintiff" or the "Pension Fund") alleges the following against Defendants (defined herein), by and through Lead Counsel, upon personal knowledge as to Plaintiff and Plaintiff's own acts and upon information and belief as to all other matters.[1]

## I.    INTRODUCTION

1.    Plaintiff brings this federal securities class action on behalf of all persons or entities who purchased or otherwise acquired the securities of Dexcom, between April 28, 2023 and July 25, 2024, inclusive (the "Class Period"), and were damaged thereby.  Plaintiff brings this action against Defendants Dexcom, its Chief Executive Officer ("CEO") Kevin R. Sayer ("Sayer"), its Chief Financial Officer ("CFO") Jereme M. Sylvain ("Sylvain"), and its former Chief Commercial Officer ("COO") Teri Lawver ("Lawver") for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), as described herein.

2.    Dexcom is a medical device company that designs, develops, and sells continuous glucose monitoring ("CGM") systems.  CGMs utilize small sensors inserted just below the skin to provide regular glucose readings to a compatible

---

[1]    Plaintiff's information and belief is based on, among other things, the independent investigation of counsel, which includes, but is not limited to: (a) review of U.S. Securities and Exchange Commission ("SEC") filings by DexCom, Inc. ("Dexcom" or the "Company"); (b) review of transcripts of Dexcom's public conference calls, press releases, and other publications issued by the Company; (c) review of media reports about the Company; (d) review of public filings and court orders in other litigation against one or more defendants; (e) interviews with third parties conducted by attorneys and/or investigators retained by attorneys; (f) review of analyst reports about Dexcom; (g) review of transcripts of Dexcom senior management's conferences with investors and analysts; (h) review of market share data reported by third parties; and (i) other public information and data regarding the Company.  Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their custody and control.  Plaintiff's investigation is ongoing and it believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

4921-5040-2578.v1

mobile device or dedicated monitor. CGMs offer many significant benefits, but they are especially critical in helping individuals with diabetes manage their blood glucose levels and prevent hyperglycemia (high blood sugar) and hypoglycemia (low blood sugar), which can have serious health consequences.

3.     CGMs profoundly changed diabetes care, offering a more regular, convenient, and less painful way to measure blood glucose levels than through traditional means, such as a finger stick test. They provide a wealth of information to patients, caregivers, and healthcare providers to optimize treatment; can send alerts to ward off cases of hyperglycemia and hypoglycemia; and can be used in conjunction with insulin pumps to administer the appropriate dose of insulin.

4.     Dexcom and Abbott Laboratories ("Abbott") dominate the CGM space, effectively giving them a duopoly. Dexcom's most current CGM system is known as the "G7" and Abbott's is known as "FreeStyle Libre 3." CGMs are costly, so Dexcom's patient base has historically been dependent on reimbursement from government healthcare programs (*i.e.*, Medicare), which began in 2017, and private health insurance. However, prior to April 2023, Medicare and private health insurance only covered CGMs for individuals with Type 1 or Type 2 diabetes that require insulin intensive treatment. They did not cover CGMs for Type 2 basal patients (individuals who use basal insulin – long-acting insulin typically delivered once a day to keep glucose levels steady) or others who do not take insulin but still experience hypoglycemic events.

5.     Prior to the Class Period, Dexcom was intensely focused on growing its presence among Type 1 and Type 2 intensive insulin users typically treated by endocrinologists – its "heritage" business. Dexcom had also focused on making pharmacy its primary sales channel instead of durable medical equipment ("DME") suppliers, who serviced Medicare patients.

6.     In contrast, Abbott had begun a massive effort to reach the Type 2 non-intensive insulin population where interest in CGMs was growing. Abbott already

had a strong presence with primary care physicians ("PCPs") due to its wide portfolio of consumer healthcare products, including glucometers and test strips. Thus, Abbott focused on reaching the Type 2 non-intensive insulin population with its marketing and sales efforts in PCP offices (where most of these patients were treated). Abbott sought to make itself a viable cash pay option for this group, through its lower price tag and strong rebate program that made its CGMs affordable even without insurance coverage. Accordingly, prior to the start of the Class Period, Type 2 non-intensive and basal patients made up 40% of Abbott's customer base.

7.    In April 2023, the Centers for Medicare & Medicaid Services ("CMS") expanded Medicare coverage for CGMs to the Type 2 basal patient population. On April 27, 2023, the day before the start of the Class Period, and in the months that followed, Defendants heralded this expansion, which they touted as "the largest single expansion of access to CGM in our industry's history" and which "expand[ed] [Dexcom's] addressable market tremendously." Defendants assured investors that they were "in a great position to compete as the market develops," had "very good relationships" with DME suppliers who would service this new Medicare population, and were "well-positioned" to succeed and "extend [their] leadership into the type 2 basal insulin segment."

8.    Unbeknownst to investors, Dexcom faced numerous obstacles that had a material negative impact on its ability to capture this newly covered Type 2 basal patient population. Primary among them was Dexcom's deficient sales force and its lack of presence and connections in PCP offices, where most of these patients were treated. Meanwhile, Abbott's investments in the Type 2 basal population were paying off. Its lower price point, rebate program, extensive sales and marketing efforts, and brand notoriety with PCPs and patients enabled it to swiftly capture the lion's share of the newly covered patient population. Dexcom was unable to compete on equal footing with Abbott and was "losing the basal wars."

4921-5040-2578.v1

9.      Defendants concealed this and other significant competitive disadvantages, painting a picture to investors and analysts alike of its early success in the burgeoning basal market, driven by the strength of its sales force and DME relationships. Defendants obfuscated challenges they were facing and falsely claimed that Dexcom's basal segment was "outperform[ing]" and that they were "doing well in the basal category," despite knowledge to the contrary. Defendants' material misstatements and omissions had the intended effect of inflating Dexcom's stock price during the Class Period, which allowed Defendants to profit from their incentive compensation structure and massive insider sales.

10.     As Defendants would admit after the Class Period, by the end of 2023, they knew they did not have the "resources in the field" to capture the Type 2 basal population, Dexcom's sales force had not gotten traction with PCPs treating Type 2 basal patients, and Dexcom was "getting very few prescriptions." Accordingly, Defendants knew they needed to rapidly expand and reorganize their sales force to try and catch up to Abbott. They undertook a last-minute sales force expansion and realignment to stem the loss of new scripts and take back the share they had ceded to Abbott.

11.     On June 5, 2024, despite mounting evidence of customer losses, at a William Blair Growth Conference, Defendants reaffirmed their full-year financial guidance and analysts' consensus, stating "we're happy with where we are. We're happy with our full year guidance."

12.     Yet, less than two months later, on July 25, 2024, the Company did an about-face, disclosing disappointing results and announcing that it was now reducing its full-year guidance by $300 million. In sharp contrast to their bullish statements one quarter earlier, Defendants admitted "[w]e're not doing wonderful in the basal space" and that they had "lost market share in the DME channel." Defendants' abrupt and staggering revision to guidance – attributed to Dexcom's failure to capitalize on the newly covered Type 2 basal patients – stunned the market, with analysts declaring

4921-5040-2578.v1

1  Dexcom was "losing the basal wars." This news caused Dexcom's stock price to
2  plummet by more than 40% – the steepest decline in Company history. Analysts
3  called this announcement a "Major Surprise," "rare, shocking (and confusing)," and
4  called into question management's credibility. Investors suffered over a billion
5  dollars in losses. Following the close of the Class Period, Defendants slowly admitted
6  what they had known but concealed from investors all along – they were not poised to
7  capture the newly covered basal population and had not meaningfully taken share
8  from Abbott.

9     13.   Defendants' deception was motivated by a misguided hope that if they
10  could only "fake it" long enough by misleading investors, they might one day "make
11  it" and never have to reveal the adverse material facts they omitted during the Class
12  Period. This strategy is no different – and no less illegal – than embezzling in the
13  hope that winning at the track will enable the embezzled funds to be replaced before
14  they are discovered to be missing.

15  **II.    JURISDICTION AND VENUE**

16     14.   Jurisdiction is conferred by 28 U.S.C. §1331 and §27 of the Exchange
17  Act, 15 U.S.C. §78aa. The claims asserted herein arise under §§10(b) and 20(a) of the
18  Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated
19  thereunder, 17 C.F.R. §240.10b-5.

20     15.   Venue is proper in this District pursuant to §27 of the Exchange Act and
21  28 U.S.C. §1391(b) because Dexcom's principal executive offices are located in this
22  District and many of the acts charged herein, including the dissemination of materially
23  false and/or misleading information, occurred in substantial part in this District. Thus,
24  substantial acts in furtherance of the alleged fraud or the effects of the fraud have
25  occurred in this District.

26     16.   In connection with the acts, transactions, and conduct alleged herein,
27  Defendants directly or indirectly used the means and instrumentalities of interstate
28

4921-5040-2578.v1

commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.  PARTIES

### A.  Plaintiff

17.  Lead Plaintiff National Elevator Industry Pension Fund is a Newtown Square, Pennsylvania-based multiemployer defined benefit pension plan managing more than $4 billion in assets for the purpose of paying benefits to eligible participants and beneficiaries under the terms of the National Elevator Industry Plan of Pension Benefits.  ECF 11-1 at 5.  As detailed in the Pension Fund's previously-filed certification (*see* ECF 11-4, ECF 11-5), the Pension Fund purchased a significant number of shares of Dexcom stock at artificially inflated prices during the Class Period and suffered damages as a result of Defendants' alleged misconduct.

### B.  Defendants

18.  Defendant Dexcom, Inc. is a Delaware corporation with its headquarters located at 6340 Sequence Drive, San Diego, California 92121.  The Company's common stock trades on the NASDAQ Global Select Market under the symbol "DXCM."  Dexcom is a medical device company that designs, develops, and sells CGM systems.

19.  Defendant Kevin R. Sayer was, at all relevant times, and continues to be, the Executive Chairman of the Board of Directors, CEO, and President of Dexcom.

20.  Defendant Jereme M. Sylvain was, at all relevant times, and continues to be, the Executive Vice President and CFO of Dexcom.  During the Class Period, Sylvain additionally was Dexcom's Chief Accounting Officer.

21.  Defendant Teri Lawver was, at all relevant times, the Executive Vice President and CCO of Dexcom.  She joined Dexcom in January 2023 and her departure was announced on October 25, 2024.

4921-5040-2578.v1

22.     Sayer, Sylvain, and Lawler are collectively referred to herein as the "Individual Defendants."  The Individual Defendants and Dexcom are collectively referred to herein as "Defendants."

23.     The Individual Defendants, because of their voting power and/or positions within the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.

24.     Defendants attended quarterly earnings calls and investor conference calls and had the ability and opportunity to prevent misleading statements or cause them to be corrected.  Because of their positions and access to material, non-public information ("MNPI") available to them, Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the representations that were being made were then materially false and/or misleading.  Defendants are liable for the false and misleading statements and omissions pleaded herein, which caused Dexcom securities to trade at artificially inflated prices during the Class Period.

**IV.     BACKGROUND**

**A.     Diabetes and Its Management**

25.     Diabetes is a disease caused by the body's inability to produce or effectively utilize the hormone insulin which prevents the body from adequately regulating blood glucose levels.  Diabetes is classified into two major types: Type 1 and Type 2.  In 2021, the prevalence of diabetes in the United States was 38.4 million people of all ages, which is 11.6% of the U.S. population.  In 2024, the estimated number of people with Type 1 diabetes in the United States was 2.07 million, which includes 1.79 million adults and 280,000 children.  Type 2 diabetes is the most common type of diabetes in the United States accounting for between 90%-95% of all cases.

4921-5040-2578.v1

26.     Type 1 diabetes is an autoimmune disorder that typically develops during childhood, in which the body's immune system destroys the insulin producing cells of the pancreas so that the body produces little to no insulin.  Individuals with Type 1 diabetes require insulin therapy to regulate blood glucose levels.  Individuals with Type 1 diabetes who are not using an insulin pump typically take a combination of two forms of insulin: basal and bolus.  Basal insulin (known as "background insulin") is long-acting insulin typically delivered once a day to keep glucose levels steady. Bolus insulin is fast-acting insulin used to bring down high blood sugar, typically after a meal.  Insulin is usually injected under the skin through a syringe, pen, or pump (a small wearable device used to deliver insulin at specific times) but can also be inhaled.

27.     Type 2 diabetes is a metabolic disorder that occurs when the body is unable to produce sufficient amounts of insulin or becomes insulin resistant.  Type 2 diabetes is more common in older adults.  The treatment paradigm for Type 2 diabetes varies by individual.  Certain individuals with Type 2 diabetes require intensive insulin therapy (which includes injections of both bolus and basal insulin), while others require only non-intensive insulin or basal therapy (taking only basal insulin ("Type 2 basal patients" or "basal patients")).  Some individuals can manage their Type 2 diabetes without insulin, using some combination of oral medications, dietary and nutritional changes, and exercise.

28.     Maintaining blood glucose levels within normal ranges is critical for the health of individuals with diabetes to avoid hyperglycemia (high blood sugar) and hypoglycemia (low blood sugar), both of which can have profound health consequences.  As blood glucose levels can be impacted by a host of factors, glucose monitoring is critical.  Traditionally, outpatient glucose monitoring involved a finger stick test, using a glucometer and test strips to collect a drop of blood through a finger prick and measure blood glucose levels.  However, this method provides limited information, cannot be done during sleep, is inconvenient, difficult to use, and painful.

4921-5040-2578.v1

**B.    Continuous Glucose Monitors**

29.    CGM devices, like Dexcom's, utilize small sensors inserted just below the skin in the abdomen or arm held in place with a patch that take regular glucose readings from interstitial fluid (fluid surrounding cells).  The sensors send real-time glucose data to a compatible mobile device or dedicated monitor.  This enables individuals, as well as their caregivers and medical providers, to see the immediate effects of food and exercise on their blood glucose levels.  CGMs can also send alerts when glucose levels are too low or too high, enabling an individual to catch cases of hyperglycemia or hypoglycemia before they happen.  Additionally, CGMs can also communicate with compatible insulin pumps to automatically administer the appropriate dose of insulin, mimicking how a pancreas would release insulin.  This is known as a "closed loop" system.

30.    The Type 1 population was the first to adopt CGM technology, followed by individuals who have Type 2 diabetes requiring intensive insulin use.  As these populations need to check glucose levels multiple times a day, CGM technology helps them lower the burden of managing their diabetes substantially.  However, CGMs offer significant benefits to individuals with less severe forms of diabetes and even to individuals without diabetes.  They have been adopted by a spectrum of individuals ranging in severity as follows: Type 1 (insulin-dependent); Type 2 IIT (intensive insulin therapy); Type 2 NIIT (non-intensive insulin therapy or basal); Type 2 NIT (non-insulin therapy); prediabetes (diagnosed and undiagnosed); and health and longevity (biohackers, athletes, and individuals engaged in general health monitoring).

**C.    The CGM Market in the United States Has Been Dominated by Two Companies: Abbott and Dexcom**

31.    Dexcom introduced its first sensor in 2004 and the first U.S. Food and Drug Administration ("FDA")-approved CGM for seven days of continuous use (its SEVEN system) in 2007.  Dexcom has continued to develop and advance its CGM technology, launching its newest generation CGM system (the G7) in 2023.  The

Company boasts that the G7 offers enhanced features over its G6 model, including smaller size and faster warm ups.  In 2024, following FDA approval, the Company launched its Stelo Glucose Biosensor ("Stelo"), a product available without a prescription, over the counter.  Stelo is targeted for adults who have Type 2 diabetes but are not on insulin, are prediabetic, or just want to monitor their blood sugar for general health reasons.  The Company also offers Dexcom ONE internationally, a lower cost device with more limited functionality than the G series.

32.     Dexcom's key competitor in the CGM space is Abbott, whose CGM systems are known as FreeStyle Libre ("Libre").  Dexcom and Abbott dominate the CGM space, effectively giving them a duopoly.

33.     In addition to CGMs, Abbott develops, manufactures, and sells a wide range of healthcare products, including pharmaceuticals, diagnostic systems and tests, nutritional products, and medical devices.  Abbott's medical devices are used in various aspects of diabetes, cardiovascular, and neuromodulator care.  Abbott first entered the diabetes testing market in 1996 with the acquisition of Medisense Inc., a maker of kits that allowed individuals to test their blood glucose levels.  Abbott debuted its first CGM product, known as the "Navigator," in 2008.  Abbott launched its Libre CGM in Europe in 2014.  The FreeStyle Libre 3 system is Abbott's latest CGM.  The FreeStyle Libre 3 has the smallest and thinnest CGM sensor on the market as well as the longest-lasting (14 days).

### D.    Endocrinologists and PCPs Prescribe CGMs to Different Patient Populations

34.     Individuals with diabetes can be treated by endocrinologists, PCPs, and diabetes clinics.  These providers prescribe CGMs to patients in order to help them track their blood glucose levels in real time; determine the effect of their behaviors, lifestyle factors, meals, exercise, and treatments, among other things; and avoid hyperglycemia and hypoglycemia.

4921-5040-2578.v1

35.     Endocrinologists are doctors who specialize in the treatment of hormone-related conditions, including diabetes.  They typically treat individuals with Type 1 diabetes or Type 2 diabetes who require intensive insulin therapy, especially when multiple daily injections or insulin pumps are needed, because they can provide more specialized diabetic care.  Endocrinologists, in particular, can use CGMs to help them determine optimal insulin dosages and treatment efficacy.

36.     Patients with non-intensive Type 2 diabetes, including basal patients, are commonly treated by PCPs.  Unlike endocrinologists, PCPs are general practitioners who do not specialize in diabetes care.

**E.      CGMs Are Sold Through Two Primary Channels: Pharmacy and DME Suppliers**

37.     CGMs are sold through pharmacies and DME suppliers.  While Dexcom was historically focused on the DME channel, the Company began transitioning its business to make pharmacy its primary sales channel because it was more accessible and cost-effective, allowing greater market penetration and increased patient volumes. Dexcom believed that doctors would be much more willing to prescribe its CGMs if they were available through pharmacies because it involved less administrative burden (*i.e.*, extensive paperwork) than the DME channel and enabled patients to gain access to their CGMs in a more timely manner.  This was particularly important for PCPs who, unlike endocrinologists, treat many diverse conditions, and were less familiar with DMEs and not as well situated to handle the administrative burden they imposed.

**F.      CGM Insurance Coverage**

38.     Reimbursement for CGMs from government healthcare programs (*i.e.*, Medicare or Medicaid) was not available until 2017.  Medicare is federal health insurance coverage for adults 65 or older and younger adults with certain long term disabilities.  It includes Hospital Insurance (Part A) and Medical Insurance (Part B). Individuals on Medicare can purchase a Medicare-approved plan from a private

4921-5040-2578.v1

1    company that offers an alternative to Medicare for health and drug coverage, known
2    as Medicare Advantage (Part C).

3        39.    In January 2017, CMS established a classification of "Therapeutic
4    Continuous Glucose Monitors" as DME eligible for coverage under Medicare Part B.
5    As Medicare covers CGMs and the supplies necessary for the use of the device only
6    as a DME benefit, Medicare patients must obtain their CGM through a DME supplier.
7    Originally, Medicare coverage was very limited but it slowly continued to expand.
8    Prior to April 2023, Medicare provided coverage for CGMs only for patients who took
9    at least three doses of insulin a day, limiting CGM reimbursement to Medicare
10   beneficiaries with intensive Type 1 and 2 diabetes.  Medicare did not cover CGMs for
11   Type 2 basal patients – approximately 1.5 million people under its umbrella.  Nor did
12   it offer coverage for individuals with prediabetes or those experiencing hypoglycemic
13   events, such as dangerously low blood glucose.

14       40.    By 2021, there was growing demand for CGMs among the non-intensive
15   Type 2 basal population.  But, without federal healthcare coverage or private
16   insurance coverage for CGMs, these individuals were forced to forego using CGMs or
17   pay out-of-pocket for these devices, which could be costly.

18   **G.    Prior to the Class Period, Abbott Dominated the Type 2 Basal Market**
19

20       41.    Despite the fact that Medicare and commercial insurance coverage had
21   not been established for CGM use among Type 2 basal patients, Abbott had targeted
22   this population by making its devices more affordable to cash pay users.  Abbott's
23   Libre CGM retails at a much lower price than Dexcom's CGM.  Moreover, Abbott
24   implemented rebate programs to help subsidize cash pay patients.  This significantly
25   lowered out-of-pocket costs for uninsured patients.  Dexcom did not launch a cash pay
26   subsidized program for its CGM until late 2022.  Thus, the view among Type 2 basal
27   patients and their providers (predominantly PCPs) was that Abbott's CGM was more
28   affordable.

42.    Prior to insurance coverage for Type 2 basal patients, Dexcom was largely focused on its "heritage" business (Type 1 and Type 2 insulin intensive patients), rather than increasing its reach with the basal population.    During a February 10, 2022 earnings call for the fourth quarter of 2021 ("Q4 2021"), Sayer stated "[t]here is some limited reimbursement for basal only and some non-type 2s, but it's not a very big number . . . . ***And it's not something that – actually, we sell to or market to because [there is] just not that much of it out there***."

43.    Thus, as detailed above, Abbott was far more successful in making its CGM devices affordable to patients without insurance.    Analysts noted that this was a critical factor in capturing the uninsured Type 2 population:

- An August 26, 2021 Cowen report noted: "This spotty reimbursement makes the CGM system's retail price an important factor in many type 2 diabetics' adoption decisions.    ***Libre's relatively low price . . . helps to capture a reasonable portion of the non-reimbursed patient population*** without any major insurance policy reversals, which obviously take time to achieve."

- A June 6, 2022 William Blair report noted: "***Abbott seems to be geared toward creating a consumer device that is affordable to patients even without insurance coverage (we believe Abbott could already have hundreds of thousands of cash pay users)*** while DexCom will focus on establishing new reimbursement pathways and partnerships that can open market access of its CGM platform."

44.    Accordingly, Abbott saw significant CGM sales growth among the Type 2 basal population prior to the Class Period.    By 2022, Abbott had amassed a sizable Type 2 non-intensive and basal customer base.    Indeed, as of the first quarter of 2022 ("Q1 2022"), Abbott boasted during its April 20, 2022 earnings call that "over 40% of our user base, which is pretty large in the U.S., is already type 2 non-intensive."    By early 2023, Dexcom was already significantly behind Abbott in this market.

4921-5040-2578.v1

**H.    In April 2023, CMS Expanded Coverage to Type 2 Basal Patients**

45.    On March 2, 2023, CMS finalized its proposal to expand coverage for CGMs, increasing patient eligibility to include Type 2 basal patients, as well as certain non-insulin using individuals who had experienced hypoglycemic events.    This coverage expansion went into effect in April 2023 and continued to be a DME-only benefit.    The Company estimated the Type 2 basal patient population at around three million people in the United States with around half being of Medicare age. Combined with individuals with hypoglycemia risk, coverage was expanded to more than six million people in the United States.

**V.    SUMMARY OF DEFENDANTS' FRAUD**

**A.    At the Start of the Class Period, Defendants Misled Investors, Claiming They Were Well-Positioned to Take Advantage of the CGM Coverage Expansion**

46.    Soon after the announcement of expanded basal Type 2 coverage, Dexcom began a campaign to hype this new opportunity to analysts and investors.    On April 27, 2023, the day before the start of the Class Period, Sayer touted during an earnings call that the CMS's expanded coverage decision "represented the ***largest single expansion of access to CGM in our industry's history***."    As Defendants would later explain during the June 23, 2023 Investor Day, this "expand[ed] [Dexcom's] addressable market tremendously."

47.    Defendants led the market to believe that they were poised to succeed with the newly covered population.    They repeatedly emphasized their expanded sales force and strong relationships with DME suppliers, who would be servicing the Type 2 basal Medicare population.    Sayer assured investors during the April 27, 2023 earnings call: "***We are in a great position to compete as the market develops*** . . . ." He further emphasized that, "[o]n the basal opportunity . . . ***we have very good relationships with our distributors*** and in that channel, and we worked very hard to

1   position them to be successful with the basal patients.  And so we're very comfortable

2   there."

3        48.    In contrast to these bullish representations, the Company was not well-

4   positioned to capture the basal population.  Dexcom faced several key obstacles that

5   prevented it from competing effectively against Abbott, including:

6        •    **Lack of Sales Force Coverage**: Dexcom's sales force lacked the
7             necessary relationships with PCPs, who play a critical role in prescribing
             CGMs for the Type 2 basal patient population.  In contrast, Abbott had
8             decades of established strong relationships with PCPs who treated Type
             2 basal patients, allowing it to dominate the market.  Dexcom's sales
9             force, while effective with endocrinologists and PCPs who treated Type
             1 and intensive insulin users, was insufficiently focused on the basal
10            market and not well poised to compete with Abbott.
11

12       •    **Lack of Cash Pay Program**: Abbott had already been successfully
             marketing its CGM devices to basal patients through a subsidized cash
13            pay program that made its CGMs much more affordable, allowing
             Abbott to capture this market even before insurance coverage became
14            available.  Dexcom, however, lacked a similar program and, thus, was
             not a viable option for Type 2 basal patients prior to the CMS's coverage
15            expansion.  Thus, PCPs were not accustomed to prescribing Dexcom
             CGMs, and Dexcom had not achieved the market penetration and brand
16            loyalty that Abbott had prior to the Class Period.
17

18       •    **Frayed DME Relationships**: Dexcom's focus on pharmacy and neglect
19            of its DME relationships further hindered its ability to compete in the
             basal market.  As the Company later admitted, this caused a loss of
20            "channel balance" putting Dexcom at a huge disadvantage with this new
             Medicare basal patient population, who could receive CGMs only
21            through a DME.
22

23       49.    As detailed below, throughout the Class Period, Defendants misled

24   investors about their purported early success in the Type 2 basal market, while

25   concealing from investors the significant impact of these impediments on Dexcom's

26   ability to seize basal patient market share.  In this way, they led the market to believe

27   they were winning the "basal wars."

28

4921-5040-2578.v1                                    **24-cv-1485-RSH-VET**

**B.    Defendants Falsely Claimed They Were Succeeding Despite Lagging Basal Sales**

50.    Unbeknownst to investors, Dexcom was "losing the basal wars" to its primary competitor.  Abbott's sales force was quickly capturing the lion's share of Type 2 basal patients.  The impediments in Dexcom's business, noted above, caused it to lag behind Abbott in the Type 2 basal market for the remainder of 2023.

51.    Nevertheless, Defendants painted a picture of early success in the market. On June 23, 2023, Dexcom held its first Investor Day in over two years, where the Individual Defendants were all present and spoke during the hours-long conference. At Investor Day, Defendants again extolled the "single largest expansion in coverage in the CGM category ever" and their ability to capture share in the basal space.

52.    Specifically, Lawver emphasized during the June 23, 2023 Investor Day that "there's coverage in place today that could allow us to *more than quadruple our U.S. customer base*, and that's before we begin to talk about the population of those not on insulin and without hypoglycemia risk."  She further stated, "[w]e're also *well-positioned to extend our leadership into the type 2 basal insulin segment*."  Despite the data and hard realities, Lawver continued to assure investors that Defendants were succeeding, saying, "what we are seeing and hearing is *really strong uptake, and we would expect that Dexcom will get our fair share of that growth in the basal population*."  She further led investors to believe Dexcom was the leader in primary care Type 2 basal patients, claiming Defendants were "*expanding [their] leadership* in primary care with the type 2 basal."

53.    Defendants continued their steady drumbeat of positivity in September 2023 during the Wells Fargo Healthcare Conference, when, in response to an analyst's question about basal adoption, Sayer reassured investors, "where there's coverage, we've always taken share, and *you see us taking share in that space.  So we feel pretty good about . . . taking share* . . . ."  In reality, Dexcom was not leading, was not

taking share, and, as Defendants would later admit, was "***not doing wonderful in the basal space***."

### C. Defendants Recognized They Were Losing the Basal Wars and Decided to Revamp Their Sales Force in 2023 but Continued to Mislead Investors

54. Seeing that they were consistently losing ground to Abbott in the basal space, Defendants recognized in late 2023 that their sales force was not in the right place to capture the basal patient market. They recognized they were "getting very few prescriptions" because they did not have a sufficient presence in PCP offices and "decided ***back in 2023***, we needed a broader sales force." Internally, they "came to the conclusion [they] didn't have the resources in the field to address these new markets." But Dexcom's largest competitor, Abbott, had already established itself in PCP offices and was aggressively taking basal patient share. Unbeknownst to investors, Defendants scrambled internally to quickly expand and reorganize Dexcom's sales force in order to compete.

55. Despite knowing that the majority of new prescriptions for this basal population were going to Abbott and that Dexcom "didn't have the resources in the field" to address the basal population, Sayer assured investors during the January 8, 2024 JPMorgan Healthcare Conference, "we are doing well in the basal category" and "where we have a presence, ***we win very much***." Sylvain affirmed this positive message during the same conference and again during the February 8, 2024 earnings call: "***[Y]ou continue to see outperformance in basal***" and "***you can see the share taking when you look at the script data, we are taking share***." Defendants also announced their guidance for 2024, specifically attributing it in part to "growth really across the board in basal."

56. Analysts bought into Defendants' misleading narrative:

- Piper Sandler analysts issued a report on February 8, 2024 titled "***A Bolus of Basal Patients*** & Upside To Margins; Still Our Favorite Name for '24." The report stated that "[t]he standout in the quarter was the domestic business, which delivered 27% growth (further acceleration

4921-5040-2578.v1

Q/Q off a more difficult comp too).  The ***big driver here is basal access alongside a quickly expanding prescribing base (they continue to take share from ABT too)***."  The Piper Sandler analysts further commented that "we see the ***biggest upside to guidance coming from [the Type 2 basal] population***."

- Wells Fargo's February 8, 2024 report noted that "***G7 and Basal Continue to Outperform***" and commented that "[t]he company expects stronger US G7 patients starts, including continued ***momentum in basal only***."

- Leerink Partners' February 9, 2024 report titled "***Momentum Keeps Building***, Attractive Setup for 2024" stated that "***we believe penetration into the basal-only TAM and competitive wins from ABT Type 2 basal-only patients will drive better than expected revenue contribution in 2024E***."

- William Blair's February 9, 2024 report stated that "clearly the company is seeing ***accelerated growth and investing/preparing for increased demand from basal*** and non-insulin users.  ***Based on management's commentary, we believe these opportunities should drive upside in 2024 and 2025 estimates***.  On basal, ***management noted the rate of adoption is accelerating faster than the 600-700 basis points per year of U.S. adoption assumed in its 2025 LRP***."

### D.    Defendants Raised Guidance and Touted a Sales Expansion

57.    Despite the ongoing challenges and a significant deficit in market share, Dexcom raised the midpoint of its revenue guidance on April 25, 2024.  Defendants noted during the Company's April 25, 2024 earnings call that they "feel much more confident about raising the base case," which took into consideration "things like competitors, things like adoption in the basal base."

58.    In addition, at the same time they announced their raised guidance, Defendants discussed the massive sales force expansion they had undertaken, which they pitched as an "upgraded structure to help us better capitalize on the significant opportunities ahead."  Purportedly, the expansion would allow Defendants to

4921-5040-2578.v1

"optimize the structure of [their] sales team to be most effective with [their] call points."

59.    In reality, this expansion, which they touted as an "opportunity," was a necessary fix because they did not have adequate resources in PCP offices and they were losing scripts to Abbott.

60.    During the same April 25, 2024 earnings call, Defendants continued to claim they were "taking share" in basal.  When questioned by an analyst that "there's been *some debate, obviously, on market share within the basal population* here in the U.S. [and] would love kind of any insight you can provide on that front as well," Sylvain responded by touting "[r]ecord new patients" and stated "*a good chunk of our new patients are coming through that basal channel, and we continue to see really well performance in that category*."  He further confirmed, "[i]n terms of share taking and how we look at that category, *we get script data, we look at script data* based on pathology.  The debate – *there's no debate internally to us.  We know we're taking share and we see that data . . . you can see the scripts continuing to come our way*."

61.    Defendants also informed investors that they "*still have a very strong DME business*."

62.    On June 5, 2024 during the William Blair Growth Stock Conference, Defendants continued misleading investors doubling down on their raised guidance and stating:

> And in terms of the full year as of the last quarter, when we issued our earnings, we raised our guidance.  And so that should give we obviously beat the street expectations in the first quarter, raised guidance and continue to do well.  So I think from that point of view, I think *we're happy with where we are.  We're happy with our full year guidance*. We don't guide to the quarters, but we were very comfortable with where folks are sitting for the quarter.

**E.    At the End of the Class Period, Investors Finally Learned that Dexcom Was Underperforming in the Type 2 Basal Market**

63.    On July 25, 2024, Defendants shocked the market by backpedaling on their bullish representations that they confirmed *less than two months earlier*. Defendants announced disappointing results and slashed their full-year sales guidance by hundreds of millions of dollars.  Central to the disappointing results and revised sales guidance was Dexcom's underperformance in the Type 2 basal market.

64.    In sharp contrast to their earlier statements, Dexcom had not capitalized on the enormous opportunity of Type 2 coverage expansion, which they had described at the start of the Class Period as "the largest single expansion of access to CGM in our industry's history."   Instead, they were forced to admit: "*We're not doing wonderful in the basal space*."  Sayer leveled with analysts, admitting: "*we've lost market share in the DME channel*," specifically with respect to Type 2 basal patients.  Sayer later acknowledged an analyst's dire characterization of the lopsided Type 2 basal market – Abbott was "winning more share at the physician level with type two basal patients."

65.    Further, Defendants were forced to admit that their sales force expansion, which they had described in glowing terms as opportunistic, was, in reality, a reactionary move done to stem the loss in market share amongst the new basal population.  As Sayer stated, Dexcom's sales force "needed to get into [PCP] offices" because "we obviously don't win in offices we don't call on."

66.    The market was shocked by this news, which contrasted sharply with the Company's earlier representations, *causing Dexcom's stock price to decline by more than 40%*.  Analysts commented on the disappointing results, noting there was "A Lot of Damage Done" and "Severe and Sudden Near-Term Challenges Derail Growth." Analysts emphasized Dexcom's underperformance in the Type 2 basal market, stressing that "*DXCM is clearly losing the basal wars right now*" and "*the most*

*worrisome dynamic to us as it implies share loss to its largest competitor Abbott* . . . which cost DXCM a meaningful number of new patients."

## VI.    DEFENDANTS' CLASS PERIOD FALSE AND MISLEADING STATEMENTS AND OMISSIONS UNDER RULE 10b-5(b)

### A.    April 27, 2023 Q1 2023 Earnings Call

67.    **Statement No. 1**: On April 27, 2023, Dexcom held a conference call for analysts and investors to discuss its first quarter of 2023 ("Q1 2023") results.  During the Q1 2023 earnings call, Sayer stated:

> In early March, CMS finalized their proposal to expand access to include people with type 2 diabetes using basal insulin only as well as certain noninsulin-using individuals that experience hypoglycemia.  With coverage officially kicking in last week, this decision represented the largest single expansion of access to CGM in our industry's history.

> As a reminder, we size the basal-only type 2 population alone at around 3 million people in the U.S. with around half being of Medicare age.  We are incredibly excited to start serving this population more broadly going forward as we see a significant opportunity to help these individuals live healthier lives.

> Our mobile trial demonstrated meaningful improvements in timing range, A1c levels and hypoglycemic events among this population wearing DexCom sensors, as sensor engagement proved to produce behavior changes within this cohort that supported greater glycemic control.  **We are in a great position to compete as this market develops** as accuracy, performance and customer engagement will continue to be the defining features of delivering outcomes.

68.    Statement No. 1 was materially false and misleading when made because Sayer omitted material facts necessary in order to make it not misleading. Specifically, as detailed below, Dexcom was not "*in a great position to compete*" in the Type 2 basal market.

(a)    By April 2023, as Defendants were aware, Abbott already had a distinct advantage over Dexcom with respect to its sales force presence in PCP offices.  PCP offices were integral to capturing Type 2 basal population market share

because basal patients were predominantly treated at PCP offices rather than by endocrinologists or specialty diabetes clinics that served diabetes Type 1 and Type 2 intensive patients.  By late 2021, Abbott's PCP strategy was paying off:

> *[We] increased our sales force in the U.S.* and other key markets for Libre so that we can call on more physicians, *and you see the impact there on Libre*. . . .
>
> We're making great progress in penetrating the type 2 population, whether it's non-insulin users or non-intensive insulin users.  We've got about a 90% market share of that segment, at least.

Likewise, in early 2022, analysts connected Abbott's PCP strategy to its success in the Type 2 basal market:

> Libre momentum can be supported by a meaningfully expanded U.S. salesforce with a specific focus on the PCP channel where 90% of type 2 patients are taken care of today.  Libre's U.S. install base is currently made up of more than 40% type 2 non-intensively managed patients despite what we expect is limited payer coverage for this population . . . .

Leading up to and during the Class Period, Abbott continued to focus its sales force on PCPs who treated Type 2 non-intensive patients, which allowed Abbott to maintain its sizeable lead over Dexcom.  For example, in late 2022, Abbott emphasized that the U.S. Type 2 basal market centered "around primary care, primary care call point . . . this is a segment where we do very well.  If you do an audit of prescriptions by physician class, *Libre has taken about 80% market share of the primary care Rx*."  Abbott also acknowledged that its prioritization of the Type 2 basal population was "*our strategy from the moment we entered the market*" (years before CMS approved coverage) and that its market leadership was "not something that [just] happened . . . *[w]e've been focus[ed] on this*, generating the clinical evidence, *building the sales forces to be able to reach a primary care team*."  Abbott's significant head start in focusing its sales force towards PCPs, who were the primary prescribers for Type 2 basal patients, was a significant impediment to Dexcom as it entered the Type 2 basal market for the first time.

4921-5040-2578.v1

**24-cv-1485-RSH-VET**

(b)    Dexcom had not meaningfully expanded its sales force since 2020 and its sales force was ill-equipped, in terms of quantity of personnel and coverage of PCP offices, to compete with Abbott in the Type 2 basal market as the Class Period began.    For example, although Dexcom had prioritized expanding beyond endocrinologists and into physician and PCP offices as part of its fiscal year ("FY") 2020 sales force expansion, Dexcom added only approximately 130 new sales representatives, increasing its total sales force to approximately 260 sales representatives across 26 sales territories throughout the country (whereas there are more than 215,000 PCPs in the United States).  In addition, Dexcom acknowledged during its February 11, 2021 earnings call that the FY 2020 sales force expansion was specifically designed to call on providers of Type 1 and Type 2 intensive patients: "The way we structure the teams out in the field is very much based upon the number of people with diabetes and ***intensive insulin users*** that they see."   Defendants explained during the June 1, 2021 William Blair Growth Stock Conference that adding new physician and PCP offices was geared towards reaching the remaining Type 1 patients who were not yet using CGM:

> We talked about expanding our sales force.  And ***a lot of the things we're trying to do there is get appropriate coverage over where those type 1s are met***.  And while the majority of type 1 patients do still go through their endocrinologists, there are still quite a decent amount that are being seen by primary care physicians that we really needed to address and get in front of.

Likewise, Defendants acknowledged that:

> [A]bout 50% plus of the ***intensive insulin*** therapy folks that are in the United States are seen by their primary care physician, a good chunk of which are the type 2 intensives.  And I think that's where we get back to ***the whole point of making the investment in the sales force*** . . . .

Thus, as Sayer acknowledged during an earnings call in February 2022, Dexcom's sales force was not targeting the Type 2 non-intensive or basal markets: "There is some limited reimbursement for basal only and some non- type 2s, but it's not a very

**24-cv-1485-RSH-VET**

4921-5040-2578.v1

1   big number . . . .  And *it's not something that – actually, we sell to* or market to

2   because [there is] just not that much of it out there."  Dexcom's failure to focus on

3   PCPs (beyond the PCPs it identified as high-volume prescribers of Type 1 and Type 2

4   intensive patients) was a significant impediment to Dexcom as it entered the Type 2

5   basal market for the first time.

6         (c)    In addition to Abbott's vast advantage with respect to PCPs,

7   Abbott had been successfully marketing its CGM devices directly to Type 2 basal

8   patients for several years.  This included direct-to-consumer advertising targeted at

9   Type 2 non-intensive patients.  In Q1 2022, Abbott noted that "the investments in the

10   U.S." which included "DTC advertising" successfully led to "*over 40% of our user*

11   *base, which is pretty large in the U.S., is already type 2 non-intensive*."  Abbott

12   would later acknowledge that prioritizing the Type 2 basal population was "*our*

13   *strategy from the moment we entered the market*" (years before CMS approved

14   coverage) and that its market leadership in the Type 2 basal space was "not something

15   that [just] happened . . . *[w]e've been focus[ed] on this*, generating the clinical

16   evidence, building the sales forces to be able to reach a primary care team, *investing*

17   *in direct-to-consumer advertising*."  Unlike Abbott, Dexcom invested very little in

18   direct-to-consumer marketing directed specifically at the Type 2 non-intensive and

19   basal population prior to the Class Period.  Rather, Dexcom's focus was almost

20   entirely on the insurance-covered Type 1 and Type 2 intensive markets.  For example,

21   Dexcom's FY 2021 Form 10-K and FY 2022 Form 10-K, which was issued

22   immediately prior to the Class Period, stated: "Direct-to-consumer (DTC) marketing

23   is one of our key initiatives to increase awareness of our CGM systems and drive new

24   leads for people with diabetes to our website. . . . *[W]e currently focus on reaching*

25   *people with Type 1 and insulin intensive Type 2 diabetes*."  Likewise, during the Q4

26   2021 earnings call, in response to an analyst question about the Type 2 basal market in

27   early 2022, Sayer stated: "There is some limited reimbursement for basal only and

28   some non-type 2s, but it's not a very big number . . . .  And *it's not something that –*

1  *actually, we sell to or market to* because [there is] just not that much of it out there."

2  Likewise, Sylvain noted in a June 2021 exchange with an analyst during the William

3  Blair Growth Stock Conference that "*a lot of our DTC marketing*" was "*targeted" at*

4  *the remaining Type 1 patients who were not yet using CGM*.  Abbott's vast head start

5  in prioritizing and marketing to the Type 2 non-intensive patient population was a

6  significant impediment to Dexcom as it entered the Type 2 basal market for the first

7  time.

8          (d)     Abbott's significant advantage over Dexcom in the Type 2 basal

9  market at the start of the Class Period also stemmed from the fact that Abbott had

10  offered a comprehensive cash pay program to Type 2 basal patients in the years

11  leading up to the CMS coverage announcement.  Abbott's cash pay program lowered

12  patients' out-of-pocket costs and allowed Abbott to capture more than 90% market

13  share in the Type 2 non-intensive and basal space prior to CMS or commercial

14  insurance coverage being established.  Meanwhile, Dexcom did not historically offer a

15  cash pay program for its higher-cost CGM devices as part of its overall strategy to

16  pursue sales into the reimbursed Type 1 and Type 2 intensive market.   Analysts

17  highlighted the difference in strategies, stating, in June 2022:

18  
19  
20  
21  
22  
> [W]hile both companies are seeking formal reimbursement pathways globally, ***Abbott seems to be geared toward creating a consumer device that is affordable to patients even without insurance coverage (we believe Abbott could already have hundreds of thousands of cash pay users)*** while DexCom will focus on establishing new reimbursement pathways and partnerships that can open market access of its CGM platform.

23  Thus, Type 2 basal patients and the providers of Type 2 basal patients (predominantly

24  PCPs) had only one affordable CGM option prior to the implementation of insurance

25  coverage.  Because PCPs were accustomed to prescribing Abbott CGMs, Dexcom

26  faced yet another impediment as it entered the Type 2 basal market for the first time in

27  April 2023.  Shortly after the CMS coverage expansion, a media article, citing a J.P.

28  

4921-5040-2578.v1

Morgan analyst, noted: "***Abbott has a leading share among people with Type 2 [basal] diabetes.  That's in part because Abbott has been selling to people on basal insulin for years through its cash-pay program***."

(e)    Abbott also had a significant pricing advantage over Dexcom in terms of its CGM list price, irrespective of insurance coverage.  For example, according to a CGM research paper published in 2024 by Advanced Sensor Research, the annual cost of Dexcom's G7 CGM was $1,200 higher than Abbott's FreeStyle Libre 3 CGM.  Abbott highlighted its cost advantage to analysts, noting in early 2024 that it sought to "bend the cost curve" to make its CGM devices more affordable to more patients: "I think a great example of that kind of thinking is ***Libre, where we price the product significantly lower [than] the competitors and all of a sudden, the entire market opened up***, and it became less of a niche and became more of a mainstream product."  Abbott's intentional cost advantage had a significant impact on physician's prescribing patterns both before and after the CMS coverage expansion.  Analysts observed, and Dexcom acknowledged, that PCPs were prescribing Abbott to Type 2 basal patients based, in part, on the lower perceived cost to patients.  For example, in June 2023, months after the CMS announcement expanded insurance coverage, an analyst noted during Dexcom's Investor Day that "***consistently when we talk to PCPs . . . those PCPs seem to prescribe to your competitor [because] [t]hey feel like that price point is lower out of pocket to the patient for your competitors' product***."  Sayer acknowledged the analyst's characterization, noting: "I was recently out in the field and actually brought some physicians in-house, and ***we heard the same thing***" and stated that it is "absolutely critical that we change that perspective" to avoid losing market share.  However, Dexcom's inadequate sales force presence in PCP offices made it difficult to change PCPs' perspective.  Abbott's significant cost advantage, which led to PCPs' and patients' pervasive perceptions that Abbott's device was more affordable, was a significant impediment to Dexcom as it entered the Type 2 basal market for the first time.

4921-5040-2578.v1

(f)     Dexcom was at a further disadvantage due to its strained relationship with DME suppliers.  As alleged herein, Dexcom had purposefully transitioned its primary sales channel from DME suppliers to the pharmacy over a period of several years leading up to the Class Period.  This alienated the DME suppliers and their sales representatives, who felt that the Company was steering business away from them.  Meanwhile, as J.P. Morgan described in a July 31, 2024 report, Abbott was viewed as "channel agnostic" by DME sales representatives and remained on better footing with them: "[There is a] perception amongst DME reps that Abbott is channel agnostic vs. Dexcom preferential to the pharmacy." Dexcom's strained DME relationships were especially impactful following the CMS coverage expansion in April 2023, because CMS only allowed newly covered Medicare patients to fulfill their CGMs through the DME channel and not Dexcom's preferred pharmacy channel.  Thus, as physicians sent all prescriptions for the newly eligible Medicare covered basal population to be filled through the DME channel, Dexcom ceded significant market share to Abbott, who maintained its DME presence.  At the end of the Class Period, Defendants admitted "*we've lost market share in the DME channel . . . and that has hurt us*." As J.P. Morgan observed in its July 31, 2024 report, the "*erosion in the relationship between the company and DME distributor[s] . . . likely alienated many of the DME partners* who felt that the company was steering business away from them.  *This could have led to some preferential treatment for Abbott specifically in the newly eligible Medicare basal population*." J.P. Morgan also noted: "*~7/10 new patients likely going to Abbott today in the DME, the vast majority of whom are Medicare basal fee for service patients*." Dexcom's strained relationship with DME suppliers was another significant impediment as the Company entered the Type 2 basal market for the first time.

(g)     Each of the above factors, including: (i) Abbott's history as the only viable CGM option to choose from for Type 2 non-intensive providers and

patients; (ii) Dexcom's strategy to focus only on patients covered by insurance and not "market [or] sell to" Type 2 basal patients and providers; (iii) Abbott's cost advantage; and (iv) Dexcom's strained relationship with DMEs, all resulted in PCPs overwhelmingly prescribing Abbott's CGM devices to Type 2 basal patients, even after the CMS coverage expansion.    Defendants could not overcome these impediments without Dexcom sales representatives contacting and convincing PCPs to change their pattern and practice of prescribing Abbott CGMs.  However, Dexcom had an inadequate PCP sales force at the start of and throughout the Class Period.  As Defendants would later admit: "[W]e didn't have the resources in the field to address these new markets . . . . ***Quite simply, Dexcom can't win in physician offices where we don't have a presence***.  It's pretty tough."  Likewise, Defendants admitted: "***[W]e were not getting any traction [at] those offices where we had no salespeople, where we weren't calling on physicians.  [We were] getting very few prescriptions***.  We needed to broaden our reach."  And Defendants additionally admitted, "***we obviously don't win in offices we don't call on***."

69.    **Statement No. 2**:  Also during the Q1 2023 earnings call, in response to an analyst's question regarding "how much of the basal opportunity [Dexcom] can garner," Sayer stated:

> On the basal opportunity, remember, Medicare sales process is ***durable medical equipment, and we have very good relationships with our distributors and in that channel, and we worked very hard to position them to be successful with the basal patients.  And so we're very comfortable there***.

70.    As detailed below, Statement No. 2 was materially false and misleading when made because Sayer omitted material facts necessary in order to make it not misleading.

(a)    Defendants did not have "***very good relationships***" with DME distributors and had not "***worked very hard to position them to be successful with the basal patients***" when Sayer made this statement in April 2023.  In fact, unbeknownst

1  to investors, Dexcom's relationship with its DME partners had soured after Dexcom

2  had purposefully transitioned its preferred sales channel to pharmacy over a period of

3  several years leading up to the Class Period.  This alienated the DME suppliers and

4  their sales representatives, who felt that the Company was steering business away

5  from them.  Meanwhile, as J.P. Morgan described in a July 31, 2024 report, Abbott

6  was viewed as "channel agnostic" by DME sales representatives and remained on

7  better footing with them: "[There is a] perception amongst DME reps that Abbott is

8  channel agnostic vs. Dexcom preferential to the pharmacy."  Dexcom's strained DME

9  relationships were especially impactful following the CMS coverage expansion for

10  Medicare patients in April 2023, because Medicare only allowed patients to fulfill

11  their prescriptions for CGMs through the DME channel and not Dexcom's preferred

12  pharmacy channel.  Thus, as physicians sent all prescriptions for the newly eligible

13  Medicare covered basal population to be filled through the DME channel, Dexcom

14  was at a significant competitive disadvantage to Abbott, who maintained its DME

15  presence and relationships.  As J.P. Morgan later observed in its July 31, 2024 report,

16  the "***erosion in the relationship between the company and DME distributor[s] . . .***

17  ***likely alienated many of the DME partners*** who felt that the company was steering

18  business away from them.  This could have led to some ***preferential treatment for***

19  ***Abbott specifically in the newly eligible Medicare basal population***."  J.P. Morgan

20  also noted: "***~7/10 new patients likely going to Abbott today in the DME, the vast***

21  ***majority of whom are Medicare basal fee for service patients***."

22        (b)    Defendants later admitted that the Company did not have "***very***

23  ***good relationships***" with its DME distributors.  To the contrary, Dexcom had lost

24  market share in the Type 2 basal space due to its frayed relationships with its DME

25  partners.  As Sayer admitted on July 25, 2024 during an earnings call, "we've lost

26  market share in the DME channel . . . and that has hurt us."  Sylvain also confirmed an

27  analyst's characterization that "the DME share loss" was "skewed more to [basal]

28  patients," with Sylvain acknowledging, "you'd probably imagine ***if we're not doing***

4921-5040-2578.v1

*well in the DME it gets back to your point. We're not doing wonderful in the basal space*." Sayer explained that the Company's "growth in the DME channel has trailed our plan" and Dexcom "need[ed] to refocus on those relationships." Following conversations with Defendants, analysts noted "DXCM said there wasn't just one big major DME that suddenly shifted away this quarter but *instead the issues being highlighted seem widespread across many of the DMEs*" and "DexCom's senior leadership team is now fully involved in rehabilitating its DME relationships." Defendants also later admitted to analysts that the DME issues disclosed in the second quarter of 2024 ("Q2 2024") had been "*present in prior quarters.*"

**B.    June 7, 2023 William Blair Growth Stock Conference**

71.    **Statement No. 3**: On June 7, 2023, during the William Blair Growth Stock Conference, an analyst asked whether Dexcom "*ha[s] the capacity to bring on a significant number of those [Type 2 basal] patients if you haven't maybe added reps in a period of time*." Sylvain responded:

> Yes. So great question. And so far, I'll tell you anecdotally, it's gone very well. There's been a lot of interest in it. The challenge, of course, is it's generally sold through the DME and so it will take a little bit of time to quantify it. But anecdotally, people have been very excited about basal coverage.
>
> In terms of capacity, *when we doubled the size of the sales force, the focus was calling on high decile prescribers of all insulin, including basal*. And so *the inroads have been made there*. So from a coverage perspective, while we may want to expand coverage a little bit from the sales force, it wouldn't be a material step change in how we're going. It'd be normal as part of our thoughts around investments. *So we do have a sizable sales force*.

72.    As detailed below, Statement No. 3 was materially false and misleading when made because Sylvain omitted material facts necessary in order to make it not misleading.

(a)    The "focus" of Dexcom's 2020 sales force expansion was *not* "calling on high decile prescribers of all insulin, *including basal*." This statement

directly contradicted Dexcom's own representations that the FY 2020 sales force initiative was specifically designed to call on providers of Type 1 and Type 2 *intensive* patients.   In fact, Defendants had previously admitted: "***The way we structure the teams out in the field is very much based upon the number of people with diabetes and intensive insulin users that they see***."   Furthermore, Defendants earlier acknowledged that adding new physician and PCP offices as part of the FY 2020 sales force initiative was geared towards reaching the remaining Type 1 patients who were not yet using a CGM:

> We talked about expanding our sales force.  ***And a lot of the things we're trying to do there is get appropriate coverage over where those type 1s are met.  And while the majority of type 1s do still go through their endocrinologists, there are still quite a decent amount that are being seen by primary care physicians that we really needed to address and get in front of***.

Likewise, Defendants explained:

> [A]bout 50% plus of the ***intensive insulin*** therapy folks that are in the United States are seen by their primary care physician, a good chunk of which are the type 2 intensives. ***And I think that's where we get back to the whole point of making the investment in the sales force*** . . . .

As Sayer acknowledged in February 2022 during an earnings call, Dexcom's sales force was not targeting the Type 2 non-intensive or basal markets: "There is some limited reimbursement for basal only and some non-type 2s, but it's not a very big number . . . . ***And it's not something that – actually, we sell to or market to because [there is] just not that much of it out there***."   Thus, Sylvain's statement that Dexcom's 2020 sales force expansion focused "on high decile prescribers of all insulin, ***including basal***" was false and misleading.

(b)    Contrary to Sylvain's statement that "***we do have a sizable sales force***," in response to an analyst's question regarding Dexcom's ability to target the Type 2 basal population, Dexcom's sales force was ill-equipped, in terms of both the number of personnel and their coverage of PCP offices, to compete with Abbott in the

4921-5040-2578.v1

1  Type 2 basal market.  Dexcom had not meaningfully expanded its sales force since

2  2020.  Although Dexcom claimed it had expanded beyond endocrinologists and into

3  physician and PCP offices as part of the FY 2020 sales force expansion, Dexcom

4  added only approximately 130 new sales representatives, increasing its total sales

5  force to approximately 260 sales representatives across 26 sales territories throughout

6  the country (whereas there are more than 215,000 PCPs in the United States).

7  Defendants would later admit that Dexcom lacked adequate PCP sales force coverage

8  to compete in the Type 2 basal market, stating "we didn't have the resources in the

9  field to address these new markets."  By late 2023, Defendants were forced to

10  significantly increase its PCP sales force by 50% in an effort to stem market share

11  losses to Abbott in the Type 2 basal market.

12             (c)      Dexcom's lack of an adequate sales force, in terms of both the

13  number of personnel and their coverage of PCP offices, was exacerbated by the

14  numerous competitive disadvantages it faced as it entered the Type 2 basal market for

15  the first time.  Each of these impediments, as described at ¶68(a)-(f), including: (i)

16  Abbott's history as the only viable CGM option to choose from for Type 2 non-

17  intensive providers and patients; (ii) Dexcom's strategy to focus only on patients

18  covered by insurance and not "market [or] sell to" Type 2 basal patients and

19  providers; (iii) Abbott's cost advantage; and (iv) Dexcom's strained relationship with

20  DMEs, all resulted in PCPs overwhelmingly prescribing Abbott's CGM devices to

21  Type 2 basal patients, even after the CMS coverage expansion.  Defendants could not

22  overcome these impediments without Dexcom sales representatives contacting and

23  convincing PCPs to change their pattern and practice of prescribing Abbott's CGMs.

24  However, unbeknownst to investors, Dexcom's sales force was ill-equipped, in terms

25  of both the number of personnel and their coverage of PCP offices, to compete with

26  Abbott in the Type 2 basal market.  As Defendants would later admit: "[W]e didn't

27  have the resources in the field to address these new markets . . . . *Quite simply,*

28  *Dexcom can't win in physician offices where we don't have a presence*.  It's pretty

4921-5040-2578.v1

tough."  Likewise, Defendants admitted: "*[W]e were not getting any traction [at] those offices where we had no salespeople, where we weren't calling on physicians. [We were] getting very few prescriptions*.  We needed to broaden our reach."  And Defendants additionally admitted "*we obviously don't win in offices we don't call on*."

### C.    June 23, 2023 Investor Day

73.    **Statement No. 4**: On June 23, 2023, Dexcom held its Investor Day conference call for analysts and investors.  During the call, Lawver stated:

> In the U.S., our products are available through both the pharmacy and DME channels.  Now the majority of our volume runs through the pharmacy channel where clinicians appreciate the prescribing simplicity.
>
> And of course, for their end users, they're very familiar with the retail infrastructure.  ***But we also work to maintain strong relationships with our DME distributor partners*** who provide great service to our customers.  Many of these DME providers have a strong track record of serving the diabetes community, and they can offer an efficient path for distributing diabetes supplies that works really well for many of our customers.

74.    As detailed below, Statement No. 4 was materially false and misleading when made because Lawver omitted material facts necessary in order to make it not misleading.

(a)    Defendants did not "work to maintain strong relationships with [its] DME distributor partners."  In fact, unbeknownst to investors, Dexcom's relationship with its DME partners had soured after Dexcom had purposefully transitioned its preferred sales channel to pharmacy over a period of several years leading up to the Class Period.  This alienated the DME suppliers and their sales representatives, who felt that the Company was steering business away from them.  As J.P. Morgan observed, Abbott was viewed as "channel agnostic" by DME sales representatives and remained on better footing with them: "[There is a] perception amongst DME reps that Abbott is channel agnostic vs. Dexcom preferential to the

- 33 -

pharmacy."    Dexcom's strained DME relationships were especially impactful following the CMS coverage expansion for Medicare patients in April 2023, because Medicare only allowed patients to fulfill their prescriptions for CGMs through the DME channel and not Dexcom's preferred pharmacy channel.  Thus, as physicians sent all prescriptions for the newly eligible Medicare covered basal population to be filled through the DME channel, Dexcom was at a significant competitive disadvantage to Abbott, who maintained its DME presence and relationships.  As J.P. Morgan later observed in its July 31, 2024 report, the "*erosion in the relationship between the company and DME distributor[s] . . . likely alienated many of the DME partners* who felt that the company was steering business away from them.  This could have led to some *preferential treatment for Abbott specifically in the newly eligible Medicare basal population*."  J.P. Morgan also noted: "*~7/10 new patients likely going to Abbott today in the DME, the vast majority of whom are Medicare basal fee for service patients*."

(b)    Defendants later admitted that Dexcom did not "work to maintain strong relationships with [its] DME distributor partners."  As Sayer admitted on July 25, 2024, "we've lost market share in the DME channel . . . and that has hurt us." Sylvain also confirmed an analyst's characterization that "the DME share loss" was "skewed more to [basal] patients," with Sylvain stating, "you'd probably imagine *if we're not doing well in the DME it gets back to your point.  We're not doing wonderful in the basal space*."  Sayer explained the Company's "growth in the DME channel has trailed our plan" and Dexcom "need[ed] to refocus on those relationships."  Following conversations with Defendants, analysts noted "DXCM said there wasn't just one big major DME that suddenly shifted away this quarter but *instead the issues being highlighted seem widespread across many of the DMEs*" and "DexCom's senior leadership team is now fully involved in rehabilitating its DME relationships."  Defendants also later admitted to analysts that the DME issues disclosed in Q2 2024 had been "*present in prior quarters*."

75.    **Statement No. 5**: During the same June 23, 2023 Investor Day call, Lawver stated:

> [There are] 6 million to 7 million people on basal insulin and with problematic hypoglycemia risk, where Medicare coverage just opened up 2 months ago and current CGM penetration is still under 7%, this growth runway is set to continue for a long time.    In sum, we have reimbursement today for more than 6 million people in the U.S. who are not yet on CGM.    To put that in perspective, there's coverage in place today that could allow us to more than quadruple our U.S. customer base . . . .

> *                *                *

> *We're also well-positioned to extend our leadership into the type 2 basal insulin segment*.

76.    As detailed below, Statement No. 5 was materially false and misleading when made because Lawver omitted material facts necessary in order to make it not misleading.

(a)    Contrary to Lawver's representation, Dexcom was not "***well-positioned to extend [its] leadership***" into the Type 2 basal market in June 2023.    As alleged herein, Abbott dominated the Type 2 basal market prior to the CMS coverage expansion in April 2023 and maintained its lead in the months that followed, as Defendants faced numerous structural impediments that put them at an immediate and significant competitive disadvantage as they entered the Type 2 basal market.    For example, as alleged at ¶68(a)-(g):

(i)    Abbott had a distinct advantage over Dexcom given its sales force presence in PCP offices, where Type 2 basal patients were treated.    For example, in early 2022, analysts noted: "***Libre momentum can be supported by a meaningfully expanded U.S. salesforce with a specific focus on the PCP channel where 90% of type 2 patients are taken care of today***."    Abbott would later acknowledge that its focus on the Type 2 basal population was "***our strategy from the moment we entered the market***" (years before CMS approved coverage for Type 2 basal patients).    Abbott

4921-5040-2578.v1

1    maintained this advantage throughout the Class Period.  For example, by FY 2024,

2    "***Libre ha[d] taken about 80% market share of the primary care Rx***."  Meanwhile, as

3    alleged at ¶68(b), Dexcom had not meaningfully expanded its sales force since 2020,

4    and conceded that the Type 2 basal markets were "***not something that – actually, we***

5    ***sell to or market to because [there is] just not that much of it out there***."  Abbott's

6    significant head start in prioritizing the Type 2 basal population and focusing its sales

7    force on PCPs, who were the primary prescribers for the Type 2 basal population, put

8    Dexcom at a significant competitive disadvantage in June 2023.

9                    (ii)    Dexcom was at a further disadvantage in the Type 2 basal

10   market and, thus, not "***well-positioned***," due to its strained relationship with DME

11   suppliers.  As alleged at ¶68(f), unbeknownst to investors, Dexcom's relationship with

12   its DME partners had soured after Dexcom had purposefully transitioned its preferred

13   sales channel to pharmacy over a period of several years leading up to the Class

14   Period.  This alienated the DME suppliers and their sales representatives, who felt that

15   the Company was steering business away from them.  Dexcom's strained DME

16   relationships were especially impactful immediately following the CMS coverage

17   expansion, including in June 2023, because Medicare required all Type 2 basal

18   patients to fill CGM prescriptions exclusively through the DME channel.  Dexcom's

19   strained relationships with its "important" DME partners placed Dexcom at a

20   significant competitive disadvantage in June 2023, especially as Abbott remained on

21   strong footing with DME suppliers.

22                   (iii)   As alleged at ¶68(g), Dexcom's lack of an adequate sales

23   force, in terms of both the number of personnel and their coverage of PCP offices, was

24   exacerbated by the numerous competitive disadvantages it faced as it entered the Type

25   2 basal market for the first time.  Each of these impediments, as described at ¶68(a)-

26   (f), including: (i) Abbott's history as the only viable CGM option to choose from for

27   Type 2 non-intensive providers and patients; (ii) Dexcom's strategy to focus only on

28   patients covered by insurance and not "market [or] sell to" Type 2 basal patients and

1  providers; (iii) Abbott's cost advantage; and (iv) Dexcom's strained relationship with

2  DMEs, all resulted in PCPs overwhelmingly prescribing Abbott's CGM devices to

3  Type 2 basal patients, even after the CMS coverage expansion.  Defendants could not

4  overcome these impediments without Dexcom sales representatives contacting and

5  convincing PCPs to change their pattern and practice of prescribing Abbott CGMs.

6  However, unbeknownst to investors, Dexcom's sales force was ill-equipped to

7  compete with Abbott in the Type 2 basal market.  As Defendants would later admit:

8  "[W]e didn't have the resources in the field to address these new markets . . . . *Quite*

9  *simply, Dexcom can't win in physician offices where we don't have a presence*.  It's

10  pretty tough."  Likewise, Defendants admitted: "*[W]e were not getting any traction*

11  *[at] those offices where we had no salespeople, where we weren't calling on*

12  *physicians.  [We were] getting very few prescriptions*.  We needed to broaden our

13  reach."  And Defendants additionally admitted "*we obviously don't win in offices we*

14  *don't call on*."

15         77.  **Statement No. 6**: Also on the June 23, 2023 Investor Day conference

16  call, Lawver stated:

17         Taken together, you can see why we're excited about our
continued strong growth and leadership in the U.S. market.  Dexcom

18  delivers a leading customer experience with industry-leading loyalty and

19  customer retention.  And with G7, we have the industry's most accurate
sensor that is incredibly simple to use, that is also the most covered and

20  has the lowest out-of-pocket costs.  *We have the right commercial*

21  *infrastructure for leading with the endocrinologists and expanding our*
*leadership in primary care with the type 2 basal and severe*

22  *hypoglycemia markets where coverage has just opened up in the last*

23  *couple of months*.  And when we take these covered populations
together, intensive insulin therapy, basal and those with severe – risk of

24  severe hypoglycemia, the CGM market in the U.S. is only 20%

25  penetrated.  So we have significant runway ahead in the U.S.

26         78.  Statement No. 6 was materially false and misleading when made because

27  Lawver omitted material facts necessary in order to make it not misleading.  For the

28

reasons set forth below, Dexcom did not "have the right commercial infrastructure" for "expanding [its] leadership in primary care with the type 2 basal and severe hypoglycemia markets where coverage has just opened up."

        (a)    First, an essential part of Dexcom's purported "***right commercial infrastructure***" for succeeding in the Type 2 basal market was Dexcom's sales force – specifically its PCP-facing sales force.  However, Dexcom had not meaningfully expanded its sales force since 2020, and the sales force was ill-equipped, in terms of both the number of personnel and their coverage of PCP offices, to compete with Abbott in the Type 2 basal market.  Although Dexcom claimed it had expanded beyond endocrinologists and into PCP offices as part of the FY 2020 sales force expansion, Dexcom added only approximately 130 new sales representatives, increasing its total sales force to approximately 260 sales representatives across 26 sales territories throughout the country (whereas there are more than 215,000 PCPs in the United States).  By Defendants' own admission, the FY 2020 sales force initiative was specifically designed to call on providers of Type 1 and Type 2 ***intensive*** patients, which did not include basal.  Indeed, Defendants admitted during the Company's February 11, 2021 earnings call: "***[T]he way we structure the teams out in the field is very much based upon the number of people with diabetes and intensive insulin users that they see***."  Defendants described the Type 2 basal market as "***not something that – actually, we sell to or market to***."  Thus, absent a sales force expansion or realignment, Dexcom did ***not*** suddenly have "the right commercial infrastructure" in place to capture this new Type 2 basal market.  Instead, Defendants would later admit that its inadequate PCP sales force resulted in PCPs (the physicians who treated Type 2 basal patients) overwhelmingly prescribing Abbott's CGM devices over Dexcom's following the CMS coverage expansion: "[W]e didn't have the resources in the field to address these new markets . . . .  ***Quite simply, Dexcom can't win in physician offices where we don't have a presence***.  It's pretty tough."  Likewise, Defendants admitted: "***[W]e were not getting any traction [at] those offices***

1    *where we had no salespeople*, where we weren't calling on physicians.  *[We were]*

2    *getting very few prescriptions*.  We needed to broaden our reach."  By late 2023,

3    Defendants were forced to significantly increase Dexcom's PCP sales force by 50% in

4    an effort to stem market share losses to Abbott in the Type 2 basal market.

5    (b)    Second, when Lawver told investors that Dexcom has "the right

6    commercial infrastructure for . . . expanding [its] leadership in primary care with the

7    type 2 basal and severe hypoglycemia markets," she omitted material facts regarding

8    Dexcom's strained relationship with DME suppliers – an essential component of

9    Dexcom's "commercial infrastructure" given that Medicare required Type 2 basal

10   patients to fill CGM prescriptions exclusively through the DME channel, as alleged

11   herein.  Thus the "commercial infrastructure" with respect to the new Type 2 markets

12   was heavily reliant on DMEs.  Unbeknownst to investors, Dexcom's relationship with

13   its DME partners had soured after Dexcom had purposefully transitioned its preferred

14   sales channel to pharmacy over a period of several years leading up to the Class

15   Period.  This alienated the DME suppliers and their sales representatives, who felt that

16   the Company was steering business away from them.  As J.P. Morgan observed,

17   Abbott was viewed as "channel agnostic" by DME sales representatives and remained

18   on better footing with them: "[There is a] perception amongst DME reps that Abbott is

19   channel agnostic vs. Dexcom preferential to the pharmacy."  Dexcom's strained DME

20   relationships were especially impactful following the CMS coverage expansion in

21   April 2023, because CMS only allowed newly covered Medicare patients to fulfill

22   their CGMs through the DME channel and not Dexcom's preferred pharmacy channel.

23   Thus, as physicians sent all prescriptions for the newly eligible Medicare covered

24   basal population to be filled through the DME channel, Dexcom ceded significant

25   market share to Abbott, who maintained its DME presence.  At the end of the Class

26   Period, Defendants admitted "*we've lost market share in the DME channel . . . and*

27   *that has hurt us*."  As J.P. Morgan observed in its July 31, 2024 report, the "*erosion*

28   *in the relationship between the company and DME distributor[s] . . . likely alienated*

4921-5040-2578.v1

1  *many of the DME partners* who felt that the company was steering business away

2  from them.  ***This could have led to some preferential treatment for Abbott***

3  ***specifically in the newly eligible Medicare basal population*.**  J.P. Morgan also

4  noted: "*~7/10 new patients likely going to Abbott today in the DME, the vast*

5  *majority of whom are Medicare basal fee for service patients*."

6         **D.**      **September 6, 2023 Wells Fargo Healthcare Conference**

7        79.    **Statement No. 7**: On September 6, 2023, Defendants presented at the

8  Wells Fargo Healthcare Conference.  When an analyst asked Sylvain "what you're

9  seeing with basal adoption," he responded:

10
11        Yes.  I'm really encouraged by it to date.  And I'll kind of
reference back to our last call, the PBMs and the health insurance
12  companies have really taken basal adoption and really aggressively
approved it.  And so you saw 60% of commercial lives covered as of our
13  last call for basal and met with Medicare coverage so comes Medicare
Advantage.
14
15        And so now you've actually got a majority of the basal population,
a significant majority of the basal population cover.  ***And where there's***
16  ***coverage, we've always taken share, and you see us taking share in***
***that space.  So we feel pretty good about one, taking share***; two, driving
17  adoption through the market.  And again, record new patients in the
second quarter, part of that as a result of some of that basal and we
18  expect to continue to do well in that market.  And I think we talked about
it, our base case is 25% adoption from sub-10%.  And obviously, we're
19  incentivized to go little faster.
20

21        80.    As detailed below, Statement No. 7 was materially false and misleading

22  when made because Sylvain omitted material facts necessary in order to make it not

23  misleading.

24        (a)    Sylvain's representation that Dexcom was "***taking share***" from

25  Abbott in the Type 2 basal market was also misleading because Dexcom was losing

26  badly to Abbott and was not taking any share at the PCP offices that its sales force did

27  not call on.  In reality, Dexcom was "***getting very few prescriptions***," "*[couldn't]*

28  ***win***," and was "***not getting any traction [at] those offices where we had no***

4921-5040-2578.v1

1   *salespeople*." Instead, as Defendants would later admit, PCPs who treated Type 2

2   basal patients were overwhelmingly prescribing Abbott's CGM devices over

3   Dexcom's. By late 2023, Defendants knew Dexcom needed to dramatically increase

4   its PCP sales force by 50% in an attempt to stem market share losses to Abbott in the

5   Type 2 basal market.

6          (b)     In addition, Sylvain's representation that Dexcom was "***taking***

7   ***share***" from Abbott in the Type 2 basal market was misleading because Dexcom was

8   in fact losing share in the critical DME channel due to its strained relationships with

9   DME distributors. As alleged herein, following the CMS coverage expansion in April

10  2023, CGM coverage for the Type 2 basal population was limited to Medicare patients

11  only, who were required to fill their CGM prescriptions through the DME channel –

12  not Dexcom's preferred pharmacy channel. Thus, the DME channel was critical to

13  the new Type 2 market following the CMS coverage announcement. Unbeknownst to

14  investors, Dexcom's relationship with its DME partners had soured after Dexcom had

15  purposefully transitioned its preferred sales channel from DME to pharmacy over a

16  period of several years leading up to the Class Period. This intentional shift in its

17  business model alienated the DME suppliers and their sales representatives, who felt

18  that the Company was steering business away from them. Meanwhile, Abbott was

19  viewed as "channel agnostic" by DME sales representatives and remained on much

20  better footing with the DME suppliers. Indeed, a J.P. Morgan analyst commented at

21  the end of the Class Period: "[There is a] perception amongst DME reps that Abbott is

22  channel agnostic vs. Dexcom preferential to the pharmacy." This placed Dexcom at a

23  significant competitive disadvantage in the months following the CMS coverage

24  expansion, where nearly all new patients were being routed through the DME channel.

25  This caused Dexcom to cede significant market share to Abbott, who maintained its

26  DME presence.

27

28

1    **E.    October 26, 2023 Q3 2023 Earnings Call**

2    81.    **Statement No. 8**: On October 26, 2023, Dexcom held a conference call

3    for analysts and investors to discuss its third quarter of 2023 ("Q3 2023") results.

4    During the Q3 2023 earnings call, Sayer stated:

5
> As a reminder, Medicare coverage went live in mid-April for people with
6    type 2 diabetes using basal insulin only as well as certain non-insulin
     individuals that experience hypoglycemia. Collectively, these 2
7    populations represent nearly 7 million people in the U.S. with
     approximately half being of Medicare age.
8

9    Encouragingly, commercial coverage continues to build for this
     group. We have established market-leading levels of basal-only
10   reimbursement as payers clearly recognize the potential for better
     outcomes driven by DexCom. This further supports our industry low
11   out-of-pocket cost for our customers. With a full quarter of broad
     coverage now under our belt, ***we continue to be very encouraged by***
12   ***early prescribing trends for this cohort***. We noted last quarter that we
13   experienced an immediate uptick in new patient starts once coverage
     went live, and we have seen a clear continuation of this trend since that
14   time. In fact, we delivered another record Medicare new patient start
     quarter in Q3 as physicians have quickly adjusted their prescribing
15   patterns to match the new reimbursement landscape.
16

17   While early, ***basal adoption trends look very similar to those we***
18   ***previously experienced once broad coverage became available for***
     ***intensively managed type 2 diabetes***. We view this as a very positive
19   sign of things to come. Importantly, when you combine this broader
     coverage with our leading sensor technology, ***we feel incredibly***
20   ***confident in our market position***. Since the launch of G7, ***we have***
21   ***gained share across all reimbursed channels and patient segments*** in
     the U.S. and that trend continued this quarter.
22

23   82.    As detailed below, Statement No. 8 was materially false and misleading

24   when made because Sayer omitted material facts necessary in order to make it not

25   misleading.

26   (a)    Sayer's representation that Defendants were "***very encouraged by***

27   ***early prescribing trends***" in the Type 2 basal cohort during Q3 2023 was also

28

4921-5040-2578.v1

1  misleading because Dexcom was not seeing encouraging prescribing trends in the vast

2  majority of PCP offices that Dexcom sales representatives did not call on.  Contrary to

3  Sayer's statement, Dexcom was "***getting very few prescriptions***" and was "***not getting***

4  ***any traction [at] those offices where [it] had no salespeople***."  Defendants admitted

5  that, by late 2023, they realized "***[q]uite simply, Dexcom can't win in physician***

6  ***offices where we don't have a presence***.  It's pretty tough."  Likewise, Defendants

7  told investors at the end of the Class Period, "***we obviously don't win in offices we***

8  ***don't call on***."  Instead, PCPs who treated Type 2 basal patients were overwhelmingly

9  prescribing Abbott's CGM over Dexcom's.  By late 2023, Defendants were forced to

10  significantly increase Dexcom's PCP sales force by 50% in a desperate effort to stem

11  its market share losses to Abbott and reverse the disappointing "prescribing trends" in

12  the Type 2 basal market.

13         (b)     In addition, Sayer's representation that Dexcom had continued to

14  "***gain[] share across all reimbursed channels and patient segments in the U.S.***"

15  during Q3 2023 was misleading because Dexcom was, in fact, losing share in the

16  critical DME channel.  As alleged herein, following the CMS coverage expansion in

17  April 2023, CGM coverage for the Type 2 basal population was limited to Medicare

18  patients only, who were required to fill their CGM prescriptions through the DME

19  channel – not Dexcom's preferred pharmacy channel.  Thus, the DME channel was

20  critical to the new Type 2 market following the CMS coverage announcement.

21  Unbeknownst to investors, Dexcom's relationship with its DME partners had soured

22  after Dexcom had purposefully transitioned its preferred sales channel from DME to

23  pharmacy over a period of several years leading up to the Class Period.  This

24  intentional shift in its business model alienated the DME suppliers and their sales

25  representatives, who felt that the Company was steering business away from them.

26  Meanwhile, Abbott was viewed as "channel agnostic" by DME sales representatives

27  and remained on much better footing with the DME suppliers.  Indeed, a J.P. Morgan

28  analyst commented at the end of the Class Period: "[There is a] perception amongst

4921-5040-2578.v1

1   DME reps that Abbott is channel agnostic vs. Dexcom preferential to the pharmacy."

2   This placed Dexcom at a significant competitive disadvantage in the months following

3   the CMS coverage expansion, where nearly all new patients were being routed

4   through the DME channel.  This caused Dexcom to cede significant market share to

5   Abbott, who maintained its DME presence.  At the end of the Class Period, a Piper

6   Sandler analyst noted: "Simply put, Abbott, with the assistance of certain DME reps

7   that also call on docs, were able to direct patients towards Libre in the quarter, which

8   cost DXCM a meaningful number of new patients . . . ."  Indeed, this led to, "~7/10

9   new patients likely going to Abbott today in the DME, the vast majority of whom are

10  Medicare basal fee for service patients," as J.P. Morgan noted in its July 31, 2024

11  report.  Moreover, Defendants later admitted that the Company had lost market share

12  in DME due to frayed relationships with its DME partners.  As Sayer explained on

13  July 25, 2024, the Company's "growth in the DME channel has trailed our plan" and

14  Dexcom "need[s] to refocus on those relationships."  Sayer also admitted at the end of

15  the Class Period, "we've lost market share in the DME channel . . . and that has hurt

16  us."

17      **F.      January 8, 2024 JPMorgan Healthcare Conference**

18      83.    **Statement No. 9**: On January 8, 2024, during the JPMorgan Healthcare

19  Conference, an analyst asked whether Defendants had "data yet on whether DexCom

20  is winning more than your fair share in the basal category."  Sayer responded:

21          You know what, ***we are doing well in the basal category***.  My fair
22          share is all of them.  So we'd like to win more.  We win – we do very
            well where we have coverage and penetration, and we know the
23          physicians, and we know the community.  And what we are working on
            is broader coverage and broader efforts to make sure we can win more
24          places.  When I said we're investing on the commercial side to get
            broader, and that's one of the things I'm inferring that we – and we're
25          looking for creative clever ways to do that.  ***But we – where we have a
            presence, we win very much***.
26

27

28

84.     As detailed below, Statement No. 9 was materially false and misleading when made because Sayer omitted material facts necessary in order to make it not misleading.

(a)     Sayer's representations that "*we are doing well in the basal category*" and "*where we have a presence, we win very much*" in response to a direct question regarding whether Dexcom was "*winning more than [its] fair share in the basal category*" was misleading because Sayer omitted the fact that Dexcom did *not* have a presence in the vast majority of PCP offices and thus was *not* "winning more than [its] fair share." In fact, Defendants have admitted that, by late 2023, prior to when Sayer made Statement No. 9, they knew that PCPs were overwhelmingly prescribing Abbott's CGM over Dexcom's to Type 2 basal patients in offices that Dexcom did not call on. As Defendants bluntly acknowledged in subsequent admissions: "*Dexcom can't win in physician offices where we don't have a presence*," "*we were not getting any traction [at] those offices*," "*[we were] getting very few prescriptions*," and "*we obviously don't win in offices we don't call on*." Thus, unbeknownst to investors in January 2024, Defendants had already put in place a plan to expand its PCP sales force by 50% in a desperate effort to stem its significant market share losses to Abbott in the Type 2 basal market.

(b)     Further, Sayer's representation that Dexcom was "*doing well in the basal category*" in response to a direct question regarding whether Dexcom was "*winning more than [its] fair share in the basal category*" was misleading because he omitted the fact that Dexcom remained significantly behind Abbott in the Type 2 basal market and was not winning close to a "fair share[]" of new patients. When Sayer spoke in January 2024, seven out of 10 new scripts for the Type 2 basal segment were for Abbott's Libre, according to third-party data. Abbott maintained its advantage over Dexcom. In April 2024, third-party data showed that *seven out of every 10 new scripts for the Type 2 basal population were going to Abbott's Libre*. By mid-2024, third-party data showed that Abbott had maintained a *71% CGM share*

among the Type 2 non-intensive population.  In July 2024, at the end of the Class Period, Defendants admitted, during an earnings call, market shares losses and acknowledged "*[w]e're not doing wonderful in the basal space*" and told investors in September 2024 "suffice it to say, *we're behind*."  Analysts emphasized "**DXCM is clearly losing the basal wars right now**" and noted that, within the Type 2 basal market, "*7 to 8 out of 10 Rx's are coming to ABT*."

85.    **Statement No. 10**: Also during the January 8, 2024 JPMorgan Healthcare Conference, an analyst asked, regarding Dexcom's announcement that it had acquired record new patients in the quarter, whether there was "[a]ny way to size how much was basal versus nonbasal because our doc checks remain just so enthusiastic about CGM for these patients now with reimbursement."  Sylvain responded, emphasizing Dexcom's strength in basal:

> Yes.  So as we think about those patients, and we'll get the full final patients numbers in soon. **We know it's trending that way**.  You're seeing – you're right.  You're seeing a very strong adoption in the basal population, that unmet need is significant. **And so you continue to see outperformance in basal**, but you're also seeing a really strong performance continuing in the intensive markets, both type 1 and type 2.

86.    As detailed below, Statement No. 10 was materially false and misleading when made because Sylvain omitted material facts necessary in order to make it not misleading.

(a)    Sylvain's representation that Dexcom was "**continu[ing] to see outperformance in basal**" with respect to its new patient additions during the fourth quarter of 2023 ("Q4 2023") was misleading because Dexcom was not "outperform[ing]" Abbott or its own sales expectations in the Type 2 basal market.  Rather, Dexcom significantly lagged behind Abbott in the Type 2 basal market.  In fact, when Sylvain spoke in January 2024, seven out of 10 new scripts for the Type 2 basal patient segment were for Abbott's Libre, according to third-party data.  Abbott maintained its advantage over Dexcom.  In April 2024, third-party data showed that

1    *seven out of 10 new scripts for the Type 2 basal patient segment were for Abbott's*

2    *Libre*.  By mid-2024, third-party data showed that Abbott maintained a 71% CGM

3    share among the Type 2 non-intensive population.  In July 2024, at the end of the

4    Class Period, Defendants admitted, during an earnings call, market share losses and

5    acknowledged "*[w]e're not doing wonderful in the basal space*" and told investors in

6    September 2024 "suffice it to say, *we're behind*."  Analysts emphasized "*DXCM is*

7    *clearly losing the basal wars*" and noted that, within the Type 2 basal market, "*7 to 8*

8    *out of 10 Rx's are coming to ABT*."

9          (b)    In addition, Sylvain's representation that Dexcom was

10   "*continu[ing] to see outperformance in basal*" with respect to its new patient

11   additions during Q4 2023 was misleading because Defendants omitted the fact that

12   Dexcom was significantly "underperforming" Abbott and its own sales expectations

13   among PCPs, who were critical to the Type 2 basal market.  In fact, Defendants later

14   admitted that, by late 2023 – before Sylvain spoke – they knew that PCPs were

15   overwhelmingly prescribing Abbott's CGM over Dexcom's to Type 2 basal patients

16   in offices that Dexcom did not call on.  As Defendants bluntly acknowledged in

17   subsequent admissions: "*Dexcom can't win in physician offices where we don't have*

18   *a presence*," "*we were not getting any traction [at] those [PCP] offices*," "*[we were]*

19   *getting very few prescriptions*," and "*we obviously don't win in offices we don't call*

20   *on*."  Thus, unbeknownst to investors at the time Sylvain spoke in January 2024,

21   Defendants had already put in place a plan to expand Dexcom's PCP sales force by

22   50% in a desperate effort to stem its significant market share losses to Abbott in the

23   Type 2 basal market.

24        **G.    February 8, 2024 Q4 2023 Earnings Call**

25        87.    **Statement No. 11**: On February 8, 2024, Dexcom held a conference call

26   for analysts and investors to discuss its Q4 2023 results.  During the Q4 2023 earnings

27   call, Sylvain responded to an analyst's question asking whether basal is "the primary

28   contributor to the domestic acceleration":

Yes. It's a good question. Let me maybe just give some color as to how we're thinking about the guidance. As you see the performance in the back half of the year, a lot of that has to do with being the most accurate sensor, launching with the G7 form factor **and then, of course, having the basal coverage there. And so when you think about it, and you can see the share taking when you look at the script data, we are taking share**. And having the sensor – the most advanced sensor on the market is the driver there. So that's taking share.

**Now within those spaces, basal is a contributor, no question. As that category expands and we take share within that category, that does contribute to the overall numbers**. And so you are right, basal is a contributor, but it has as much to do with us taking share as it does with category expansion. So think about both of those as contributors.

As you think about 2024, we've talked a little bit about the adoption rate, basal in total adopting in this back half of the year around 9% to 10% per year on a per annum basis. The guide assumes about 8% there. And so I think you can assume that was the case. Our long-range plan was more like 6% to 7% per year. So we are seeing basal going faster than what was in our long-range plan. And **what's great about that is as we continue to take share and the category grows a little faster than expected, that will help contribute over the longer haul**.

88.     As detailed below, Statement No. 11 was materially false and misleading when made because Sylvain omitted material facts necessary in order to make it not misleading.

(a)     Sylvain's representation that Dexcom was continuing to "**take share**" in the Type 2 basal market was misleading because PCPs who treated Type 2 basal patients were overwhelmingly prescribing Abbott's CGM over Dexcom's. In fact, when Sylvain spoke in February 2024, **seven out of 10 new scripts for the Type 2 basal patient segment were Abbott's Libre**, according to third-party data. Abbott maintained its advantage over Dexcom. In April 2024, third-party data showed that **seven out of 10 new scripts for the Type 2 basal patient segment were for Abbott's Libre**. By mid-2024, third-party data showed that Abbott maintained a 71% CGM share among the Type 2 non-intensive population. In July 2024, at the end of the

4921-5040-2578.v1

1  Class Period, Defendants admitted, during an earnings call, market share losses and

2  acknowledged "***[w]e're not doing wonderful in the basal space***" and told investors in

3  September 2024 "suffice it to say, ***we're behind***."  Analysts emphasized "***DXCM is***

4  ***clearly losing the basal wars right now***" and noted that, within the Type 2 basal

5  market, "***7 to 8 out of 10 Rx's are coming to ABT***."

6         (b)    Sylvain's representation that Dexcom was continuing to "***take***

7  ***share***" in the Type 2 basal market was misleading because Defendants omitted the

8  fact that Dexcom was ***not*** taking share among PCPs, who were critical to the Type 2

9  basal market.  In fact, Defendants later admitted that, by late 2023, before Sylvain

10  spoke in February 2024, they knew that PCPs were overwhelmingly prescribing

11  Abbott's CGM over Dexcom's to Type 2 basal patients in PCP offices that Dexcom

12  did not call on.  As Defendants bluntly acknowledged in subsequent admissions:

13  "***Dexcom can't win in physician offices where we don't have a presence***," "***we were***

14  ***not getting any traction [at] those offices***," "***[we were] getting very few***

15  ***prescriptions***," and "***we obviously don't win in offices we don't call on***."  Thus,

16  unbeknownst to investors at the time Sylvain spoke in February 2024, Defendants had

17  already put in place a plan to expand Dexcom's PCP sales force by 50% in a desperate

18  effort to stem its significant market share losses to Abbott in the Type 2 basal market.

19         (c)    Additionally, Sylvain's representation that Dexcom was continuing

20  to "***take share***" in the Type 2 basal market was misleading because Dexcom was, in

21  fact, losing share in the critical DME channel.  As alleged herein, following the CMS

22  coverage expansion in April 2023, CGM coverage for the Type 2 basal population

23  was limited to Medicare patients only, who were required to fill their CGM

24  prescriptions through the DME channel – not Dexcom's preferred pharmacy channel.

25  Thus, the DME channel was critical to the new Type 2 market following the CMS

26  coverage announcement.  Unbeknownst to investors, Dexcom's relationship with its

27  DME partners had soured after Dexcom had purposefully transitioned its preferred

28  sales channel from DME to pharmacy over a period of several years leading up to the

4921-5040-2578.v1

Class Period.  This intentional shift in its business model alienated the DME suppliers and their sales representatives, who felt that the Company was steering business away from them.  Meanwhile, Abbott was viewed as "channel agnostic" by DME sales representatives and remained on much better footing with the DME suppliers.  Indeed, a J.P. Morgan analyst commented at the end of the Class Period: "[There is a] perception amongst DME reps that Abbott is channel agnostic vs. Dexcom preferential to the pharmacy."  This placed Dexcom at a significant competitive disadvantage in the months following the CMS coverage expansion, where nearly all new patients were being routed through the DME channel.  This caused Dexcom to cede significant market share to Abbott, who maintained its DME presence.  At the end of the Class Period, a Piper Sandler analyst noted: "Simply put, Abbott, with the assistance of certain DME reps that also call on docs, were able to direct patients towards Libre in the quarter, which cost DXCM a meaningful number of new patients . . . ."  Indeed, this led to, "~7/10 new patients likely going to Abbott today in the DME, the vast majority of whom are Medicare basal fee for service patients," as J.P. Morgan noted in its July 31, 2024 report.  Moreover, Defendants later admitted that the Company had lost market share in DME due to frayed relationships with its DME partners.  As Sayer explained on July 25, 2024, the Company's "growth in the DME channel has trailed our plan" and Dexcom "need[s] to refocus on those relationships." Sayer also admitted at the end of the Class Period, "we've lost market share in the DME channel . . . and that has hurt us."

## H.    April 25, 2024 Q1 2024 Earnings Call

89.    **Statement No. 12**: On April 25, 2024, Dexcom held a conference call for analysts and investors to discuss its first quarter of 2024 ("Q1 2024") results.  During the Q1 2024 earnings call, Defendants were asked about acceleration in basal and Dexcom's market share within that population.  Sylvain and an analyst engaged in the following colloquy:

[Analyst:] *So wanted to ask on basal. Just any visibility you can give on how that's been scaling. Obviously, a record new start quarter this quarter. I would assume basal's contributing nicely to that. But what are the sequential patterns the last few quarters? Is it still sequentially growing at a pretty healthy rate, I'd assume, but any color you can provide there? And also, there's been some debate, obviously, on market share within the basal population here in the U.S. Just would love kind of any insight you can provide on that front as well*.

[Sylvain:] Yes. Sure, I can take that one. Thanks, Jeff. I think when we talked about what we expected this year, we really talked about it in the context of basal adoption across the entire population. And we talked about exiting the year right around that 15% adoption across the basal population in the U.S. and the year moving over the course of the year to 23%. So about 8 points of penetration.

*So far through the first quarter, things are going as we expected. Record new patients, I think, helps enforce that. And you are correct, a good chunk of our new patients are coming through that basal channel, and we continue to see really well performance in that category*.

So qualitatively, the things we talked about, the excitement in that channel, those still remain. *In terms of share taking and how we look at that category, we get script data, we look at script data based on pathology. The debate – there's no debate internally to us. We know we're taking share and we see that data. And I think a lot of you guys see that data. So for what it's worth, that data is out there, you can see the scripts continuing to come our way*.

For the . . . purpose we talked about, when we have coverage and when we compete head-to-head, we've typically won. So I think we maybe disagree with some comments out there. But I think the data is clear. *When you look at the script data, I think it will continue to demonstrate where this is going over time. I hope that helps*.

90.    As detailed below, Statement No. 12 was materially false and misleading when made because Sylvain omitted material facts necessary in order to make it not misleading.

(a)     Sylvain's representation that Dexcom was "***taking share***" in the Type 2 basal market was misleading because Dexcom remained significantly behind Abbott in market share and was not "taking share," gaining share, or catching up to Abbott as of April 25, 2024.  In fact, when Sylvain spoke in April 2024, third-party data showed that ***seven out of every 10 new scripts for the Type 2 basal population were going to Abbott's Libre***, which matched Abbott's advantage in January 2024, when third-party data showed the same ratio.  Thus, contrary to Sylvain's assertion, Dexcom was not "taking share" from Abbott as of April 25, 2024.  Likewise, within months of Sylvain's statement, Dexcom itself confirmed that it was not taking share from Abbott, with Sylvain admitting that they were "***not doing wonderful in the basal space***" and Sayer acknowledging "suffice it to say we're behind" in response to an analyst's dire characterization of the lopsided Type 2 basal market – Abbott was "winning more share at the physician level with type two basal patients" and had a "70% share in that channel in that population."  Analysts emphasized "***DXCM is clearly losing the basal wars right now***" and noted that, within the Type 2 basal market, "***7 to 8 out of 10 Rx's are coming to ABT***."

(b)     Sylvain's representation that Dexcom was "***taking share***" in the Type 2 basal market was also misleading because Defendants omitted the fact that Dexcom was ***not*** taking share among PCPs, who were critical to the Type 2 basal market.  In fact, Defendants have admitted that, by late 2023, before Sylvain spoke in April 2024, they knew that PCPs were overwhelmingly prescribing Abbott's CGM over Dexcom's to Type 2 basal patients in PCP offices that Dexcom did not call on.  As Defendants bluntly acknowledged in subsequent admissions: "***Dexcom can't win in physician offices where we don't have a presence***," "***we were not getting any traction [at] those offices***," "***[we were] getting very few prescriptions***," and "***we obviously don't win in offices we don't call on***."  Thus, unbeknownst to investors at the time Sylvain spoke in April 2024, rather than "taking share" from Abbott, Defendants were aware Dexcom was significantly behind Abbott and had already put

24-cv-1485-RSH-VET

4921-5040-2578.v1

1    in place a plan to expand its PCP sales force by 50% in a desperate effort to stem its

2    significant market share losses in the Type 2 basal market.

3              (c)     Additionally, Sylvain's representation that Dexcom was "***taking***

4    ***share***" in the Type 2 basal market was misleading because Dexcom was, in fact,

5    losing share in the critical DME channel.  As alleged herein, following the CMS

6    coverage expansion in April 2023, CGM coverage for the Type 2 basal population

7    was limited to Medicare patients only, who were required to fill their CGM

8    prescriptions through the DME channel – not Dexcom's preferred pharmacy channel.

9    Thus, the DME channel was critical to the new Type 2 market following the CMS

10   coverage announcement.  Unbeknownst to investors, Dexcom's relationship with its

11   DME partners had soured after Dexcom had purposefully transitioned its preferred

12   sales channel from DME to pharmacy over a period of several years leading up to the

13   Class Period.  This intentional shift in its business model alienated the DME suppliers

14   and their sales representatives, who felt that the Company was steering business away

15   from them.  Meanwhile, Abbott was viewed as "channel agnostic" by DME sales

16   representatives and remained on much better footing with the DME suppliers.  Indeed,

17   a J.P. Morgan analyst commented at the end of the Class Period: "[There is a]

18   perception amongst DME reps that Abbott is channel agnostic vs. Dexcom

19   preferential to the pharmacy."  This placed Dexcom at a significant competitive

20   disadvantage in the months following the CMS coverage expansion, where nearly all

21   new patients were being routed through the DME channel.  This caused Dexcom to

22   cede significant market share to Abbott, who maintained its DME presence.  In fact,

23   contrary to Sylvain's assertion that Dexcom was "taking share" in April 2024,

24   Defendants have admitted that Dexcom was, in fact, losing Type 2 basal market share

25   in the DME space as of that date.  On July 25, 2024, Dexcom attributed its

26   disappointing financial results, in large part, to losing market share in the DME space.

27   Sayer stated: "[W]e've lost market share in the DME channel . . . and that has hurt

28   us."  Analysts noted: "Simply put, Abbott, with the assistance of certain DME reps

that also call on docs, were able to direct patients towards Libre in the quarter, which cost DXCM a meaningful number of new patients . . . ."  Indeed, this led to, "~7/10 new patients likely going to Abbott today in the DME, the vast majority of whom are Medicare basal fee for service patients."  Sylvain further explained that the DME market share loss was partly due to a sales force disruption that was "***bigger than we would have anticipated***," which led to "lower than expected new customer starts . . . ***particularly in the DME channel***."  Sayer confessed that the sales force reorganization "lead to a lot of disruption, ***particularly at the beginning of the quarter***" (*i.e.*, April 2024 – the first month of Dexcom's fiscal second quarter).  Thus, Defendants would have witnessed the purported disruption, and resulting market share loss in the DME space, "at the beginning of the quarter," or sometime in April 2024.

91.   **Statement No. 13**: Also during the April 25, 2024 Q1 2024 earnings call, Sylvain reassured investors:

> ***We still have a very strong DME business, and certainly, the DME business continues to be supported by our partners very, very well***.

92.   As detailed below, Statement No. 13 was materially false and misleading when made because Sylvain omitted material facts necessary in order to make it not misleading.

(a)   Defendants did not "***have a very strong DME business***."  Nor was Dexcom "***supported by [its] partners very, very well***."  In fact, just three months after Sylvain made this statement, Defendants would admit that its DME business had significantly deteriorated and its relationships with DME suppliers were impaired. Sylvain and Sayer admitted on July 25, 2024, "***we're not doing well in the DME***" and "***we've lost market share in the DME channel*** . . . and that has hurt us."  Sayer acknowledged that Dexcom "need[ed] to refocus on those [DME] relationships." Following conversations with Defendants, analysts noted "DXCM said there wasn't just one big major DME that suddenly shifted away this quarter but ***instead the issues***

1  *being highlighted seem widespread across many of the DMEs*" and "DexCom's

2  senior leadership team is now fully involved in *rehabilitating its DME relationships*."

3      (b)    Unbeknownst to investors, Dexcom's relationship with its DME

4  partners had soured after Dexcom had purposefully transitioned its preferred sales

5  channel from DME to pharmacy over a period of several years leading up to the Class

6  Period.  This intentional shift in its business model alienated the DME suppliers and

7  their sales representatives, who felt that the Company was steering business away

8  from them.  Meanwhile, Abbott was viewed as "channel agnostic" by DME sales

9  representatives and remained on much better footing with the DME suppliers.  Indeed,

10  a J.P. Morgan analyst commented at the end of the Class Period: "[There is a]

11  perception amongst DME reps that Abbott is channel agnostic vs. Dexcom

12  preferential to the pharmacy."  That same analyst observed, the "*erosion in the*

13  *relationship between the company and DME distributor[s] . . . likely alienated many*

14  *of the DME partners* who felt that the company was steering business away from

15  them.  This could have led to some *preferential treatment for Abbott specifically in*

16  *the newly eligible Medicare basal population*."  J.P. Morgan also noted: "*~7/10 new*

17  *patients likely going to Abbott today in the DME, the vast majority of whom are*

18  *Medicare basal fee for service patients*."  This placed Dexcom at a significant

19  competitive disadvantage in the months following the CMS coverage expansion,

20  where nearly all new patients were being routed through the DME channel.  This

21  caused Dexcom to cede significant market share to Abbott, who maintained its DME

22  presence.

23      (c)    Contrary to Sylvain's assertion in April 2024 that Dexcom had "*a*

24  *very strong DME business*" was "*supported by [its] partners very, very well*,"

25  Defendants later admitted that Dexcom was, in fact, losing market share in the DME

26  space as of that date.  Three months after Sylvain's reassurances, on July 25, 2024,

27  Dexcom attributed its disappointing second quarter financial results, in large part, to

28  losing market share in the DME space.  Sayer conceded: "[W]e've lost market share

4921-5040-2578.v1

in the DME channel . . . and that has hurt us."  Analysts noted: "Simply put, Abbott, with the assistance of certain DME reps that also call on docs, were able to direct patients towards Libre in the quarter, which cost DXCM a meaningful number of new patients . . . ."  Indeed, this led to, "**~7/10 new patients likely going to Abbott today in the DME**, the vast majority of whom are Medicare basal fee for service patients." Sylvain further explained that the DME market share loss was partly due to a sales force disruption that was "**bigger than we would have anticipated**," which led to "lower than expected new customer starts . . . **particularly in the DME channel**." Sayer confessed that the sales force reorganization "lead to a lot of disruption, **particularly at the beginning of the quarter**" (*i.e.*, April 2024 – the first month of Dexcom's fiscal second quarter).    Thus, Defendants witnessed the purported disruption, and resulting market share loss in the DME space, "at the beginning of the quarter," or sometime in April 2024.

**I.    June 5, 2024 William Blair Growth Stock Conference**

93.    <u>**Statement No. 14**</u>: On June 5, 2024, during the William Blair Growth Stock Conference, an analyst asked Sylvain about guidance for Q2 2024 and the full-year 2024 and "what was contemplated in that."  Sylvain responded:

> And in terms of the full year as of the last quarter, when we issued our earnings, we raised our guidance.  And so that should give we obviously beat the street expectations in the first quarter, raised guidance and continue to do well.  So I think from that point of view, I think we're happy with where we are.  **We're happy with our full year guidance**. We don't guide to the quarters, but **we were very comfortable with where folks are sitting for the quarter**.

94.    As detailed below, Statement No. 14 was materially false and misleading when made because Sylvain omitted material facts necessary in order to make it not misleading.

(a)    When Sylvain reaffirmed Dexcom's full-year 2024 guidance ("**[w]e're happy with our full year guidance**") on June 5, 2024, Sylvain knew, or was

4921-5040-2578.v1

reckless in not knowing, that: (i) there was no reasonable basis for Dexcom's full-year financial guidance; and (ii) Dexcom's guidance projections were impossible to meet, in light of the numerous difficulties Dexcom would reveal just weeks later, including Dexcom's massive underperformance in the Type 2 basal market.  Indeed, on July 25, 2024, Defendants shocked the market by announcing disastrous Q2 2024 results and slashing Dexcom's full-year sales guidance by hundreds of millions of dollars. Defendants explained the issues that impacted the Company's quarterly revenue and 2024 sales forecast, including Sayer's admission that "we've lost market share in DME channel . . . and that has hurt us," while Sylvain admitted "[w]e're not doing wonderful in the basal space," and Sayer confirming that "we've lost market share in the DME channel."  As alleged herein, Defendants admitted that they were aware of the significant underperformance that would impact Dexcom's Q2 2024 and full-year 2024 results weeks before they spoke on June 5, 2024.  In particular, Defendants admitted that they witnessed a significant shortfall in expected new customer additions "*at the beginning of the [second] quarter*" which put Dexcom "*a quarter behind" where they "expect[ed] to be*."  Defendants also knew the shortfall could not be quickly remedied but rather, being "*a quarter behind*" would necessarily impact the remainder of the year because of the "*compounding effect* of our slower than expected new customer growth."  Thus, because Sylvain was aware of these adverse circumstances at the time he made Statement No. 14, he was aware that the Company's full-year guidance lacked a reasonable basis and would be impossible to achieve.

(b)     When Sylvain confirmed analysts' consensus expectations for Dexcom's Q2 2024 results ("*we were very comfortable with where folks are sitting for the quarter*"), on June 5, 2024, Sylvain knew, or was reckless in not knowing, that: (i) there was no reasonable basis for analysts' consensus expectations for Dexcom's Q2 2024 results; and (ii) the analysts' consensus expectations were impossible to meet, in light of the numerous difficulties Dexcom would reveal just

4921-5040-2578.v1

weeks later, including Dexcom's massive underperformance in the Type 2 basal market. Indeed, at the time Sylvain spoke, Dexcom was only 25 days from the end of the disastrous second quarter for which it was confirming analysts' expectations. As detailed above, Defendants admitted that they were aware of the significant underperformance that would impact Dexcom's Q2 2024 results weeks before they spoke on June 5, 2024. In particular, Defendants admitted that they witnessed a significant shortfall in expected new customer additions "***at the beginning of the [second] quarter***" which put Dexcom "***a quarter behind***" where they "***expect[ed] to be***." Defendants also knew the shortfall could not be quickly remedied but rather, being "***a quarter behind***" would necessarily impact the remainder of the second quarter because of the "***compounding effect*** of our slower than expected new customer growth." Thus, because Sylvain was aware of these adverse circumstances at the time he made Statement No. 14, he was aware that analysts' consensus expectations for Dexcom's Q2 2024 results lacked a reasonable basis and would be impossible to achieve.

(c)    Sylvain's statements regarding full year 2024 guidance and Q2 2024 consensus estimates gave analysts a misleading impression. For example, following the call, William Blair analysts were left with the impression that the guidance was, in fact, conservative, stating "[m]anagement reiterated its ***confidence in previously issued guidance*** and remains comfortable in consensus estimates. As it has done for as long as we can remember, management set a base case in guidance incorporating a number of inputs . . . ***which we believe de-risks the numbers and leaves room for potential upside in the guide throughout the year***." Following the release of Q2 2024 results just weeks later, analysts were surprised and disappointed, given Defendants' positive statements to the market just the month prior. For example, on July 26, 2024, Bernstein analysts reported on the "[d]isastrous revenue miss and guidance cut" and commented that "***DXCM credibility is damaged after***

4921-5040-2578.v1

*June 5th comments that management was 'happy with full year guidance' and 'very comfortable with where folks are sitting in the quarter.'"*

## VII.  DEFENDANTS STUN THE MARKET BY DISCLOSING ANEMIC PERFORMANCE IN THE TYPE 2 BASAL MARKET

95.    Less than two months after Defendants had confirmed their bullish outlook and reiterated Dexcom's FY 2024 sales guidance on the heels of what they claimed was continued momentum in the Type 2 basal space, Defendants shocked the market on July 25, 2024, by announcing disastrous Q2 2024 results and slashing Dexcom's full-year sales guidance by hundreds of millions of dollars.

96.    In sharp contrast to their earlier statements, Defendants revealed that Dexcom had not, in fact, capitalized on the enormous opportunity of Type 2 coverage expansion, which they had described at the start of the Class Period as "the largest single expansion of access to CGM in our industry's history."  Instead, Sylvain was forced to admit: "*We're not doing wonderful in the basal space*."  Sayer leveled with analysts, admitting for the first time "*we've lost market share in the DME channel*," specifically with respect to Type 2 basal patients.  In his prepared remarks, Sayer disclosed that "we have seen our share of new customers fall short of our expectations" and described the need to "enhance our competitive position and reestablish momentum."  Sayer also admitted that "we've lost market share in the DME channel . . . and that has hurt us."  Further, Defendants were forced to admit that their recent PCP sales force expansion, which they had described in glowing terms as opportunistic just months earlier was, in reality, a reactionary move done to stem the loss in market share to Abbott amongst the new basal population.  As Sayer stated, Dexcom's sales force "needed to get into [PCP] offices" because "we obviously don't win in offices we don't call on."

97.    The market was shocked by this news, *causing Dexcom's stock price to decline by more than 40%*, the worst day on record for Dexcom's shares since the Company's initial public offering in April 2005.  *CNBC* reported that "Dexcom shares

4921-5040-2578.v1

sank more than 40% on Friday, ***their steepest decline ever . . . wiping out more than $17 billion in market cap***.”   Analysts commented on the disappointing results, stressing that there was “***A Lot of Damage Done***” and “***Severe and Sudden Near-Term Challenges Derail Growth***.”   Analysts highlighted Dexcom’s underperformance in the Type 2 basal market, noting “***DXCM is clearly losing the basal wars right now***” and “***the most worrisome dynamic to us as it implies share loss to its largest competitor Abbott*** . . . which cost DXCM a meaningful number of new patients.”

98.    Analysts were particularly stunned – and frustrated – in light of Defendants’ positive statements to the market just the month prior.   For example, one Bernstein analyst reported on the “[d]isastrous revenue miss and guidance cut” and commented that “***DXCM credibility is damaged after June 5th comments that management was ‘happy with full year guidance’ and ‘very comfortable with where folks are sitting in the quarter*** .’”   J.P. Morgan analysts similarly remarked that “***investor faith in management has been severely shaken, especially following reiterated guidance at a June competitor conference***.”   BofA Global Research’s July 26, 2024 report likewise commented that “***[t]his is a credibility hit for DXCM and it will take time to earn that back, especially given DXCM blessed consensus revenue in early June***.”

99.    In the weeks and months that followed the end of the Class Period, Defendants made further revelations contradicting their positive statements during the Class Period regarding the Company’s performance in the Type 2 basal market and the strength of Dexcom’s DME business.   For example, on July 28, 2024, Wolfe Research analysts issued a report that summarized their Q&A call back with Sayer and Dexcom’s head of Investor Relations, Sean Christensen, following Defendants’ July 25, 2024 disclosures.   The focus of the Wolfe Research analysts’ call back was “‘what went wrong.’”   The Wolfe Research analysts reported on the issues that Dexcom was facing, divulging that “[b]luntly, DXCM acknowledged share loss in

1  DME and said ABT doing a better job there."  Wolfe Research reported that "***DXCM***

2  ***suggests most of the above issues have been present in prior quarters***."

3      100.  Similarly, J.P. Morgan analysts issued a report on July 31, 2024 after

4  they "caught up with management earlier this week to better understand the

5  headwinds" revealed on the July 25, 2024 call.  The analysts reported that "we suspect

6  an ***erosion in the relationship between the company and DME distributor [partners]***

7  ***has been ongoing for some time, likely starting with the company's fanfare around***

8  ***pharmacy access with the launch of G7 [in February 2023]***."

9      101.  On August 5, 2024, following conversations with Defendants, BofA

10  Global Research analysts noted: "DXCM said there wasn't just one big major DME

11  that suddenly shifted away this quarter but ***instead the issues being highlighted seem***

12  ***widespread across many of the DMEs***."  On August 28, 2024, William Blair analysts,

13  following a meeting with management, revealed: "Management walked through DME

14  dynamics that led to share loss during the quarter, with its 'top-to-top' discussions

15  suggesting that a handful of DMEs felt DexCom may have been 'working against

16  them' as it shifted focus to the pharmacy channel."  The analysts further noted,

17  "DexCom's senior leadership team is now fully involved in ***rehabilitating its DME***

18  ***relationships***."

19      102.  Then, during the September 4, 2024 Wells Fargo Healthcare Conference,

20  Sayer acknowledged "suffice it to say we're behind" in response to an analyst's dire

21  characterization of the lopsided Type 2 basal market – Abbott was "winning more

22  share at the physician level with type two basal patients" and had a "70% share in that

23  channel in that population."  Sayer also admitted that Defendants were aware, by late

24  2023, that they did not have the sales force to acquire potential new basal customers

25  and had been falling behind:

26          We decided back in 2023, we needed a broader sales force for a number
        of reasons.  The first reason is we've looked at prescribing patterns and

27          the places where ***we were not getting any traction are those offices***

28

4921-5040-2578.v1

*where we had no salespeople, where we weren't calling on physicians. We're getting very few prescriptions*.  We needed to broaden our reach.

103.    On September 24, 2024, Piper Sandler analysts noted: "Now to the bigger issue, *DexCom cannot compete against Abbott for basal patients*.  DexCom talked about their DME share declining, which makes sense as this would be the company missing out on many of the Medicare basal patients."

104.    On January 13, 2025, at the JP Morgan Healthcare Conference, Sayer confirmed that Defendants knew, by late 2023, that they were losing significant share to Abbott among PCPs who treated type 2 basal patients:

> *As we looked at that situation in late 2023 and early 2024, we came to the conclusion we didn't have the resources in the field to address these new markets that we were going to go after*.

> *Quite simply, Dexcom can't win in physician offices where we don't have a presence.  It's pretty tough*.  We made the decision to expand the commercialization organization by 40%, so we could go after these opportunities.

## VIII.  ADDITIONAL ALLEGATIONS OF SCIENTER

### A.    Defendants Spoke Frequently Regarding the Impact of the Medicare Coverage Expansion on Their Core Business, Expressing Personal Involvement and Knowledge

105.    Throughout the Class Period, Sayer, Sylvain, and Lawver served as CEO, CFO, and CCO, respectively, occupying top leadership positions at Dexcom.  By virtue of their management and/or control of the Company's operations and their access to confidential proprietary information concerning the Company's operations and financial results, Defendants either knew or recklessly disregarded the omitted information which rendered their statements materially misleading.

106.    Dexcom has *only one core product* – CGMs.  The Company's focus is the design, development, and commercialization of CGMs, and its stated "objective is to remain a leading provider of CGM systems and related products."  The Company has explained that reimbursement from government healthcare programs and third-

4921-5040-2578.v1

party payers "is an important element of our success."  Accordingly, the Company's ability to capture patients newly covered by the CMS coverage expansion in April 2023 was of critical importance to its growth.  In its 2024 Proxy statement, Dexcom described it as the "largest expansion of coverage in our company's history" and noted it as one of its three strategic achievements for 2023.  As Defendants made clear, the newly covered expansion opportunity represented "nearly 7 million people in the U.S. with approximately half being of Medicare age."

107.  Defendants repeatedly acknowledged the importance of the Medicare coverage expansion to Dexcom's business:

- **February 9, 2023**: Sayer encouraged investors, asserting that the expansion "has the potential to nearly double [Dexcom's] addressable reimbursed market in the United States."

- **April 27, 2023**: Sayer again underscored that "this decision represented the largest single expansion of access to CGM in our industry's history."

- **June 23, 2023**: Lawver boasted: "We have the right commercial infrastructure for leading with the endocrinologists and expanding our leadership in primary care with the type 2 basal and severe hypoglycemia markets where coverage has just opened up in the last couple of months."

- **July 27, 2023**: Sylvain emphasized that the "expanded coverage that we've worked on for years and years and years, and that really we've led."

- **October 26, 2023**: Sayer stressed: "Our latest product cycle has also coincided with the largest expansion of coverage in our company's history, with significant reimbursement now established beyond intensive insulin use.  There are more people with covered access to DexCom CGM than ever before.  As a reminder, Medicare coverage went live in mid-April for people with type 2 diabetes using basal insulin only as well as certain non-insulin individuals that experience hypobychemia [sic]. Collectively, these 2 populations represent nearly 7 million people in the U.S. with approximately half being of Medicare age."

108.   Defendants also understood the importance of the newly covered basal patient population and touted the Company's ability to address it. In fact, Defendants heralded the role that the Company played in CMS's decision to expand coverage. Sayer stated during the February 9, 2023 earnings call that CMS's coverage determination was "led by the publication of Dexcom's MOBILE study."[2]  Sylvain also highlighted the Company's advanced knowledge of Type 2 basal coverage because of its MOBILE study and, correspondingly, its anticipatory sales force expansion in his prepared remarks during the William Blair Growth Stock Conference on June 7, 2023.

109.   In addition, Defendants professed knowledge of the Company's strong relationships with DME suppliers, who would service the new Medicare population, and emphasized the efforts Dexcom undertook with them to meet demand from the newly covered Type 2 basal group. For example, on the April 27, 2023 earnings call, Sayer stated: "On the basal opportunity, remember, Medicare sales process is durable medical equipment, and we *have very good relationships with our distributors and in that channel, and we worked very hard to position them to be successful with the basal patients.  And so we're very comfortable there*."

110.   During the same call, Sayer reiterated:

We do see pent-up demand, and we do see people very excited for this opportunity.  We've got to get – as I said earlier, *we worked very hard with our channel partners to prepare and so we're ready for that with our DME distributors to handle the influx of users that will come through that*.

With respect to pricing [in models] . . . this is the same Medicare pricing that we have in our Medicare business for those who are on intensive insulin therapy.  So the only thing that would change is a larger portion of our patients could become Medicare patients and subject to

---

[2]   Dexcom's MOBILE study was an eight-month study of 175 diverse adults across 15 clinical sites with Type 2 diabetes, age 30 years or older that the Company used to show the benefits of CGM use in Type 2 basal patients.

Medicare reimbursement.  And on an overall basis, Medicare is very favorable for us.  ***So we're in a very good position there with these patients***.

111.   As detailed above in §VI and herein, on nearly ***every*** earnings call and analyst-hosted conference call during the Class Period, Defendants consistently discussed and professed knowledge about the importance of the basal coverage expansion and the Company's purported success in capturing market share from this newly covered population.  Moreover, analysts frequently questioned Defendants on their sales force coverage, their market share, or Dexcom's position vis-á-vis its key competitor Abbott.  Despite knowing that the Company was losing share amongst the new basal population due to the impediments the Company faced, Defendants diverted investors' attention to other, more favorable topics, omitted critical facts, and expressly misled investors.  Indeed, as detailed below, even after possessing months of data regarding the uptake – or lack thereof – of Dexcom's CGMs among the new basal population and having to reconfigure the Company's flailing sales force, Defendants still falsely assured the market that they were "taking share."  These false assurances, especially in response to pointed questions, further demonstrate Defendants' fraudulent intent and knowledge.

**B.   Defendants Admitted They Had Script-Level Data and Assured Analysts that Dexcom Was "Winning" Market Share in the Basal Space**

112.   In addition, Defendants repeatedly admitted to having access to and tracking script and coverage data, which informed them in real time of the struggles Dexcom was facing in reaching the newly covered basal population.  Indeed, just prior to the start of the Class Period, on January 9, 2023, at the JP Morgan Healthcare Conference, Sayer bragged:

Almost half of the basal population is a Medicare patient.  So we're going to be able to address the majority of those people very quickly. We have the data capabilities to show what outcomes we're going to generate within this population, and we'll do that.  We can download the

data we get from those patients and present a very strong case to those payers.

113.    And, after coverage for the basal population was initiated, Lawver described Defendants' visibility into, and tracking of, basal patient uptake of Dexcom's CGMs.  During the October 26, 2023 earnings call, answering a question regarding "color [Defendants] can give on how these basal patients are adopting technology" because they "should have had some reorders by now," Lawver stated: "The trends, as Kevin referenced, that we see in [basal] in terms of uptake and intention to prescribe from physicians mirror what we've seen in other segments of the marketplace.  And the coverage is certainly a big driver of that.  ***We track coverage very closely for DexCom for the industry***."

114.    Likewise, on November 29, 2023, in response to an analyst's question during the Piper Sandler Healthcare Conference about whether new basal patient additions were coming from Medicare or private insurance, Sylvain said, "***[w]e know exactly*** where the patients are coming from."  And, on January 8, 2024, Sylvain confirmed "we'll get the full final patients numbers in soon."

115.    And, on the February 8, 2024 Q4 2023 earnings call, a Piper Sandler analyst asked, "[w]hat should we think about in terms of basal contribution to the topline this year?  And are we inflecting right now as far as basal adoption goes with CGM here in the States?"  Sylvain's response underscored his reliance on script data: "***And so when you think about it, and you can see the share taking when you look at the script data, we are taking share***."

116.    Moreover, Sylvain specifically admitted his own access to and review of data in response to an analyst's question regarding "market share within the basal population" during the April 25, 2024 earnings call, saying: "***In terms of share taking and how we look at that category, we get script data, we look at script data based on pathology.  The debate – there's no debate internally to us.  We know we're taking share and we see that data***."

117.    Defendants' assertions made clear that they had access to and did in fact review and analyze real time data on uptake of Dexcom's CGM among basal patients at the time they made the false and misleading Class Period statements set forth above.

**C.    Defendants' Admissions Affirm Their Contemporaneous Knowledge of, or Deliberate Recklessness Regarding, Information Undermining Their Public Statements**

118.    Defendants' admissions at the end of the Class Period and in the months that followed confirm that the facts they concealed from investors were *known* to them *at the time* they made false and misleading statements during the Class Period.

119.    First, on July 25, 2024, Defendants admitted that the sales force expansion they had previously touted on April 25, 2024, as an "upgraded structure to help us better capitalize on the significant opportunities ahead" was actually a "reorganization" that was "much different than what we've done in the past." While they had previously stated that the purpose of their sales expansion and repositioning was "to be most effective with our call points," they now revealed that this expansion was really an effort to stem the loss in market share they were experiencing amongst the new basal population. As Sayer conceded, they "needed to get into [PCP] offices and develop relationships" because "what we've noted in our data is we obviously don't win in offices we don't call on."

120.    Defendants continued to affirm their knowledge of the falsity of their statements during the July 25, 2024 call. First, Sayer confessed that their sales force reorganization *led* "*to a lot of disruption, particularly at the beginning of the quarter*." Defendants blamed the purported "disruption" for the significant shortfall in expected new basal patient additions that occurred during the quarter. Thus, Defendants, *by their own admission*, witnessed disappointing new basal patient additions beginning at the same time as the "disruption" – "at the beginning of the quarter" in April 2024. Sylvain continued, specifying that "*the disruption [was] bigger than we would have anticipated*" and, in fact, was not one from which they

1  could recover.  In responding to an analyst's question about loss of new customers,

2  Sylvain explained that "***when the disruption is bigger than anticipated, even as you***

3  ***have some of that recovery, again, you were a quarter behind where you'd expect to***

4  ***be***."  Thus, Defendants' admissions confirm that Defendants knew at the beginning of

5  the second quarter in April 2024 that they "were a quarter behind" in new customer

6  additions.  As Sylvain explained, it was apparent that the shortfall would necessarily

7  affect the rest of the year, resulting in lowered guidance, because of the

8  "compounding effect of our slower than expected new customer growth."

9      121.  Second, Sylvain expressly connected the purported sales force disruption

10  with a loss of new customer additions in DME, stating, "we experienced lower than

11  expected new customer starts ***in conjunction with our sales force expansion and***

12  ***realignment, particularly in the DME channel***."  Given their recognition that the

13  sales force disruption was most impactful at the beginning of the quarter (*i.e.*, during

14  April 2024), they knew about the corresponding impact on DME customer losses at

15  that same time.  Defendants claimed they did not see DME customer losses in real

16  time because DME data lags behind other sales data.  But even crediting their "four to

17  six week delay," this suggests they had parallel DME information no later than the

18  end of May – four to six weeks after the sales force disruption at the beginning of the

19  quarter caused DME customer losses.  Thus, even using a conservative calculation, by

20  the time Defendants spoke in June, they knew that they were falling behind in all sales

21  channels and could not catch up.

22      122.  During the September 4, 2024 Wells Fargo Healthcare Conference, Sayer

23  also admitted that Defendants were aware, in 2023, that they did not have the sales

24  force to acquire potential new basal customers and had been falling behind:

25  > We decided back in 2023, we needed a broader sales force for a number
26  > of reasons.  The first reason is we've looked at prescribing patterns and
27  > the places where ***we were not getting any traction are those offices***
28  > ***where we had no salespeople, where we weren't calling on physicians.***
   > ***We're getting very few prescriptions***.  We needed to broaden our reach.

4921-5040-2578.v1

123.    Moreover, as Sayer conceded at the JP Morgan Healthcare Conference on January 13, 2025, Defendants knew by late 2023 that they did not have the sales force necessary to acquire new basal patients and had been falling behind:

> On top of that, we knew the Stelo launch was coming and was going to be an opportunity for type 2 diabetes, prediabetes, and metabolic health. ***As we looked at that situation in late 2023 and early 2024, we came to the conclusion we didn't have the resources in the field to address these new markets that we were going to go after***.

> Quite simply, Dexcom can't win in physician offices where we don't have a presence.  It's pretty tough.  We made the decision to expand the commercialization organization by 40%, so we could go after these opportunities.

124.    Defendants' admissions demonstrate that they had knowledge of facts that contradicted their Class Period statements but withheld them to paint a misleading impression of what they described as their "outperformance" in the new basal market.

**D.    The Proximity Between Defendants' Misstatements and the Emergence of the Relevant Truth Further Establishes a Strong Inference of Scienter**

125.    As detailed above, Defendants knew of the systemic problems the Company was facing that were negatively impacting its ability to take share in the new basal patient population, even admitting that they "came to the conclusion" by "late 2023 and early 2024," that Dexcom "didn't have the resources in the field to address these new markets that we were going to go after."  Despite this, Defendants continued to mislead investors, even raising the midpoint of full-year 2024 guidance on April 25, 2024, touting organic revenue growth of 17%-21% and telling investors, "[w]e know we're taking share and we see that data" and "[w]e still have a very strong DME business."  Then, on June 5, 2024, in response to an analyst question as to their comfort with this guidance, Defendants doubled down on their raised guidance, stating as follows:

> And in terms of the full year as of the last quarter, ***when we issued our earnings, we raised our guidance***.  And so that should give we

4921-5040-2578.v1

obviously beat the street expectations in the first quarter, *raised guidance and continue to do well*. So I think from that point of view, I think *we're happy with where we are. We're happy with our full year guidance*. We don't guide to the quarters, but we *were very comfortable with where folks are sitting for the quarter*.

126.   Yet, *less than two months later*, on July 25, 2024, the Company did an about-face, disclosing disappointing results and announcing that it was now *reducing* its full-year guidance by *$300 million* and that they now expected organic growth of only 11%-13% for the year. Sylvain described this "growth number" as "*lower than we've historically seen*." In sharp contrast to their statements one quarter earlier, Defendants blamed these results, in part, on lower than expected new customer additions because of issues in their DME channel.

127.   The magnitude of this abrupt revision to guidance was staggering, causing the stock price to plummet by more than 40% – *the steepest decline in Dexcom's history* – leading analysts to question management's credibility. *See* §IX. This dramatic reversal from Defendants' representations just a few weeks earlier demonstrates that Defendants knowingly misled investors or, at a minimum, were deliberately reckless in ignoring material facts in their possession (*i.e.*, shattered DME relationships and lack of resources in the field to capture new basal population) when making public statements.

**E.     Lawver's Suspiciously-Timed Departure Supports a Strong Inference of Her Scienter**

128.   As CCO, Lawver's role encompassed the oversight of the global commercial organization with responsibility for global sales, marketing, and customer experience. She was responsible for leading Dexcom's worldwide commercial teams. Lawver started as CCO in January 2023 just as the Company was admittedly positioning its sales force to capture the basal patients that would acquire insurance coverage through the CMS expansion decision. Sayer explained that Lawver's new role would entail "'lead[ing] Dexcom's worldwide commercial teams as we build

1    from a position of strength and look to bring Dexcom CGM to millions of additional

2    people around the world who can benefit from our technology.'"  As CCO, she had

3    responsibility over the Company's commercial strategy and sales efforts, which the

4    Company ultimately admitted were deficient on July 25, 2024.

5        129.  Just one quarter later, on October 24, 2024, Dexcom announced that

6    Lawver would "retire" at the end of the year.  The Company disclosed that she would

7    stay on as a "special advisor" in early 2025 but would be replaced by Sayer as the

8    Company searched for a new CCO.  Lawver's departure, which came on the heels of

9    the Company's disappointing news in July 2024, is circumstantial evidence that

10   Lawver had knowledge of and responsibility for the Company's sales force issues and

11   inability to gain market share in the newly covered basal patient population.  There is

12   a strong inference that Lawver's sudden exit is an attempt by Lawver to distance

13   herself from potential legal liability and suggests a conscious effort to avoid the

14   consequences of the misconduct.

### F. Defendants Were Motivated to Mislead Investors as to Dexcom's True Prospects

#### 1. Defendants Had a Motive to Conceal the Bad News in the Hope that They Might Be Able to Right the Ship and Avoid Disclosure Entirely

130.  Defendants were motivated to make the false and misleading statements
and omissions alleged herein in order to maintain the public perception that they were
competitive with Abbott in the CGM space, which was crucial to the Company's
commercial prospects.  Winning the "basal wars" and being able to capture market
share in what Defendants described as the "***largest single expansion of access to
CGM in our industry's history***" was also critical to Dexcom's ability to persuade
investors that they could achieve the growth they had conditioned the market to
expect.  Defendants were motivated to mislead investors while simultaneously hoping
that they might ultimately be able to "right the ship" and avoid having to disclose
negative news to the public.  After all, Defendants desperately expanded their sales

1  force in an effort to stem the loss of market share.  The fact that a gamble – concealing

2  bad news in the hope that it will be overtaken by good news – fails is not inconsistent

3  with scienter.  It is like embezzling in the hope that winning at the track will enable

4  the embezzled funds to be replaced before they are discovered to be missing.

**2.  Defendants' Suspicious Insider Sales Support Scienter**

6  131.  Defendants were also motivated to engage in the fraud alleged herein to

7  prop up Dexcom's stock price in order to profit from their sales of nearly $25.8

8  million in Dexcom common stock.

9  132.  During the Class Period, while in possession of the MNPI described

10  above, Sayer sold a total of 167,965 shares at prices as high as $138.70 for total

11  proceeds of $22.3 million.  These sales amounted to 43% of his total ownership and

12  ***nearly 20 times*** the amount he made from his salary in 2023.  Sayer began selling

13  stock on January 16, 2024 – a week after he touted "where we have a presence, we

14  win very much" – at prices exceeding $120 per share with a sale of $4.6 million in

15  stock.  He sold another $10.8 million on March 12, 2024, and, on April 8, 2024, he

16  made his final sale of $6.9 million near Class-Period high prices.  Sayer made these

17  sales despite knowing, as he later admitted, that in "late 2023 and early 2024, . . . we

18  didn't have the resources in the field to address these new markets."  Notably, this

19  final sale came less than two weeks before the first corrective disclosure on April 25,

20  2024, when Dexcom's stock price began to drop.

21  133.  Sylvain also profited from the fraud.  He sold a total of 22,747 shares

22  during the Class Period for total proceeds of nearly $2.9 million.  These sales

23  amounted to 41% of his total ownership and ***more than five times*** the amount he made

24  from his salary in 2023.  In contrast, in the 15 months leading up to the Class Period,

25  Sylvain sold just 6,000 shares for less than $1 million in proceeds – one quarter as

26  many shares as he sold during the Class Period.

27  134.  Sylvain began selling on May 22, 2023 with a sale of 2,400 shares for

28  $282,192 and another sale on August 22, 2023 of 1,844 shares for $192,477.  He

4921-5040-2578.v1

continued selling in 2024, after Defendants became aware of their increasingly deficient sales force, with sales on January 16, 2024 and February 20, 2024 – less than two weeks after he touted to investors that "you can see the share taking when you look at the script data, we are taking share" – for a total of $730,567. Sylvain made an outsized sale on March 12, 2024 as a last-ditch effort to profit before the Company began to issue corrective disclosures. He sold 11,661 shares at a per-share price of $134.41 for proceeds of nearly $1.6 million. Immediately after he reaffirmed guidance on June 5, 2024, Sylvain made one final sale of 745 shares on June 10, 2024 for $85,712.

135.    Lawver sold 4,764 shares of Dexcom stock for proceeds of $640,329 on March 12, 2024, just a little over a month before the relevant truth began to be revealed regarding Defendants' failure to take market share in the Type 2 basal space. These sales amounted to 42% of her total ownership and 118% the amount she made from her salary in 2023. In contrast, she did not sell a single share in the 15 months leading up to the Class Period.

136.    Although Sayer and Sylvain each had a 10b5-1 trading plan in place during the Class Period, they manipulated those plans while in possession of MNPI, which further supports a strong inference of scienter. Indeed, during the Class Period, Sayer and Sylvain each adopted *new* 10b5-1 plans – on December 12, 2023 and November 21, 2023, respectively – prior to making the vast majority of their trades. These plan adoptions occurred at the same time that Defendants knew about Dexcom's deficient sales force and its diminishing share in the basal space. Thus, at every point that Defendants made the decision to trade, they were in possession of MNPI.

137.    The short period between Sayer's and Sylvain's adoption of their 10b5-1 plans and their first trade is a bright red flag. Rule 10b5-1 was intended to provide a mechanism for insiders to sell while not in possession of MNPI. By attempting to commit insiders to a predetermined plan, it moves the relevant date at which the

insider possessed material information from the date of the trade to the date when the trade was planned. However, this purpose has frequently been circumvented. A January 19, 2021 Stanford study, entitled "Gaming the System: Three 'Red Flags' of Potential 10b5-1 Abuse," that examined over 20,000 10b5-1 plans between January 2016 and May 2020 found that a 10b5-1 plan would perform demonstrably better than its counterparts when it had shorter periods between adoption or modification and the first trade, which allows insiders to "systematically avoid losses." The Stanford study concluded that shorter periods between adoption or modification and the first trade were red flags of an insider abusing his 10b5-1 plan. Additionally, in a June 29, 2022 article entitled "CEO Stock Sales Raise Questions About Insider Trading," *The Wall Street Journal* analyzed 75,000 sales by corporate insiders from 2016 through 2021 and found that "insiders who sold within 60 days [of plan adoption] reaped $500 million more in profits than they would have if they sold three months later."

138.    This manipulation, which defeats the purpose of a trading plan, has prompted the SEC and the U.S. Department of Justice ("DOJ") to take recent action. For example, in a March 1, 2023 DOJ press release, entitled "CEO of Publicly Traded Health Care Company Charged for Insider Trading Scheme," the DOJ indicted a CEO for insider trading "exclusively on [his] use of Rule 10b5-1 trading plans," explaining it "'will not allow corrupt executives to misuse 10b5-1 plans as a shield for insider trading.'" Further, in a February 13, 2023 article, entitled "New SEC Rules Target Corporate Insider Trading: Loopholes will close for executives selling company stock," *The Wall Street Journal* reported that the SEC effectively amended the Rule on February 26, 2023 to "target corporate insider trading" and "remove many of the loopholes that allowed corporate insiders to hide behind these trading plans."

139.    Because Sayer and Sylvain manipulated their 10b5-1 plans to defeat the very purpose of Rule 10b5-1, their plans provide even further evidence of an already compelling inference of scienter.

### 3.    Dexcom's Incentive Pay Structure Provides Additional Motive to Inflate Dexcom's Stock Price

140.    Sayer and Sylvain were further incentivized to inflate the Company's stock price because Dexcom's stock price was a significant input to their incentive compensation.    In discussing executive compensation, the Company's Proxy statements noted "the direct relationship between the value of our equity awards and the fair market value of our common stock."

141.    The stock price not only determined the value of any shares received or sold but also the number of shares awarded.    Specifically, performance stock units ("PSUs") were calculated and awarded based on a formula in which the Company's stock performance was a decisive factor.    Notably, if Dexcom's stock price underperformed, the number of PSUs would decrease dramatically or even fall to zero.

142.    Dexcom targeted PSU awards constituting 43% of Sayer's compensation and, on average, 11% of other executives' compensation.    In comparison, the Company targeted Sayer's base salary at 7% of his total compensation and other executives' base salaries at 11% of their total compensation.    Given that a significant portion of their compensation depended on maintaining or increasing Dexcom's stock price, Sayer and Sylvain were further motivated to continue their fraud.

### G.    Corporate Scienter

143.    The allegations above also establish a strong inference that Dexcom acted with corporate scienter throughout the Class Period as Defendants and Dexcom's officers, management, and agents had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were known or available to them.    Such material misrepresentations and/or omissions were made knowingly or recklessly, and without a reasonable basis.    By concealing

4921-5040-2578.v1

these material facts from investors, Dexcom maintained and/or increased its artificially inflated securities prices throughout the Class Period.

## IX.    LOSS CAUSATION

144.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused Plaintiff's and members of the Class (defined below) economic loss. Plaintiff's claims for securities fraud are asserted under the fraud-on-the-market and *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), theories of reliance. The markets for Dexcom's stock were open, well-developed, and efficient at all relevant times. During the Class Period, as detailed herein, Defendants made materially misleading statements and omissions. Defendants' conduct artificially inflated the price of Dexcom stock and operated as a fraud or deceit on the Class.

145.    The Class Period inflation in Dexcom's stock price was removed when information concealed by Defendants' misleading statements and omissions was revealed to the market. The information was disseminated through partial disclosures that revealed the nature and effect of Defendants' alleged misconduct. These disclosures, as more particularly described below, removed artificial inflation from Dexcom's stock price, causing economic injury to Plaintiff and other members of the Class.

146.    The corrective impact of the partial disclosures during the Class Period alleged herein, however, was tempered by Defendants' continued misleading statements and omissions that continued to conceal the true nature of Defendants' fraud. Each partial disclosure did not on its own fully remove the inflation from Dexcom's stock price, because it only partially revealed the nature and ramifications of Defendants' previously misrepresented and concealed conduct. Defendants' continued misrepresentations and omissions maintained the price of Dexcom securities at a level that was inflated by fraud and induced members of the Class to continue purchasing shares in Dexcom even after Defendants' partial disclosures.

24-cv-1485-RSH-VET

147.    The disclosures that corrected the market price to reduce the inflation maintained by Defendants' fraud are detailed below.  These stock price declines were due to firm-specific, fraud-related disclosures and were not the result of market, industry, or firm-specific, non-fraud factors.   The following partial disclosures, resulting in stock price declines, and descriptions thereof are not necessarily comprehensive because fact and expert discovery are not complete.

148.    On April 25, 2024, after the market closed, Dexcom reported its Q1 2024 results, including U.S. revenue of $653 million, and updated its FY 2024 revenue guidance to a range of $4.20 billion-$4.35 billion, from a range of $4.15 billion-$4.25 billion.

149.    On this news, Dexcom's stock price fell $13.67, or 9.9%, to close at $124.34 per share on April 26, 2024.  In contrast to the 9.9% decline in Dexcom stock, the Standard & Poor's Composite Stock Index ("S&P 500") increased by 1% during this period, the S&P Health Care Equipment Select Industry Index ("S&P Health Care Equipment") increased by 0.8%, and the Nasdaq Composite Index ("Nasdaq") increased by 2.0%.[3]

150.    Analysts commented on the news and attributed Dexcom's stock price decline to Dexcom's lower-than-expected Q1 2024 U.S. revenue growth and sales outlook for the remainder of the year.  For example, on April 25, 2024, J.P. Morgan analysts noted: "we're not surprised to see shares indicating down in after-market trading as sales of $921M (+25% organic) missed the buy-side expectations."  A Jefferies analyst report noted: "investors [were] looking for a stronger US [revenue] beat."  Likewise, a Morgan Stanley report attributed the "tough[] stock reaction" to the fact "the US sequentially slowed a touch."

---

[3]    For purposes of comparing its stock price performance vis-à-vis its peers and the relevant market, Dexcom referred investors to the S&P 500, the S&P Health Care Equipment, and the Nasdaq.

4921-5040-2578.v1

151.   This partial disclosure did not on its own fully remove the inflation from Dexcom's stock price because it only partially revealed the nature and extent of Defendants' previously misrepresented and concealed conduct.   Defendants also falsely reassured the market.   For example, in an April 25, 2024 Form 8-K, Sayer stated: "'Dexcom is off to a great start in 2024, delivering another quarter of strong financial results while advancing several key strategic initiatives . . . .'"   During the earnings call on the same day, Sylvain stated, "[w]e still have a very strong DME business, and certainly, the DME business continues to be supported by our partners very, very well."   Accordingly, the price of Dexcom's stock remained artificially inflated.

152.   After the market closed on July 25, 2024, Defendants issued disappointing financial results for the Q2 2024, and slashed their full-year guidance by $300 million to a range of $4.00 billion-$4.05 billion, representing organic growth of only 11%-13% for the year.   In the related earnings call held the same day, Defendants explained the issues that impacted its quarterly revenue and 2024 sales forecast.   In his prepared remarks, Sayer disclosed that "we have seen our share of new customers fall short of our expectations" and described the need to "enhance our competitive position and reestablish momentum."   Sayer also admitted that "we've lost market share in the DME channel . . . and that has hurt us."   In his prepared remarks, Sylvain stated that Dexcom's customer growth had "decelerated slightly."   Sylvain also admitted that "we experienced lower than expected new customer starts" and that "[w]e're not doing wonderful in the basal space."

153.   On this news, Dexcom's stock price **plummeted by $43.85, or 40.7%**, to close at $64.00 per share on July 26, 2024.   In comparison, the S&P 500 increased by 1.1%, the S&P Health Care Equipment declined by just 0.9%, and the Nasdaq increased by 1.0%.   Media and analysts reported extensively on this corrective disclosure.   For example, in a July 26, 2024 article titled "Dexcom shares plunge more than 40% for worst day on record," *CNBC* reported that "Dexcom shares sank more

than 40% on Friday, *their steepest decline ever*, after the diabetes management company reported disappointing revenue for the second quarter and offered weak guidance." *CNBC* further reported that "[t]he stock fell $43.85 to close at $64, *wiping out more than $17 billion in market cap*."

154.    Analysts were stunned.  For example, Wolfe Research analysts issued a report on July 25, 2024 with a headline that stated: "DXCM: *Wow.  Ugh.  Sigh. . . . Cliché but . . . 'Didn't see That Coming*.'"  On July 25, 2024 UBS analysts wrote: "*2Q24: Sales Miss and Guide Lower a Major Surprise*" and noted that "this *comes as quite a surprise to us* given our view that CGM (Continuous Glucose Monitoring) broadly is in the midst of an adoption inflection as basal ramps."  Raymond James similarly issued a report on July 26, 2024 that described Defendants' news as "*[a] Painful (and Puzzling) Reset*" and commented that "[w]e are obviously frustrated with 2Q results and the associated estimate revision" and "*[a]dmittedly these dynamics are puzzling*."  Barclays analysts similarly reported that "*Mgmt surprised investors with slower Q2 sales, particularly surprising given the company's reputation for consistent beats and raises and DD growth end markets*."  BofA Global Research's July 26, 2024 report commented: "*A rare, shocking (and confusing) DXCM miss/lower*."  The report further stated:

> *But still many more questions than answers*[.]
>
> *We still do not fully understand how a business that should be predictable with recurring revenue could see such an outsized surprise in a single quarter.  The pieces of the puzzle DXCM gave on the call just do not make sense to us* especially when Libre still looks normal. DXCM admittedly does not even fully understand why the share loss in DME happened – saying it still needs to unpack what happened in DME over the course of the year.

155.    A July 25, 2024, Piper Sandler analysts stated that "[i]t goes without saying the main topic of the call today was the Q2 miss and FY guide down (the guide down was ~$300M for the year in total)" and that "[t]he share loss in DME is

worrisome (***DXCM is clearly losing the basal wars right now***),” and additionally commented that “***[t]omorrow will likely be a painful day for DXCM shares***.”

156.    Analysts were also surprised with Defendants’ disclosures given their positive statements to the market just the month prior.  For example, on July 26, 2024, Bernstein analysts reported on the “[d]isastrous revenue miss and guidance cut” and commented that “***DXCM credibility is damaged after June 5th comments that management was ‘happy with full year guidance’ and ‘very comfortable with where folks are sitting in the quarter***.’”

157.    In sum, both of the corrective disclosures listed above – April 25 and July 25, 2024 – served to remove the artificial inflation from the price of Dexcom’s securities, and were direct and foreseeable consequences of the disclosure of the relevant truth concealed by Defendants.

**X.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND THE FRAUD-ON-THE-MARKET DOCTRINE**

158.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that: (i) Defendants made public misrepresentations or failed to disclose material facts during the Class Period; (ii) the omissions and misrepresentations were material; (iii) Dexcom securities were traded in an efficient market; (iv) the Company’s securities are liquid and were heavily traded during the Class Period; (v) the Company’s securities were traded on the Nasdaq and were covered by multiple analysts; and (vi) Plaintiff and members of the Class purchased, acquired, and/or sold Dexcom securities between the time Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

159.    Based upon the foregoing, Plaintiff and members of the Class are entitled to a presumption of reliance upon the integrity of the market.

160.    Plaintiff and members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute*, 406 U.S. at 128, as

4921-5040-2578.v1

1  Defendants omitted material information in their Class Period statements in violation

2  of a duty to disclose such information, as detailed above.

3  **XI.    NO SAFE HARBOR**

4  161.    Many (if not all) of Defendants' false and misleading statements and

5  omissions during the Class Period were not forward-looking statements ("FLS")

6  and/or identified as such by Defendants, and thus did not fall within any "Safe

7  Harbor."

8  162.    Defendants' verbal "Safe Harbor" warnings accompanying its oral FLS

9  issued during the Class Period were ineffective to shield those statements from

10  liability.

11  163.    Defendants are also liable for any false or misleading FLS pleaded

12  because, at the time each FLS was made, the speaker knew the FLS was false or

13  misleading and the FLS was authorized and/or approved by an executive officer of

14  Dexcom who knew that the FLS was false or misleading.  Further, none of the historic

15  or present tense statements made by Defendants were assumptions underlying or

16  relating to any plan, projection, or statement of future economic performance, as they

17  were not stated to be such assumptions underlying or relating to any projection or

18  statement of future economic performance when made.

19  **XII.    CLASS ACTION ALLEGATIONS**

20  164.    Plaintiff brings this action as a class action pursuant to Rule 23 of the

21  Federal Rules of Civil Procedure on behalf of a class, consisting of all those who

22  purchased or otherwise acquired Dexcom securities during the Class Period (the

23  "Class").  Excluded from the Class are Defendants and their families, the officers and

24  directors of the Company, at all relevant times, members of their immediate families

25  and their legal representatives, heirs, successors or assigns, and any entity in which

26  Defendants have or had a controlling interest.

27  165.    The members of the Class are so numerous that joinder of all members is

28  impracticable.  Throughout the Class Period, Dexcom securities were actively traded

on the Nasdaq.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Dexcom or its transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

166.    Common questions of law and fact predominate and include: (i) whether Defendants' acts violated the federal securities laws; (ii) whether the Individual Defendants omitted and/or misrepresented material facts; (iii) whether Defendants acted knowingly or recklessly disregarded the truth; (iv) whether the prices of Dexcom securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and (vi) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

167.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

168.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

169.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small per Class member, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

24-cv-1485-RSH-VET

4921-5040-2578.v1

# XIII.  CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

## COUNT I
### Violations of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

170.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

171.    This Count is based upon §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and SEC Rule 10b-5 promulgated thereunder.

172.    During the Class Period, Defendants made various untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in connection with the purchase and sale of Dexcom securities. Defendants' statements were intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Dexcom securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Dexcom securities at artificially inflated prices.  In furtherance of this unlawful course of conduct, Defendants, and each of them, took the actions set forth herein.

173.    Pursuant to the above wrongful course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual earnings releases and conference calls, press releases, and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Dexcom securities.  Such statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Dexcom's finances and business prospects.

174.    By virtue of their ownership and/or positions at Dexcom, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other

4921-5040-2578.v1

1    members of the Class, or, in the alternative, Defendants acted with reckless disregard

2    for the truth in that they failed or refused to ascertain and disclose such facts as would

3    reveal the false and misleading nature of the statements made, although such facts

4    were readily available to Defendants.  Said acts and omissions were committed

5    willfully or with reckless disregard for the truth.

6        175.    Information showing that Defendants acted knowingly or with reckless

7    disregard for the truth is peculiarly within Defendants' knowledge and control.  As

8    executive officers and/or directors of Dexcom, Defendants had knowledge of the

9    details of Dexcom's internal affairs.

10       176.    Defendants are directly and indirectly liable for the wrongs complained

11   of herein.  Because of their positions of control and authority, Defendants were able to

12   and did, directly or indirectly, control the content of the statements of Dexcom.  As

13   officers and/or directors of a publicly held company, Defendants had a duty to

14   disseminate timely, accurate, and truthful information with respect to Dexcom's

15   businesses, operations, future financial condition, and future prospects.  As a result of

16   Defendants' misconduct, the market price of Dexcom's securities was artificially

17   inflated throughout the Class Period.  In ignorance of the adverse facts concerning

18   Dexcom's business and financial condition which were concealed by the Individual

19   Defendants, Plaintiff and other members of the Class purchased or otherwise acquired

20   Dexcom securities at artificially inflated prices and in doing so relied upon the price of

21   the securities, the integrity of the market for the securities, and/or upon statements

22   disseminated by the Individual Defendants, and were damaged thereby.

23       177.    During the Class Period, Dexcom securities were traded on an active and

24   efficient market.  Plaintiff and the other members of the Class, relying on the

25   materially false and misleading statements described herein, which Defendants made,

26   issued, or caused to be disseminated, or relying upon the integrity of the market,

27   purchased or otherwise acquired Dexcom securities at prices artificially inflated by

28   Defendants' wrongful conduct.  Had Plaintiff and other members of the Class known

the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Dexcom securities was substantially lower than the prices paid by members of the Class. The market price of Dexcom securities declined upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

178. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

179. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and/or sales of Dexcom securities during the Class Period, as the truth about Dexcom's operations and prospects began to be disclosed to the investing public.

### COUNT II
### Violations of §20(a) of the Exchange Act Against All Defendants

180. Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

181. During the Class Period, the Individual Defendants participated in and oversaw the operation and management of Dexcom, and conducted and participated, directly and indirectly, in the conduct of Dexcom's business affairs.

182. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Dexcom's financial condition and results of operations, and to correct promptly any public statements issued by Dexcom which had become materially false or misleading.

183. Each of the Individual Defendants, therefore, acted as a controlling person of Dexcom. By reason of their senior management positions as officers and/or

4921-5040-2578.v1

directors of Dexcom, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Dexcom to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over Dexcom's operations and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Dexcom to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Dexcom within the meaning of §20(a) of the Exchange Act.

184. Dexcom had the power to control and influence the Individual Defendants, and other Company executives through its power to hire, fire, supervise, and otherwise control the actions of its employees and their salaries, bonuses, incentive compensation, and other employment considerations. By virtue of the foregoing, Dexcom had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Individual Defendants, including the content of their public statements.

185. By reason of the above conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act for the violations committed by Dexcom.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Declaring this action to be a class action properly maintained pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and certifying Plaintiff as Class Representative and Robbins Geller Rudman & Dowd LLP as Class Counsel;

B. Awarding compensatory damages in favor of Plaintiff and other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

4921-5040-2578.v1

1      C.     Awarding Plaintiff and the Class rescission or a rescissory measure of

2  damages;

3      D.     Awarding Plaintiff and the Class their reasonable costs and expenses

4  incurred in this action, including reasonable attorneys' fees, accountants' fees, and

5  experts' fees, and other costs and disbursements; and

6      E.     Awarding Plaintiff and other members of the Class such other injunctive

7  or equitable relief, including disgorgement and/or the imposition of a constructive

8  trust, that may be deemed just and proper by the Court.

9                      **DEMAND FOR TRIAL BY JURY**

10     Plaintiff demands a trial by jury.

11  DATED:  January 27, 2025            ROBBINS GELLER RUDMAN
                                          & DOWD LLP
12                                      DANIEL S. DROSMAN
                                        W. MARK CONOVER
13                                      JENNIFER N. CARINGAL
                                        SARAH A. FALLON
14

15                                              s/ Daniel S. Drosman
16                                      DANIEL S. DROSMAN

17                                      655 West Broadway, Suite 1900
                                        San Diego, CA  92101
18                                      Telephone:  619/231-1058
                                        ddrosman@rgrdlaw.com
19                                      mconover@rgrdlaw.com
                                        jcaringal@rgrdlaw.com
20                                      sfallon@rgrdlaw.com

21                                      ROBBINS GELLER RUDMAN
                                          & DOWD LLP
22                                      ELIZABETH A. SHONSON
23                                      (admitted *pro hac vice*)
                                        225 NE Mizner Boulevard, Suite 720
24                                      Boca Raton, FL  33432
                                        Telephone:  561/750-3000
25                                      eshonson@rgrdlaw.com

26                                      Lead Counsel for Lead Plaintiff

27

28

**24-cv-1485-RSH-VET**
4921-5040-2578.v1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

O'DONOGHUE & O'DONOGHUE LLP
JOHN M. McINTIRE
5301 Wisconsin Avenue, N.W., Suite 800
Washington, DC  20015
Telephone:  202/362-0041
imcintire@odonoghuelaw.com

Additional Counsel

**24-cv-1485-RSH-VET**

4921-5040-2578.v1