COOLEY LLP
KOJI F. FUKUMURA (189719)
(kfukumura@cooley.com)
HEATHER M. SPEERS (305380)
(hspeers@cooley.com)
DYLAN K. SCOTT (332796)
(dscott@cooley.com)
10265 Science Center Drive
San Diego, CA 92121-1117
Telephone: +1 858 550 6000
Facsimile: +1 858 550 6420

*Attorneys for Defendants Dexcom Inc., Kevin Sayer, Jereme Sylvain, and Teri Lawver*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: DEXCOM, INC. CLASS ACTION SECURITIES LITIGATION | Lead Case No. 24-cv-01485-RSH-VET<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS LEAD PLAINTIFF'S CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>Ctrm: 3B, 3rd Floor<br>Judge: Honorable Robert S. Huie<br>Hearing: April 17, 2025<br><br>PER CHAMBERS RULES, NO ORAL ARGUMENT UNLESS SEPARATELY ORDERED BY THE COURT |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................... 1

II.   STATEMENT OF FACTS ....................................................... 2

     A.   Overview of Dexcom's Business. ................................... 2

     B.   Dexcom Shifts to DME-Pharmacy Hybrid. ................... 3

     C.   Dexcom Expands Its Sales Force in 2020 to Reach More PCPs. ......... 4

     D.   In April 2023, Medicare Expands Coverage to Basal Patients ............. 4

     E.   Dexcom Begins Competing in Basal Segment. ............... 4

     F.   Dexcom Expands and Restructures Its Sales Force. ........ 5

     G.   Dexcom Announces Q2'24 Earnings and Lowers Guidance. .............. 5

     H.   This Action. ................................................................... 6

III.  LEGAL STANDARDS ............................................................ 6

IV.  ARGUMENT ........................................................................... 7

     A.   The Complaint Should Be Dismissed for Failure to Plead Falsity. ................................. 7

         1.   Most challenged statements are legally inactionable. ............... 7

         2.   Plaintiff misconstrues nearly every challenged statement. ...... 11

         3.   None of the alleged omissions supports falsity. ...................... 16

     B.   The Complaint Should Be Dismissed for Failure to Plead Scienter. .................................. 20

         1.   Plaintiff pleads no contemporaneous facts to support scienter. ............................. 20

         2.   Plaintiff's failure to plead motive undermines scienter ........... 23

V.   CONCLUSION ...................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Affirm Holdings, Inc. Securities Litigation*,
2024 WL 3955453 (N.D. Cal. Aug. 26, 2024)............................................................23

*In re AnaptysBio, Inc. Securities Litigation*,
2021 WL 4267413 (S.D. Cal. Sept. 20, 2021) ...........................................17, 18

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...........................................................................................6

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ...........................................................................................6

*Bodri v. GoPro, Inc.*,
252 F.Supp.3d 912 (N.D. Cal. 2017)..............................................................13

*Chicago & Vicinity Laborers' District Council Pension Fund v.
Amplitude, Inc.*,
2025 WL 82206 (N.D. Cal. Jan. 13, 2025) ....................................................21

*In re Cisco Systems Inc. Securities Litigation*,
2013 WL 1402788 (N.D. Cal. Mar. 29, 2013) ................................................8

*City of Dearborn Heights Act 345 Police & Fire Retirement System v.
Align Technology, Inc.*,
2013 WL 6441843 (N.D. Cal. Dec. 9, 2013) ...................................................8

*City of Roseville Employees' Retirement System v. Sterling Financial
Corp.*,
963 F.Supp.2d 1092 (E.D. Wash. 2013) ........................................................20

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
2019 WL 6877195 (N.D. Cal. Dec. 17, 2019) .................................................8

*City of Taylor General Employees Retirement System v. Magna
International Inc.*,
967 F.Supp.2d 771 (S.D.N.Y. 2013) ..............................................................12

*Curry v. Yelp Inc.*,
875 F.3d 1219 (9th Cir. 2017)..........................................................................6

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

# TABLE OF AUTHORITIES

**Page(s)**

*Electrical Workers Pension Fund, Local 103, I.B.E.W. v. HP Inc.*,
2021 WL 1056549 (N.D. Cal. Mar. 19, 2021) ..............................................24-25

*Eminence Capital, LLC v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003) ..................................................................... 20

*In re Eventbrite, Inc. Securities Litigation*,
2020 WL 2042078 (N.D. Cal. Apr. 28, 2020) ........................................... 7

*Gammel v. Hewlett-Packard Company*,
905 F.Supp.2d 1052 (C.D. Cal. 2012) ...................................................... 8

*Garcia v. J2 Global, Inc.*,
2021 WL 1558331 (C.D. Cal. Mar. 5, 2021) ............................................ 22

*Hadian v. Fate Therapeutics, Inc.*,
2024 WL 4246083 (S.D. Cal. Sept. 19, 2024) ................................... 8, 11, 12

*In re Impac Mortgage Holdings, Inc. Securities Litigation*,
554 F.Supp.2d 1083 (C.D. Cal. 2008) ...................................................... 25

*In re iPass, Inc. Securities Litigation*,
2006 WL 496046 (N.D. Cal. Feb. 28, 2006) ............................................ 10

*In re LeapFrog Enterprises, Inc. Securities Litigation*,
200 F.Supp.3d 987 (N.D. Cal. 2016) ........................................................ 8

*In re LeapFrog Enterprises, Inc. Securities Litigation*,
527 F.Supp.2d 1033 (N.D. Cal. 2007) ...................................................... 10

*Lipton v. Pathogenesis Corp.*,
284 F.3d 1027 (9th Cir. 2002) ................................................................... 21

*Lowe v. Tandem Diabetes Care Inc.*,
2024 WL 1898473 (S.D. Cal. Apr. 30, 2024) .......................................... 19

*M & M Hart Living Trust v. Global Eagle Entertainment, Inc.*,
2017 WL 5635424 (C.D. Cal. Aug. 20, 2017) .......................................... 24

*Mallen v. Alphatec Holdings, Inc.*,
2013 WL 1294640 (S.D. Cal. Mar. 28, 2013) .......................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

*In re Medicis Pharmaceutical Corp. Securities Litigation*,
  689 F.Supp.2d 1192 (D. Ariz. 2009) ................................................................ 20

*Metzler Investment GMBH v. Corinthian Colleges, Inc.*,
  540 F.3d 1049 (9th Cir. 2008) ................................................................ 7, 25

*In re NextCard, Inc. Securities Litigation*,
  2005 WL 6342406 (N.D. Cal. Feb. 7, 2005) ................................................ 16

*Ng v. Berkeley Lights, Inc.*,
  2024 WL 695699 (N.D. Cal. Feb. 20, 2024) ................................................ 12

*Nguyen v. Endologix, Inc.*,
  962 F.3d 405 (9th Cir. 2020) ................................................................ 20

*In re NVIDIA Corp. Securities Litigation*,
  768 F.3d 1046 (9th Cir. 2014) ................................................................ 23, 25

*Oklahoma Firefighters Pension & Retirement System v. Xerox Corp.*,
  300 F.Supp.3d 551 (S.D.N.Y. 2018) ................................................ 13, 14, 15

*Omnicare, Inc. v. Laborers District Council Construction Industry
  Pension Fund*,
  575 U.S. 175 (2015) ................................................................ 8, 11

*Osher v. JNI Corp.*,
  302 F.Supp.2d 1145 (S.D. Cal. 2003) ................................................ 8

*Park v. GoPro, Inc.*,
  2019 WL 1231175 (N.D. Cal. Mar. 15, 2019) ................................................ 19

*Police Retirement System of St. Louis v. Intuitive Surgical, Inc.*,
  759 F.3d 1051 (9th Cir. 2014) ................................................................ 7, 8

*Prodanova v. H.C. Wainwright & Co., LLC*,
  993 F.3d 1097 (9th Cir. 2021) ................................................................ 23

*Retail Wholesale & Department Store Union Local 338 Retirement
  Fund v. Hewlett-Packard Co.*,
  845 F.3d 1268 (9th Cir. 2017) ................................................................ 7

# TABLE OF AUTHORITIES

**Page(s)**

*Retail Wholesale Department Store Union Local 338 Retirement Fund*
    *v. Stitch Fix, Inc.*,
    2024 WL 3447524 (N.D. Cal. July 16, 2024) ...................................................25

*In re Rigel Pharmaceuticals, Inc. Securities Litigation*,
    697 F.3d 869 (9th Cir. 2012) ......................................................................24

*Rombach v. Chang*,
    2002 WL 1396986 (E.D.N.Y. June 7, 2002)...................................................8

*Ryan v. FIGS, Inc.*,
    2024 WL 187001 (C.D. Cal. Jan. 17, 2024).............................................23, 24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ...................................................................................20

*In re Twitter, Inc. Securities Litigation*,
    506 F.Supp.3d 867 (N.D. Cal. 2020).............................................................21

*United Food & Commercial Workers International Union Local 464A*
    *v. Pilgrim's Pride Corp.*,
    2022 WL 684169 (D. Colo. Mar. 8, 2022).......................................................8

*In re Vantive Corp. Securities Litigation*,
    110 F.Supp.2d 1209 (N.D. Cal. 2000).....................................................18, 19

*Veal v. LendingClub Corp.*,
    423 F.Supp.3d 785 (N.D. Cal. 2019).......................................................11, 12

*In re Verifone Securities Litigation*,
    2016 WL 1213666 (N.D. Cal. Mar. 29, 2016) .................................................23

*Webb v. SolarCity Corp.*,
    884 F.3d 844 (9th Cir. 2018) ......................................................................20

*Weston Family Partnership LLLP v. Twitter, Inc.*,
    29 F.4th 611 (9th Cir. 2022) .........................................................................6

*Wochos v. Tesla, Inc.*,
    985 F.3d 1180 (9th Cir. 2021) ...........................................................9, 10, 11

# TABLE OF AUTHORITIES

**Page(s)**

*Wong v. Arlo Technologies, Inc.*,
   2019 WL 7834762 (N.D. Cal. Dec. 19, 2019) ..................................................22

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) ........................................................24, 25

**Statutes**

15 U.S.C.
   §78u-4(b)(1).............................................................................7, 11
   §78u-4(b)(2)(A) .........................................................................7, 20

Cooley LLP
Attorneys at Law
San Diego

# I.    INTRODUCTION

The Complaint is a masterclass in pleading fraud by hindsight. Plaintiff alleges Defendants made positive statements about Dexcom's prospects in 2023 and early 2024, before announcing disappointing financial results in July 2024. Based on this, Plaintiff accuses Defendants of committing securities fraud. But failing to predict the future is not fraud. And that is all Plaintiff alleges here.

Dexcom is a publicly traded medical device company that develops and commercializes continuous glucose monitoring ("CGM") devices. Historically, Dexcom focused on a core group of CGM users: those with type 1 or type 2 diabetes who use multiple forms of insulin each day. Dexcom was a leader in this "intensive insulin" segment; while its competitor, Abbott Laboratories, prevailed among non-intensive insulin users—specifically, those with type 2 diabetes using once-daily basal insulin ("Basal"). But, in early 2023, as insurers extended CGM coverage to Basal patients, Dexcom began competing with Abbott in this segment. Like any company breaking into a new market, Dexcom faced its share of challenges: Abbott controlled over 90% of the Basal market; it had a larger sales force; a more robust "cash pay" offering; and greater brand awareness among the primary care physicians ("PCPs") who treat Basal patients. ***But investors knew all of that; Dexcom repeatedly disclosed as much and more.*** Before and during the class period (which begins April 28, 2023), Dexcom told investors that its sales force was "under-indexed" in the PCP community and could be expanded. It disclosed that its growing share of the Basal market was still dwarfed by Abbott's. And it also cautioned that it was shifting away from the high-margin durable medical equipment ("DME") channel to the lower-margin (but increasingly popular) retail pharmacy channel.

In early 2024, Dexcom announced it was expanding and realigning its U.S. sales force in the second quarter ("Q2'24"). The goal was to strengthen its standing in the PCP community and Basal market, while also solidifying its leadership in the intensive insulin segment. Dexcom was optimistic about this strategy, and in April

2024, increased revenue guidance for the year. Unfortunately, after closing the books and tallying Q2'24 results, Dexcom identified several trends that drove results below expectations: (i) a disruption from the sales force realignment resulting in lower new-customer growth; (ii) higher rebate eligibility resulting in lower revenue-per-customer; and (iii) an increase in pharmacy sales as compared to DME sales, also resulting in lower revenue-per-customer. On July 25, 2024, Dexcom lowered guidance to reflect these new developments, and its stock price fell.

From this fact pattern—of a company routinely disclosing new strategies and promptly updating investors on new developments—Plaintiff cries fraud. It insists that as early as April 2023, Defendants knew, but concealed, that previously disclosed risks and challenges—*e.g.* those related to Dexcom's sales force, the DME-to-pharmacy transition, and Abbott's head start in the Basal/PCP space—would cause Dexcom to underperform more than a year later. That is pure speculation; not one contemporaneous fact is pled to support it.

The Complaint should be dismissed for two independent reasons.

**First**, Plaintiff fails to plead falsity. Most of the challenged statements are inactionable as a matter of law. Many are taken out of context. And none is rendered misleading by any alleged omission.

**Second**, Plaintiff fails to plead a strong inference of scienter. The Complaint contains no contemporaneous facts that any Defendant intentionally deceived investors or acted with deliberate recklessness. And, while motive alone is never enough to support a strong inference of scienter, the lack of one here is fatal.

## II. STATEMENT OF FACTS

### A. Overview of Dexcom's Business.

Based in San Diego, California, Dexcom designs and sells CGM systems to help diabetes patients effectively and conveniently manage their condition. ¶2.[1]

---

[1] Unless otherwise noted, "¶" refers to the Complaint, Ex. and App. refer to the Exhibits and Appendices to the Speers Declaration, emphasis is added, and internal quotation marks, citations, and alterations are omitted.

CGMs revolutionized diabetes care, offering a more regular, convenient, and less painful way to measure blood glucose levels than traditional means, such as a finger stick test. ¶3. Dexcom introduced its first CGM in 2004 and has since continued to advance its technology, launching its newest generation CGM in 2023: the G7. ¶31.

One of Dexcom's key competitors, Abbott, produces a CGM system known as FreeStyle Libre ("Libre"). ¶32. Dexcom and Abbott are by far the largest players in the U.S. CGM space. ¶4.

Two other groups are important to the CGM landscape: (i) prescribers (*i.e.*, PCP or endocrinologist); and (ii) fulfillment channels (*i.e.*, DME or pharmacy). The prescribing physician typically designates a specific brand (*e.g.*, Dexcom G7 or Abbott Libre). *See* Ex. 1 at 2 ("[M]ost scripts are branded…so patients and their docs have the most influence"). That CGM prescription is then fulfilled through either a pharmacy or DME (*e.g.*, McKesson and AmerisourceBergen). ¶37. If the prescription is unbranded, the distributor may choose which brand to provide. However, "[i]f a script is for G7, a DME distributor can't change it to Libre." *Id.*

## B.    Dexcom Shifts to DME-Pharmacy Hybrid.

In 2018, Dexcom began transitioning its business from high-margin DME to lower-margin pharmacy because pharmacy was more accessible and cost-effective for patients, allowing greater market penetration and increased patient volumes. ¶37. During this process, Dexcom reminded investors why it made the shift, and kept them updated on its progress and the associated risks and headwinds:

- <u>February 2020</u>: "[W]e are making great progress in our effort to transition to the pharmacy channel….we see the utilization is higher and retention is better." Ex. 2 at 5, 9.

- <u>August 2022</u>: "[M]oving our DME channel folks to pharmacy" has "introduced some significant pricing headwinds." Ex. 3 at 10.

- <u>April 2023</u>: "[W]e already have more commercial pharmacy coverage established for G7 today than our competitor…." Ex. 4 at 5.

### C.     Dexcom Expands Its Sales Force in 2020 to Reach More PCPs.

In 2020, Dexcom doubled its U.S. sales force from 130 to 260 sales representatives. ¶68(b). Dexcom explained the goal was to "enhance our footprint across the country, ***including our reach into primary care offices***." Ex. 5 at 7. It reiterated it would continue "to prioritize the pharmacy channel, which is the most efficient channel for our patients, clinicians and Dexcom." *Id.* And it explained the new sales representatives' "focus will initially be on insulin-using patients who have reimbursement for the technology…On the type 2 nonintensive patient…we're looking forward to going there…but these guys will focus on our core markets and where we play with reimbursement first and foremost." *Id.* at 16.

### D.     In April 2023, Medicare Expands Coverage to Basal Patients.

Prior to April 2023, Medicare and private health insurers covered CGMs for intensive-insulin users only. ¶39. As Dexcom told investors, it focused on that population—covered patients. *Supra* §II.C. But Dexcom also worked to ***expand*** coverage. As Dexcom explained in February 2023, Dexcom's "MOBILE study" helped support the Center for Medicare and Medicaid Services' ("CMS") proposal to "broaden coverage to include people with type 2 diabetes using basal insulin only." Ex. 6 at 5; *see also* ¶108. In April 2023, CMS officially expanded Medicare coverage for CGMs to Basal patients. ¶45. And in July 2023, Dexcom announced private insurers had "quickly follow[ed] suit." Ex. 7 at 5.

### E.     Dexcom Begins Competing in Basal Segment.

In early 2023, when Dexcom entered the Basal market in earnest, Abbott held a commanding lead, with over 90% share in the U.S. ¶68(a). Investors were fully aware of this fact. Indeed, in September 2022, Dexcom disclosed Abbott was "***clearly leading***" in the "type 2 [Basal] environment." Ex. 8 at 6. In June 2023, an analyst reported, "Abbott has a leading share among people with type 2 diabetes…in part because Abbott has been selling to people on Basal insulin for years through its cash-pay program." ¶68(d). Even as Dexcom grew its Basal market share during 2023, it

made clear ***Basal was not, nor expected to be, a material contributor to its overall revenue in the near term***. *E.g.*, Ex. 4 at 8 (projecting Basal revenue to contribute ~1.5%). Dexcom predicted its core segment (intensive insulin users) would drive growth, while Basal remained "relatively nominal." Ex. 7 at 10.

### F. Dexcom Expands and Restructures Its Sales Force.

Throughout 2023, Dexcom acknowledged the need to further expand its sales force and adjust to better target PCPs and the Basal patients they treat. *E.g.*, Ex. 9 at 6 ("We expect to ***continue investing in our field sales force***"); Ex. 10 at 11 (acknowledging that sales force "***[c]ould expand***" further); Ex. 7 at 14 ("we know there's more work to do"); *id.* at 15 ("we don't have a specific PCP sales force"). Nevertheless, during this same period, Dexcom reported market share growth. *See* Ex. 11 at 6. Before the class period, Dexcom had <10% market share in Basal, but by January 2024, it was winning ~30% of new Basal CGM prescriptions. ¶84(b).

In early 2024, Dexcom announced it would further expand and revamp its sales force to match its plans for accelerated growth. Ex. 12 at 10. Specifically, for the first time in Dexcom's history, it would structure its sales force by prescriber-type, rather than by geography, with specialized sales groups dedicated to endocrinologists and PCPs, respectively. Ex. 13 at 8; Ex. 14 at 8, 17.

### G. Dexcom Announces Q2'24 Earnings and Lowers Guidance.

On July 25, 2024, Dexcom announced financial results for Q2'24 and reduced full-year revenue guidance by ~$300 million to a range of $4 billion to $4.05 billion. ¶152. Dexcom identified several "near-term trends" that "emerge[d] over the course of the second quarter that drove results below [its] expectations." Ex. 14 at 4. First, there was a larger-than-expected disruption from the recent sales force expansion and realignment. *Id.* at 8. As Dexcom explained, "[t]his was a different expansion for us than other ones. In other ones we've done, we literally took territories and just divided them geographically. And this time, we changed roles [and] we changed [the] physicians [our sales] people called on." *Id.* Thus, while new customer growth

remained strong in absolute terms, it was below expectations. *Id.* at 4. Second, there was higher-than-expected rebate eligibility in Q2'24 because Dexcom was able to secure insurance coverage for its G7 sensor faster than expected. *Id.* The increased rebates translated to lower revenue. *Id.* Third, there was an increase in pharmacy channel sales as compared to DME channel sales, which also resulted in lower margins. *Id.* As Dexcom explained, growth "remained strong in our pharmacy business as we expand our reach into primary care and type 2 diabetes more broadly…[but] growth in the DME channel has trailed our plan," in part, because "we've not executed well ***this quarter*** against these [DME] partnerships. *Id.* at 5.

## H. This Action.

Following this news, Dexcom's stock price declined and within weeks this lawsuit was filed. On January 27, 2025, Plaintiff filed the operative Complaint against Dexcom; Kevin Sayer (Dexcom's CEO); Jereme Sylvain (Dexcom's CFO); and Teri Lawver (Dexcom's former Chief Commercial Officer).

## III. LEGAL STANDARDS

Section 10(b) requires "a material misrepresentation or omission of fact, scienter, a connection with the purchase or sale of a security, transaction and loss causation, and economic loss." *Curry v. Yelp*, 875 F.3d 1219, 1224 (9th Cir. 2017) To survive dismissal, the Complaint must clear three pleading hurdles.

**First**, it must allege facts that state a plausible claim under Rule 8. *Bell Atl. v. Twombly*, 550 U.S. 544, 569-70 (2007). The Court need not accept conclusions, unwarranted deductions, unreasonable inferences, or allegations that contradict matters subject to judicial notice. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

**Second**, it must satisfy Rule 9(b) by pleading with particularity the "who, what, when, where, and how" of the alleged fraud. *Weston Fam. P'ship v. Twitter*, 29 F.4th 611, 619 (9th Cir. 2022).

**Third**, it must satisfy the "formidable pleading requirements" of the Private Securities Litigation Reform Act ("PSLRA"), which are among the highest in the

law. *Metzler Inv. v. Corinthian Colls.*, 540 F.3d 1049, 1054-55 (9th Cir. 2008). For falsity, Plaintiff must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1). For scienter, Plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2)(A).

## IV.   ARGUMENT

### A.   The Complaint Should Be Dismissed for Failure to Plead Falsity.

Plaintiff challenges 14 statements made between April 27, 2023, and June 5, 2024. ¶¶67, 69, 71, 73, 75, 77, 79, 81, 83, 85, 87, 89, 91, 93; *see In re Eventbrite Sec. Litig.*, 2020 WL 2042078, at *10 n.5 (N.D. Cal. Apr. 28, 2020) ("[F]or falsity, the Court must do a statement-by-statement analysis."). None of the 14 statements is actionable, for one or more reasons: **(1)** most are inactionable as a matter of law; **(2)** Plaintiff mischaracterizes or takes many out of context; and **(3)** none is misleading by omission. *See* App. A (mapping arguments below to each challenged statement).

#### 1.   Most challenged statements are legally inactionable.

Most of the challenged statements (11 of 14) are inactionable as a matter of law because they are: (i) puffery; (ii) opinions; and/or (iii) forward-looking.

**<u>Puffery</u>.** Eleven challenged statements are simply expressions of corporate optimism or "puffing" that cannot be misleading as a matter of law because they are not "capable of objective verification." *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. HP*, 845 F.3d 1268, 1275 (9th Cir. 2017). Such statements are legally inactionable because courts recognize that "investors…know how to devalue the optimism of corporate executives." *Police Ret. Sys. of St. Louis v. Intuitive Surgical*, 759 F.3d 1051, 1060 (9th Cir. 2014). For example:

- "We are in a ***great position to compete***." ¶67; *see also* ¶75 ("We're also ***well-positioned*** to extend our leadership").

- "[W]e have ***very good relationships*** with our [DME] distributors" and "we worked ***very hard*** to position them to be successful." ¶69; *see* ¶73 ("[W]e also work to maintain ***strong relationships*** with our DME…partners").

- "[W]e do have *a sizable sales force*." ¶71.

- "We have the *right commercial infrastructure* for leading with the endocrinologists and *expanding our leadership* in primary care…." ¶77.

- "[W]e continue to be *very encouraged* by early prescribing trends…." ¶81.

- "[W]e are *doing well* in the basal category" and "where we have a presence, *we win very much*." ¶83

- "[Y]ou continue to see *outperformance* in basal." ¶85.

- "We still have a *very strong* DME business," which "continues to be supported by our partners *very, very well*." ¶91.

- "We're *happy with* our full year guidance" and "*very comfortable* with where folks are sitting for the quarter." ¶93.

Courts routinely find these and similar statements inactionable because they are not "objectively verifiable." *Intuitive Surgical*, 759 F.3d at 1060 ("pretty *good position*" was puffery); *see United Food & Com. Workers Int'l Union v. Pilgrim's Pride*, 2022 WL 684169, at *5 (D. Colo. Mar. 8, 2022) ("*strong relationships*"); *Rombach v. Chang*, 2002 WL 1396986, at *5 (E.D.N.Y. June 7, 2002) ("*working hard* to integrate"); *In re Leapfrog Enter. Sec. Litig.*, 200 F.Supp.3d 987, 1002 & n.3 (N.D. Cal. 2016) ("*sizeable business*"); *In re Cisco Sys. Sec. Litig.*, 2013 WL 1402788, at *13 (N.D. Cal. Mar. 29, 2013) ("*strong foundation*"); *Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech.*, 2013 WL 6441843, at *11 (N.D. Cal. Dec. 9, 2013) ("*better than expected* revenue"); *Hadian v. Fate Therapeutics*, 2024 WL 4246083, at *20 (S.D. Cal. Sept. 19, 2024) ("*going very well*"); *Sunrise Firefighters' Pension Fund v. Oracle*, 2019 WL 6877195, at *9 (N.D. Cal. Dec. 17, 2019) ("*very strong*"); *Osher v. JNI*, 302 F.Supp.2d 1145, 1158 (S.D. Cal. 2003) ("*comfortable* with current analyst expectations"); *Gammel v. HP*, 905 F.Supp.2d 1052, 1071 (C.D. Cal. 2012) ("*very happy* with [product] ramp").

**Opinions.** All of the above-identified statements are also opinions. App. A. Pleading falsity for an opinion "is no small task." *Omnicare v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 194 (2015). Plaintiff must allege specific facts showing the opinion (i) was objectively false and disbelieved *when made*, or

(ii) omitted "particular (and material) facts going to the basis for the [speaker's] opinion." *Id.* "[W]hether an omission makes an expression of opinion misleading *always* depends on context," however, a "reasonable investor does not expect that *every fact* known to an issuer supports its opinion." *Id.* at 190.

The Complaint falls well short of this standard. Plaintiff does not allege any Defendant doubted (much less disbelieved) their optimistic opinions in real time. In fact, in many instances, Defendants expressly cited the basis for their optimism. *E.g.*, ¶67 (citing recent trial results that "demonstrated meaningful improvements…among [the Basal] population" to support opinion that Dexcom was "in a great position to compete"); Ex. 15 at 11 (citing Dexcom's role in securing Medicare expansion for Basal patients to support opinion that Dexcom was "well-positioned to extend our leadership into the type 2 basal insulin segment"). And Plaintiff identifies no "particular (and material) facts" going to the basis of any opinion that were omitted when viewing the statement in context. *See infra* at §§IV.A.2-3.

**Forward-looking.** Finally, two of the alleged misstatements are forward-looking and protected under the PSLRA safe harbor. ¶¶75, 93; App. A. Forward-looking statements are immunized from liability *if they are __either__* (i) accompanied by meaningful cautionary language, __*or*__ (ii) made without "actual knowledge" of falsity. *Wochos v. Tesla*, 985 F.3d 1180, 1189-90 (9th Cir. 2021) (noting protections apply if *either* prong is satisfied). Here, both prongs apply for both statements.

Forward-looking. Statements "declaring or reaffirming" future goals are inherently forward-looking. *Wochos*, 985 F.3d at 1192 (holding "on track" is forward-looking despite implicating the current state of affairs). That is exactly what Statements 5 and 14 do. ¶75 ("well-positioned to extend our leadership into the type 2 basal insulin segment"); ¶93 ("happy with our full year guidance" and "very comfortable with where folks are sitting for the quarter").

Meaningful cautionary language. Both statements were identified as forward-looking and directed investors to Dexcom's SEC filings for risks that could cause

actual results to differ. Ex. 15 at 1, 29; Ex. 16 at 4; Ex. 17 at 2. For example:

- "We operate in a highly competitive market and face competition from large, well-established companies with significant resources, and, as a result, we may not be able to compete effectively." Ex. 9 at 13; Ex. 18 at 13.

- "The market for glucose monitoring devices is intensely competitive" and "subject to rapid change" Ex. 9 at 13; Ex. 18 at 13.

- "We cannot guarantee that [our DME distributor] relationships will continue or that we will be able to maintain this volume of sales from these relationships in the future." Ex. 9 at 13; Ex. 18 at 13.

- "[W]e might be unable to successfully expand the commercialization of our existing products…for a number of reasons, including…the limited size of our sales force." Ex. 9 at 10; Ex. 18 at 10.

- "Our sales and marketing organization competes with the experienced, larger and well-funded marketing and sales operations of our competitors. We may not be able to successfully manage our dispersed sales force or increase our product sales at acceptable rates." Ex. 9 at 13; Ex. 18 at 13.

These disclosures address the very factors Plaintiff complains about: DME relationships, shift from DME to pharmacy, and sales force. *See In re Leapfrog Enter. Sec. Litig.*, 527 F.Supp.2d 1033, 1047 (N.D. Cal. 2007) ("cautionary statements" that "explain[] the risks associated with the subject matter of plaintiffs' claims" are "meaningful"). Accordingly, these statements are protected under the first prong.

No actual knowledge of falsity. These statements are *independently* protected under the second prong of the safe harbor unless Plaintiff pleads specific facts ***that the speaker actually "knew" the stated goals were "impossible" to achieve***. *Wochos*, 985 F.3d at 1192. The actual knowledge standard is "***stricter*** than the standard for establishing scienter." *In re iPass Sec. Litig.*, 2006 WL 496046, at *8 (N.D. Cal. Feb. 28, 2006). And Plaintiff's allegations here come nowhere close to meeting it. For Statement 5, Plaintiff pleads no facts whatsoever about Lawver's actual knowledge in June 2023, much less facts that would necessarily render her prediction false. The same goes for Statement 14. Although Dexcom later noted disruptions at the start of Q2'24, ¶94, Plaintiff alleges no particularized facts that Sylvain actually knew, on June 5, 2024, it was ***impossible*** for Dexcom to exit the quarter on pace with analyst estimates and full-year guidance. And Defendants' statements in late July 2024—

*e.g.*, "we've lost market share in DME channel"—say nothing about the severity of circumstances that existed when Sylvain spoke nearly two months earlier. ***That is the definition of pleading fraud by hindsight***, which Congress expressly condemned, and which animated the heightened pleading standards of the PSLRA. *Hadian*, 2024 WL 4246083, at \*30.

### 2. Plaintiff misconstrues nearly every challenged statement.

Plaintiff mischaracterizes or ignores relevant context for most of the challenged statements (12 of 14). *See Wochos*, 985 F.3d at 1193 (falsity cannot be pleaded by "rewrit[ing]" the challenged statements). When read "fairly and in context"—as required—none is misleading. *Omnicare*, 575 U.S. at 194.

**Statement 1.** On Dexcom's April 27, 2023, earnings call, Sayer told investors (i) Medicare now covered Basal patients, (ii) Dexcom was "excited to start serving this population more broadly going forward," and (iii) based on recent trial results in Basal patients, Dexcom was "*in a great position to compete as this market develops*." ¶67. Plaintiff challenges the italicized portion only.[2] ¶68. It claims this was false because Abbott purportedly had a better sales force, marketing campaign, product pricing, and DME relationships. *Id.* Even if Plaintiff could support that premise (it cannot), Sayer's failure to make that comparison does not render his statement false or misleading. "Companies are not required to engage in self-flagellation." *Veal v. LendingClub*, 423 F.Supp.3d 785, 806 (N.D. Cal. 2019). And Sayer was not talking about any of the comparisons Plaintiff cites; he was addressing Dexcom's trial results that "demonstrated meaningful improvements …among [the Basal] population." ¶67. Thus, "the reasons Plaintiff[] offer[s] as to why the statements are false or misleading bear no connection to the substance of the statements themselves" and cannot support falsity. *Ng v. Berkeley Lights,* 2024 WL 695699, at \*8 (N.D. Cal. Feb. 20, 2024);

---

[2] Defendants presume Plaintiff challenges only those portions cited in the paragraphs stating the alleged reasons for falsity. ¶¶68, 70, 72, 74, 76, 78, 80, 82, 84, 86, 88, 90, 92, 94. If Plaintiff means to challenge other portions, it fails because it does not state the reasons why such portions were false or misleading. 15 U.S.C. §78u-4(b)(1).

*Veal*, 423 F.Supp.3d at 807 ("[I]t is not enough to allege that a statement is incomplete; rather, the plaintiff must state facts showing that, due to its incompleteness, the statement affirmatively led the plaintiff in a wrong direction").

**Statement 3.** At a June 7, 2023, conference, Sylvain explained (i) "when we doubled the size of the sales force, *the focus was calling on high decile prescribers of all insulin, including basal*," and (ii) "*we do have a sizable sales force*," but (iii) we "could expand a little bit more." ¶71; Ex. 10 at 11. Plaintiff challenges only the italicized parts. ¶72. As for the "focus" of Dexcom's sales force, Plaintiff insists this was false because it was purportedly inconsistent with Dexcom's prior disclosure that it focused on "providers of type 1 and type 2 intensive patients." ¶72(a). But there is no well-pled fact that "providers of type 1 and type 2 intensive patients" and "high decile prescribers of all insulin, including basal" are meaningfully different groups. *See Taylor Gen. Emps. Ret. Sys. v. Magna Int'l*, 967 F.Supp.2d 771, 793-94 (S.D.N.Y. 2013) (plaintiff must "adequately explain[]" how disclosures "were ***meaningfully different***" to support falsity theory). As for the size of the sales force, Plaintiff ignores that Sylvain clarified it "could expand" further. Ex. 10 at 11.

**Statement 4.** At Dexcom's June 23, 2023, Investor Day conference, Lawver told investors (i) "the majority of our volume runs through the pharmacy channel where clinicians appreciate the prescribing simplicity," but (ii) "*we also work to maintain strong relationships with our DME distribution partners*." ¶73. Plaintiff claims the italicized portion ***must*** have been false because ***13 months later***, an analyst speculated that Dexcom's relationships with DMEs had eroded, and Dexcom reported that it "needed to refocus on those relationships." ¶74. But that says nothing about the ***effort*** Dexcom was making to maintain those relationships ***back in June 2023***. *See Hadian*, 2024 WL 4246083, at *32 (finding allegations were "mere fraud by hindsight" as "[e]ven the most fruitful relationships can encounter bumps along the road"). Additionally, Plaintiff's suggestion that Lawver overstated Dexcom's attention to DMEs is not plausible as she expressly stated, "***the majority***" of

Dexcom's business now "runs through the **pharmacy**." ¶73.

  **Statement 5.** During the same June 23, 2023, conference, Lawver stated "we're also *well-positioned to extend our leadership into the type 2 basal insulin segment*," reminding investors it was, in part, Dexcom's "MOBILE trial…that led to the recent CMS coverage expansion" for Basal patients. ¶75; Ex. 15 at 11. Plaintiff challenges only the italicized portion. ¶76. But it omits the context that explains her opinion ***was based on Dexcom's role in securing Medicare expansion for Basal patients***. *See Bodri v. GoPro*, 252 F.Supp.3d 912, 924 (N.D. Cal. 2017) (falsity not pled because "Plaintiff omits the context in which the statements were made").

  **Statement 6.** Also at the June 23, 2023, conference, Lawver explained "why we're excited about our continued strong growth and leadership in the U.S. market," citing (i) "we have the industry's most accurate sensor," (ii) "that is also the most covered and has the lowest out-of-pocket costs," and (iii) "*the right commercial infrastructure* for leading with the endocrinologists and *expanding our leadership in primary care with the type 2 basal and severe hypoglycemia markets* where coverage has just opened up in the last couple of months." ¶77. Plaintiff challenges only the italicized part, claiming Dexcom did not have the "right" infrastructure to "***succeed[]*** in the type 2 basal market." ¶78. Lawver, however, made no representation about success. *Okla. Firefighters Pension v. Xerox*, 300 F.Supp.3d 551, 572 (S.D.N.Y. 2018) ("[T]he Court focuses on the statements themselves, not plaintiff's recasting of them."). Further, Plaintiff's contention that there is only one "right commercial infrastructure," and it requires a "PCP-facing sales force" is wholly unsupported. ¶78. Even so, there is no dispute Dexcom's sales force ***did*** interface with PCPs. *Id.*

  **Statement 7.** At a September 6, 2023, conference, Sylvain said "a significant majority of the basal population" now has insurance coverage and "where there's coverage, we've always taken share, and you see us *taking share* in that space." ¶79. Plaintiff challenges only the italicized phrase, arguing Dexcom "was not taking any share at the PCP offices that its sales force did not call on." ¶80. But Sylvain never

claimed otherwise; his statement was about the market as a whole, not the specific offices Dexcom called on. ¶79; *see Xerox*, 300 F.Supp.3d at 572. And there are no well-pled facts that Dexcom did not increase its overall Basal share. *Infra* §IV.A.3.

**Statement 8.** On Dexcom's October 26, 2023, earnings call, Sayer told investors: (i) Dexcom had "market-leading levels of basal-only reimbursement"; (ii) "*we continue to be very encouraged by early prescribing trends for this cohort*"; (iii) "we delivered another record Medicare new patient start quarter in Q3"; and (iv) "[s]ince the launch of G7, we have *gained share across all reimbursed channels and patient segments in the U.S.* and that trend continued this quarter." ¶81. Plaintiff challenges the italicized portions but does not contend the other portions were false. ¶82. And those other portions provide relevant context: of course Sayer was "encouraged" by trends after a record quarter, and it makes sense Dexcom "gained share" with "market-leading levels of basal-only reimbursement." ¶81.

**Statement 9.** At a January 8, 2024, conference, Sayer said: (i) "*we are doing well in the basal category*," but (ii) "we'd like to win more," so "we are working on…broader coverage and broader efforts to make sure we can win more places," by "investing on the commercial side" because (iii) "*where we have a presence, we win very much*." ¶83. Plaintiff challenges the italicized parts based on the false premise that Sayer said Dexcom was "winning more than its fair share in the basal category." ¶84(a). But Sayer never said that; he said he wanted "to win more" and was "investing on the commercial side" to make that happen. ¶83; *see Xerox*, 300 F.Supp.3d at 572.

**Statement 10.** During the same January 8, 2024, investor conference, in response to a question about new Basal patients, Sylvain explained (i) he did not yet have "the full final patients numbers," but (ii) it was "trending" in a positive direction, (iii) "you're seeing a very strong adoption in the basal population," and (iv) "*so you continue to see outperformance in basal*, but you're also seeing a really strong performance continuing in the intensive markets, both type 1 and type 2." ¶85. Plaintiff challenges the italicized portion only, ¶86, claiming it was misleading

because Dexcom was purportedly underperforming compared to Abbott in the Basal market and among PCPs. ¶86(a)-(b). But Sylvain made no such comparisons and specifically said he did not have final numbers. ¶85; *see Xerox*, 300 F.Supp.3d at 572.

**Statement 11.** On Dexcom's February 8, 2024, earnings call, Sylvain noted if "you look at the script data," you can see "we are taking share." ¶87. He also explained the guidance "has as much to do with us taking share as it does with category expansion," and the "guide assumes about 8%" adoption rate in Basal, and "what's great about that is as we continue to *take share* and the [Basal] category grows a little faster than expected, that will help contribute over the longer haul." *Id.* Plaintiff challenges the italicized phrase, claiming it was false because "PCPs were overwhelmingly prescribing Abbott's CGM over Dexcom's to Type 2 basal patients in PCP offices that Dexcom did not call on." ¶88(b). But Sylvain never claimed Dexcom was beating Abbott or taking share in offices Dexcom did not call on. ¶87; *see Xerox*, 300 F.Supp.3d at 572. And there are no well-pled facts that Dexcom was not—as of February 2024—increasing its overall share in Basal. *Infra* §IV.A.3.

**Statement 12.** On Dexcom's April 25, 2024, earnings call, Sayer addressed an analyst question about "basal's contribution" to Dexcom's "record new start[s]…this quarter," stating: "We know we're *taking share* and we see that data. And I think a lot of you guys see that data. So for what it's worth, that data is out there, you can see the scripts continuing to come our way." ¶89; Ex. 13 at 11. Again, Plaintiff challenges only the italicized phrase—that Dexcom is "taking share"—claiming it was false because "Dexcom remained significantly behind Abbott in market share and was not…catching up to Abbott," as evidenced by "third-party data" showing Abbott was getting 70% of new scripts. ¶90. Sayer, however, never claimed Dexcom was not behind Abbott. ¶89; *see Xerox*, 300 F.Supp.3d at 572. And Abbott getting 70% of new scripts is not at odds with Dexcom also "taking share." *Infra* §IV.A.3.

**Statement 13.** During the same April 25, 2024, earnings call, Sylvain said (i) "we do see a lot of our new patients coming through the pharmacy channel," and

(ii) "*[w]e still have a very strong DME business, and certainly, the DME business continues to be supported by our partners very, very well*," but (iii) "what we find is as we call on more and more primary care physicians who are seeing where basal patients are seen, there is a bit of a heavier tilt towards the pharmacy channel for new patients." ¶91; Ex. 13 at 15. Plaintiff challenges the italicized portion only and omits the rest. ¶92. In doing so, Plaintiff misleadingly implies Sylvain expressed unbridled bullishness about the DME business. In reality, that statement is sandwiched between two others unequivocally stating that pharmacy is driving the business. Ex. 13 at 15.

### 3. None of the alleged omissions supports falsity.

As to each challenged statement, Plaintiff claims Defendants "omitted material facts." ¶¶68, 70, 72, 74, 76, 78, 80, 82, 84, 86, 88, 90, 92, 94. But despite recycling the same quotes to support their theory for each statement, Plaintiff changes the organization and emphasis, making it difficult to identify the overlap (and sometimes, the source). The allegations fall into seven categories. *See* App. B (cataloguing allegations by categories below). None supports falsity.

**Abbott's early focus on PCPs.** Plaintiff claims Abbott's early focus on PCPs allowed it to capture a larger share of the basal market. ¶¶68(a), 72(c), 76(a)(i). Even if true, Plaintiff fails to plead how this renders any challenged statement false or misleading. *In re NextCard Sec. Litig.*, 2005 WL 6342406, at *7 (N.D. Cal. Feb. 7, 2005) ("It is Plaintiffs' burden to connect the dots by clearly alleging particularized facts demonstrating why each statement was false or misleading when made.").

Also, there was no omission. ***Plaintiff concedes Abbott publicly touted its PCP-focus before the class period and by "early 2022, analysts connected Abbott's PCP strategy to its success in the type 2 basal market."*** ¶68(a). In September 2022, Dexcom told investors that Abbott was "clearly leading" in the "type 2 [Basal] environment." Ex. 8 at 6. In April 2023 (on day one of the class period), Dexcom admitted "we do have some work to do in the PCP community," and "[w]e have a lot of prescribers to go…particularly as you look at the basal opportunity we have ahead

of us." Ex. 4 at 8, 14. And Defendants reiterated this point throughout the class period. *E.g.*, Ex. 7 at 15 (July 2023: "we don't have a specific PCP sales force"); Ex. 19 at 9 (November 2023: "we've been kind of under-indexed" in PCP); *see In re AnaptysBio*, 2021 WL 4267413, at *5 (S.D. Cal. Sept. 20, 2021) ("Omission theories are not viable when the Defendants clearly disclosed material information to investors.").

**Abbott's cash pay program.** Next, Plaintiff points to Abbott's "cash pay program" that was available to Basal patients before Medicare began covering this population in April 2023. ¶68(d); *see also* ¶¶72(c), 76(a). Again, ***Plaintiff concedes this information was public before the start of the class period***, and that the market understood Dexcom and Abbott were pursuing different strategies. ¶68(d) (citing June 2022 analyst report that "highlighted the difference in strategies"); *see* Ex. 8 at 6 (stating Abbott was "clearly leading" in the basal space due in part to "the strategy [Abbott] has around cash pay"). In fact, on day one of the class period, when asked about Dexcom's cash pay program, Sylvain said "we have seen some encouraging initial adoption" but "it's really not a material contributor." Ex. 4 at 9; *see also* ¶41.

**Marketing.** Plaintiff also alleges that, unlike Abbott, Dexcom had "invested very little in direct-to-consumer marketing directed specifically at the type 2 non-intensive and Basal population prior to the Class Period." ¶68(c); *see also* ¶¶72(c), 76(a). But, again, ***Plaintiff concedes that Dexcom informed investors of this very fact before the start of the class period***. *Id.*; *AnaptysBio*, 2021 WL 4267413, at *5.

**Dexcom's sales force.** Plaintiff also insists Dexcom's 2020 sales force expansion was too small and too focused on intensive insulin patients to effectively compete with Abbott for Basal patients. ¶68(b); *see also* ¶¶72, 76, 78(a), 80(a), 82(a), 84(a), 86(b), 88(b), 90(b). Again, ***Plaintiff concedes Dexcom disclosed these details in 2021 and 2022—years before the start of the class period***. *See id.* And throughout 2023 and 2024, Dexcom acknowledged the need to do more. *E.g.*, Ex. 9 at 10 ("we might be unable to successfully expand the commercialization…for a number of

reasons, including…the limited size of our sales force"); ¶83 ("we're investing on the commercial side to get broader"); *AnaptysBio*, 2021 WL 4267413, at *5.[3]

**Abbott's pricing.** Next, Plaintiff claims Abbott "had a significant pricing advantage over Dexcom in terms of its CGM list price, irrespective of insurance coverage." ¶68(e); *see also* ¶¶72(c), 76(a). To the extent Plaintiff means that Abbott's price was lower even with insurance, no well-pled fact supports this. Plaintiff cites Sayer's June 23, 2023, exchange with an analyst discussing the perception among PCPs that Dexcom's product was more expensive. ¶68(e). But Plaintiff omits Sayer's response that "that really is not the truth." Ex. 15 at 21.[4] To the extent Plaintiff means Dexcom's pricing was higher without insurance, that argument is irrelevant. As ***Plaintiff concedes, the market understood that Dexcom's strategy was centered on getting coverage for the basal population***. ¶68(d) ("Abbott seems to be geared toward creating a consumer device that is affordable to patients even without insurance coverage…while DexCom will focus on establishing new reimbursement pathways and partnerships that can open market access of its CGM platform.").

**DME relationships.** Next, Plaintiff alleges "Dexcom had purposefully transitioned its primary sales channel from DME suppliers to the pharmacy," which, according to Plaintiff, "alienated the DME suppliers and their sales representatives." ¶68(f); *see also* ¶¶70, 72(c), 74, 76, 78(b), 80(b), 82(b), 88(c), 90(c), 92, 94(a). But again, nothing was omitted. This is a fraud case and ***Dexcom repeatedly disclosed— before the class period—that it was intentionally moving a portion of its business from DME to pharmacy***. *See e.g.*, Ex. 8 at 14 ("[I]n terms of the migration from the DME to the pharmacy, we should be relatively done with that by the end of the year. We're on track to that 75%, 25% split."); Ex. 21 at 6 ("we've moved from the DME

---

[3] Plaintiff also cites several disclosures between July 2024 and January 2025. ¶68(g). But none was inconsistent with Defendants' real-time sales force updates throughout 2023 and 2024. *See In re Vantive Sec. Litig.*, 110 F.Supp.2d 1209, 1217 n.14 (N.D. Cal. 2000) (plaintiff must "point to particular *contemporaneous* facts that establish the falsity of the statement *at the time it was made*").

[4] Likewise, Plaintiff cites a 2024 paper, ¶68(e), but omits that the pricing figures in it do not account for "health insurance coverage or support policies," Ex. 20 at 5.

to the pharmacy"). It also warned this might have negative ramifications: "We cannot guarantee that these relationships [with DMEs] will continue or that we will be able to maintain this volume of sales from these relationships in the future." Ex. 9 at 13.

As for Plaintiff's contention that Dexcom had "strained relationships with DME suppliers," ¶68(f), the Complaint contains no contemporaneous facts showing this was true during the class period. Plaintiff relies solely on analyst **speculation** in July 2024—over a year after the start of the class period—that "we **suspect** an erosion in the relationship between the company and DME distributor partners has been ongoing for some time, **likely** starting with the company's fanfare around pharmacy access with the launch of G7" and "the issue is **likely** more related to perception amongst DME reps that Abbott is channel agnostic vs. Dexcom preferential to the pharmacy." Ex. 1 at 2.[5] This falls far short of the particularized, contemporaneous facts necessary to plead falsity. *See Lowe v. Tandem Diabetes Care*, 2024 WL 1898473, at *10 (S.D. Cal. Apr. 30, 2024) (finding "analyst's speculative opinion" could not support falsity). Moreover, it says nothing about the status of DME relationships at any specific point in time, much less the point in time each challenged statement was made. *See Vantive*, 110 F.Supp.2d at 1217 n.14 (requiring "contemporaneous facts" of falsity when the statement was made).[6]

**Basal market share**. Finally, Plaintiff claims Dexcom was not "gaining share" in the basal space, citing "third-party data" that purportedly showed Abbott won "seven out of every 10 new scripts for the type 2 Basal population" in early 2024. ¶¶84(b), 86(a), 90(a). Plaintiff pleads no source for this data, without which, there is no basis to support its reliability. *See Roseville Emps.' Ret. Sys. v. Sterling Fin.*, 963

---

[5] Similarly, Plaintiff cites a July 2024 analyst report stating: "*most* of the above issues have been present in prior quarters." ¶99; *see* ¶¶70(b), 74(b). It is unclear whether DME relationships are among such issues. Regardless, it continues: "they've been ~small and DXCM was simply able to grow through them." Ex. 11 at 4.

[6] In the same July 25, 2024, call that Plaintiff contends exposed the "truth," Sylvain explained that although the DME issues "took place over the course of the quarter," ***Dexcom only "became aware of it really as we closed out the quarter***." Ex. 14 at 11-12; *see Park v. GoPro*, 2019 WL 1231175, at *11 (N.D. Cal. Mar. 15, 2019) ("documents Plaintiffs rely on" contradict their allegations).

F.Supp.2d 1092, 1112-13 (E.D. Wash. 2013) (discrediting data where plaintiff failed to "fully identify the source"). ***But even assuming this data is accurate, it is not inconsistent with any challenged statement***. As Plaintiff concedes, Abbott held "more than 90% market share" in Basal before the class period. ¶68(d). If Abbott was only winning 7 out of 10 new scripts by early 2024 (instead of 9 out of 10), it means ***someone*** was taking market share from Abbott. And Plaintiff's own allegations show it was Dexcom. ¶32 (Dexcom and Abbott had "a duopoly").

## B. The Complaint Should Be Dismissed for Failure to Plead Scienter.

Plaintiff fails to plead facts giving rise to *any* inference of scienter, much less the "strong" one needed to survive dismissal. 15 U.S.C. §78u-4(b)(2)(A). The PSLRA's "strong inference" requirement "has teeth." *Nguyen v. Endologix*, 962 F.3d 405, 414 (9th Cir. 2020). Plaintiff must plead facts "with an unprecedented degree of specificity and detail," establishing that each Defendant intended to deceive or was deliberately reckless. *Eminence Cap. v. Aspeon*, 316 F.3d 1048, 1052 (9th Cir. 2003). "Deliberate recklessness is an ***extreme departure from the standards of ordinary care***…which presents a danger of misleading [investors] that is ***either known to the defendant or is so obvious that the actor must have been aware of it***." *Webb v. SolarCity*, 884 F.3d 844, 851 (9th Cir. 2018). A securities fraud complaint will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs v. Makor Issues & Rts.*, 551 U.S. 308, 324 (2007). The Court "must consider plausible, nonculpable explanations" for Defendants' conduct. *Id.* at 323-24. This must be done for "each act or omission alleged" and "each defendant[]." *In re Medicis Pharm. Sec. Litig.*, 689 F.Supp.2d 1192, 1214 (D. Ariz. 2009).

Plaintiff's scienter allegations fall far short of these exacting standards.

### 1. Plaintiff pleads no contemporaneous facts to support scienter.

Plaintiff relies on generic allegations of access to data, *post hoc* "admissions," temporal proximity, and an executive departure, none of which supports scienter.

**Access to data.** Plaintiff claims Defendants had "access to and track[ed] script and coverage data." ¶112; *see* ¶¶113-117. But access alone cannot support an inference of scienter; Plaintiff must *specifically* plead "the *contents*" of that data so the Court can "ascertain whether there is any basis for the allegations that [Defendants] had actual or constructive knowledge" that their statements were misleading when made. *Lipton v. Pathogenesis*, 284 F.3d 1027, 1036 (9th Cir. 2002). The Complaint contains no such details. Instead, Plaintiff cites general statements about publicly available script and insurance data. ¶¶114-116. But it pleads no facts about the *contents* of that data, without which, there is no basis to infer it contradicted Defendants' public statements. *See In re Twitter Sec. Litig.*, 506 F.Supp.3d 867, 888 (N.D. Cal. 2020) (allegation about daily reports "not sufficiently specific…to infer that the contents of the reports were inconsistent" with any challenged statement).[7]

**Purported post hoc admissions.** Next, Plaintiff claims Sayer's and Sylvain's post-class period "admissions" confirm their intent to deceive. ¶¶118-124. Not so.

First, no purported admission contradicts a challenged statement. Take, for instance, Sylvain's July 25, 2024 statement that the salesforce disruption was "bigger than we would have anticipated" and led "to a lot of disruption, particularly at the beginning of the quarter." ¶120. Plaintiff claims this "admission" shows Sayer knew in April 2024 that Dexcom would not meet guidance. *Id.* Plaintiff, however, ignores that Sayer continues his train of thought by saying *"[w]e saw things getting better towards the end*." Ex. 14 at 8. Thus, the very statement Plaintiff relies on explains why, despite the disruption, Dexcom remained confident in its guidance. *See Mallen v. Alphatec Holdings*, 2013 WL 1294640, at *8 (S.D. Cal. Mar. 28, 2013) ("statement has to be read in conjunction with the surrounding language, not in a vacuum").

Second, none of the "admissions" addresses Defendants' knowledge when the

---

[7] For the same reasons, Plaintiff's core operations allegations also fail. ¶¶105-111; *see Chi. & Vicinity Laborers' Dist. Council Pension Fund v. Amplitude*, 2025 WL 82206, at *2 (N.D. Cal. Jan. 13, 2025) (finding "core operations inference…fails because the complaint…does not provide any hard numbers or other detail").

challenged statements were made. For example, Plaintiff cites Sayer's January 2025 statement that Dexcom "looked at that situation in late 2023 and early 2024…[and] came to the conclusion we didn't have the resources in the field to address these new markets." ¶123. But ***Plaintiff never identifies which challenged statement this purportedly contradicts.*** And the only one made in this timeframe about Dexcom's sales force is in January 2024, when Sayer said, "where we have a presence, we win very much." ¶83. But on that same call, he also said, "we'd like to win more," so "what we are working on is broader [sales] coverage…to make sure we can win more places." *Id.* In short, the same thing he "admitted" in January 2025. *See Garcia v. J2 Glob.*, 2021 WL 1558331, at *20 (C.D. Cal. Mar. 5, 2021) ("[T]hat Defendants disclosed the adverse information publicly negates an inference of scienter.").

Third, none of the purported admissions is revelatory. Take Sayer's September 2024 statement that "we were not getting any traction [in] those offices where we had no salespeople." ¶122. This could not come as a surprise: Sayer said the same thing during the class period. *E.g.*, ¶83. Plus, it is obvious: the purpose of a sales force is to educate physicians on Dexcom's products so they know the benefits for patients. Physicians not contacted did not receive that one-on-one education.

**<u>Temporal Proximity.</u>** Plaintiff also points to the so-called "temporal proximity" between the challenged statements and alleged corrective disclosures. ¶¶125-127. Although such allegations may "bolster a complaint" when close enough together, they are never sufficient on their own to support a strong inference of scienter. *Wong v. Arlo Techs.*, 2019 WL 7834762, at *8 (N.D. Cal. Dec. 19, 2019). Here, the timing is much too far. Plaintiff cites Dexcom's July 25, 2024, reduction in full-year guidance, ¶126, claiming it was so close in time to Defendants' April and June 2024 statements about Dexcom's full-year 2024 guidance, ¶125, that it supports scienter. Plaintiff is wrong. The first statement was made ***a full quarter*** before the July 2024 disclosure. And while the second statement is closer, it was still ***six weeks*** earlier, before quarter close, and ***prior to Dexcom's receipt of complete DME data.***

*See* Ex. 14 at 11 (noting "4- to 6-week delay" for DME data).[8] That lag is far "too attenuated" to support scienter. *In re Verifone Sec. Litig.*, 2016 WL 1213666, at *8 (N.D. Cal. Mar. 29, 2016) (***ten-week gap*** did not support scienter); *see In re Affirm Holdings Sec. Litig.*, 2024 WL 3955453, at *12-13 (N.D. Cal. Aug. 26, 2024) (same for ***five-week gap*** lapping quarter-end).

**Executive Departure.** Finally, Plaintiff points to Dexcom's October 2024 announcement that Lawver would retire at year end, claiming it supports scienter because it "came on the heels of the Company's disappointing news in July 2024." ¶¶128-129. That is wrong. "A resignation…provides evidence of scienter only when it is accompanied by additional evidence of the defendant's wrongdoing." *Ryan v. FIGS*, 2024 WL 187001, at *13 (C.D. Cal. Jan. 17, 2024). No such facts are pled here. Plaintiff concedes that despite retiring, Lawver agreed to "stay on as a special advisor" into 2025—*i.e.*, over ***six months beyond*** the "disappointing news." ¶¶128-129; *see In re NVIDIA Sec. Litig.*, 768 F.3d 1046, 1063 (9th Cir. 2014) (no scienter where "two of the three individuals remained at NVIDIA in…advisory role").

### 2. Plaintiff's failure to plead motive undermines scienter.

Where, as here, there are no specific contemporaneous facts showing fraudulent intent or deliberate recklessness, the failure to allege a plausible motive is fatal. *Prodanova v. H.C. Wainwright*, 993 F.3d 1097, 1108 (9th Cir. 2021).

**Commercial prospects.** Plaintiff alleges Defendants lied to "maintain the public perception that they were competitive with Abbott in the GCM space" to protect Dexcom's "commercial prospects." ¶130. "However, allegations of routine corporate objectives such as the desire to obtain good financing and expand are not, without more, sufficient to allege scienter; to hold otherwise would support a finding of scienter for any company that seeks to enhance its business prospects." *In re Rigel*

---

[8] Plaintiff attempts to downplay this lag, claiming Dexcom would have had data for the first week of Q2'24 by the end of May 2024. ¶121. But there are no well-pled facts that DME sales dropped the ***first week*** of Dexcom's sales reorganization, ***much less that Defendants believed any drop represented a trend***.

*Pharms. Sec. Litig.*, 697 F.3d 869, 884 (9th Cir. 2012).

**Incentive Compensation.** Plaintiff claims "Sayer and Sylvain were further incentivized to inflate the Company's stock price because Dexcom's stock price was a significant input to their incentive compensation." ¶140; *see* ¶¶141-142. "Incentive compensation can hardly be the basis on which an allegation of fraud is predicated." *M & M Hart Living Tr. v. Glob. Eagle Ent.*, 2017 WL 5635424, at *13 (C.D. Cal. Aug. 20, 2017); *Zucco Partners v. Digimarc*, 552 F.3d 981, 1005 (9th Cir. 2009) ("bare assertion that executive-level bonuses were based in part on [company's] financial performance" inadequate without "comparisons to prior years bonuses" or "correlation between [defendants'] compensation and [the company's] bottom line").

**Stock sales.** Plaintiff also points to Defendants' stock sales. ¶¶131-139. For such sales to support scienter, Plaintiff must allege facts showing the sales were "dramatically out of line with prior trading practices" and were executed "at times calculated to maximize the personal benefit from undisclosed inside information." *Zucco*, 552 F.3d at 1005. Plaintiff alleges nothing of the sort here.

Lawver. Plaintiff identifies only one class period sale by Lawver, which it claims is suspicious because she did not sell any shares in the "months prior to the class period." ¶135. But that sale was "to cover tax withholding obligations in connection with the vesting of RSUs" and did "not represent a discretionary trade." Ex. 22 at 1. As such, neither the timing nor amount supports an inference of scienter. *FIGS*, 2024 WL 187001, at *11 (finding "nothing suspicious about the timing of [defendants'] stock sales because the sales were tax related").

Sylvain. Plaintiff identifies six stock sales by Sylvain. ¶¶133-134. Three were nondiscretionary to satisfy tax obligations, Ex. 23 at 4, 6-7, and thus "do[] not support a strong inference of scienter." *FIGS*, 2024 WL 187001, at *11. Another two were made pursuant to 10b5-1 plans entered into before the class period, Ex. 23 at 1-2, and thus, "do not support a strong inference of scienter." *Elec. Workers Pension Fund v. HP*, 2021 WL 1056549, at *7 (N.D. Cal. Mar. 19, 2021). This leaves only one sale,

also pursuant to a 10b5-1 plan, adopted in November 2023. Ex. 23 at 5. While that timing does "less to shield a defendant from suspicion," it "may still mitigate any inference of improper motive surrounding stock sales." *Pontiac Gen. Emps. Ret. Sys. v. First Solar*, 2023 WL 155861, at *9 (D. Ariz. Jan. 11, 2023). And here, Plaintiff pleads no facts showing this sale was "dramatically out of line with [Sylvain's] prior trading practices." *Id.* Nor could it, as Sylvain set up 10b5-1 plans nearly once a year and sold shares under those plans on a quarterly basis. Speers Decl., ¶28; Exs. 23-24; *see Metzler*, 540 F.3d at 1066-67.

Sayer. Plaintiff cites three sales by Sayer, ¶132, all of which were to satisfy tax obligations or pursuant to a 10b5-1 plan. Ex. 25. And, while that 10b5-1 plan was adopted during the class period, Plaintiff alleges no facts showing the sales under that plan were suspicious. *See First Solar*, 2023 WL 155861, at *8-9. Nor could it, as ***Sayer sold more shares in the four months before the class period than he did during the entire 15-month class period***. Speers Decl., ¶¶30, 32; Exs. 25-26; *see Retail Wholesale Dep't Store Union v. Stitch Fix*, 2024 WL 3447524, at *7 (N.D. Cal. July 16, 2024) (no scienter where defendant "sold more shares in the 18-month period before the class period than during the [18-month] class period").[9]

\*     \*     \*

Viewed holistically and comparing the "malicious and innocent inferences cognizable from the facts pled," *Zucco*, 552 F.3d at 991, the far more compelling inference is innocent: Dexcom worked to gain market share and did not foresee the disruption its novel sales-force realignment and evolving channel mix would create.[10]

## V.     CONCLUSION

The Complaint should be dismissed in its entirety, with prejudice.

---

[9] Because Plaintiff fails to plead scienter for any Individual Defendant, it also fails to plead a strong inference of scienter as to Dexcom. *See In re Impac Mortg. Holdings Sec. Litig.*, 554 F.Supp.2d 1083, 1101 & n.12 (C.D. Cal. 2008).

[10] Plaintiff's failure to plead a violation under Section 10(b) mandates dismissal of its Section 20(a) claim. *In re NVIDIA*, 768 F.3d at 1052.

| | |
|---|---|
| 1 | Dated: March 13, 2025 |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |

Dated:     March 13, 2025          COOLEY LLP


By: */s/ Koji F. Fukumura*
     Koji F. Fukumura

*Attorneys for Defendants Dexcom Inc.,
Kevin Sayer, Jereme Sylvain, and Teri
Lawver*