1    ROBBINS GELLER RUDMAN
       & DOWD LLP
2    DANIEL S. DROSMAN (200643)
   W. MARK CONOVER (236090)
3    SARAH A. FALLON (345821)
   655 West Broadway, Suite 1900
4    San Diego, CA 92101
   Telephone: 619/231-1058
5    ddrosman@rgrdlaw.com
   mconover@rgrdlaw.com
6    sfallon@rgrdlaw.com

7    Lead Counsel for Lead Plaintiff

8    [Additional counsel appear on signature page.]

9                 UNITED STATES DISTRICT COURT

10             SOUTHERN DISTRICT OF CALIFORNIA

| In re DEXCOM, INC. CLASS ACTION SECURITIES LITIGATION | ) ) ) ) ) ) | Lead Case No. 24-cv-1485-RSH-VET |
|---|---|---|
| | | LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| | | DATE:     April 17, 2025 |
| | | CTRM:    3B, 3rd Floor |
| | | JUDGE:    Honorable Robert S. Huie |

4907-0272-6965.v1

1

# TABLE OF CONTENTS

2

Page

3  I.     INTRODUCTION ................................................................................ 1

4  II.    LEGAL STANDARD ......................................................................... 2

5  III.   PLAINTIFF ALLEGES ACTIONABLE MISSTATEMENTS AND
        OMISSIONS ....................................................................................... 3

6
        A.    Defendants Created a Material Misimpression ........................ 3
7
        B.    Defendants Fail to Defeat the Misimpression Created by Their
8              Statements ................................................................................ 6

9              1.    Defendants' Truth-on-the-Market Defense Is Meritless ......... 6

10             2.    Defendants' Cherry-Picked Disclosures Do Not Negate
                     Their Misleading Narrative ............................................ 7
11
               3.    Literal Truth Is Not a Defense .................................... 10
12
        C.    Defendants Distort the Record ............................................... 11
13
        D.    Defendants' Remaining Arguments Fail ................................ 13
14
               1.    The Misstatements Are Not Mere Puffery .................. 13
15
               2.    The Misstatements Are Not Inactionable Opinions ............ 15
16
               3.    Defendants' Statements Are Not Protected by the Safe
17                   Harbor ................................................................... 16

18 IV.    PLAINTIFF ADEQUATELY ALLEGES DEFENDANTS' SCIENTER ....... 17

19        A.    Defendants Frequently Reported on and Professed Knowledge as
                to the Impact of the Medicare Coverage Expansion on Its Core
20              Business ................................................................................. 18

21        B.    Defendants' Post-Class Period Admissions Confirm Their
                Contemporaneous Knowledge – or Reckless Disregard – of
22              Information Undermining Their Statements ............................ 20

23        C.    Temporal Proximity Supports Scienter ................................... 22

24        D.    Lawyer's Sudden Departure Supports Scienter ....................... 22

25        E.    Defendants Were Motivated to Conceal the Fraud ................. 23

26 V.     PLAINTIFF HAS ADEQUATELY ALLEGED §20(a) CLAIMS ............. 25

27 VI.    CONCLUSION ................................................................................ 25

28

4907-0272-6965.v1

# TABLE OF AUTHORITIES

**Page**

## CASES

*Azar v. Yelp, Inc.*,
2018 WL 6182756 (N.D. Cal. 2018).................................................................24

*Batwin v. Occam Networks, Inc.*,
2008 WL 2676364 (C.D. Cal. 2008).................................................................23

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008).....................................................................12, 22

*Cal. Pac. Bank v. Fed. Deposit Ins. Corp.*,
885 F.3d 560 (9th Cir. 2018)............................................................................20

*City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*,
2023 WL 1769810 (S.D. Cal. 2023) ...............................................................6, 7

*City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*,
963 F. Supp. 2d 1092 (E.D. Wash. 2013),
*aff'd*, 691 F. App'x 393 (9th Cir. 2017) ..........................................................11

*Crews v. Rivian Auto., Inc.*,
2023 WL 4361098 (C.D. Cal. 2023).................................................................25

*Cutler v. Kirchner*,
696 F. App'x 809 (9th Cir. 2017).....................................................................14

*Eminence Cap., LLC v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003)..........................................................................25

*ESG Cap. Partners, LP v. Stratos*,
828 F.3d 1023 (9th Cir. 2016)....................................................................18, 24

*Evanston Police Pension Fund v. McKesson Corp.*,
411 F. Supp. 3d 580 (N.D. Cal. 2019)..............................................................19

*Galestan v. OneMain Holdings, Inc.*,
348 F. Supp. 3d 282 (S.D.N.Y. 2018)...............................................................14

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
63 F.4th 747 (9th Cir. 2023).......................................................................14, 17

24-cv-1485-RSH-VET

4907-0272-6965.v1

1

2                                                                                    **Page**

3
*Hill v. State Street Corp.*,
4        2011 WL 3420439 (D. Mass. 2011)................................................................ 16

5
*Homyk v. ChemoCentryx, Inc.*,
6        2023 WL 3579440 (N.D. Cal. 2023)................................................................. 7

7
*In re Affirm Holdings, Inc. Sec. Litig.*,
8        2024 WL 3955453 (N.D. Cal. 2024)............................................................... 22

9
*In re Alphabet, Inc. Sec. Litig.*,
10       1 F.4th 687 (9th Cir. 2021).................................................................... 5, 18

11
*In re Ambac Fin. Grp., Inc. Sec. Litig.*,
12       693 F. Supp. 2d 241 (S.D.N.Y. 2010).............................................................. 14

13
*In re Apple Inc. Sec. Litig.*,
         2020 WL 6482014 (N.D. Cal. 2020).......................................................... 21, 22
14

15
*In re Banc of Cal. Sec. Litig.*,
         2017 WL 3972456 (C.D. Cal. 2017)............................................................... 10
16

17
*In re Energy Recovery Inc. Sec. Litig.*,
         2016 WL 324150 (N.D. Cal. 2016).................................................................. 17
18

19
*In re eSpeed, Inc. Sec. Litig.*,
         457 F. Supp. 2d 266 (S.D.N.Y. 2006)............................................................... 8
20

21
*In re Facebook, Inc. Sec. Litig.*,
         87 F.4th 934 (9th Cir. 2023).......................................................................... 3
22

23
*In re Fibrogen, Inc. Sec. Litig.*,
         2022 WL 2793032 (N.D. Cal. 2022).......................................................... 14, 23
24
*In re Gilead Scis. Sec. Litig.*,
25       536 F.3d 1049 (9th Cir. 2008).......................................................................... 3

26
*In re Golden Heaven Grp. Holdings Ltd. Sec. Litig.*,
         2025 WL 714171 (C.D. Cal. 2025)............................................................ 14, 16
27

28

4907-0272-6965.v1

1

2                                                                                              **Page**

3

4
*In re Green Dot Corp. Sec. Litig.*,
  2024 WL 1356253 (C.D. Cal. 2024) .......................................................... 14, 19

5

6
*In re Harman Int'l Indus., Inc. Sec. Litig.*,
  791 F.3d 90 (D.C. Cir. 2015) ........................................................................ 17

7

8
*In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*,
  2020 WL 1479128 (E.D. Pa. 2020) ................................................................ 7

9

10
*In re InterMune, Inc.*,
  2004 WL 1737264 (N.D. Cal. 2004) .............................................................. 14

11

12
*In re Iso Ray, Inc. Sec. Litig.*,
  189 F. Supp. 3d 1057 (E.D. Wash. 2016) ...................................................... 14

13
*In re Musicmaker.com Sec. Litig.*,
  2001 WL 34062431 (C.D. Cal. 2001) ............................................................ 13

14

15
*In re NVIDIA Corp. Sec. Litig.*,
  768 F.3d 1046 (9th Cir. 2014) ...................................................................... 22

16

17
*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) ...................................................................... 16

18

19
*In re QuantumScape Sec. Class Action Litig.*,
  580 F. Supp. 3d 714 (N.D. Cal. 2022) .......................................................... 15

20

21
*In re Res. Am. Sec. Litig.*,
  2000 WL 1053861 (E.D. Pa. 2000) ................................................................ 7

22

23
*In re Rigel Pharms., Inc. Sec. Litig.*,
  697 F.3d 869 (9th Cir. 2012) ........................................................................ 23

24
*In re Spectrum Pharms. Inc.*,
  2015 WL 1413385 (D. Nev. 2015) ................................................................ 19

25

26
*In re Splunk Inc. Sec. Litig.*,
  592 F. Supp. 3d 919 (N.D. Cal. 2022) .......................................................... 17

27

28

4907-0272-6965.v1

**Page**

*In re Twitter Sec. Litig.*,
 506 F. Supp. 3d 867 (N.D. Cal. 2020) ................................................................ 19

*In re UTStarcom, Inc. Sec. Litig.*,
 617 F. Supp. 2d 964 (N.D. Cal. 2009) ................................................................ 24

*In re VeriFone Holdings, Inc. Sec. Litig.*,
 704 F.3d 694 (9th Cir. 2012) ................................................................................ 3

*In re VeriFone Sec. Litig.*,
 2016 WL 1213666 (N.D. Cal. 2016) ................................................................... 22

*In re Vivendi Universal, S.A. Sec. Litig.*,
 381 F. Supp. 2d 158 (S.D.N.Y. 2003) .................................................................. 7

*In re WageWorks, Inc., Sec. Litig.*,
 2020 WL 2896547 (N.D. Cal. 2020) ................................................................... 23

*Karinski v. Stamps.com, Inc.*,
 2020 WL 281716 (C.D. Cal. 2020) ................................................................ 9, 14

*Khoja v. Orexigen Therapeutics, Inc.*,
 899 F.3d 988 (9th Cir. 2018) ............................................................................ 3, 5

*Laborers Dist. Council Constr. Indus. Pension Fund v. Sea Ltd.*,
 743 F. Supp. 3d 1083 (D. Ariz. 2024) ................................................................ 19

*Lamartina v. VMware, Inc.*,
 2021 WL 4133851 (N.D. Cal. 2021) ................................................................... 24

*Lamartina v. VMware, Inc.*,
 2023 WL 2763541 (N.D. Cal. 2023) ................................................................... 24

*Lilien v. Olaplex Holdings, Inc.*,
 2025 WL 444254 (C.D. Cal. 2025) ....................................................................... 8

*Lipton v. Pathogenesis Corp.*,
 284 F.3d 1027 (9th Cir. 2002) ............................................................................ 19

1

2                                                                                    **Page**

3

*M & M Hart Living Tr. v. Glob. Eagle Ent., Inc.*,
   2017 WL 5635424 (C.D. Cal. 2017) ................................................... 24

*M.M. ex rel. Ficklin v. Antelope Valley Union High Sch. Dist.*,
   2024 WL 4560172 (C.D. Cal. 2024) ................................................... 11

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
   601 U.S. 257 (2024) ........................................................................... 10

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
   513 F.3d 702 (7th Cir. 2008) .............................................................. 23

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) ............................................................................... 5

*Merkamerica Inc. v. Glover*,
   2019 WL 8989833 (C.D. Cal. 2019) ................................................... 14

*Miller v. Thane Int'l Inc.*,
   519 F.3d 879 (9th Cir. 2008) .............................................................. 10

*Mulligan v. Impax Lab'ys, Inc.*,
   36 F. Supp. 3d 942 (N.D. Cal. 2014) .................................................. 14

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v.
   Am. W. Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) ........................................................ 23, 24

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
   380 F.3d 1226 (9th Cir. 2004) ............................................................ 18

*Ohio Pub. Emps. Ret. Sys. v. Meta Platforms, Inc.*,
   2024 WL 4353049 (N.D. Cal. 2024) ............................................. 15, 16

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015) ............................................................. 10, 15, 16

*Pampena v. Musk*,
   705 F. Supp. 3d 1018 (N.D. Cal. 2023) ................................................ 5

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

24-cv-1485-RSH-VET

4907-0272-6965.v1

Page

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014) ................................................................. 15

*Provenz v. Miller*,
   102 F.3d 1478 (9th Cir. 1996) ........................................................... 7, 23

*Purple Mountain Tr. v. Wells Fargo & Co.*,
   432 F. Supp. 3d 1095 (N.D. Cal. 2020) ................................................. 21

*Reese v. Malone*,
   747 F.3d 557 (9th Cir. 2014) ........................................................... 17, 22

*Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v.*
   *Hewlett-Packard Co.*,
   845 F.3d 1268 (9th Cir. 2017) ................................................................ 15

*Roberti v. OSI Sys., Inc.*,
   2015 WL 1985562 (C.D. Cal. 2015) ....................................................... 20

*Ryan v. FIGS*,
   2024 WL 187001 (C.D. Cal. 2024) .......................................................... 22

*S. Ferry LP #2 v. Killinger*,
   687 F. Supp. 2d 1248 (W.D. Wash. 2009) ........................................ 19, 20

*S. Ferry LP, No. 2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) .................................................................. 17

*Schueneman v. Arena Pharms., Inc.*,
   840 F.3d 698 (9th Cir. 2016) .................................................................... 5

*SEB Inv. Mgmt. AB v. Wells Fargo & Co.*,
   742 F. Supp. 3d 1003 (N.D. Cal. 2024) ................................................. 22

*Shenwick v. Twitter, Inc.*,
   282 F. Supp. 3d 1115 (N.D. Cal. 2017) ................................................. 18

*Slayton v. Am. Express Co.*,
   604 F.3d 758 (2d Cir. 2010) ................................................................... 17

4907-0272-6965.v1

**Page**

*Stardock Sys., Inc. v. Reiche*,
   2019 WL 8333563 (N.D. Cal. 2019)................................................. 20

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007) ..........................................................*passim*

*Turocy v. El Pollo Loco Holdings, Inc.*,
   2017 WL 3328543 (C.D. Cal. 2017)............................................. 24

*Washtenaw Cnty. Emps. Ret. Sys. v. Celera Corp.*,
   2012 WL 3835078 (N.D. Cal. 2012)............................................. 20

*Wochos v. Tesla, Inc.*,
   985 F.3d 1180 (9th Cir. 2021) ................................................... 17

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C.
   §78j(b) ............................................................................... 25
   §78t(a).............................................................................. 25
   §78u-4(b)(2)....................................................................... 17

Federal Rule of Civil Procedure
   Rule 12(b)(6) ........................................................................ 2

17 C.F.R.
   §240.10b5-1 ........................................................................ 24

4907-0272-6965.v1

1    Lead Plaintiff National Elevator Industry Pension Fund ("Plaintiff") respectfully

2    submits this memorandum of law in opposition to Defendants' Motion to Dismiss Lead

3    Plaintiff's Consolidated Complaint for Violations of the Federal Securities Laws (Doc. No.

4    29) ("Motion").[1]

5    **I.    INTRODUCTION**

6    When the Centers for Medicare & Medicaid Services ("CMS") dramatically

7    broadened coverage for continuous glucose monitors ("CGMs") to include millions of

8    Type 2 basal insulin patients, it was not just a policy shift; it was heralded by Dexcom itself

9    as the "single largest expansion in coverage" the industry had ever witnessed. This

10   unlocked a vast, multi-million patient market, setting the stage for intense competition, a

11   veritable "basal war," primarily between Dexcom and its rival, Abbott.

12   Against this backdrop, Defendants painted a consistently optimistic picture for

13   investors throughout the Class Period. They were not just participating; they were

14   winning. In a steady drumbeat, Defendants assured the market that Dexcom was "in a

15   great position to compete," "well-positioned to extend our leadership," and actively "taking

16   share" from Abbott in the crucial Type 2 basal segment. Investors heard repeatedly about

17   Dexcom's "right commercial infrastructure," its "sizable sales force" poised to engage

18   primary care physicians ("PCPs") who treat most of these new patients, and its "strong

19   relationships" with the durable medical equipment ("DME") suppliers critical for servicing

20   the Medicare basal cohort.

21   But this narrative was a carefully constructed mirage. While Dexcom publicly

22   projected strength and growth, the reality behind the scenes was starkly different. The

23   Company lacked the fundamental tools to succeed in this new arena. Far from having the

24   "right commercial infrastructure," Dexcom later admitted it simply did not have "the

25   resources in the field." Its under-resourced sales force struggled to gain traction with

26   
27   [1] Capitalized terms not defined herein have the meaning ascribed in the Consolidated Complaint for Violations of the Federal Securities Laws (Doc. No. 27) ("CC"). Unless otherwise noted, all "¶" or "¶¶" references are to the CC, emphasis is added, and citations are omitted.

28

essential PCPs, securing "very few prescriptions" compared to Abbott's entrenched dominance.  Further, Dexcom had alienated the DME partners it needed to access the influx of Medicare basal patients, ceding ground to Abbott, who maintained those vital relationships.  By selectively presenting positive information, they created a materially false impression of the Company's position and performance in the vital basal market.

The illusion shattered on July 25, 2024.  When Dexcom finally disclosed the truth – a significant shortfall in new customer acquisition, decelerating growth, a weakened competitive stance, and a massive cut to revenue guidance – the market's reaction was swift and brutal.  The Company's stock price plummeted by over 40%, erasing more than $17 billion in market capitalization in a single day, the steepest decline in its history.  This catastrophic drop underscores the materiality of the information concealed and reveals the stark difference between the optimistic narrative sold to investors and the challenging reality the Company faced.

Defendants' Motion attempts to dismantle the CC by mischaracterizing misstatements as puffery or opinion, invoking an inapplicable safe harbor, and arguing literal truth or that the market knew.  These arguments fail.  Defendants cannot sanitize their statements by selectively quoting them out of context or ignoring the wealth of detail alleged in the CC.  Furthermore, the CC pleads a strong inference of scienter, supported by the Defendants' roles and access to core operational data, their admissions that they tracked the very metrics that belied their public statements, post-Class Period admissions confirming contemporaneous knowledge, the temporal proximity between reassurances and the eventual disastrous revelation, a key executive departure, and significant, suspiciously timed insider stock sales.

## II.    LEGAL STANDARD

In assessing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must "accept all factual allegations in the complaint as true" and "assess all the allegations holistically." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322, 326 (2007).  "[S]o long as the plaintiff alleges facts to support a theory that is not facially

implausible, the court's skepticism is best reserved for later stages." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

## III.  PLAINTIFF ALLEGES ACTIONABLE MISSTATEMENTS AND OMISSIONS

To plead falsity under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), a complaint must "'specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading.'" *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012).  Statements are misleading when they give investors an "impression of a state of affairs that differs in a material way from the one that actually exists." *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 950 (9th Cir. 2023) (cleaned up).  "'[O]nce defendants . . . tout positive information . . . they [are] bound to do so in a manner that wouldn't mislead investors.'" *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008-09 (9th Cir. 2018).

### A.  Defendants Created a Material Misimpression

Just prior to the start of the Class Period, CMS announced that Medicare coverage for CGMs would be expanded to Type 2 basal patients (and others), which served as a precursor for private insurance coverage.  ¶45.  Dexcom described this as the "single largest expansion in coverage" in the industry's history, which expanded the addressable market "tremendously" by millions of patients for the two players in the CGM duopoly – Dexcom and Abbott.  ¶¶32, 46, 51, 75.  This new patient population, primarily comprised of Type 2 basal users, was pivotal to Dexcom's growth.  Dexcom and Abbott were vying for market dominance in the wake of this expansion – a competition described by analysts as the "basal wars."  ¶66.

At the start of the Class Period, Defendants consistently reassured investors that Dexcom was positioned to compete in the new Type 2 basal segment and extend their leadership from the Type 1 segment into this space.  *See, e.g.*, ¶67 ("***We are in a great position to compete as this market develops . . . .***"); ¶75 ("***We're also well-positioned to extend our leadership into the type 2 basal insulin segment***.").  This included assurances

4907-0272-6965.v1

that Dexcom had the right sales force and commercial infrastructure in place to reach the tens of thousands of PCPs across the country who were the primary providers and prescribers for Type 2 basal patients. ¶77 ("***We have the right commercial infrastructure for leading with the endocrinologists and expanding our leadership in primary care with the type 2 basal [markets]*** . . . ."); ¶71 ("In terms of capacity . . . . ***So we do have a sizable sales force***."); *infra*, n.4. Defendants also touted the strength of their relationships with DME suppliers, critical as they exclusively serviced Medicare Type 2 basal patients. *See, e.g.*, ¶73 ("***But we also work to maintain strong relationships with our DME distributor partners*** . . . ."); ¶91 ("***We still have a very strong DME business*** . . . .").

As the Class Period progressed, Defendants continuously extolled Dexcom's performance, promoting the notion that it was "taking share" from Abbott in the Type 2 basal market. *See, e.g.*, ¶79 ("***[Y]ou see us taking share in that space. So we feel pretty good about one, taking share*** . . . ."); ¶83 ("***we are doing well in the basal category***," and "***where we have a presence, we win very much***"); ¶85 ("***you continue to see outperformance in basal***"); ¶87 ("***you can see the share taking when you look at the script data***"); ¶89 ("***[T]here's no debate internally to us. We know we're taking share and we see that data***."). Defendants further reinforced this misimpression of Dexcom's growth and success by raising revenue guidance in April 2024 and then doubling down on that raised guidance in June. *See* ¶93 ("***[w]e're happy with our full year guidance***").

But, the rosy picture Defendants had painted was a mirage. Dexcom did not have the right commercial infrastructure to compete effectively against Abbott in the Type 2 basal market and was not well-positioned to lead in basal, as it had with its legacy business (Type 1 and other intensive insulin users). *See* ¶¶42, 48, 78. As Defendants would later admit, Dexcom did not have "the resources in the field" to compete in the Type 2 basal market and was "getting very few prescriptions," lacking both presence and connections in PCP offices, where most of these patients were treated. ¶¶102, 104. This was an insurmountable impediment to competing against Abbott in the Type 2 basal space. Abbott, with its entrenched advantages and pre-existing dominance in the PCP market, was

securing a disproportionate share of new prescriptions (approximately seven of ten new patients). ¶¶68(a), (c)-(e), 72(c), 76(a)(i). This was exacerbated by Dexcom's alienation of its DME partners through its years-long pharmacy push, as all new basal patients were being routed through the DME channel. ¶68(f). In contrast, Abbott (which had maintained its DME relationships) was performing well in this market. *Id.* Similarly, Defendants were not "taking share" throughout the Class Period. As Defendants knowingly concealed and would later admit, Dexcom was badly losing to Abbott in the Type 2 basal market. By the end of 2023, the Company was forced to belatedly expand its sales force by 50% and undertake a massive sales force reorganization. *See* ¶¶54, 72(b); *see also* ¶122.

Once defendants chose to tout this positive information to the market, they were bound to do so in a manner that would not mislead investors, "including disclosing adverse information that cuts against the positive information." *See Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705-06 (9th Cir. 2016); *Khoja*, 899 F.3d at 1008-09 (same). Defendants breached this requirement.

The adverse facts Defendants omitted were material because they "'would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011). The market's sharp reaction to Defendants' July 25, 2024 disclosures of the truth they had concealed – Defendants' shortfall in new customers, decelerating growth, loss of market share, weak competitive position, massive reduction of revenue guidance – causing the Company's stock price to ***plummet by $43.85***, or ***40.7%***, in a single day, a loss of more than $17 billion in market cap and the steepest decline in Dexcom's history. ¶¶152-153;[2] *see In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703 (9th Cir. 2021) (finding that the market reaction to a disclosure supports the materiality of the misleading omission); *Pampena v. Musk*, 705 F. Supp. 3d 1018, 1043 (N.D. Cal. 2023) (stock decline of 9.67% supported

---

[2]    Analysts who followed the Company were also stunned. ¶154 ("quite a surprise"); ¶156 (finding Dexcom's credibility "damaged" in light of management's recent contrary comments); ¶97 ("***DXCM is clearly losing the basal wars right now***").

materiality).

**B.    Defendants Fail to Defeat the Misimpression Created by Their Statements**

Rather than confront the actual misrepresentations, pleaded in the CC, Defendants construct and attack a "straw man" – a self-serving distortion of the misstatements and the reasons why they are misleading.  Doc. No. 29-1 at 23-27; Doc. No. 29-5.[3]  Defendants purport to categorize the list of omissions pleaded by Plaintiff, but they instead manipulate the record through selective quotations while disregarding crucial, undisclosed adverse facts.  Because Defendants completely side-step the ***actual*** misimpression alleged in the CC and described above, their attacks against these mischaracterized omissions necessarily fail to undermine the sufficiency of the claims.

**1.    Defendants' Truth-on-the-Market Defense Is Meritless**

Defendants improperly attempt to litigate factual issues by submitting hundreds of pages of extraneous materials, selectively compiled from various sources and time periods, to argue the market already knew the truth.  *See* Doc. No. 29-1 at 23-27; Doc. No. 29-5; *see also* RJN Opp. at 5-10 (explaining why Defendants' exhibits cannot be considered for the purpose advanced).  But this is nothing more than a premature truth-on-the-market defense.  Such a defense, being "'intensely fact-specific,'" is reserved for the trier of fact, not decided on pleadings.  *City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*, 2023 WL 1769810, at *6 (S.D. Cal. 2023).  To prevail now, Defendants bear the heavy burden of "'prov[ing] that the information that was withheld or misrepresented was "transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by [an] insider's one-sided

---

[3]    Defendants' Appendix B, presented as "cataloguing allegations by categories" (Doc. No. 29-1 at 23), fundamentally misrepresents the CC's allegations.  It omits key points, introduces extraneous material not alleged, and distorts the actual claims, rendering it useless in assessing the sufficiency of the actual allegations.  *See* Lead Plaintiff's Opposition to Defendants' Request for Judicial Notice and Incorporation by Reference ("RJN Opp.") at 10-12, filed herewith.  Appendix A similarly mischaracterizes the misleading statements and omissions at issue.  Neither appendix withstands scrutiny; nor do they refute the well-pleaded allegations of falsity.

4907-0272-6965.v1

1  representations."'" *Id.* at \*5 (quoting *Provenz v. Miller*, 102 F.3d 1478, 1492-93 (9th Cir.

2  1996)).

3       Defendants fall far short.  Even considered on the merits, their defense fails because

4  objective market indicators contradict it.  Analyst commentary throughout the Class Period

5  clearly reflects the market's reliance on Defendants' misleading narrative.  *See* ¶56 (*e.g.*,

6  "clearly the company is seeing accelerated growth … [b]ased on management's

7  commentary, we believe these opportunities should drive upside in 2024 and 2025

8  estimates").  In addition, the market's reaction to the July 25, 2024 corrective disclosure – a

9  stunning 40% stock price collapse accompanied by analyst shock – demonstrates

10 conclusively that the concealed facts were not previously known.  *See, e.g.*, *In re Innocoll*

11 *Holdings Pub. Ltd. Co. Sec. Litig.*, 2020 WL 1479128, at \*15 (E.D. Pa. 2020) ("At the

12 motion to dismiss stage, courts have rejected the truth on the market defense when drops in

13 stock prices have created reasonable inferences of the materiality of information not

14 previously available on the market."); *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F.

15 Supp. 2d 158, 182 (S.D.N.Y. 2003) (considering "the precipitous drop in debt ratings and

16 securities prices" of the defendant company after the alleged corrective disclosure in

17 rejecting truth-on-the-market defense); *In re Res. Am. Sec. Litig.*, 2000 WL 1053861, at \*5

18 (E.D. Pa. 2000) (a "marked[] … drop in price creates a reasonable inference that the

19 information contained in those reports was material information that had not been

20 previously available to the market").  If the "truth" were already public, the market would

21 not have reacted with such surprise and severity.  *See* ¶¶97-98 (analysts expressing shock,

22 loss of "faith in management," and a "credibility hit for DXCM" after the stock's worst day

23 ever).  This market response undercuts Defendants' claim that the truth was already

24 absorbed.

25         **2.    Defendants' Cherry-Picked Disclosures Do Not Negate**
                **Their Misleading Narrative**

26

27      None of the isolated disclosures Defendants selectively highlight effectively

28 counteract the misimpression created by Defendants.  *See* Doc. No. 29-1 at 23-27; *Homyk*

4907-0272-6965.v1

1   *v. ChemoCentryx, Inc.*, 2023 WL 3579440, at *12 (N.D. Cal. 2023) (finding that

2   "[b]ecause the adequacy of Defendants' disclosures is not obvious . . . [it] is a factual issue

3   that the Court may not resolve at this [pleading] stage"); *Lilien v. Olaplex Holdings, Inc.*,

4   2025 WL 444254, at *10 (C.D. Cal. 2025) (rejecting argument that the allegedly omitted

5   information was "common knowledge at the time of the IPO" as a "factual question that

6   the Court will not resolve at the pleading stage"). Defendants' scattered, vague, and

7   outdated disclosures were insufficient to cure the misimpression.

8       ***Abbott's Pricing, Cash Pay Program, Marketing***: Defendants misdirect by

9   focusing on pre-Class Period disclosures about Abbott's programs. Doc. No. 29-1 at 23-

10  25. Plaintiff alleges Defendants failed to disclose how these known factors presented a

11  significant competitive impediment as Dexcom entered the Type 2 basal market. Instead

12  of acknowledging this hurdle, Defendants falsely portrayed Dexcom as: (1) possessing the

13  commercial infrastructure to lead this new market, mirroring its Type 1 success; and (2)

14  already successfully competing and gaining share from Abbott.

15      ***PCP Focus***: Defendants claim CEO Sayer revealed limitations in PCP reach, citing

16  his April 2023 statement about having "'work to do in the PCP community.'" *Id.* at 23-24.

17  But Sayer misleadingly framed this as educational, not structural, while boasting of a prior

18  expansion. *Id.*; Doc. No. 29-9 at 9 ("[w]e did a big sales force expansion last year in

19  anticipation of going more broadly"). This created the false impression the necessary PCP-

20  focused sales force was already in place. Sayer's admission that "[w]e have a lot of

21  prescribers to go" (Doc. No. 29-1 at 23) was immediately nullified by his assurance that

22  Dexcom had already "structured our sales force . . . to, in fact, go after" them. Doc. No.

23  29-9 at 15. Specific assurances override vague caveats. *See In re eSpeed, Inc. Sec. Litig.*,

24  457 F. Supp. 2d 266, 288 (S.D.N.Y. 2006).

25      ***Dexcom's Sales Force***: Similarly, Defendants contend that disclosures of sales

26  force size in 2021 and 2022 shield them from liability. Doc. No. 29-1 at 24-25. But these

27  disclosures did not inform investors as to the sufficiency of Dexcom's sales force and its

28  ability to reach the massive newly-insured Type 2 basal population that Dexcom had not

1    previously targeted.  And, when specifically questioned on this during the Class Period,

2    Defendants misleadingly claimed that the prior sales force expansion was designed to

3    target basal prescribers – further reinforcing the false impression of readiness and a

4    sufficient PCP-facing sales force.[4]  The truth – that Dexcom lacked the resources and PCP

5    relationships necessary to effectively compete in the basal Type 2 market – was only

6    disclosed at the end of the Class Period.  *See* ¶¶102-104; *see also* ¶122.[5]

7        ***DME Relationships***: Defendants point to pre-Class Period disclosures about shifting

8    from DME to pharmacy channels.  Doc. No. 29-1 at 25-26.  They ignore their critical

9    omission: this shift had alienated vital DME partners, hindering Dexcom's ability to

10   capture newly-insured Type 2 basal patients, especially Medicare beneficiaries relying

11   exclusively on the DME channel.  ¶¶68, 76, 88.  Failing to disclose risks to key business

12   relationships is actionable.  *See, e.g.*, *Karinski v. Stamps.com, Inc.*, 2020 WL 281716, at

13   *11 (C.D. Cal. 2020).

14       In short, Defendants' supposed disclosures were incomplete, vague, and repeatedly

15

16   _____

     [4]   An analyst specifically asked whether Dexcom "ha[s] the capacity to bring on a
17   significant number of those [Type 2 basal] patients if you haven't maybe added reps in a
     period of time."  ¶71.  Sylvain responded:

18           In terms of capacity, ***when we doubled the size of the sales force, the
             focus was calling on high decile prescribers of all insulin, including basal***.
19           And so ***the inroads have been made there***.  So from a coverage perspective,
             while we may want to expand coverage a little bit from the sales force, ***it
20           wouldn't be a material step change in how we're going.  It'd be normal as
             part of our thoughts around investments.  So we do have a sizable sales
21           force***.

22   *Id.*; *see also* ¶77.

     [5]   Defendants argue that throughout 2023 and 2024 they "acknowledged the need to do
23   more" (Doc. No. 29-1 at 24) by pointing to a boilerplate risk disclosure from a 2022 SEC
     filing (Doc. No. 29-14 at 11) and a comment buried among other misleading statements
24   that "'we're investing on the commercial side to get broader.'"  Doc. No. 29-1 at 25.  But
     these vague disclosures cannot override repeated Class Period assurances of Dexcom's
25   preparedness.  And, as Defendants had earlier told investors that any expanded sales force
     coverage would not be "material" and would be "normal as part of our thoughts around
26   investments" (¶71), Defendants' statement that they were "investing on the commercial
     side" (¶83) was entirely consistent with Defendants' misleading messaging and not a
27   disclosure of truth.  As later admitted, Dexcom lacked the "resources in the field" and had
     to undertake a major sales force reorganization to access the PCP market.  *See* ¶¶102-104,
28   119, 122.

                              - 9 -                          24-cv-1485-RSH-VET

1  undermined by their own contradictory statements.[6]  None of those disclosures conveyed
2  the truth that: (1) Dexcom was ill-equipped to compete in the newly covered Type 2 basal
3  market; and (2) Dexcom was not meaningfully "taking share" from Abbott.  Because these
4  truths remained obscured, Defendants' defense fails.

5  ### 3.  Literal Truth Is Not a Defense

6  Defendants contend that their statements that they were "taking share" in the basal
7  space cannot be misleading because they were literally true.[7]  *See* Doc. No. 29-1 at 20-22,
8  26-27.  This defense fails as a matter of law.[8]  Even literally accurate statements may be
9  misleading due to "'their context and manner of presentation.'"  *Miller*, 519 F.3d at 886;
10 *see Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 263 (2024)
11 (defining actionable "[h]alf-truths" as "'representations that state the truth only so far as it
12 goes, while omitting critical qualifying information'"); *Omnicare, Inc. v. Laborers Dist.*
13 *Council Constr. Indus. Pension Fund*, 575 U.S. 175, 192 (2015) ("[L]iteral accuracy is not
14 enough: An issuer must as well desist from misleading investors by saying one [true] thing
15 and holding back another.").  While gaining some minimal customers initially, Dexcom
16 gained no meaningful "share" from Abbott.  *See, e.g.*, ¶¶96, 122 (admissions: "***[w]e're***
17 ***getting very few prescriptions***," and were "***not doing wonderful in the basal space***"); *see*
18 *also* ¶97 (analyst commentary: "***DXCM is clearly losing the basal wars right now***" and
19 "***the most worrisome dynamic to us as it implies share loss to its largest competitor***
20 ***Abbott*** . . . which cost DXCM a meaningful number of new patients").  This concealed
21 reality directly contradicts Defendants' steady drumbeat of Class Period statements, such

---

22
23 [6]  Moreover, "investors are not generally required to look beyond a given document to discover what is true and what is not."  *Miller v. Thane Int'l Inc.*, 519 F.3d 879, 887 (9th Cir. 2008); *In re Banc of Cal. Sec. Litig.*, 2017 WL 3972456, at *5 (C.D. Cal. 2017)
24 (agreeing with plaintiff that investors are not required to "comb[] through and analyz[e] hundreds of legal and agency documents").

25 [7]  *See* ¶¶89-90 (when Sylvain stated they were "taking share" on April 24, 2024, this was false because Dexcom remained significantly behind Abbott in market share, was not
26 taking share, gaining share, or catching up – the ratio of scripts Abbott was receiving (7/10) remained unchanged from January to April).

27 [8]  Defendants concede these statements are not puffery, opinion, or eligible for the safe harbor.  Doc. No. 29-1 at 14; Doc. No. 29-4.
28

4907-0272-6965.v1

1  as "*we are doing well in the basal category*," "*where we have a presence, we win very*

2  *much*," and "*you continue to see outperformance in basal*," which painted a false picture

3  of competitive success.   ¶¶55, 83-86, 95-104.   Defendants amplified the deception by

4  frequently bolstering their "taking share" statements with assurances of certainty, citing

5  "script data" in their possession. *See, e.g.*, ¶¶89-90, 116 ("*The debate – there's no debate*

6  *internally to us.   We know we're taking share and we see that data*.").[9]   Defendants'

7  statements about market share are precisely the type of misleading "half-truths" that courts

8  find actionable under the federal securities laws.

9        **C.    Defendants Distort the Record**

10        Defendants seek dismissal by falsely suggesting Plaintiff mischaracterizes their

11  misstatements or takes them out of context. Doc. No. 29-1 at 18-23; Doc. No. 29-4.[10] This

12  argument ignores that the CC presents each challenged statement in full (¶¶67-94),

13  provides surrounding context including analyst questions, and details precisely why each

14  statement was misleading when made.   It is Defendants, not Plaintiff, who distort the

15  record.   They omit context, selectively emphasize words, inject extrinsic materials, and

16  demand adoption of their self-serving interpretation, contrary to the pleading standard.   At

17  this stage, all well-pleaded allegations must be accepted as true and all reasonable

18  inferences drawn in Plaintiff's favor. *See Tellabs*, 551 U.S. at 326.

---

19

20  [9]    Although they present no data that undermines the allegation that Abbot won seven out of ten scripts written for the Type 2 basal population, Defendants question its reliability

21  because "[p]laintiff pleads no source for this data, without which, there is no basis to support its reliability." Doc. No. 29-1 at 26.  But "no plaintiff . . . is required to provide

22  citation to sources or otherwise support specific allegations with evidence at the motion to dismiss stage." *M.M. ex rel. Ficklin v. Antelope Valley Union High Sch. Dist.*, 2024 WL

23  4560172, at *10 (C.D. Cal. 2024).  Defendants' cited authority is distinguishable. *See City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1112-13 (E.D.

24  Wash. 2013) (declining to credit allegation that more than half of defendant's contractually due construction loan portfolio was unpaid where plaintiff identified no source for the data

25  and defendants illustrated flaws in the calculations), *aff'd*, 691 F. App'x 393 (9th Cir. 2017).  In any event, the data cited is consistent with Defendants' own disclosures and the

26  analyst reports pleaded in the CC. ¶¶84, 86, 90, 102 (Sayer acknowledging on September 4, 2024 that Abbott had a "70% share" in the basal population).  Defendants even rely on

27  this data for their own arguments. *See* Doc. No. 29-1 at 22.

[10]    As detailed in the RJN Opp. at 10-12, the Court should refuse to consider Appendix A
28  for both procedural and substantive reasons.

Defendants' efforts to rewrite their statements are unavailing, as demonstrated by these examples:

- **Statement 3 (¶¶71-72)**. ***Defendants' Distortion***: Excising the analyst's specific question about sales force capacity for new Type 2 patients and deleting key phrases ("***the inroads have been made there***" (¶71)) to wrongly assert Plaintiff "challenges only the italicized parts." Doc. No. 29-1 at 19. ***True context***: Sylvain's full response – emphasizing past expansions targeting basal prescribers, claiming "inroads ha[d] been made" with PCPs, downplaying the need for significant changes, and affirming a "sizable sales force" (¶71) – misleadingly conveyed that Dexcom possessed sufficient resources and effective PCP engagement for the 2023 expansion.

- **Statement 9 (¶¶83-84)**. ***Defendants' Distortion***: Omitting the direct analyst question about winning "fair share" against competitors, altering typographical emphasis, and incorrectly claiming that the CC attributed the analyst's question to Sayer. *Compare* Doc. No. 29-1 at 21, *with* ¶83. ***True context***: Sayer's response was unequivocally positive (*e.g.*, "***we are doing well in the basal category***") and created a misimpression of success against Abbott. *See* ¶84. While Defendants point to Sayer's statement that "we'd like to win more," as undercutting the misimpression (Doc. No. 29-1 at 21), they ignore the lead-in to that statement: that Dexcom's "fair share is all of them" (¶83). Thus, a desire to "win more" is not a disclosure of truth. *Id.*

- **Statement 12 (¶¶89-90)**. ***Defendants' Distortion***: Omitting practically all of the analyst's lengthy question, which included the observation that "there's been some debate, obviously, on market share within the basal population," as well as the absolute certainty expressed in response, to argue that the statement was literally true. *Compare* Doc. No. 29-1 at 22, *with* ¶89. ***True context***: The response deliberately created a misimpression, citing data to reassure the analyst that "***there's no debate internally to us. We know we're taking share and we see that data***" and "***a good chunk of our new patients are coming through that basal channel, and we continue to see really well performance in that category***." ¶89. And, as stated *supra*, §III.B.3. & n.8, Defendants' literal truth arguments fail.

Defendants similarly distort the remaining statements, repeatedly: (a) removing analyst questions that prompted the statements (Statements 7 and 10-11); (b) claiming only the italicized portion is challenged while omitting the full statements (Statements 1, 4-8, and 10-11); and (c) offering implausible inferences as to the actual meaning of the statements (Statements 1, 4-8, 10-11, and 13). Defendants then insist their sanitized versions are the only reasonable readings. Doc. No. 29-1 at 18-23. But Defendants do not get to dictate the meaning of the statements at the pleading stage. Plaintiff's burden is met by showing a reasonable investor could have been misled. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 986 (9th Cir. 2008) (the plaintiff's plausible interpretation

4907-0272-6965.v1

1    sufficient even if the defendant's is conceivable); *In re Musicmaker.com Sec. Litig.*, 2001

2    WL 34062431, at *19 n.13 (C.D. Cal. 2001) (question at pleadings stage is "whether a

3    defendant deliberately made a statement which would mislead a reasonable investor, not

4    whether there is any conceivable interpretation of the defendant's words according to

5    which they were not false").

6              **D.     Defendants' Remaining Arguments Fail**

7              In addition, Defendants argue that most (11 of 14) statements are inactionable as a

8    matter of law because they are either puffery, opinion, and/or forward-looking, but these

9    challenges also miss the mark.  Doc. No. 29-1 at 14-18.

10             **1.     The Misstatements Are Not Mere Puffery**

11             Defendants argue that 11 of the challenged statements are "simply expressions of

12   corporate optimism or 'puffing' that cannot be misleading as a matter of law."  Doc. No.

13   29-1 at 14.  This puffery challenge rests entirely on their blatant mischaracterization of the

14   alleged statements.  Defendants remove key portions from the statements actually alleged

15   in the CC (going so far as to cut off statements mid-sentence and insert periods), ignore the

16   analyst questions which prompted them, and otherwise strip them of their context.

17   *Compare* Doc. No. 29-1 at 14-15, *with* Statements 1 (¶67), 2 (¶69), 3 (¶71; *supra*, n.4), 5

18   (¶75), 6 (¶77), 8 (¶81), 9 (¶83), 10 (¶85), *and* 14 (¶93).  For example, to argue that

19   Statements 1, 2, 5, 6, and 8 are mere puffery, Defendants cut the statements off

20   immediately prior to the portions which attribute those statements specifically and

21   exclusively to the basal population.  *Compare, e.g.*, ¶75 (As pleaded: "***We're also well-***

22   ***positioned to extend our leadership into the type 2 basal insulin segment***."), *with* Doc.

23   No. 29-1 at 14 (Defendants' version: "'***We're also well-positioned to extend our***

24   ***leadership***.'"); *compare* ¶77 (As pleaded: "***We have the right commercial infrastructure***

25   ***for leading with the endocrinologists and expanding our leadership in primary care with***

26   ***the type 2 basal and severe hypoglycemia markets where coverage has just opened up in***

27   ***the last couple of months***."), *with* Doc. No. 29-1 at 15 (Defendants' version: "'We have

28   the ***right commercial infrastructure*** for leading with the endocrinologists and ***expanding***

4907-0272-6965.v1

1     *our leadership* in primary care . . . .'").

2         They misleadingly cite cases out of context to argue certain words automatically

3 constitute puffery.   Doc. No. 29-1 at 14-15.[11]   Defendants cannot reimagine their

4 statements, nor change the standard by which courts evaluate puffery.   A statement is

5 puffery only if it is "'so "exaggerated" or "vague" that no reasonable investor would rely

6 on it when considering the total mix of available information.'"   *Merkamerica Inc. v.*

7 *Glover*, 2019 WL 8989833, at *9 (C.D. Cal. 2019).   Such a determination is fact-intensive:

8 "'courts must exercise great caution'" in determining puffery at the motion to dismiss

9 stage.   *Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014).   The

10 "Court may not assess the statements . . . in a vacuum, 'plucking the statements out of their

11 context to determine whether the words, taken *per se*, are sufficiently "vague" so as to

12 constitute puffery.'"   *Id.*; *see also Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63

13 F.4th 747, 770 (9th Cir. 2023) ("'[G]eneral statements of optimism, when taken in context,

14 may form a basis for a securities fraud claim.'").   Yet, this is precisely what Defendants

15 impermissibly do.[12]

16

17    [11]   Defendants' cases are factually inapposite and certainly do not hold that the words
Defendants challenge are *per se* puffery. Doc. No. 29-1 at 15. Indeed, many courts have

18 held the phrases Defendants challenge to be material. *Compare* Doc. No. 29-1 at 14-15,
*with, e.g.*, *In re Golden Heaven Grp. Holdings Ltd. Sec. Litig.*, 2025 WL 714171, at *6

19 (C.D. Cal. 2025) ("'we *are* well positioned for even stronger business growth'") (emphasis
in original), *Karinski*, 2020 WL 281716, at *11 (business partner was "'very happy'" with

20 the relationship), *In re Fibrogen, Inc. Sec. Litig.*, 2022 WL 2793032, at *9-*10 (N.D. Cal.
2022) (data was "'encouraging'" and defendants were "encouraged"), *In re Green Dot*

21 *Corp. Sec. Litig.*, 2024 WL 1356253, at *4 & n.2 (C.D. Cal. 2024) ("'continues to gain
traction on nearly all fronts'" and "'continue to do extremely well'"), *Galestan v. OneMain*

22 *Holdings, Inc.*, 348 F. Supp. 3d 282, 303-04 (S.D.N.Y. 2018) ("'[w]e remain comfortable
with our previously stated EPS guidance'"), *In re InterMune, Inc.*, 2004 WL 1737264, at

23 *7 (N.D. Cal. 2004) (finding statements that "deceived the public as to the size and strength
of [defendant's] sales force" were not puffery), *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693

24 F. Supp. 2d 241, 272 (S.D.N.Y. 2010) (statement that company's portfolio was
"outperforming" relevant indices was not puffery), *In re Iso Ray, Inc. Sec. Litig.*, 189 F.

25 Supp. 3d 1057, 1071 (E.D. Wash. 2016) (statement referencing "'outstanding . . .
outcomes'" was not too vague because "[a] reasonable inference is that 'outstanding'

26 means superior in relation to the other . . . options"), *and Cutler v. Kirchner*, 696 F. App'x
809, 814 (9th Cir. 2017) (statements that business is "'ready to scale'" and capable of

27 "integrating acquisitions 'quickly'" not puffery as they "describ[ed] what [the business] did
and what practical aims it was supposed to achieve").

28    [12]   While they acknowledge the importance of context in the puffery analysis, Defendants'

Here, when viewed in their entirety and contextually, as required by law, it is evident that Defendants' misstatements were not vague "corporate optimism" but were specific and concrete statements, many in response to direct analyst questions, about the Company's positioning and ability to compete for the newly covered basal population; the sufficiency and placement of its sales force to capture this population; the strength of its DME business and relationships with DME suppliers (who were serving the newly covered basal population); and its performance in the newly covered basal population *vis a vis* its only meaningful competitor, Abbott. These statements were thus materially misleading and actionable. *See* n.12; §III.A.

## 2.     The Misstatements Are Not Inactionable Opinions

Defendants next wrongly argue that the same 11 statements are inactionable opinions, but do not attempt to explain why they qualify as opinions under *Omnicare*. *See* Doc. No. 29-1 at 15-16. Defendants do not point to any qualifiers even identifying them as opinions (*i.e.*, "I believe" or "I think"). *See* Doc. No. 29-1 at 15-16; Doc. No. 29-4; *cf. In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 739 (N.D. Cal. 2022) (finding statements were not opinions because they did not "use opinion-qualifying language such as 'I think' or 'I believe'"); *Ohio Pub. Emps. Ret. Sys. v. Meta Platforms, Inc.*, 2024 WL 4353049, at *12 (N.D. Cal. 2024) (similar).

Rather, Defendants' sweeping characterization of these statements as opinions appears to rest on the fact that they contain descriptive words. *See* Doc. No. 29-1 at 15; Doc. No. 29-4. But descriptive language does not transform an objective statement into an opinion. *See Omnicare*, 575 U.S. at 183 (noting that the statement "'the coffee is ***hot***'" is

cited authorities are factually inapt. *See Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1276 (9th Cir. 2017) (finding inactionable statements regarding the company's ethical leadership because they were "'inherently aspirational,'" could not be objectively verified, and appeared in the company's code of conduct – where plaintiff conceded that the code was not actionable and could not locate a single case finding non-compliance with an ethical code to be actionable); *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014) (finding inactionable statements where the company noted it was "'reservedly optimistic,'" "wish[ed] it had a 'crystal ball,'" and "'in a pretty good position' despite the economic crisis").

"a statement of fact" because it "expresses certainty about a thing"); *Meta*, 2024 WL 4353049, at *12 (finding statement that research findings were "'bi-directional, so small effects positive and small effects negative but it's quite small'" was not an opinion). Indeed, such a broad interpretation of "opinion" would undermine the federal securities laws by allowing companies to immunize themselves by merely describing their business to investors. *Hill v. State Street Corp.*, 2011 WL 3420439, at *23 (D. Mass. 2011) (treating "'high quality'" as "a factual declaration" and not opinion, explaining that "[i]nterpreting the term 'opinion' more broadly . . . would allow [defendants] to immunize themselves from the consequences of their use of descriptive language"). Even if certain of the challenged statements somehow could be considered opinions, they would remain actionable because they omitted material facts going to the basis of the opinion. *Omnicare*, 575 U.S. at 194; *see* §§III.A., IV. (describing the facts of which Defendants had knowledge concerning the basis of their statements which rendered them misleading).[13]

### 3. Defendants' Statements Are Not Protected by the Safe Harbor

Defendants fail to meet the PSLRA safe harbor requirements for Statements 5 (¶75) and 14 (¶93). Doc. No. 29-1 at 16-18. The statements are unprotected for three reasons. ***First***, they are not forward-looking.[14] They promoted the Company's current position (¶75: "well-positioned") and performance (¶93: "continue to do well," "happy with where we are," "[w]e're happy with our full year guidance," and "we were very comfortable with where folks are sitting for the quarter") while omitting present facts, thus falling outside the safe harbor. *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142, 1148 (9th Cir. 2017); *Golden Heaven*, 2025 WL 714171, at *6. Unlike reaffirming future goals (*cf.*

---

[13]   Defendants' argument that they provided facts that go to the basis of their opinions fails. Doc. No. 29-1 at 16. Their citation to two out-of-context facts does not immunize them from omitting the critical facts detailed above, which "conflict with what a reasonable investor would take from the statement itself." *Omnicare*, 575 U.S. at 189.

[14]   Defendants incorrectly claim the statements were specifically "identified as forward-looking"; their citations show only boilerplate or third-party language. Doc. No. 29-1 at 16-17; Doc. No. 29-20 at 2, 30; Doc. No. 29-21.

*Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1192 (9th Cir. 2021)), these statements address present realities.

**Second**, any accompanying warnings were meaningless. Defendants point only to generic, boilerplate disclaimers, not specific, tailored cautions. *See In re Energy Recovery Inc. Sec. Litig.*, 2016 WL 324150, at *17-*18 & n.5 (N.D. Cal. 2016). These static, repeated warnings (identical pre-, during-, and post-Class Period) failed entirely to address the specific risks from the unprecedented April 2023 CGM coverage expansion. Such warnings are legally insufficient. *See Glazer*, 63 F.4th at 780-81; *Slayton v. Am. Express Co.*, 604 F.3d 758, 772-73 (2d Cir. 2010); *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 107 (D.C. Cir. 2015).[15]

**Third**, as detailed in §IV., Defendants made these statements with actual knowledge of their falsity, independently negating any safe harbor protection. *See In re Splunk Inc. Sec. Litig.*, 592 F. Supp. 3d 919, 944 (N.D. Cal. 2022). Thus, Statements 5 and 14 are not protected by the safe harbor.

## IV.    PLAINTIFF ADEQUATELY ALLEGES DEFENDANTS' SCIENTER

To adequately plead scienter, a complaint must allege that defendants made false or misleading statements either intentionally or with deliberate recklessness. 15 U.S.C. §78u-4(b)(2); *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008). A defendant is deliberately "'reckless if he [or she] had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he [or she] could have done so without extraordinary effort.'" *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014). "The inquiry . . . is whether **all** of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23 (emphasis in original). A "strong inference" is one that a reasonable person would

---

[15]  Defendants cannot rely on a generic disclaimer added after-the-fact by Refinitiv, the transcript provider. *See* Doc. No. 29-1 at 17; Doc. No. 29-20 at 30. Nor does this generic statement that "[a]ctual results may differ" even contain a specific caution.

1  deem "cogent and at least as compelling as any opposing inference one could draw from

2  the facts alleged." *Id.* at 324. "[I]f two possible inferences – one fraudulent and the other

3  nonfraudulent – are equally compelling, a plaintiff has demonstrated a strong inference of

4  scienter." *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1033 (9th Cir. 2016).

### A. Defendants Frequently Reported on and Professed Knowledge as to the Impact of the Medicare Coverage Expansion on Its Core Business

7      Dexcom has ***only one core product – CGMs***. As Defendants repeatedly recognized,

8  the CMS coverage expansion to basal patients was the "largest expansion of coverage in

9  [the] company's history" and capturing this new population was critical to Dexcom's

10 future. ¶¶106-107. Accordingly, it is "absurd" to suggest that Sayer (CEO), Sylvain

11 (CFO), and Lawver (CCO with responsibility over the Company's commercial strategy

12 and sales efforts) would not be aware of deficiencies in the Company's sales infrastructure

13 that were causing significant downward trends in sales in this new market and the massive

14 loss of market share to Abbott, its only meaningful competitor. ¶¶106-108; *see Alphabet*, 1

15 F.4th at 706 ("given the importance of the information, 'it would be "absurd" to suggest

16 that management was without knowledge of the matter'"); *Shenwick v. Twitter, Inc.*, 282 F.

17 Supp. 3d 1115, 1145-46 (N.D. Cal. 2017) (finding scienter and holding that "it would be

18 'absurd' for [defendant CEO and CFO] not to have been aware of adverse . . . trends" in a

19 metric described "as one of its five 'major growth drivers'"). This is especially true as

20 Sayer and Sylvain stressed their involvement in the coverage expansion, stating that the

21 decision is one "that we've worked on for years and years and years, and that really we've

22 led." ¶107. A strong inference of Defendants' scienter is inescapable here. *Nursing Home*

23 *Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004) (reasonable

24 to conclude executives knew the company would fail to meet projected earnings where

25 CEO "acknowledged that 'I was involved in an awful lot of these deals'").

26     Defendants also repeatedly ***admitted*** they were tracking sales data, knew where their

27 patients were coming from, and knew what the Company's market share in the basal

28 market was, showing that they possessed data undermining their Class Period statements.

1   *See* ¶112 (Sayer assuring that "[w]e have the data capabilities to show what outcomes

2   we're going to generate within this population, and we'll do that"); ¶113 (Lawver

3   discussing "[t]he trends . . . that we see in [basal] in terms of uptake" and "[w]e track

4   coverage very closely for Dexcom for the industry"); ¶114 (Sylvain confirming that "***[w]e

5   know exactly*** where the patients are coming from"); ¶116 (Sylvain stating that "***there's no

6   debate internally to us[,] [w]e know we're taking share and we see that data***").  This

7   unequivocally demonstrates their scienter.  *Green Dot*, 2024 WL 1356253, at *5 (scienter

8   established under core operations where defendants "acknowledged to investors, '[w]e

9   know what the internal numbers are'"); *Laborers Dist. Council Constr. Indus. Pension

10  Fund v. Sea Ltd.*, 743 F. Supp. 3d 1083, 1109 (D. Ariz. 2024) (scienter adequately alleged

11  where defendants "regularly acknowledged that they tracked [key business segment's] user

12  engagement, monetization metrics, and trends"); *In re Spectrum Pharms. Inc.*, 2015 WL

13  1413385, at *4 (D. Nev. 2015) (scienter where plaintiff "sufficiently alleged that

14  monitoring end-user demand would have revealed the decline of end-user demand");

15  *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 601-02 (N.D.

16  Cal. 2019) (scienter where defendants "touted intimate knowledge" of pricing).

17      Moreover, Defendants often referenced this knowledge to bolster their statements

18  regarding the basal population and demonstrate their credibility when answering analysts'

19  pointed questions.  *S. Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1259 (W.D. Wash.

20  2009) (that defendant "represented that he had access to the information that underpinned

21  his sunny announcements" proves "actual knowledge").  To the extent Defendants "did not

22  in fact have such knowledge, it would be at least actionably reckless to reassure the public

23  about these matters at all."  *Id.* at 1260.[16]

24

---

25  [16]  Contrary to Defendants' assertion, Plaintiff does not allege that Defendants merely had access to data but also that they reviewed that data, had knowledge of it, and what it showed.  Defendants' cited authority is inapt as it addresses mere allegations concerning

26  internal reports, which are not at issue here. *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035-36 (9th Cir. 2002) (requiring only "some specifics" regarding the data available to

27  defendants and rejecting "conclusory [allegations] that the defendants had access to internal data"); *In re Twitter Sec. Litig.*, 506 F. Supp. 3d 867, 888 (N.D. Cal. 2020)

28  (plaintiffs' reliance on review of reports insufficient to demonstrate scienter).

1    Defendants' scienter is also evident from their repeated discussion of the
2    Company's strong relationships with DME suppliers, the importance of the Medicare
3    coverage expansion, and Dexcom's purported success in capturing market share from this
4    newly covered population throughout the Class Period.  ¶¶107-111; *see Roberti v. OSI Sys.,
5    Inc.*, 2015 WL 1985562, at *12 (C.D. Cal. 2015) ("scienter can be established by the fact
6    that the Defendants touched on the specific issue . . . in their public statements").
7    Defendants also made frequent statements on these topics in response to analyst questions.
8    *See* ¶¶69, 71, 79, 83, 85, 87, 89, 93, 114-115; *Washtenaw Cnty. Emps. Ret. Sys. v. Celera
9    Corp.*, 2012 WL 3835078, at *3 (N.D. Cal. 2012) ("The wording of Defendants'
10   statements on [earnings] calls suggests they understood what was going on . . . ."); *S.
11   Ferry*, 687 F. Supp. 2d at 1259-60 (some emphasis in original) (statements touching on the
12   issues, including in response to "***direct questioning***" "sufficient to satisfy the ***actual
13   knowledge*** analysis and allows the Court to infer scienter").[17]

14   **B.    Defendants' Post-Class Period Admissions Confirm Their
         Contemporaneous Knowledge – or Reckless Disregard – of
15       Information Undermining Their Statements**

16   Following the Class Period, Defendants admitted to having contemporaneous
17   knowledge of their deficient sales infrastructure and lackluster performance in the Type 2
18   basal market.  Defendants acknowledged that "back in 2023" based on "prescribing
19   patterns" – the very data they had told investors they were tracking throughout the Class
20   Period – they knew that they "were not getting any traction [in] those offices where we had
21   no salespeople, where we weren't calling on physicians.  We're getting very few
22   prescriptions." ¶122.  They also acknowledged that, by late 2023, they knew they "didn't
23   have the resources in the field to address these new markets that we were going to go
24   after." ¶123.  Moreover, Defendants admitted that their sales force expansion in early 2024

25

26   [17]  Defendants' attempt to dismiss pages of scienter allegations in a footnote should be
     disregarded.  *See* Doc. No. 29-1 at 28 n.7; *Stardock Sys., Inc. v. Reiche*, 2019 WL 8333563,
27   at *3 n.3 (N.D. Cal. 2019) (quoting *Cal. Pac. Bank v. Fed. Deposit Ins. Corp.*, 885 F.3d
     560, 570 (9th Cir. 2018)) ("'Inadequately briefed and perfunctory arguments are
28   waived.'").

1  was actually a "reorganization" that led "to a lot of disruption, particularly at the beginning

2  of the quarter" – April 2024 – which involved a decline in basal patient additions.  ¶¶119-

3  120.  Accordingly, Defendants knew in April 2024 that they "were a quarter behind" in

4  new customer additions.  ¶120; *see also* ¶121 ("lower than expected new customer starts in

5  conjunction with our sales force expansion and realignment, particularly in the DME

6  channel").

7          These admissions unequivocally establish their contemporaneous knowledge during

8  the Class Period.  *See Purple Mountain Tr. v. Wells Fargo & Co.*, 432 F. Supp. 3d 1095,

9  1106 (N.D. Cal. 2020) (scienter adequately alleged where defendants later admitted they

10  "had been aware of the problem" when they made misstatements).  Plaintiff thus does not

11  allege this fraud simply with the benefit of hindsight (*see* Doc. No. 29-1 at 8, 18-19, 27-29)

12  – Defendants themselves time-stamped their knowledge of the issues.  *In re Apple Inc. Sec.*

13  *Litig.*, 2020 WL 6482014, at *10 (N.D. Cal. 2020) (defendant's statement after announcing

14  the company's year-over-year guidance miss "that Apple 'saw' – using the past tense that

15  suggests contemporaneous knowledge – troubling signs in China 'as the [fourth] quarter

16  went on'" "constitutes an 'I knew it all along' type of admission" supporting scienter and

17  was not fraud by hindsight).

18          Defendants' attempt to raise premature factual disputes to counter their post-Class

19  Period admissions fails.  Doc. No. 29-1 at 28-29.  For example, Defendants argue that

20  Sayer's statement that "[w]e saw things getting better towards the end" shows that he

21  remained confident in the Company's guidance (*id.*), but their interpretation is inconsistent

22  with the Company's July 25, 2024 guidance reduction.  If things were improving, Dexcom

23  would not have reduced guidance, and revenue growth would not have been, as Sylvain

24  stated, "lower than we've historically seen."  ¶126.  The Court cannot at this stage assume

25  the truth of Sayer's self-serving statement.  *See* RJN Opp. at 6-7.  Sayer's vague statement

26  demonstrates that Defendants knew, but failed to disclose, how bad things were at the time

27

28

1    of the reorganization in April when guidance was raised.[18]

2    **C.    Temporal Proximity Supports Scienter**

3        The "'temporal proximity'" of the misstatements and the subsequent disclosures

4    indicates "that defendants knew about the [problem] when they made the statement."

5    *Berson*, 527 F.3d at 988 n.5.  The stark contrast between the April 25, 2024 and June 5,

6    2024 statements raising and then reaffirming guidance (¶¶57, 93) and Defendants' $300

7    million guidance reduction just six weeks later supports scienter.  ¶¶125-127.  Defendants

8    concede that temporal proximity allegations may "bolster a complaint" but argue that the

9    "timing is much too far."[19]  Doc. No. 29-1 at 29.  But Defendants fail to identify any

10   "intervening events" causing the "sudden and extreme change of fortune."  *Apple*, 2020

11   WL 6482014, at *10-*11; *Reese*, 747 F.3d at 575 ("three to six months" between "the

12   statements and the contradictory disclosures" supports scienter).

13   **D.    Lawver's Sudden Departure Supports Scienter**

14       Lawver was hired in January 2023 (when Dexcom began its sales force expansion),

15   and her responsibilities included commercial strategy and sales force efforts – which

16   Defendants acknowledged were deficient just a year and a half later.  ¶128.  Then, less than

17   three months later, Dexcom reported that Lawver would "retire."  ¶129.  Such

18   circumstances support scienter.[20]  *See SEB Inv. Mgmt. AB v. Wells Fargo & Co.*, 742 F.

---

[18]   Defendants praise themselves for purportedly "disclos[ing] adverse information," but ignore critical information they omitted.  Doc. No. 29-1 at 29; *see* §III.A.

[19]   Defendants misconstrue *In re VeriFone Sec. Litig.*, 2016 WL 1213666, at *8 (N.D. Cal. 2016).  After the court upheld only one statement, the gap between the misleading statement and the disclosure was *a year and ten weeks*, not the ten weeks Defendants argue.  *Id.*  Their other authority is distinguishable.  *In re Affirm Holdings, Inc. Sec. Litig.*, 2024 WL 3955453, at *13 (N.D. Cal. 2024) (unlike here, plaintiff failed to allege "facts that would plausibly establish that Linford was in possession of contrary information at the time").

[20]   Defendants' authority does not demonstrate otherwise.  Plaintiff provided "'additional evidence of [her] wrongdoing'" (*Ryan v. FIGS*, 2024 WL 187001, at *13 (C.D. Cal. 2024)), as Lawver is alleged to have made misleading statements.  *See* ¶¶73-78; *Ryan*, 2024 WL 187001, at *13 (finding non-defendant director's resignation did not add to scienter).  And in *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046 (9th Cir. 2014), the plaintiffs "fail[ed] to provide any facts to connect these departures with the problems at issue in this lawsuit," and the "advisory role[s]" emphasized by Defendants had no termination date, unlike Lawver's brief six-month holdover.  *Id.* at 1062-63.

1    Supp. 3d 1003, 1023 (N.D. Cal. 2024) (executive departures "accompanied by suspicious

2    circumstances" support scienter); *Fibrogen*, 2022 WL 2793032, at *25 ("abrupt resignation

3    tends to support scienter"); *In re WageWorks, Inc., Sec. Litig.*, 2020 WL 2896547, at *6

4    (N.D. Cal. 2020) (resignations in "close temporal proximity to the initial revelations"

5    supported scienter).

6    **E.    Defendants Were Motivated to Conceal the Fraud**

7    "[T]he absence of a motive allegation is not fatal," but "personal financial gain may

8    weigh heavily in favor of a scienter inference." *Tellabs*, 551 U.S. at 325.

9    ***Defendants wanted to "right the ship."***  Here, Defendants needed to demonstrate

10    their ability to capture market share in what they described as the "***largest single expansion***

11    ***of access to CGM in our industry's history***." ¶130.  Thus, Defendants were motivated to

12    conceal Dexcom's underperformance in the basal space in the hopes that they would

13    eventually be able to "right the ship" and report positive growth.[21]  *Makor Issues & Rts.,*

14    *Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) (defendants "may have thought that

15    there was a chance that the situation . . . would right itself" and thus were motivated to

16    conceal the information).

17    ***Insider sales support scienter***.  "'[U]nusual' or 'suspicious'" stock sales provide

18    circumstantial evidence of scienter and relevant factors are: "'(1) the amount and

19    percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales

20    were consistent with the insider's prior trading history.'"  *No. 84 Emp.-Teamster Joint*

21    *Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 938 (9th Cir. 2003).

22    Sayer's ($22.3 million), Sylvain's ($2.9 million), and Lawver's ($640,329) Class

23    Period sales, amounting to ***41%-43% of their ownership***, support scienter. ¶¶132-135; *see,*

24    *e.g.*, *Provenz*, 102 F.3d at 1491 (20%); *Batwin v. Occam Networks, Inc.*, 2008 WL

25    2676364, at *14-*15 (C.D. Cal. 2008) (7%).  Defendants' sales were suspicious in timing,

26

_____

27    [21]  Defendants' authority misses the point.  This is not the "routine corporate objective[]" which their case rejects but, rather, the only corporate objective of its kind in Dexcom's

28    history.  *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 884 (9th Cir. 2012).

- 23 -                                    24-cv-1485-RSH-VET

1  occurring shortly after positive statements.  ¶¶132, 134; *Lamartina v. VMware, Inc.*, 2023

2  WL 2763541, at *3, *15 (N.D. Cal. 2023) (sales coinciding with "repeated positive

3  statements" suspicious).  And each individual defendant traded shortly before the loss

4  events, supporting scienter.  *See* ¶¶132, 134-135; *Turocy v. El Pollo Loco Holdings, Inc.*,

5  2017 WL 3328543, at *18 (C.D. Cal. 2017).   Sylvain and Lawver also sold

6  disproportionately more stock during the Class Period than prior.  ¶¶133, 135.[22]

7       Further, the weight of authority in this Circuit holds that the existence of a Rule

8  10b5-1 plan is an affirmative defense that cannot form the basis for dismissal at this

9  stage.[23]  *See, e.g.*, *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 n.16 (N.D.

10  Cal. 2009); *Azar v. Yelp, Inc.*, 2018 WL 6182756, at *4 (N.D. Cal. 2018).  Even then, such

11  a defense stands "only if the insider adopted the plan '[b]efore becoming aware of the

12  [material nonpublic] information'" (*Lamartina v. VMware, Inc.*, 2021 WL 4133851, at *12

13  (N.D. Cal. 2021)), which is not true here.  ¶137.

14       ***Incentive Pay Structure Provides Motive***.  Defendants' performance stock units

15  were chiefly determined by Dexcom's stock price and amounted to ***43%*** of Sayer's

16  compensation and approximately 11% of Sylvain's.  This contributes to scienter.[24]  *See*

17  *Am. W.*, 320 F.3d at 944.

18                        *    *    *

19       Defendants offer no plausible competing inference of non-culpability, let alone one

20  stronger than Plaintiff's showing of scienter.  *See Tellabs*, 551 U.S. at 326; *ESG*, 828 F.3d

21

22  [22]  Defendants' one-off claim that "Plaintiff pleads no facts showing this sale was
23  'dramatically out of line with [Sylvain's] prior trading practices'" simply ignores Plaintiff's allegations.  *Compare* Doc. No. 29-1 at 32, *with* ¶133 (alleging that, in the prior period, Sylvain sold "one quarter as many shares as he sold during the Class Period").

24  [23]  Defendants' rebuttal relies on isolating one individual factor and introducing
25  procedurally improper fact-based arguments. Doc. No. 29-1 at 31-32. But at this stage the Court cannot accept Defendants' Form 4s for the truth of the matter asserted.  *See* RJN
26  Opp. at 6-8.

27  [24]  Defendants' argument (Doc. No. 29-1 at 31) fails, as this motive is ***additional*** evidence
     of Defendant's scienter, not as "the ***basis*** on which [its] allegation of fraud is predicated."
28  *M & M Hart Living Tr. v. Glob. Eagle Ent., Inc.*, 2017 WL 5635424, at *13 (C.D. Cal. 2017).

4907-0272-6965.v1

1    at 1033. Plaintiff pleads facts demonstrating knowledge or deliberate recklessness:

2    Defendants knew the unprecedented CMS expansion scale, tracked patient data, discussed

3    basal market performance with analysts, and admitted contemporaneous awareness of their

4    inadequate sales infrastructure. This, coupled with the stark $300 million guidance cut

5    shortly after affirming guidance, indicates Defendants knew or recklessly disregarded

6    Dexcom's basal market underperformance. Defendants' competing claim they simply "did

7    not foresee" issues from sales force changes is far less compelling and fails to negate the

8    strong inference of scienter here. *See Tellabs*, 551 U.S. at 326

9    **V.  PLAINTIFF HAS ADEQUATELY ALLEGED §20(a) CLAIMS**

10         Because the CC adequately alleges §10(b) violations and Defendants do not dispute

11    their control, the Court should uphold Plaintiff's §20(a) claims. *See Crews v. Rivian Auto.,*

12    *Inc.*, 2023 WL 4361098, at *14 (C.D. Cal. 2023).

13    **VI.  CONCLUSION**

14         For the foregoing reasons, the Motion should be denied. If the Court holds

15    otherwise, Plaintiff respectfully requests leave to amend. *See Eminence Cap., LLC v.*

16    *Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (leave to amend should be granted

17    "'with extreme liberality'").

18    DATED: April 14, 2025            Respectfully submitted,

19                            ROBBINS GELLER RUDMAN

20                             & DOWD LLP
                                  DANIEL S. DROSMAN

21                             W. MARK CONOVER
                                  SARAH A. FALLON

22

23                                s / Daniel S. Drosman
                            DANIEL S. DROSMAN

24

25                           655 West Broadway, Suite 1900
                          San Diego, CA 92101

26                           Telephone: 619/231-1058
                          ddrosman@rgrdlaw.com

27                           mconover@rgrdlaw.com
                          sfallon@rgrdlaw.com

28

4907-0272-6965.v1                                                        24-cv-1485-RSH-VET

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ROBBINS GELLER RUDMAN
  & DOWD LLP
ELIZABETH A. SHONSON
(admitted *pro hac vice*)
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL  33432
Telephone:  561/750-3000
eshonson@rgrdlaw.com

Lead Counsel for Lead Plaintiff

O'DONOGHUE & O'DONOGHUE LLP
JOHN M. McINTIRE
5301 Wisconsin Avenue, N.W., Suite 800
Washington, DC  20015
Telephone:  202/362-0041
imcintire@odonoghuelaw.com

Additional Counsel

4907-0272-6965.v1