1  ROBBINS GELLER RUDMAN
   & DOWD LLP
2  DANIEL S. DROSMAN (200643)
   W. MARK CONOVER (236090)
3  SARAH A. FALLON (345821)
   655 West Broadway, Suite 1900
4  San Diego, CA  92101
   Telephone:  619/231-1058
5  ddrosman@rgrdlaw.com
   mconover@rgrdlaw.com
6  sfallon@rgrdlaw.com

7  Lead Counsel for Lead Plaintiff

8  [Additional counsel appear on signature page.]

9           UNITED STATES DISTRICT COURT

10         SOUTHERN DISTRICT OF CALIFORNIA

11  In re DEXCOM, INC. CLASS ACTION ) Lead Case No. 24-cv-1485-RSH-VET
    SECURITIES LITIGATION          )
12                                 )
                                   ) LEAD PLAINTIFF'S OPPOSITION TO
13 ─────────────────────────────── ) DEFENDANTS' MOTION TO
                                   ) DISMISS THE FIRST AMENDED
14                                   CONSOLIDATED COMPLAINT FOR
                                     VIOLATIONS OF THE FEDERAL
15                                   SECURITIES LAWS

16                                   DATE:     July 16, 2025
                                     CTRM:     3B, 3rd Floor
17                                   JUDGE:    Honorable Robert S. Huie

18

19

20

21

22

23

24

25

26

27

28

4935-5577-4286.v4

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................. 1

II.    ARGUMENT ....................................................................................... 1

   A.    Legal Standard............................................................................ 1

   B.    Plaintiff Has Adequately Pleaded Actionable False and Misleading Statements ................................................................. 2

      1.    Defendants' Claims of Competitive Readiness and Market Success Were False and Misleading ......................... 2

         a.    Defendants Falsely Touted an Adequate Sales Force and "Taking Share" While Knowing Their Strategy Had Failed ........................................ 2

         b.    Defendants Misleadingly Portrayed a Remedial Overhaul as an Offensive, Opportunistic Strategy.............. 3

         c.    The Concealed Truth Was Undeniably Material ................ 4

      2.    The FAC Pleads with Particularity Why Each Challenged Statement Was False or Misleading When Made ........................ 4

      3.    Defendants' Challenged Statements Are Actionable and Not Shielded by Legal Doctrines ................................................ 6

         a.    The Statements Are Not Mere Puffery............................... 6

         b.    The Statements Are Not Inactionable Opinions ................. 9

         c.    The Statements Are Not Protected by the PSLRA's Safe Harbor ........................................................... 10

      4.    The FAC Alleges Specific, Verifiable Facts Supporting Falsity ................................................................................ 12

      5.    Defendants' Remaining Arguments Fail ...................................... 18

   C.    Plaintiff's Allegations Raise a Strong Inference of Scienter .................. 20

      1.    Defendants' Knowledge Is Inferred from the Core Importance of the Basal Market Expansion and Their Professed Oversight................................................................ 21

      2.    Defendants' Own Statements Confirm They Possessed Data Revealing the Fraud .......................................................... 22

      3.    Defendants' Post-Class Period Admissions Confirm Their Contemporaneous Knowledge................................................ 22

1

2                                                                                    **Page**

3

4.    A Collection of Corroborating Factors Solidifies the Strong
      Inference of Scienter.................................................................. 23

5.    The Inference of Scienter Is Far More Compelling than Any
      Innocent Explanation................................................................. 25

D.    Plaintiff Has Adequately Alleged §20(a) Control Person Claims ........... 25

III.    CONCLUSION .................................................................................. 25

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4935-5577-4286.v4

1

**TABLE OF AUTHORITIES**

2

**Page**

3

**CASES**

4

*Berson v. Applied Signal Tech., Inc.*,

5
    527 F.3d 982 (9th Cir. 2008) ................................................................. 19

6

*Chi. & Vicinity Laborers' Dist. Council Pension Fund v. Amplitude, Inc.*,

7
    2025 WL 82206 (N.D. Cal. 2025) ......................................................... 22

8

*City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*,

9
    2023 WL 1769810 (S.D. Cal. 2023) ..................................................... 13

10

*Crews v. Rivian Auto., Inc.*,
    2023 WL 4361098 (C.D. Cal. 2023) ..................................................... 25

11

*Eminence Cap., LLC v. Aspeon, Inc.*,

12
    316 F.3d 1048 (9th Cir. 2003) ............................................................... 25

13

*ESG Cap. Partners, LP v. Stratos*,

14
    828 F.3d 1023 (9th Cir. 2016) ............................................................... 21

15

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,

16
    63 F.4th 747 (9th Cir. 2023) ................................................... 6, 10, 11

17

*Homyk v. ChemoCentryx, Inc.*,

18
    2023 WL 3579440 (N.D. Cal. 2023) ..................................................... 13

19

*In re Alphabet, Inc. Sec. Litig.*,

20
    1 F.4th 687 (9th Cir. 2021) ..................................................... 4, 11, 21

21

*In re Ambac Fin. Grp., Inc. Sec. Litig.*,

22
    693 F. Supp. 2d 241 (S.D.N.Y. 2010) ................................................... 9

23

*In re Apple Inc. Sec. Litig.*,
    2020 WL 6482014 (N.D. Cal. 2020) ..................................................... 23

24

*In re Dermtech, Inc. Sec. Litig.*,

25
    2025 WL 1618193 (S.D. Cal. 2025) ............................................. 10, 12, 19, 22

26

*In re Facebook, Inc. Sec. Litig.*,

27
    87 F.4th 934 (9th Cir. 2023) ....................................................... 2, 5

28

4935-5577-4286.v4

1

2                                                                                                    **Page**

3

4    *In re Gilead Scis. Sec. Litig.*,
        536 F.3d 1049 (9th Cir. 2008) ................................................................. 1

5

6    *In re Golden Heaven Grp. Holdings Ltd. Sec. Litig.*,
        2025 WL 714171 (C.D. Cal. 2025) ............................................................ 9

7

8    *In re Green Dot Corp. Sec. Litig.*,
        2024 WL 1356253 (C.D. Cal. 2024) .................................................... 9, 22

9

10   *In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*,
        2020 WL 1479128 (E.D. Pa. 2020) .......................................................... 14

11   *In re NVIDIA Corp. Sec. Litig.*,
        768 F.3d 1046 (9th Cir. 2014) ................................................................. 24

12

13   *In re Quality Sys., Inc. Sec. Litig.*,
        865 F.3d 1130 (9th Cir. 2017) ................................................................. 10

14

15   *In re QuantumScape Sec. Class Action Litig.*,
        580 F. Supp. 3d 714 (N.D. Cal. 2022) ..................................................... 9

16

17   *In re Rigel Pharms., Inc. Sec. Litig.*,
        697 F.3d 869 (9th Cir. 2012) ................................................................... 24

18

19   *In re SVB Fin. Grp. Sec. Litig.*,
        2025 WL 1676800 (N.D. Cal. 2025) ......................................................... 9

20

21   *In re UTStarcom, Inc. Sec. Litig.*,
        617 F. Supp. 2d 964 (N.D. Cal. 2009) ................................................... 25

22   *Karinski v. Stamps.com, Inc.*,
        2020 WL 281716 (C.D. Cal. 2020) ........................................................... 9

23

24   *Khoja v. Orexigen Therapeutics, Inc.*,
        899 F.3d 988 (9th Cir. 2018) ..................................................................... 2

25

26   *Lamartina v. VMware, Inc.*,
        2021 WL 4133851 (N.D. Cal. 2021) ....................................................... 25

27

28

*In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049 (9th Cir. 2008) — 1
*In re Golden Heaven Grp. Holdings Ltd. Sec. Litig.*, 2025 WL 714171 (C.D. Cal. 2025) — 9
*In re Green Dot Corp. Sec. Litig.*, 2024 WL 1356253 (C.D. Cal. 2024) — 9, 22
*In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*, 2020 WL 1479128 (E.D. Pa. 2020) — 14
*In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046 (9th Cir. 2014) — 24
*In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130 (9th Cir. 2017) — 10
*In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714 (N.D. Cal. 2022) — 9
*In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869 (9th Cir. 2012) — 24
*In re SVB Fin. Grp. Sec. Litig.*, 2025 WL 1676800 (N.D. Cal. 2025) — 9
*In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964 (N.D. Cal. 2009) — 25
*Karinski v. Stamps.com, Inc.*, 2020 WL 281716 (C.D. Cal. 2020) — 9
*Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018) — 2
*Lamartina v. VMware, Inc.*, 2021 WL 4133851 (N.D. Cal. 2021) — 25

4935-5577-4286.v4

1

2                                                                                         **Page**

3

*Lilien v. Olaplex Holdings, Inc.,*
4      765 F. Supp. 3d 993 (C.D. Cal. 2025) ............................................................. 13

5

*Makor Issues & Rts., Ltd. v. Tellabs Inc.,*
6      513 F.3d 702 (7th Cir. 2008) ....................................................................... 24

7

*Matrixx Initiatives, Inc. v. Siracusano,*
8      563 U.S. 27 (2011) ........................................................................ 4, 18, 19

9   *Merkamerica Inc. v. Glover,*
      2019 WL 8989833 (C.D. Cal. 2019) .............................................................. 8
10

11  *Miller v. Thane Int'l Inc.,*
      519 F.3d 879 (9th Cir. 2008) ....................................................................... 13
12

13  *Mulligan v. Impax Lab'ys, Inc.,*
      36 F. Supp. 3d 942 (N.D. Cal. 2014) ............................................................. 6
14

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v.*
15     *Am. W. Holding Corp.,*
      320 F.3d 920 (9th Cir. 2003) ....................................................................... 25
16

17  *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.,*
      380 F.3d 1226 (9th Cir. 2004) ............................................................. 15, 16, 22
18

19  *Ohio Pub. Emps. Ret. Sys. v. Meta Platforms, Inc.,*
      2024 WL 4353049 (N.D. Cal. 2024) .............................................................. 9
20

21  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,*
      575 U.S. 175 (2015) .......................................................................... 9, 10, 18
22

23  *Provenz v. Miller,*
      102 F.3d 1478 (9th Cir. 1996) ..................................................................... 13
24

*Reese v. Malone,*
25     747 F.3d 557 (9th Cir. 2014),
      *overruled on other grounds by City of Dearborn Heights Act 345*
26     *Police & Fire Ret. Sys. v. Align Tech., Inc.,*
27     856 F.3d 605 (9th Cir. 2017) ....................................................................... 23

28

4935-5577-4286.v4

**Page**

*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001) ................................................................ 24

*Ryan v. FIGS, Inc.*,
   2024 WL 187001 (C.D. Cal. 2024) ...................................................... 24

*Schueneman v. Arena Pharms., Inc.*,
   840 F.3d 698 (9th Cir. 2016) ....................................................... 2, 3, 14

*SEB Inv. Mgmt. AB v. Wells Fargo & Co.*,
   742 F. Supp. 3d 1003 (N.D. Cal. 2024) ............................................. 24

*Shenwick v. Twitter, Inc.*,
   282 F. Supp. 3d 1115 (N.D. Cal. 2017) ............................................. 21

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007) ........................................................... 1, 20, 21

*Wochos v. Tesla, Inc.*,
   985 F.3d 1180 (9th Cir. 2021) ............................................................ 12

*Wong v. Arlo Techs., Inc.*,
   2019 WL 7834762 (N.D. Cal. 2019) .................................................. 24

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C.
   §78j(b) ................................................................................................ 25
   §78t(a) ................................................................................................. 25
   §78u-4(b)(1) ........................................................................................... 4
   §78u-4(b)(2) ......................................................................................... 20

Federal Rules of Civil Procedure
   Rule12(b)(6) .......................................................................................... 1

17 C.F.R.
   §240.10b-5 .......................................................................................... 25
   §240.10b5-1 ........................................................................................ 24

4935-5577-4286.v4

1  Lead Plaintiff National Elevator Industry Pension Fund ("Plaintiff") respectfully

2  submits this memorandum of law in opposition to Defendants' Motion.[1]

3  ## I.    INTRODUCTION

4  Defendants sold investors a story of unqualified success.  The plot was simple:

5  Dexcom, a leader in its field, was poised to dominate the new, multi-billion-dollar Type 2

6  basal insulin market.  They assured investors of a winning strategy, the "right commercial

7  infrastructure," and that they were already "taking share."  But this was fiction.  The

8  reality, which Defendants knew and concealed, was a story of failure.  Their strategy was

9  crippled by a sales force that could not reach the right doctors, relationships with key

10  distributors that were falling apart, and a market share that was being decimated by their

11  only competitor.  This is not a case of failed forecasts; it is a case of concealed facts.

12  Because the FAC pleads this deception with compelling particularity, Defendants' Motion

13  should be denied.

14  ## II.    ARGUMENT

15  ### A.    Legal Standard

16  In assessing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) and

17  the Private Securities Litigation Reform Act of 1995 ("PSLRA"), a court must "accept all

18  factual allegations in the complaint as true" and "assess all the allegations holistically."

19  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322, 326 (2007).  "[S]o long as the

20  plaintiff alleges facts to support a theory that is not facially implausible, the court's

21  skepticism is best reserved for later stages."  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049,

22  1057 (9th Cir. 2008).

23

24

---

[1] "Motion" and "MTD" refer to the Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss Lead Plaintiff's First Amended Consolidated Complaint for Violations of the Federal Securities Laws (Doc. No. 39-1).  In accordance with the Court's Civil Pretrial and Trial Procedures, pinpoint cites to the MTD are to the ECF-generated page number.  Capitalized terms not defined herein have the meaning ascribed in Lead Plaintiff's First Amended Consolidated Complaint for Violations of the Federal Securities Laws (Doc. No. 37) ("FAC").  Unless noted otherwise, all "¶__" or "¶¶__" references are to the FAC, emphasis is added, and citations are omitted.

## B. Plaintiff Has Adequately Pleaded Actionable False and Misleading Statements

A statement is false or misleading under the securities laws when it creates an "'impression of a state of affairs that differs in a material way from the one that actually exists.'" *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 948 (9th Cir. 2023). Once corporate insiders choose to tout "'positive information,'" they are "'bound to do so in a manner that wouldn't mislead investors, including [by] disclosing adverse information that cuts against the positive information.'" *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008-09 (9th Cir. 2018); *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705-06 (9th Cir. 2016).

### 1. Defendants' Claims of Competitive Readiness and Market Success Were False and Misleading

#### a. Defendants Falsely Touted an Adequate Sales Force and "Taking Share" While Knowing Their Strategy Had Failed

From the outset of the Class Period, Defendants assured investors that Dexcom was not only prepared to compete but was already succeeding. They claimed the Company was in a "great position to compete as this market develops." ¶75. Central to this narrative were assurances that Dexcom had the "right commercial infrastructure" and a "sizable sales force" to penetrate the PCP channel, which is crucial to the basal market. ¶¶104, 114. They also touted their "very strong DME business," a critical channel for Medicare patients. ¶277; *see also* ¶97.

These claims were demonstrably false. As Defendants later conceded, their sales force was woefully inadequate. They knew they "needed a broader sales force" because they were "getting very few prescriptions" from PCP offices where they "had no salespeople." *E.g.*, ¶304. A later-disclosed, frantic effort to expand and reorient the sales force – an effort that began in mid-2023 – proves that Defendants knew their prior claims of readiness were baseless. ¶¶304, 308, 330-334.

Even as this secret overhaul unfolded, Defendants' misstatements grew bolder:

- ***June 23, 2023***: Dexcom has "the right commercial infrastructure . . . [to] expand[]

our leadership in primary care with the type 2 basal." ¶114.

- **September 6, 2023**: "[W]here there's coverage, we've always taken share, and you see us taking share in th[e] [basal] space." ¶135.

- **October 26, 2023**: "[E]arly prescribing trends for th[e] [basal] cohort" were "very encourag[ing]," and Dexcom had "gained share across all reimbursed channels and patient segments in the U.S." ¶156.

- **January 8, 2024**: "[W]e are doing well in the basal category," our "commercial strategy has worked wonderfully," Dexcom was seeing "outperformance in basal," and "[w]e win – we do very well where we have coverage and penetration." ¶¶175, 195, 215.

- **February 8, 2024**: "[Y]ou can see the share taking when you look at the script data, we are taking share." ¶235.

These statements were factually untrue, not mere optimistic spin. At the very time Defendants claimed to be "taking share," they knew that Abbott, with its entrenched PCP relationships, was capturing the vast majority of new patients. ¶¶234-237, 255-258. By touting purported market gains while concealing the adverse reality that they were ceding significant ground to their primary competitor, Defendants violated their duty not to mislead. *See Schueneman*, 840 F.3d at 705-06.

> **b.** **Defendants Misleadingly Portrayed a Remedial Overhaul as an Offensive, Opportunistic Strategy**

When announcing the sales force expansion in April 2024, Defendants continued deceiving investors. They misleadingly framed the massive overhaul as an offensive, forward-looking move that "was really about being bullish about our future." ¶283. This was a sham. The expansion was not opportunistic but defensive – a remedial action underway for nearly a year to staunch market share losses. As analysts confirmed after meeting with senior management, the sales force overhaul had "started in Q2/Q3" of 2023. *E.g.*, ¶331. This timeline is critical: Defendants initiated an urgent and fundamental course correction at the very same time they were making their most confident public statements about their existing strategy's success.

Defendants' own after-the-fact admissions confirm their contemporaneous knowledge of these severe problems. ¶¶274(d), 326-334. CEO Sayer later confessed that "**back in 2023, we needed a broader sales force**" because "we were not getting any

traction" and "***getting very few prescriptions***." *E.g.*, ¶¶271, 274(d), 330. He conceded that "we didn't have the resources in the field to address these new markets" and that, "[q]uite simply, Dexcom can't win in physician offices where we don't have a presence." *E.g.*, ¶¶259, 262, 264, 308. These admissions prove the so-called "opportunistic" expansion was, in fact, a desperate attempt to fix a failing strategy. *E.g.*, ¶¶284-285, 288.

### c. The Concealed Truth Was Undeniably Material

Defendants' misrepresentations and omissions were indisputably material. They concealed the failure of their strategy in a critical new market and their ceding of market share to their chief competitor. These facts undoubtedly "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011).

The devastating market reaction caused by the final revelation confirms the information's materiality. On July 25, 2024, the disclosure that Dexcom was losing the basal market to Abbott caused the Company's stock price to plummet $43.85, or 40.7%, in a single day. ¶363. This erased over $17 billion in market capitalization and marked the steepest decline in Dexcom's history. *Id.* Such a dramatic market reaction provides powerful evidence of materiality. *See In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703 (9th Cir. 2021).

### 2. The FAC Pleads with Particularity Why Each Challenged Statement Was False or Misleading When Made

The PSLRA requires a complaint to specify each misleading statement and the "reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1). The FAC methodically does so and fully complies with the Court's Order. Doc. No. 36 at 10. The FAC clearly identifies the exact statements challenged, the passage from which they are derived (including pertinent analyst questions) for context, the reasons why each is false and misleading, and scienter for each. In response, Defendants disingenuously parse several sentences from the challenged statements and argue that Plaintiff fails to explain their falsity. *See* MTD at 15. Defendants' argument fails. Statements are misleading

when they "'create an impression of a state of affairs that differs in a material way from the one that actually exists.'" *Facebook*, 87 F.4th at 948. Each challenged statement, viewed in context, did just that:

- For the statement in ¶156 touting an "uptick in new patient starts" and "continuation of this trend," the FAC alleges this was a classic half-truth. It was profoundly misleading because it omitted that Dexcom was, in reality, "getting very few prescriptions" in this new market (¶170) and the far more material fact that the actual "trend" was one of being decimated in the new basal market, where Abbott was capturing the vast majority of new patients. The real, undisclosed trend was that Dexcom's competitive failures had already forced it to begin a secret, frantic overhaul of its entire sales strategy. ¶¶158, 173.

- For the statements in ¶256 that "things are going as we expected" and celebrating "[r]ecord new patients," the FAC alleges these created the false impression of success in the market that mattered most. Any "[r]ecord" number of total patients was rendered misleading by the simultaneous, concealed failure in the new basal segment, where Dexcom was losing approximately seven of every ten new patient scripts to Abbott. ¶258. No reasonable investor would think things were going "as . . . expected" if they knew the Company was being routed in its single most important new market.

- For the statement in ¶256 about using "script data," Defendants parse this statement from the words that followed: "The debate – there's no debate internally to us. We know we're taking share, and we see that data." *Id.* This statement was deceptive because it invoked their access to data to lend credibility to their claims of success, when they knew full well that this very data revealed the opposite: that Abbott was the one taking significant market share. *See* ¶258 (referencing "taking share" from this statement). Using the very tool that proves the lie as supposed evidence for the lie is the essence of a misleading statement.

- For the statements in ¶283 justifying the massive sales force expansion by pointing to ancillary opportunities like "[m]aternal health" and discharged patients, the FAC precisely alleges why this was misleading. ¶285 ("The primary reason for the change was not driven by a bullish view about the future and did not center on expounding to new markets such as Stelo, *gestational diabetes, and/or discharged hospital patients*."). While Defendants pitched the expansion as a proactive, elective "bullish" move, the expansion was a defensive, necessary fix for the Company's profound, existing, and undisclosed failures in the basal market. ¶¶284-285. By misrepresenting the *reason* for the overhaul, Defendants concealed the failing strategy that made it necessary. *Id.*

Defendants' attempt to isolate individual sentences from the overall narrative of deception alleged in the FAC is an unavailing tactic. The PSLRA requires particularity, but it does not mandate that every sentence be parsed in a vacuum if its misleading nature derives from its role in a broader, consistently deceptive message about a core aspect of a company's business – here, Dexcom's ability to compete in the transformative Type 2 basal market. The FAC provides ample explanation for why these statements, viewed in

their full context and in light of the material omissions, were misleading components of a larger fraudulent effort designed to hide Dexcom's significant struggles.

### 3. Defendants' Challenged Statements Are Actionable and Not Shielded by Legal Doctrines

Defendants' attempts to immunize certain of their false statements by labeling them "puffery," "opinion," or "forward-looking" (*see* MTD at 15-19) fail because they ignore the statements' factual nature, the context in which they were made, and the well-pleaded allegations of contrary facts known to Defendants.

#### a. The Statements Are Not Mere Puffery

Defendants seek refuge in the puffery doctrine, impermissibly "plucking the statements out of their context to determine whether the words . . . are sufficiently 'vague' so as to constitute puffery." *Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014). The Ninth Circuit recognizes that "'general statements of optimism, when taken in context, may form a basis for a securities fraud claim.'" *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 770 (9th Cir. 2023). Here, the critical context was Dexcom's entry into the transformative, multi-million patient Type 2 basal insulin market. When viewed against Defendants' own hype about this opportunity, their statements were not vague boasts; they were specific, falsifiable, and material claims about Dexcom's operational readiness and market performance, directly contradicted by a concealed, failing reality.

*First*, a central pillar of Defendants' Motion is the artful deconstruction of their own public statements. Defendants systematically misquote their executives and strip away dispositive context, including the analyst questions that prompted them, attempting to transform concrete, falsifiable representations into vague generalities of puffery. MTD at 16. Defendants surgically remove specific references to the "Type 2 basal market" – the single most critical growth opportunity and the central subject of the fraud – to create the illusion of non-actionable corporate optimism and likewise strip critical context from statements regarding the size of their sales force. For example:

4935-5577-4286.v4

| Statement as Actually Made to Investors | Defendants' Sanitized Version in Their Motion |
|---|---|
| "We are in a great position to compete **as this market develops** . . . ." ¶76. | "'We are in a great position to compete.'" MTD at 16. |
| "We have the right commercial infrastructure for leading with the endocrinologists and expanding our leadership in primary care **with the type 2 basal and severe hypoglycemia markets where coverage has just opened up in the last couple of months**." ¶114. | "'We have the right commercial infrastructure for leading with the endocrinologists and expanding our leadership in primary care . . . .'" MTD at 16. |
| "**So from a coverage perspective, while we may want to expand coverage a little bit from the sales force, it wouldn't be a material step change in how we're going. It'd be normal as part of our thoughts around investments**. So we do have a sizable sales force." ¶104. | "'[W]e do have a sizable sales force.'" MTD at 16. |

Defendants cannot create puffery by omitting facts that make statements specific, verifiable, and material. The Court must analyze the statements Defendants actually made, not their litigation-driven caricatures.

**Second**, Defendants' assurances about their competitive position and operational readiness were belied by undisclosed, fundamental weaknesses. Defendants did not make statements that Dexcom was in a "great position to compete" (¶76), had the "right commercial infrastructure" (¶114), and that its "commercial strategy has worked wonderfully" (¶175) in a vacuum. They made them to reassure investors of Dexcom's ability to capture the new basal market. Yet, as alleged, Defendants knew these claims were false. They were simultaneously concealing that: (i) their PCP sales force was inadequate (¶¶116-123, 177-183); (ii) Dexcom could not "win in physician offices where we don't have a presence" (¶¶80, 118, 177); and (iii) a frantic, behind-the-scenes scramble was underway to secretly overhaul that very sales force because it was failing to penetrate the basal market. ¶¶84-85, 122-123, 177. These are not statements of general optimism. They are specific factual claims about operational capabilities for a market segment that

1  were knowingly false.

2      **Third**, Defendants' claims of strong performance and market share gains in the

3  basal segment were demonstrably false.  Statements claiming Dexcom was "doing well in

4  the basal category" (¶195), achieving "outperformance in basal" (¶215), and seeing "really

5  well performance" (¶256) constituted assertions about then-current business results.  These

6  claims were made while Defendants concealed the truth: Dexcom was "getting very few

7  prescriptions" in the basal segment (*e.g.*, ¶¶198, 218, 259, 304), and approximately seven

8  out of every ten new basal patient scripts were going to its primary competitor, Abbott.

9  ¶¶197, 217, 258.  Such statements are the opposite of puffery; they are verifiably false

10  representations of fact regarding performance in a key market.

11      **Fourth**, Defendants materially misrepresented the state of their crucial distributor

12  relationships.  Assurances of "very good relationships with our distributors" (¶97) and a

13  "very strong DME business" (¶277) were specific factual claims about the health of the

14  channel responsible for all Medicare basal patients.  These statements were rendered

15  materially misleading by the undisclosed reality that Dexcom's "pharmacy-first" strategy

16  had alienated its vital DME partners, directly causing a loss of market share in that

17  indispensable channel.  *E.g.*, ¶¶99, 279.

18      **Finally**, the market clearly understood Defendants' statements as factual

19  representations about their basal market capabilities and performance, not as mere puffery.

20  Analyst reports during the Class Period specifically cited Defendants' statements about

21  basal performance and share gains in maintaining their positive view of Dexcom. *See, e.g.*,

22  ¶¶252, 273, 286.  When the truth finally emerged, analysts expressed shock and a

23  significant loss of "faith in management" – hardly the reaction one would expect if the

24  prior statements were merely inconsequential puffing.  ¶300.  The $17 billion collapse in

25  market capitalization further underscores that these statements were taken seriously by the

26  market and were material to investment decisions.  ¶¶299, 363.

27      In short, these statements – regarding operational readiness, market performance,

28  and channel health – were not so ""exaggerated' or 'vague' that no reasonable investor

1    would rely on [them]." *Merkamerica Inc. v. Glover*, 2019 WL 8989833, at *9 (C.D. Cal.

2    2019); *see also In re SVB Fin. Grp. Sec. Litig.*, 2025 WL 1676800, at *11 (N.D. Cal. 2025)

3    (rejecting puffery argument because "the Court is skeptical that Defendants' statements . . .

4    were unimportant to a reasonable investor" and "'[i]n deeming a statement puffery at the

5    motion to dismiss stage, courts must exercise great caution'" because it is an issue more

6    properly left to the jury).[2]   They were specific, contextual, and reassuring answers to the

7    market's most pressing questions.  They were also false.

8                    **b.    The Statements Are Not Inactionable Opinions**

9            Defendants argue the same statements they characterize as puffery are also

10    inactionable opinions.  MTD at 17-18.  Defendants are wrong.  As established, statements

11    like "we are doing well in the basal category" (¶195) or "[w]e have the right commercial

12    infrastructure" (¶114) are assertions of fact.  *See In re QuantumScape Sec. Class Action*

13    *Litig.*, 580 F. Supp. 3d 714, 739 (N.D. Cal. 2022) (finding statements were not opinions

14    because they did not "use opinion-qualifying language such as 'I think' or 'I believe'").

15    Descriptive language does not transform an objective statement into an opinion.  *See, e.g.*,

16    *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183

17    (2015) (noting that the statement "'the coffee is ***hot***'" is "a statement of fact" because it

18    "expresses certainty about a thing"); *Ohio Pub. Emps. Ret. Sys. v. Meta Platforms, Inc.*,

19    2024 WL 4353049, at *12 (N.D. Cal. 2024) (finding statement that research findings were

20    "'bi-directional, so small effects positive and small effects negative but it's quite small'"

21    was not an opinion).[3]

22    _____

23    [2] Courts have rejected puffery challenges like Defendants' and found similar statements to
      be actionable.  *See, e.g.*, *In re Golden Heaven Grp. Holdings Ltd. Sec. Litig.*, 2025 WL

24    714171, at *6 (C.D. Cal. 2025) (original emphasis omitted) ("'we are well positioned for
      even stronger business growth'"); *In re Green Dot Corp. Sec. Litig.*, 2024 WL 1356253, at
      *4-*5 & n.2 (C.D. Cal. 2024) ("'continues to gain traction on nearly all fronts'" and

25    "'continue[s] to do extremely well'"); *Karinski v. Stamps.com, Inc.*, 2020 WL 281716, at
      *11 (C.D. Cal. 2020) (business partner was "'very happy'" with the relationship); *In re*

26    *Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 272 (S.D.N.Y. 2010) (company's
      portfolio was "outperforming . . . relevant indices").

27
      [3] Even statements that begin with "opinion words" can contain non-opinion statements of

28    fact.  *See Omnicare*, 575 U.S. at 185.

But even if construed as opinions, they are actionable where, as here, the speaker omitted material facts that undermine the basis for that opinion. *Omnicare*, 575 U.S. at 188-89. A reasonable investor hearing an executive opine that the company is "doing well in the basal category" (¶195) assumes the executive has a reasonable basis for that belief. Here, Defendants knew facts that made their opinions baseless. Defendants repeatedly professed to have specific, internal data regarding patient uptake and share in the basal space. *See, e.g.*, ¶¶322-324. And, Defendants also later admitted that they knew they were "getting very few prescriptions" (¶304) and had already secretly begun a massive sales force overhaul precisely ***because*** they were not doing well. ¶308. An opinion offered without disclosing known, contrary facts that reveal it to be baseless is misleading under *Omnicare*. 575 U.S. at 188-89.

### c.    The Statements Are Not Protected by the PSLRA's Safe Harbor

The safe harbor protects statements about the future, not misrepresentations about the present. *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017). The challenged statements concern then-present facts.

Defendants argue that portions of Sylvain's June 5, 2024 statements professing confidence as to the Company's current performance and doubling down on its raised guidance (*see* ¶290 ("we were very comfortable with where folks are sitting for the quarter," and "[w]e're happy with our full year guidance")) are protected. MTD at 18-19. Defendants are wrong for three reasons. First, these are statements of ***present*** satisfaction based on ***present*** (and misrepresented) conditions. *See In re Dermtech, Inc. Sec. Litig.*, 2025 WL 1618193, at *6 (S.D. Cal. 2025) (finding revenue projection is a "'misrepresentation of . . . current business conditions'"). Second, they were not accompanied by meaningful cautionary language. Generic warnings about "'competition'" and the "'size of our sales force'" (MTD at 18) are useless when a company is concealing that its sales force is inadequate, that this is causing it to lose the competitive battle, and that the secret overhaul to fix this failure is causing significant disruption. *See Glazer*, 63

F.4th at 780-81 ("language is not 'meaningful' [when] it amounts to only a boilerplate listing of generic risks and does not mention the specific risk"); *see also Alphabet*, 1 F.4th at 703 (risk disclosures can mislead if they speak of "'as-yet unrealized risks'" that "'already have come to fruition'").  Moreover, these warnings, which remained almost entirely unchanged before, during, and after the Class Period despite dramatically different and deteriorating circumstances in the basal market, are legally insufficient.[4]  *Glazer*, 63 F.4th at 780 (conclusion that warning was not "meaningful" was "bolstered by the fact that [d]efendants did not update" it after a factual development).  These generic warnings did not address the acute, undisclosed problems Dexcom was then experiencing in its basal market entry such as "getting very few prescriptions" and the need for a massive sales force overhaul to ameliorate this.  ¶304; *see Glazer*, 63 F.4th at 780.

Third, the FAC pleads a strong inference that Defendants made the statements with ***actual knowledge*** of their falsity, as the very problems they later blamed for lowering guidance were already known to them.  Defendants, including Sylvain, were acutely aware by the "beginning" of Q2 2024 (which began April 1, 2024) of a significant shortfall in expected new customer additions, which put Dexcom "a quarter behind" where they "expect[ed] to be."  ¶295.  Moreover, they were aware of the severe underperformance in the basal market, the significant disruption and ineffectiveness of the sales force realignment (which began ***a year earlier*** in Q2/Q3 2023) (*e.g.*, ¶331), and the continued loss of DME market share.  These were known, material adverse facts that directly undermined their statements and the reasonableness of maintaining the existing full-year guidance.  Expressing "happ[iness]" with guidance under these known, dire circumstances

---

[4] For example, Defendants' repeated citation to the following generic risk disclosure does not protect them: "'[W]e might be unable to successfully expand the commercialization . . . for a number of reasons, including . . . the limited size of our sales force.'" MTD at 18, 20. It was not specifically tailored to the known problem at hand – that the Company's lack of robust PCP-focused sales force prevented it from capturing the newly covered basal population being treated in PCP offices.  That this supposed warning appears verbatim in all Dexcom's Forms 10-K since 2010 further demonstrates how truly generic it was.

constitutes a knowing falsehood, stripping the statement of any safe harbor protection.[5]

### 4. The FAC Alleges Specific, Verifiable Facts Supporting Falsity

The FAC provides compelling evidence – Defendants' admissions, third-party data, and logical calculations – demonstrating their statements' falsity. Defendants claim the FAC fails to support its three "premises": (1) inadequate sales force; (2) underperforming DME relationships; and (3) declining basal market share. This argument mischaracterizes both the FAC's allegations and the evidentiary standard at the pleading stage. MTD at 19-23.

***Sales Force Inadequacy***: The FAC alleges specific facts showing Dexcom's sales force was fundamentally unable to compete in the basal market:

- Reach: Dexcom could access at most 25% of PCPs in early 2023, while Type 2 basal patients are predominantly treated by PCPs. ¶46 n.3; *see, e.g.*, ¶¶117-120.

- Focus: The 2021 expansion targeted intensive insulin prescribers, not basal prescribers. *E.g.*, ¶¶106-108.

- Performance: Defendants later admitted they were "getting very few prescriptions" in offices without a sales presence. *E.g.*, ¶¶108, 118, 330.

- Timing: The massive overhaul began in Q2/Q3 2023, demonstrating acknowledged inadequacy at the beginning of the Class Period. *E.g.*, ¶¶109, 130.

Defendants cannot credibly dispute these facts. Their own post-Class Period statements confirm that "back in 2023," they recognized the need for "a broader sales force" because they "didn't have the resources in the field." *E.g.*, ¶108. This contemporaneous knowledge directly contradicts their Class Period assurances about, for example, having the "right commercial infrastructure." ¶114.

Despite this, Defendants seek to excuse their conduct with several meritless arguments. MTD at 19-21. First, they string together various disclosures to argue that "Dexcom acknowledged the limitations of its sales force," "disclos[ing] the very observations Plaintiff contends were misleading [sic] omitted." *Id.* at 19-20. But this is

---

[5] Unlike a reiteration of uncertain, future goals (*cf. Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1192 (9th Cir. 2021)), these statements address present realities.

1   nothing more than a premature truth-on-the-market defense.[6]  Such a defense, being

2   "'intensely fact-specific,'" is not decided on pleadings.  *City of Birmingham Relief & Ret.*

3   *Sys. v. Acadia Pharms., Inc.*, 2023 WL 1769810, at *6 (S.D. Cal. 2023).  To prevail now,

4   Defendants bear the heavy burden of "prov[ing] that the information that was withheld or

5   misrepresented was 'transmitted to the public with a degree of intensity and credibility

6   sufficient to effectively counterbalance any misleading impression.'"  *Id.* at *5 (quoting

7   *Provenz v. Miller*, 102 F.3d 1478, 1492-93 (9th Cir. 1996)).

8       Defendants fall far short.  None of the various disclosures Defendants selectively

9   highlight counteract the misimpression Defendants created.[7]  *See* Doc. No. 39-1 at 20-22;

10  *Homyk v. ChemoCentryx, Inc.*, 2023 WL 3579440, at *12 (N.D. Cal. 2023) ("Because the

11  adequacy of Defendants' disclosures is not obvious . . . [it] is a factual issue that the Court

12  may not resolve at this [pleading] stage."); *Lilien v. Olaplex Holdings, Inc.*, 765 F. Supp.

13  3d 993, 1010-11 (C.D. Cal. 2025).  Rather, viewed in context, they furthered that

14  misimpression.  For example:

15  • Defendants repeatedly cite the statement that "'we don't have a specific PCP sales
      force'" as evidence that they disclosed the flaws in their sales force.  *See* MTD at
16    20-21.  But the language Defendants quote was merely a comment about the
      geographic organization of the sales force, and, in the same paragraph, Sayer was
17    actually making a positive statement about the sales team's success with PCPs.  *See*
      Doc. No. 39-13 at 16 (noting that their sales force "call[s] on both specialty diabetes
18    clinics and primary care" and "it's [the sales force's] job to drive that business and
      bring those offices along . . . ***[t]hey do a really good job of that***").

19
    • Likewise, Sayer's April 2023 statement that we have "'work to do in the PCP
20    community'" (MTD at 20) was about work to further educate, not work to expand,
      and Sayer went on to boast of the prior sales force expansion, misleading investors
21    to believe the sales force was sufficient and appropriately placed.  Doc. No. 39-11 at
      9 ("[w]e did a big sales force expansion last year in anticipation of going more
22    broadly").  And Sayer's statement that "'[w]e have a lot of prescribers to go'"
      (MTD at 20) was immediately nullified by his assurance that Dexcom had already
23    "structured our sales force . . . to, in fact, go after" them, creating the false
      impression the necessary PCP-focused sales force was already in place.  Doc. No.
24    39-11 at 15.

25  _____
    [6] Defendants raise similar fact-bound truth on the market arguments throughout their
26  Motion.  *See, e.g.*, MTD at 21 (arguing that Dexcom disclosed that it was aiming for a
    "75%, 25%" channel split).  These fail for the same reasons.

27  [7] Moreover, "investors are not generally required to look beyond a given document to
    discover what is true and what is not."  *Miller v. Thane Int'l Inc.*, 519 F.3d 879, 887 (9th
28  Cir. 2008).

- Defendants repeatedly cite Sylvain's statement that "'[w]e've been kind of under-indexed' in PCP." MTD at 20-21. But that statement did not refer to Dexcom's sales force at all, and, in context, Sylvain was once again touting Dexcom's success among PCPs, noting they had been "very receptive" to the G7's "ease of [use]." Doc. No. 39-14 at 10.

- Defendants' vague disclosures (a boilerplate risk disclosure about the "limited size of our sales force" from Dexcom's 2022 Form 10-K and a comment, buried among misleading statements, that "'we're investing on the commercial side to get broader'" (MTD at 20) cannot override repeated Class Period assurances of Dexcom's preparedness, particularly where Defendants had earlier told investors that any sales force expansion would not be "material" and would be "normal as part of our thoughts around investments." ¶104. Indeed, "investing on the commercial side to get broader" (¶194) is not the same as admitting that Defendants "***need[ed]*** a broader sales force" because they were "***getting very few prescriptions***" *E.g.*, ¶198.[8]

Defendants' remaining arguments misconstrue the Complaint. Their argument that companies need not compare themselves to competitors misses the point. MTD at 19-20. The issue is not a failure to compare but Defendants' false statements about their own capabilities. When Lawver said Dexcom had "the right commercial infrastructure" for "expanding our leadership in primary care with the type 2 basal," she triggered a duty to disclose information that cut against her positive statement. ¶114; *see Schueneman*, 840 F.3d at 705-06.

Defendants also erroneously argue that Plaintiff's allegation that the 2024 sales force expansion "'started in Q2/Q3 of 2023'" is confusing, contradictory, and omits context that hiring started in Q4 2023. MTD at 20-21. The FAC clearly alleges, based on a 2024 Bank of America Global Research report directly attributing statements to Sylvain and Lawver after a call, that the ***implementation*** of this massive sales force expansion "started in Q2/Q3 last year." ¶¶10, 84, 109, 122, 158, 177. This is not confusing; it is a critical allegation demonstrating Defendants' contemporaneous knowledge of their existing sales

---

[8] Analyst commentary during the Class Period clearly reflects the market's reliance on Defendants' misleading narrative. *See, e.g.*, ¶61. In addition, the market's reaction to the July 25, 2024 corrective disclosure – a stunning 40% stock price collapse accompanied by analyst shock and loss of "faith in management" (*see* ¶¶299-300) – demonstrates conclusively that the concealed facts were not previously known. *See, e.g.*, *In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*, 2020 WL 1479128, at *15 (E.D. Pa. 2020) ("At the motion to dismiss stage, courts have rejected the truth on the market defense when drops in stock prices have created reasonable inferences of the materiality of information not previously available on the market.").

force's failure, even as they publicly touted success and readiness throughout mid-to-late 2023. *E.g.*, ¶¶76, 104, 114. Reliance on such analyst reports – where an analyst confirmed after meeting with senior management that the sales force overhaul had "started in Q2/Q3" of 2023 – is proper. *See Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1234-35 (9th Cir. 2004). The timing of actual hiring versus the decision and commencement of the overhaul is a distinction without a difference when the core allegation is the concealed ***recognition*** of failure and the need for remedial action.

Finally, Defendants argue they never claimed to win in physician offices their sales representatives did not call on. MTD at 21. The point is not that Defendants made this specific narrow claim but that they made broad, positive statements about being "in a great position to compete" (¶76), having the "right commercial infrastructure" (¶114), and "doing well in the basal category" (¶195). These statements were materially misleading because Defendants knew their lack of presence in the vast majority of PCP offices – the primary prescribers for the new basal market – made such overall success impossible and was, in fact, leading to significant market share losses and the need for a secret, massive sales force overhaul. *E.g.*, ¶¶79-85, 116-123, 304, 308.

***Deteriorating DME Relationships***: The FAC provides substantial evidence that, while Defendants were publicly touting "a very strong DME business" (¶277), their relationships with DME distributors were, in fact, deteriorating. *See, e.g.*, ¶¶99, 278-279 (Dexcom's DME sales had bottomed out at 25% before the Class Period, and the shift to pharmacy had alienated DME partners). The FAC further explains that these relationships were critical because they were the ***exclusive*** channel for newly-eligible Medicare basal patients to access CGMs. *E.g.*, ¶99. Moreover, Defendants later admitted they had "lost market share in the DME channel . . . and that has hurt us," and that "growth in the DME channel has trailed our plan" such that Dexcom "need[ed] to refocus on those relationships." ¶99; *see e.g.*, ¶¶90-91 (detailing the impact of DME on Dexcom's market position). These allegations directly contradict Defendants' claims of having "very good relationships with" DME distributors (¶97) and a "very strong DME business." ¶277; *see*

1    *also* ¶¶76, 114, 135, 156, 175, 195, 215, 235, 256.

2        Defendants' attempt to reframe the issue by arguing the FAC's allegations of
3    "strained" DME relationships are mere speculation fails because it ignores the
4    contemporaneous facts alleged.  MTD at 21-22.  The FAC details a confluence of facts
5    which demonstrate that these strained relationships ***and their negative consequences*** were
6    impacting the Company during the Class Period.  *E.g.*, ¶¶91, 98-99, 278-279, 301-303,
7    305.  Far from being speculative, the multiple analyst reports cited in the FAC, each of
8    which were published ***following*** analysts' conversations with Defendants, confirm that
9    these issues were not sudden but were festering throughout the Class Period.  For example,
10   one analyst reported directly after speaking with the Company: "DXCM said there wasn't
11   just one big major DME that suddenly shifted away this quarter but ***instead the issues***
12   ***being highlighted seem widespread across many of the DMEs*.**"  *See* ¶303; *see also* ¶¶99,
13   279, 301-302.  Such corroboration by multiple, independent sources is the very antithesis
14   of speculation.

15       Further eviscerating any claim of speculation is the pervasive damage to Dexcom's
16   core partnerships, as evidenced by Defendants' own description of the top-down effort to
17   stanch the bleeding.  ¶305.  Defendants admitted that they had to undertake "top-to-top
18   meetings throughout the organization," make "personal[] . . . calls with the CEOs of [their]
19   top distributors," and "retrain" the sales force.  *Id*.  Senior management was "fully involved
20   in rehabilitating" these supposedly "very good" relationships.  *See* ¶¶99, 279, 303.
21   Crucially, Defendants also admitted that the problem was so entrenched that it would take
22   significant time to fix,  acknowledging that "it's going to take us some time," and that
23   "[t]his is not something we're going to fix in . . . 2 weeks, it can take us a while to get back
24   to where we need to get."  ¶305.

25       Defendants erect a strawman by contending that Dexcom disclosed its aim for a
26   75% pharmacy/25% DME split and that Plaintiff's allegation that DME sales "'bottom[ed]
27   out at 25%'" pre-Class Period implies an increase during the Class Period.  MTD at 21.
28   Defendants miss the point.  The FAC alleges that Dexcom's multi-year strategy to

1    prioritize the pharmacy channel had *alienated* its DME partners.  ¶¶91, 99, 129, 150, 169,

2    189, 209, 229, 249, 270.  The misrepresentation lies in Defendants reassuring the market

3    that they have "very good relationships with our distributors" (¶97) and a "very strong

4    DME business" (¶277), while simultaneously concealing that these relationships were

5    hindering Dexcom's ability to capture the new, crucial Medicare basal market, leading to

6    lost market share.  ¶¶301-303, 305.  Thus, the FAC pleads specific facts showing that these

7    positive statements about DME relationships and Dexcom's position to compete in the

8    Type 2 basal market were false and misleading.

9         *The Basal Market*: Defendants' assertions regarding their performance in the basal

10   market were objectively false and misleading.  The consistent capture by Abbott of

11   approximately 70% of all *new* patient scripts in the Type 2 basal market in January and

12   April 2024 (*e.g.*, ¶258) directly and powerfully contradicts Defendants' contemporaneous

13   claims of success, share taking, and outperformance during that same period.  *See* ¶215

14   (January 2024: "you continue to see outperformance in basal"); ¶235 (February 2024: "So

15   we are seeing basal going faster than what was in our long-range plan.  And what's great

16   about that is as we continue to take share . . . ."); ¶256 (April 2024: "The debate – there's

17   no debate internally to us.  We know we're taking share [in basal], and we see that data.");

18   *see also* ¶¶76, 97, 114, 135, 156, 175, 195.

19        The claim that Dexcom was "taking share" in any meaningful sense is also directly

20   contradicted by Defendants' later admissions.  Defendants acknowledged that "back in

21   2023," based on prescribing patterns, they knew they were "getting very few

22   prescriptions."  *E.g.*, ¶¶230, 304; *see also* ¶298 ("[w]e're not doing wonderful in the basal

23   space").  Defendants' narrative of success is further belied by their decision to undertake a

24   massive, disruptive sales force overhaul – a remedial action necessitated by the very

25   failures they concealed.  *E.g.*, ¶¶218, 331-332.  The market's verdict was equally clear: the

26   stock price cratered 40.7% when the truth emerged, demonstrating the materiality of the

27   concealed information and the shock of deceived investors.  ¶363; *see* ¶¶299-300 (analysts

28   reporting "DXCM clearly losing the basal wars" and discussing "share loss to . . . Abbott"

1   and damage to "credibility" and "investor faith in management").

2        Nonetheless, Defendants insist that Dexcom really was taking share. MTD at 22-23.

3   Even crediting Defendants' flawed argument that Dexcom moved from 10% to 30%,

4   moving from a de minimis pre-Class Period base to a small minority share does not

5   constitute "taking share" in any meaningful sense.[9] To investors, hearing executives claim

6   they are "taking share" in the "largest single expansion of access to CGM in our industry's

7   history" (¶75) implies the company is making significant competitive inroads and

8   successfully challenging the incumbent's dominance. It does not mean the company is

9   merely capturing the scraps from its competitor's table while that competitor's absolute

10   lead in new patient acquisition widens. A statement is misleading when it omits material

11   facts that, if disclosed, would have "altered the 'total mix' of information" available.

12   *Matrixx*, 563 U.S. at 38; *Omnicare*, 575 U.S. at 192 ("[L]iteral accuracy is not enough: An

13   issuer must as well desist from misleading investors by saying one [true] thing and holding

14   back another."). Here, celebrating "taking share" and strong positioning while concealing

15   that Abbott was winning seven of every ten new basal patients (¶¶178, 197, 237, 258)

16   paints a picture of competitive success that is diametrically opposed to the bleak reality of

17   continued market defeat.

18        **5.   Defendants' Remaining Arguments Fail**

19        Defendants' final attempt to save their statements by ripping them from their context

20   and drawing inferences in their favor is unavailing. MTD at 23-28. Securities fraud is not

21   a word game. A statement's truthfulness is judged by the total impression it creates for a

22   ***reasonable investor***. Accordingly, the Court must consider the "'total mix' of information

23

---

24   [9] Defendants wrongly insinuate that, because Abbott held a dominant position among the very limited population of basal patients who utilized CGMs ***prior*** to the coverage

25   expansion in early 2023 (*i.e.*, Abbott served ~90% of all basal patients prior to the Class Period), its capture of ***only*** 70% of the newly expanded insured basal market during the

26   Class Period represented a loss of market share to Dexcom. MTD at 22. But this is not an apples-to-apples comparison. The small, pre-expansion basal market had little in common

27   with the post-expansion basal market consisting of more than three million potential CGM users. Thus, Abbott's 70% market share during the Class Period meant Dexcom was

28   losing the vast majority of new basal patients to Abbott.

4935-5577-4286.v4

made available" and the overall impression created by Defendants' communications. *Matrixx*, 563 U.S. at 38. Defendants do not get to dictate the meaning of the statements to investors at the pleading stage. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 986 (9th Cir. 2008) (the plaintiff's plausible interpretation sufficient even if the defendant's is conceivable); *Dermtech*, 2025 WL 1618193, at *4 (even where "the parties both put forth plausible theories about how a reasonable investor would interpret" defendants' statement, plaintiff adequately alleged falsity).

The following chart summarizes Defendants' misleading spin on their statements and the undisclosed reality that rendered them false.

| Statement | Misleading Statement and Defendants' Excuse[10] | The Undisclosed Reality that Rendered the Statement Misleading |
|---|---|---|
| A (¶76) | "[G]reat position to compete." <br><br> <u>Excuse</u>: Only addressing trial data. | Misleading. A broad claim of competitive readiness, rendered false by the concealed facts that Dexcom could not reach ~75% of PCPs and had alienated its DME channel, making it impossible to effectively compete. |
| C (¶104) | Expansion "wouldn't be a material step change." <br><br> <u>Excuse</u>: Already disclosed a shift to PCPs. | Misleading. A massive, material overhaul was ***already secretly underway*** precisely because the prior strategy had failed to adequately penetrate the PCP market. |
| D (¶114) | "[R]ight commercial infrastructure" to "expand[] our leadership in primary care." <br><br> <u>Excuse</u>: Did not claim to "dominate." | Misleading. An infrastructure is not the "right" one when it has a fatal flaw: no access to the vast majority of the target market's prescribers. |
| E (¶135) | "[Y]ou see us taking share in that space [basal]." <br><br> <u>Excuse</u>: Focused on insurance coverage, not PCP reach. | Misleading. The statement explicitly linked coverage to taking share. This was false because, despite coverage, Dexcom was ***ceding*** significant share due to its inadequate PCP sales force and DME channel. |
| F (¶156) | "[V]ery encouraged by early prescribing trends [in basal]." <br><br> <u>Excuse</u>: It was a record quarter. | Misleading. The statement created the false impression of success and share gains specifically within the ***newly critical basal segment*** while concealing that Abbott was capturing the vast |

---

[10] Plaintiff quotes only a portion of the statement for identification and brevity. The full statement can be found in the FAC at the paragraph identified.

24-cv-1485-RSH-VET

| Statement | Misleading Statement and Defendants' Excuse[10] | The Undisclosed Reality that Rendered the Statement Misleading |
|---|---|---|
| | | majority of these new basal patients and that Dexcom's sales force was being secretly overhauled due to its failure in this very segment. |
| G (¶175) | PCP sales force expansion and "commercial strategy has worked wonderfully [in basal]." <u>Excuse</u>: PCPs were writing the majority of new scripts. | Misleading. Dexcom's commercial strategy **had not** worked for the basal market, necessitating another, secret, and massive overhaul that began in Q2/Q3 2023, so touting an overall increase in the prescriber base masked the specific and critical failure in the basal segment. |
| H (¶195) | "[D]oing well in the basal category." <u>Excuse</u>: Qualified by saying he wanted "to win more." | Misleading. Dexcom was **not** doing well; Abbott was winning ~70% of new scripts. A vague desire "to win more" does not cure a misrepresentation of current performance. |
| I (¶215) | "[O]utperformance in basal." <u>Excuse</u>: Made no direct comparison to Abbott. | Misleading. In a duopoly, "outperformance" has only one meaning. The claim was directly contrary to the reality that Dexcom was being significantly **outperformed** by Abbott. |
| K (¶256) | "We know we're taking share . . . ." <u>Excuse</u>: Share dynamics are complex. | Misleading. In a brand-new market, ceding ~70% of all new patients to a competitor is the opposite of taking share in any meaningful sense, particularly where that share remained static between January and April 2024. |
| L (¶277) | "[V]ery strong DME business." <u>Excuse</u>: Also noted pharmacy growth. | Misleading. Touting one channel does not excuse misrepresenting another. The DME business was weak and its relationships frayed, costing critical market share. |
| M (¶283) | Sales force expansion was to capitalize on opportunities and was "really about being bullish about our future." <u>Excuse</u>: Also mentioned needing more PCP coverage. | Misleading. This misrepresented the **reason** for the expansion. It was not a bullish, opportunistic move but a defensive, desperate attempt to fix a failing strategy. |

## C.   Plaintiff's Allegations Raise a Strong Inference of Scienter

To survive dismissal, a complaint must allege facts creating a "strong inference" of scienter – an intent to deceive or deliberate recklessness. 15 U.S.C. §78u-4(b)(2); *Tellabs*,

551 U.S. at 322-23.  The inference of scienter must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.  A tie goes to the plaintiff: if the fraudulent and non-fraudulent inferences are equally compelling, the complaint survives.  *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1033 (9th Cir. 2016).

Here, the FAC's allegations overwhelmingly support a strong inference of scienter.  Defendants knew the success of their single most important strategic initiative – the expansion into the basal insulin market – was failing.  They knew this because their core business depended on it, they repeatedly told investors they were tracking the dispositive data with precision, and their subsequent admissions confirm their contemporaneous knowledge of the problems.  This inference is far more compelling than any innocent explanation Defendants can muster.

### 1. Defendants' Knowledge Is Inferred from the Core Importance of the Basal Market Expansion and Their Professed Oversight

The core operations doctrine supports inferring that senior executives know facts critical to the company's core business.  *See Alphabet*, 1 F.4th at 706.  For Dexcom, a company with essentially ***only one core product*** – ***CGMs*** – the CMS coverage expansion for basal patients was everything.  Defendants themselves called it the "largest expansion of coverage in [the] company's history," a linchpin of Dexcom's future growth.  ¶¶313-314.

It is "absurd" to suggest that the CEO (Sayer), CFO (Sylvain), and Chief Commercial Officer (Lawver) would be ignorant of the failing sales infrastructure, cratering new patient starts, and massive loss of market share to Abbott, the Company's only real competitor.  ¶¶313-316; *see Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1145-46 (N.D. Cal. 2017) (finding it "'absurd'" for executives not to know of adverse trends in a key "'growth driver[]'").  The inference is particularly strong given Defendants' claims of personal involvement, with Sylvain stressing that the expansion was a project "that we've worked on for years and years and years, and that really we've led."  ¶314.

Such hands-on management of a critical initiative makes ignorance of its profound problems implausible.  *See Oracle*, 380 F.3d at 1232 (scienter inferred where CEO "acknowledged that 'I was involved in an awful lot of these deals'").[11]

### 2. Defendants' Own Statements Confirm They Possessed Data Revealing the Fraud

This is not a case where Plaintiff asks the Court to merely presume Defendants had access to negative information.  *See* MTD at 28-29.  Defendants repeatedly and explicitly admitted they were tracking the very metrics that would have revealed the falsity of their public statements.  For example:

- ***Sayer***: "***[w]e have the data capabilities*** to show what outcomes we're going to generate within this population, and we'll do that."  ¶320.

- ***Lawver***: "[w]e track coverage ***very closely*** for Dexcom for the industry," discussing "[t]he trends . . . that we see in [basal] in terms of uptake."  ¶321.

- ***Sylvain***: "***[w]e know exactly*** where the patients are coming from."  ¶322.

- ***Sylvain***: "there's no debate internally to us[,] [w]e know we're taking share and ***we see that data***."  ¶324.

These are admissions of possessing specific, contemporaneous, internal data – not, as Defendants attempt to argue, "only . . . DME data."  MTD at 29.  When defendants claim to be tracking the precise numbers that later prove to be disastrous, scienter is established.  *See Green Dot*, 2024 WL 1356253, at *5 (scienter established where defendants admitted "'[w]e know what the internal numbers are'").  To the extent Defendants now claim they made these positive statements ***without*** actually possessing such knowledge, their conduct was, at a minimum, deliberately reckless.  *See Dermtech*, 2025 WL 1618193, at *11 ("it would be deliberately reckless if [defendants] did not know" the falsity of their statements about their "'flagship' product").

### 3. Defendants' Post-Class Period Admissions Confirm Their Contemporaneous Knowledge

---

[11] Defendants fail to rebut this point, merely making a passing reference to a single inapposite authority.  *See* MTD at 29; *Chi. & Vicinity Laborers' Dist. Council Pension Fund v. Amplitude, Inc.*, 2025 WL 82206, at *2 (N.D. Cal. 2025) (core operations fail where "the complaint does not state with enough specificity what it is that the defendants must have known").

Any doubt about Defendants' contemporaneous knowledge is erased by their own post-Class Period admissions, which effectively "time-stamp" when they knew of the problems. This is not fraud-by-hindsight; it is fraud confirmed by Defendants' confessions of contemporaneous knowledge of the facts that made their public statements false.

Defendants confessed that "***back in 2023***," based on the same "prescribing patterns" they touted to investors, they knew they "were not getting any traction" and were getting "very few prescriptions" where they lacked a sales force. ¶330. They further admitted that by "***late 2023***," they knew they "didn't have the resources in the field to address these new markets." ¶332. After meeting with Defendants, an analyst confirmed that the sales force expansion – a reaction to this known deficiency – actually "***started in Q2/Q3" of 2023***. ¶331.

These are the classic "'I knew it all along' type of admission[s]" that directly support scienter. *In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *10 (N.D. Cal. 2020) (finding scienter as Apple admitted it "'saw' – using the past tense that suggests contemporaneous knowledge – troubling signs"). Defendants' attempt to dismiss these as mere "hindsight reflections" (MTD at 29) fails. They are admissions that the problems underlying the eventual guidance collapse were known and understood long before they were disclosed.

### 4. A Collection of Corroborating Factors Solidifies the Strong Inference of Scienter

Multiple additional factors, viewed holistically, buttress the already strong inference of fraudulent intent.

***Revealing Temporal Proximity***: The timeline is damning. On April 25 and June 5, 2024, Defendants raised and then reaffirmed guidance. ¶¶62, 282, 335. But ***less than two months later***, they announced a shocking ***$300 million guidance reduction***. ¶¶335-337. Such a rapid and dramatic reversal of fortune, absent any intervening cataclysmic event, strongly indicates the underlying problems were known when the positive statements were made.[12] *See Reese v. Malone*, 747 F.3d 557, 575 (9th Cir. 2014) (three to six months

---

[12] Both of Defendants' cases on this point merely conclude that temporal proximity is

1  between statements and disclosure supports scienter), *overruled on other grounds by City*

2  *of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th

3  Cir. 2017).

4       ***Suspicious Executive Departure***: The sudden "retire[ment]" of Lawver, the Chief

5  Commercial Officer, just as the truth began to surface is highly suspicious. ¶339. Hired in

6  January 2023 to lead Dexcom's commercial strategy, which included the basal market

7  expansion, she was responsible for the very sales force efforts that Defendants later

8  admitted were deficient. ¶338. Her abrupt exit, in close proximity to the revelation of the

9  failure she was hired to prevent, contributes to the inference of scienter.[13] *See SEB Inv.*

10 *Mgmt. AB v. Wells Fargo & Co.*, 742 F. Supp. 3d 1003, 1023 (N.D. Cal. 2024).

11      ***Clear Motive and Opportunity***: Defendants were motivated to conceal the truth by

12 both professional and personal incentives.

13 •   ***Defendants' desire to "right the ship."*** Defendants needed to demonstrate their
      ability to capture market share in what they described as the "***largest single***
14    ***expansion of access to CGM in our industry's history***." ¶340. Thus, Defendants
      were motivated to conceal Dexcom's underperformance in the basal space in the
15    hopes that they would eventually be able to avoid disclosure by reporting positive
      growth.[14] *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir.
16    2008) (defendants "may have thought that there was a chance that the situation . . .
      would right itself" and thus were motivated to conceal the information).

17
18 •   ***Insider Trading***: The Individual Defendants cashed out millions in stock at
      artificially inflated prices while concealing the negative news. Sayer sold $22.3
19    million, Sylvain sold $2.9 million, and Lawver sold over $640,000, representing a
      suspicious ***41%-43% of their holdings***. ¶¶342-345. The sales were suspiciously
      timed, often following positive statements and preceding the eventual disclosure.
20    ¶¶342, 344-345. Defendants' reliance on Rule 10b5-1 trading plans – and their

21
22 insufficient on its own – a conclusion inapplicable to this case, given the myriad grounds
   for scienter. *See Wong v. Arlo Techs., Inc.*, 2019 WL 7834762, at *8 (N.D. Cal. 2019);
23 *Ronconi v. Larkin*, 253 F.3d 423, 437 (9th Cir. 2001) (emphasis in original) (five-week
   period "***without more***" did not establish scienter).

24 [13] Defendants' authority does not demonstrate otherwise. In *In re NVIDIA Corp. Sec.*
   *Litig.*, 768 F.3d 1046 (9th Cir. 2014), the plaintiffs "fail[ed] to provide any facts to connect
25 these departures with the problems at issue in this lawsuit," and the "advisory role[s]"
   emphasized by Defendants had no termination date, unlike Lawver's brief six-month
26 holdover. *Id.* at 1062-63; *see also Ryan v. FIGS, Inc.*, 2024 WL 187001, at *13 (C.D. Cal.
   2024) (non-defendant director's resignation did not indicate scienter).

27 [14] This is not the "routine corporate objective[]" which Defendants' case rejects but, rather,
   the only corporate objective of its kind in Dexcom's history. *In re Rigel Pharms., Inc. Sec.*
28 *Litig.*, 697 F.3d 869, 884 (9th Cir. 2012).

4935-5577-4286.v4

claim that they sold shares only to cover tax obligations – is a merits-based affirmative defense, improper at this stage. *See In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 n.16 (N.D. Cal. 2009). In any event, a plan provides no defense if adopted after the executive became aware of material non-public information (*Lamartina v. VMware, Inc.*, 2021 WL 4133851, at *12 (N.D. Cal. 2021)), as alleged here. ¶347.

- ***Incentive Compensation***: A significant portion of executive compensation was tied directly to stock performance. ¶¶350-352. For Sayer, performance-based stock units constituted *43%* of his pay. ¶352. This gave Defendants a powerful motive to keep the stock price high by hiding the truth about the failing basal market expansion. *See No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003).

### 5. The Inference of Scienter Is Far More Compelling than Any Innocent Explanation

Collectively, these allegations paint a compelling picture of fraud. The competing inference – that Defendants were merely blindsided by the poor results of a sales force reorganization – is far less plausible. MTD at 32. It requires the Court to believe that top executives were simultaneously deeply involved in and completely oblivious to the performance of their single most important growth driver. The facts alleged make that conclusion untenable. The inference of scienter is cogent, powerful, and, at a minimum, at least as compelling as any innocent explanation.[15]

### D. Plaintiff Has Adequately Alleged §20(a) Control Person Claims

Because the FAC adequately alleges a primary violation of §10(b) and Rule 10b-5, and Defendants do not – and cannot – dispute their control over Dexcom, Plaintiff also sufficiently pleads claims for control person liability under §20(a). *See Crews v. Rivian Auto., Inc.*, 2023 WL 4361098, at *14 (C.D. Cal. 2023).

## III. CONCLUSION

For the foregoing reasons, this Court should deny Defendants' Motion. If the Court holds otherwise, Plaintiff respectfully requests leave to amend. *See Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (leave to amend should be granted "'with extreme liberality'").

---

[15] Plaintiff has also adequately alleged Dexcom's scienter. *See* ¶358; *supra* §II.C.

1  DATED:  July 2, 2025                              Respectfully submitted,

2                                                    ROBBINS GELLER RUDMAN
                                                       & DOWD LLP
3                                                    DANIEL S. DROSMAN
                                                     W. MARK CONOVER
4                                                    SARAH A. FALLON

5

6                                                        s/ Daniel S. Drosman
                                                      _____
7                                                       DANIEL S. DROSMAN

8                                                    655 West Broadway, Suite 1900
                                                     San Diego, CA  92101
9                                                    Telephone:  619/231-1058
                                                     ddrosman@rgrdlaw.com
10                                                   mconover@rgrdlaw.com
                                                     sfallon@rgrdlaw.com
11
                                                     ROBBINS GELLER RUDMAN
12                                                     & DOWD LLP
                                                     ELIZABETH A. SHONSON
13                                                   (admitted *pro hac vice*)
                                                     225 NE Mizner Boulevard, Suite 720
14                                                   Boca Raton, FL  33432
                                                     Telephone:  561/750-3000
15                                                   eshonson@rgrdlaw.com

16                                                   Lead Counsel for Lead Plaintiff

17                                                   O'DONOGHUE & O'DONOGHUE LLP
                                                     JOHN M. McINTIRE
18                                                   5301 Wisconsin Avenue, N.W., Suite 800
                                                     Washington, DC  20015
19                                                   Telephone:  202/362-0041
                                                     imcintire@odonoghuelaw.com
20
                                                     Additional Counsel
21

22

23

24

25

26

27

28

4935-5577-4286.v4                              - 26 -                    24-cv-1485-RSH-VET