UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: DEXCOM, INC. CLASS ACTION SECURITIES LITIGATION | Case No.:  24-cv-1485-RSH-VET<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS LEAD PLAINTIFF'S CONSOLIDATED AMENDED COMPLAINT**<br><br>[ECF No. 39] |

Before the Court is a motion to dismiss filed by defendants Dexcom Inc. ("Dexcom"), Kevin Sayer ("Sayer"), Jereme Sylvain ("Sylvain"), and Teri Lawver ("Lawver"). ECF No. 39. Pursuant to Local Civil Rule 7.1(d)(1), the Court finds the motion presented appropriate for resolution without oral argument. For the reasons below, the Court grants in part and denies in part Defendants' motion.

## I.    BACKGROUND

### A.    Plaintiff's Allegations

Lead Plaintiff National Elevator Industry Pension Fund brings this putative securities class action against Dexcom and its current and former senior executives—

defendants Sayer (Chief Executive Officer), Sylvain (Chief Financial Officer) and Lawver (former Chief Commercial Officer)—on behalf of all persons or entities who purchased or otherwise acquired Dexcom securities between April 28, 2023 and July 25, 2024 ("Class Period"). Plaintiff's Consolidated Amended Complaint ([ECF No. 37], "CAC") alleges as follows.

### 1. CGMs

Dexcom is a medical device company headquartered in San Diego that designs, develops, and sells continuous glucose monitoring devices ("CGMs"). CAC ¶¶ 3, 20. CGMs utilize sensors that are inserted just below a user's skin to provide regular glucose readings to a compatible mobile device or dedicated monitor. *Id.* ¶ 31. The devices assist persons with diabetes in managing their blood glucose levels. *Id.* Of relevance here, CGMs are used both by: (1) individuals with Type 1 or Type 2 diabetes who require insulin intensive treatment; and (2) individuals with Type 2 diabetes who use basal insulin, a long-acting insulin typically delivered once a day. *Id.* ¶ 32.

### 2. Insulin Intensive versus Type 2 Basal Market

The CGM market space is dominated by Dexcom and its competitor Abbott Laboratories ("Abbott"). *Id.* ¶ 5. Dexcom's current CGM system is known as "G7" while Abbott's is named "FreeStyle Libre 3." *Id.*

Several factors influence the CGM market, including prescribers and fulfillment channels. *Id.* ¶¶ 36–39. Diabetes patients are generally treated by endocrinologists, primary care physicians ("PCPs"), or through diabetes clinics. *Id.* ¶ 36. Type 2 Basal patients are more commonly treated by PCPs. *Id.* ¶ 38. After prescription, CGMs are then sold through two primary channels: pharmacies or durable medical equipment suppliers ("DMEs"). *Id.* ¶ 39.

The CGM market is additionally influenced by the availability of reimbursement from government health care programs. *Id.* ¶ 40. CGMs are costly. *Id.* ¶ 5. Prior to April 2023, Medicare covered CGMs only for Type 1 and Type 2 insulin intensive patients; it did not cover CGMs for Type 2 Basal patients. *Id.* ¶¶ 5, 41, 48. During this period, Dexcom

was focused on growing its presence among Type 1 and Type 2 intensive insulin users (those covered by Medicare). *Id.* ¶ 6. It also focused on making its primary sales channel pharmacies, rather than DMEs. *Id.* In contrast, Abbott had undertaken efforts to target the Type 2 Basal market. *Id.* ¶¶ 7, 43. It did so by focusing its marketing and sales efforts at PCP offices and offering a viable cash pay option, a lower price tag, and a rebate program that made its CGMs affordable even without insurance. *Id.* ¶¶ 7, 43, 45. In addition, Abbott's sales force was significantly larger than Dexcom's. *Id.* ¶ 46.

### 3.    *Dexcom Promotes Opportunities in Type 2 Basal Market*

In April 2023, the Centers for Medicare & Medicaid Services ("CMS")[1] expanded Medicare coverage for CGMs to Type 2 Basal patients. *Id.* ¶¶ 8, 48. In response, Dexcom began promoting this expansion as an opportunity for the company to capture a greater share of the Type 2 Basal market. *Id.* ¶¶ 8, 50–51.

However, Dexcom faced several obstacles negatively impacting its ability to capture market share and effectively compete with Abbott. *Id.* ¶ 52. First, Dexcom's sales force was smaller and lacked the necessary relationships with PCPs. *Id.* Second, Abbott had already entrenched itself as the CGM option for Type 2 Basal patients. *Id.* Finally, Dexcom had begun transitioning to using pharmacies as its primary fulfillment channel. *Id.*.[2] Despite this, Dexcom allegedly falsely assured investors of its readiness to compete. *Id.* ¶ 53.

### 4.    *Dexcom Expands and Reorganizes Sales Force*

After allegedly recognizing it lacked the capacity and positioning to compete in the Type 2 Basal market, Dexcom initiated a major sales force expansion and restructuring set for 2024. *Id.* ¶ 58. At the same time, however, Dexcom allegedly continued to assure investors that it was succeeding and outperforming in the Type 2 Basal market. *Id.* ¶¶ 10,

---

[1]    The CMS is the federal agency that administers the federal Medicare and Medicaid program. *See* https://www.usa.gov/agencies/centers-for-medicare-and-medicaid-services (last accessed September 8, 2025).

[2]    However, DMEs, rather than pharmacies, serviced Medicare patients. CAC ¶¶ 6, 53.

60. Defendants also allegedly falsely characterized the sales force expansion as opportunistic, rather than a defensive, remedial action. *Id.* ¶¶ 12, 63–64.

On April 25, 2024, during an earnings call, Dexcom raised the midpoint of its revenue guidance. *Id.* ¶ 62. On June 5, 2025, during a conference, Defendants stated they were "happy" with their full year revenue guidance. *Id.* ¶ 67.

### 5.    *Decline in Dexcom Stock Price*

On July 25, 2024, Dexcom reduced its full-year revenue guidance by $300 million. *Id.* ¶¶ 13, 68. In contrast to their earlier statements, Defendants now allegedly conceded Dexcom was "not doing wonderful in the basal space" and its sales force expansion was a remedial move to stem loss in market share. *Id.* ¶¶ 13, 69–70. Following the announcement, Dexcom's stock price dropped by more than 40%. *Id.* ¶¶ 13, 71.

### B.    Procedural Background

This consolidated action combines three securities class actions against Defendants: *Alonzo v. Dexcom Inc., et al.*, 24cv1485-RSH-VET, *Oakland County Employees' Retirement Systems et al. v. Dexcom Inc., et al.*, 24cv1804-RSH-VET and *Carnes v. Dexcom Inc., et al.*, 24cv1809-RSH-VET ("Related Actions").

On December 13, 2024, the Court consolidated the Related Actions and appointed the National Elevator Industry Pension Fund as Lead Plaintiff and Robbins Geller LLP as Lead Counsel. ECF No. 19 at 15–16. On January 27, 2025, pursuant to the Court's direction, Lead Plaintiff filed a Consolidated Complaint. ECF No. 27. On March 13, 2025, the Defendants filed a motion to dismiss. ECF No. 29. On May 14, 2025, the Court granted Defendants' motion. ECF No. 36.

Lead Plaintiff subsequently filed a CAC. ECF No. 37. The CAC assert claims for: (1) violation of § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5; and (2) violation of § 20(a) of the Exchange Act. CAC ¶¶ 380–395.

On June 11, 2025, Defendants filed the instant motion to dismiss Lead Plaintiff's CAC. ECF No. 39. Lead Plaintiff has filed a response, and Defendants have filed a reply. ECF Nos. 41, 45.

## II.    LEGAL STANDARD

### A.    Section 10(b) and Rule 10b-5

Section 10(b) of the Exchange Act makes it unlawful:

> To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

One such rule promulgated under the Exchange Act is Rule 10b-5, which declares it unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5; *Zucco Partners, LLC v. Digimarc Corp*., 552 F.3d 981, 989–90 (9th Cir. 2009).

"In a typical § 10(b) private action based on material misrepresentations or omissions, a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Rhode Island v. Alphabet, Inc. (In re Alphabet Sec. Litig.)*, 1 F.4th 687, 699 (9th Cir. 2021); *Curry v. Yelp Inc.*, 875 F.3d 1219, 1224 (9th Cir. 2017).

///

///

### 1.    *Falsity*

"In the securities fraud context, statements and omissions are actionably false or misleading if they directly contradict what the defendant knew at that time, or create an impression of a state of affairs that differs in a material way from the one that actually exists[.]" *Amalgamated Bank v. Facebook, Inc. (In re Facebook, Inc. Sec. Litig.)*, 84 F.4th 844, 858 (9th Cir. 2023) (internal quotation marks and citations omitted). "To be misleading, a statement must be capable of objective verification." *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017) (internal quotation marks omitted).

"Even if a statement is not false, it may be misleading if it omits material information." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008–09 (9th Cir. 2018). Nevertheless, "the securities laws 'do not create an affirmative duty to disclose any and all material information.'" *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011)). Instead, "companies can control what they have to disclose under these provisions by controlling what they say to the market." *Matrixx Initiatives*, 563 U.S. at 45. "But once defendants choose to tout positive information to the market, they [are] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Schueneman*, 840 F.3d at 705–06 (internal quotation marks omitted).

### 2.    *Scienter*

"'Scienter' as used in the federal securities laws means the 'intent to mislead investors' or deliberate recklessness to 'an obvious danger of misleading investors.'" *Glazer Capital Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 765 (9th Cir. 2023) (quoting *Cohen v. NVIDIA Corp. (In re NVIDIA Corp. Sec. Litig.)*, 768 F.3d 1046, 1059 (9th Cir. 2014)). "To allege the required scienter, a complaint must 'allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness.'" *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020) (quoting

*Zucco*, 552 F.3d at 991)). "Deliberate recklessness" is more than "*mere* recklessness or a motive to commit fraud." *Schueneman*, 840 F.3d at 705 (internal quotation marks omitted) (emphasis in original). "Instead, deliberate recklessness is an *extreme* departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it." *Id.* at 705 (internal quotation marks omitted) (emphasis in original).

### B.    Section 20(a)

"Section 20(a) imposes liability on a person who is in control of the person who is directly responsible for a securities fraud violation." *In re Alphabet Sec. Litig.*, 1 F.4th at 701.

Section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). "In order to prove a prima facie case under § 20(a), plaintiff must prove: (1) a primary violation of federal securities laws . . . and (2) that the defendant exercised actual power or control over the primary violator." *Howard v. Everex Sys.*, 228 F.3d 1057, 1065 (9th Cir. 2000).

### C.    Pleading Requirements

Securities fraud complaints "face heightened pleading requirements." *Okla. Firefighters Pension & Ret. Sys. v. Nektar Therapeutics (In re Nektar Therapeutics Sec. Litig.)*, 34 F.4th 828, 835 (9th Cir. 2022). At the pleading stage, a complaint stating claims "under § 10(b) and Rule 10b-5 must satisfy the dual pleading requisites of Federal Rule of Civil Procedure 9(b) and the PSLRA." *Nat'l Elevator Indus. Pension Fund v. VeriFone Holdings, Inc. (In re VeriFone Holdings, Inc. Sec. Litig.)*, 704 F.3d 694, 701 (9th Cir.

2012). "These requirements present no small hurdle for the securities fraud plaintiff." *Id.*; *see Glazer*, 63 F.4th at 765 ("[T]he PSLRA imposes formidable pleading requirements to properly state a claim and avoid dismissal under Rule 12(b)(6).") (internal quotation marks omitted).

### 1.    Rule 9

Federal Rule of Civil Procedure 9(b) provides that "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "To comply with Rule 9(b), allegations of fraud must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001) (internal quotation marks omitted). "[T]he pleader must state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Odom v. Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007).

### 2.    PSLRA Pleading Requirements

"The PSLRA significantly altered pleading requirements in private securities fraud litigation by requiring that a complaint 'plead with particularity both falsity and scienter.'" *Gompper v. VISX, Inc.*, 298 F.3d 893, 895 (9th Cir. 2002) (quoting *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001)).

#### a.    Falsity

"The PSLRA has exacting requirements for pleading 'falsity.'" *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008). Under the PSLRA, a plaintiff's complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). "By requiring specificity, [the PSLRA] prevents a plaintiff from skirting dismissal by filing a complaint laden with vague allegations of deception unaccompanied by a particularized

explanation stating *why* the defendant's alleged statements or omissions are deceitful." *Metzler*, 540 F.3d at 1061.

### b.  Scienter

To plead scienter adequately under the PSLRA, the complaint must "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A) (emphasis added). The PSLRA's "strong inference" requirement, like the falsity standard, is also "an exacting pleading obligation, that present[s] no small hurdle for the securities fraud plaintiff." *Nguyen*, 962 F.3d at 414 (internal quotation marks and citation omitted).

The Court "conduct[s] a two-part inquiry for scienter[.]" *N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011). First, the Court determines "whether any of the allegations, standing alone, are sufficient to create a strong inference of scienter." *Id.* "[S]econd, if no individual allegation is sufficient," the Court conducts "a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Id.*

"To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323–24 (2007). "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences[.]" *Id.* at 324 (internal quotation marks and citation omitted). "Yet the inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Id.* "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

///

///

9

## III.    ANALYSIS

### A.    Request for Judicial Notice

The Court first considers Plaintiff's objections to Defendants' request for judicial notice. *See* ECF Nos. 40; 42; 46.

#### 1.    Appendices

Defendants request that the Court consider two appendices that purportedly outline Plaintiff's falsity allegations and Defendants' responses. ECF Nos. 39-4; 39-5; 46 at 9–10. Plaintiff objects on the grounds that the appendices are improper supplemental briefs. ECF No. 42 at 6–8. The Court finds it unnecessary to consider Defendants' appendices and therefore declines to do so. *See Bissoon-Dath v. Sony Comput. Entm't Am., Inc.*, 694 F. Supp. 2d 1071, 1081 (N.D. Cal. 2010) (declining to consider charts that were produced "for the purposes of argument" as they were "briefing, not evidence").

#### 2.    Exhibits 5, 8-9, 18

Defendants request that the Court take judicial notice of Dexcom's Form 10-K filing for the fiscal year ending December 31, 2022 (Exhibit 5) as well as transcripts from Dexcom's July 27, 2023 earnings call for Q2 2023 (Exhibit 8), November 29, 2023 conference presentation (Exhibit 9), and July 25, 2024 earnings call (Exhibit 18). ECF No. 40 at 6–7. Plaintiff objects to the extent Defendants are requesting that these documents be used for the truth of their contents. ECF No. 42 at 4–5.

"SEC forms such as a Form 8–K or Form 10–K are matters of public record and may be subject to judicial notice." *Wynn v. Chanos*, 75 F. Supp. 3d 1228, 1235 (N.D. Cal. 2014). Similarly, the statements made in Dexcom's July 27, 2023 earnings call, November 29, 2023 company conference presentation, and July 25, 2024 earnings call are directly referenced in Plaintiff's CAC. CAC ¶¶ 13, 68, 314, 322. The Court finds these documents are proper subjects for judicial notice. However, the Court will take judicial notice of these documents not for the truth of the statements they contain, but only for the fact that certain statements were provided to the public on the dates specified. *Wynn*, 75 F. Supp. 3d at 1235 (taking judicial notice of Form 8-K or Form 10-K filings "for the fact that they were filed

and provided certain information to the public."); *Shurkin v. Golden State Vintners Inc.*, 471 F. Supp. 2d 998, 1011 (N.D. Cal. 2006), *aff'd*, 303 F. App'x 431 (9th Cir. 2008) (taking judicial notice of SEC filings "not for the truth of the statements contained therein, but for the fact that these documents [] were publicly-filed and for the fact that the statements made therein were made to the public on the dates specified.").

### 3.    *Exhibits 24-28*

Defendants request that the Court take judicial notice of the Individual Defendants' Form 4 filings (Exhibits 24-28). ECF No. 40 at 8. Plaintiff objects to the extent the Form 4 filings are offered for the truth of their contents. ECF No. 42 at 5.

Here, defendants Sayer, Sylvain, and Lawver's stock sales are specifically referenced in Plaintiff's CAC to support an inference of scienter. *See* CAC ¶¶ 192(e), 212(e), 232(e), 253(e), 287(d), 295(f), 341–49. Sayer, Sylvain and Lawver's Form 4 filings are, therefore, proper subjects for judicial notice. *See Wietschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1109 (N.D. Cal. 2003) ("[T]he Court takes judicial notice of [defendants]' SEC Forms 4 . . . in that they are clearly, if indirectly, referenced in the Complaint as integral to the stock sale allegations made in the Complaint.").

The Court must still address whether to consider the truth of the contents of Exhibits 24-28 for the purposes of disputing Plaintiff's scienter allegations. Here, Plaintiff alleges the Individual Defendants' stock sales are circumstantial evidence of scienter. In contrast, the Individual Defendants argue most of their stock sales were executed pursuant to either a pre-Class Period 10b5-1 plan or to cover tax withholding obligations. ECF No. 39-1 at 31–32. In light of this dispute and this early stage of the proceedings, the Court declines to consider Exhibits 24-28 for the truth of their contents. *See Hadian v. Fate Therapeutics, Inc.*, No. 3:23-CV-00111-RBM-AHG, 2024 WL 4246083, at *9 (S.D. Cal. Sept. 19, 2024) ("[W]hile the Court may consider the filing and existence of the Form 4s, it may not assume the truth of the matters asserted therein for the purposes of disputing Plaintiffs' trading and scienter allegations."); *Das v. Unity Software Inc.*, No. 5:22-CV-03962-EJD, 2024 WL

1141733, at *7 (N.D. Cal. Mar. 15, 2024) (taking judicial notice of Form 4 filings, but declining to consider the truth of the statements within the filings).[3]

## B.    Section 10(b) of the Exchange Act and Rule 10b-5

In the CAC, Lead Plaintiff challenges fourteen statements made by the Individual Defendants between April 27, 2023 and June 5, 2024 as violating Section 10(b) of the Exchange Act and Rule 10b-5. CAC ¶¶ 74–296. Defendants move to dismiss, arguing that Plaintiff has failed to plead sufficient facts to demonstrate that any of the challenged statements are actionable or that Defendants acted with scienter. ECF No. 39-1 at 14–32.

### 1.    Falsity

The Court first considers whether Plaintiff has adequately alleged falsity.

### Statement A[4]

Statement A was made by Sayer on April 27, 2023 during a conference call discussing Dexcom's Q1 2023 results:

> In early March, CMS finalized their proposal to expand access to include people with type 2 diabetes using basal insulin only as well as certain noninsulin-using individuals that experience hypoglycemia. With coverage officially kicking in last week, this decision represented the largest single expansion of access to CGM in our industry's history.
>
> As a reminder, we size the basal-only type 2 population alone at around 3 million people in the U.S. with around half being of Medicare age. We are incredibly excited to start serving this population more broadly going forward as we see a significant opportunity to help these individuals live healthier lives.
>
> Our mobile trial demonstrated meaningful improvements in timing range, A1c levels and hypoglycemic events among this population wearing DexCom sensors, as sensor engagement proved to produce

---

[3]    For the same reasons, the Court declines to consider statements made in the declaration of Defendants' counsel, Heather M. Speers, regarding the contents of the Rule 4 filings. *See* ECF No. 39-2 at ¶¶ 31–35.

[4]    For ease of reference, the Court refers to each statement as it is labeled in the paragraph headings of Plaintiff's CAC.

behavior changes within this cohort that supported greater glycemic control. **We are in a great position to compete as this market develops** as accuracy, performance and customer engagement will continue to be the defining features of delivering outcomes.

CAC ¶¶ 75–76 (emphasis added).[5]

Plaintiff alleges Sayer's statement Dexcom was "in a great position to compete as this market develops" was false or misleading because "Dexcom lacked both the PCP sales force coverage and DME channel relationships to compete with Abbott[.]" CAC ¶¶ 77, 93. Defendants respond the challenged statement is inactionable corporate puffery. ECF No. 39-1 at 16.

"When valuing corporations . . . investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers." *Onie v. Conners (In re Cutera Sec. Litig.)*, 610 F.3d 1103, 1111 (9th Cir. 2010); *see Macomb Cnty. Emps. Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092, 1098 (9th Cir. 2022) (holding "vague, generically positive terms, describing China as 'a great growth market,' 'a huge market opportunity,' 'a market that's growing significantly for us,' and possessing 'really good' 'dynamics,' and describing [defendant's] performance there as 'tremendous' and 'great'" were inactionable puffery); *Police Ret. Sys. v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014) (holding statement that company was "in a pretty good position" despite economic crisis was "the antithesis of facts.").

Here, Sayer's subjective assessment Dexcom's competitive position was "great" is "both unquantifiable and unverifiable, as well as extremely imprecise." *Elliott v. Conagra Brands, Inc.*, No. 2:23-CV-01417-MCE-AC, 2024 WL 3275567, at *6 (E.D. Cal. July 1, 2024). Such a generic assertion of corporate optimism is inactionable puffery.

For these reasons, the Court concludes Plaintiff has failed to adequately plead falsity with respect to Statement A.

---

[5]     The Court has emphasized the portions of the challenged statements Plaintiff alleges are false or misleading.

### Statement B

Statement B was made by Sayer during the same Q1 2023 results call:

> [Analyst]: So I wanted to ask you one about just how quickly the coverage has been established in the DME and the pharmacy channel. I thought it was an interesting comment that you made that you think you have more coverage in pharmacy than your competitor. Maybe you could compare that and talk about what that means for ultimately how much of the basal opportunity you think you can garner? . . .
>
> [Sayer]: On the basal opportunity, remember, Medicare sales process is durable medical equipment, and ***we have very good relationships with our distributors and in that channel, and we worked very hard to position them to be successful with the basal patients. And so we're very comfortable there.***

CAC ¶¶ 96–97 (emphasis added).

Plaintiff alleges Sayer's statement Dexcom had "very good relationships with our distributors and in that channel" and was "very comfortable there" operated to create "a materially false impression as to Dexcom's readiness in the critical DME sales channel." *Id.* ¶¶ 98, 110. Defendants argue the challenged statement is an inactionable opinion. ECF No. 39-1 at 17–18.

In the securities context, a statement of fact "expresses certainty about a thing, whereas a statement of opinion . . . does not." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183 (2015). Here, Sayer's statement that Dexcom was "very comfortable" and had "good relationships" with its DME suppliers is subjective and more properly characterized as a statement of opinion.

There are "three different standards for pleading falsity of opinion statements." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615 (9th Cir. 2017). "First, when a plaintiff relies on a theory of material misrepresentation, the plaintiff must allege both that the speaker did not hold the belief she professed and that the belief is objectively untrue." *Id.* at 615–16. "Second, when a plaintiff relies on a theory that a statement of fact contained within an opinion statement

is materially misleading, the plaintiff must allege that the supporting fact [the speaker] supplied [is] untrue." *Id.* (internal quotation marks omitted). "Third, when a plaintiff relies on a theory of omission, the plaintiff must allege facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.* (internal quotation marks omitted).

Proceeding under an omission theory "is no small task for an investor." *Omnicare*, 575 U.S. at 194. Plaintiff contends Sayer failed to disclose that Dexcom had begun a year-long push prior to April 2023 to shift its sales away from DMEs and towards pharmacies. CAC ¶¶ 91, 99. Plaintiff does not, however, sufficiently allege how this fact would have rendered Sayer's opinion materially misleading. "An opinion statement . . . is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way. Reasonable investors understand that opinions sometimes rest on a weighing of competing facts[.]" *Omnicare*, 575 U.S. at 189–90; *Intuitive Surgical*, 759 F.3d at 1061 (expressly declining "to require a rule of completeness for securities disclosures because [n]o matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not.") (internal quotation marks omitted); *see Stephens v. Maplebear Inc.*, No. 5:24-CV-00465-EJD, 2025 WL 1359125, at *6 (N.D. Cal. May 9, 2025) (holding complaint did not sufficiently explain "why things were so dire that it was misleading for [defendant] to be optimistic about its prospects."). Here, Plaintiff has not explained how Sayer's statement ruled out the possibility Dexcom was shifting to pharmacies as its primary fulfillment channel.

For these reasons, the Court concludes Plaintiff has failed to adequately plead falsity with respect to Statement B.

///

///

///

///

### *Statement C*

Statement C was made by Sylvain on June 7, 2023 during the William Blair Stock Conference:

> [Analyst]: So I think the first question is you guys just got basal reimbursement for CMS at mid-April. I'm not sure if you're going to be willing to talk about how that is so far. But I guess just bigger picture, do you guys have the capacity to bring on a significant number of those patients if you haven't maybe added reps in a period of time? And how do you do so?

> [Sylvain]: Yes. So great question. And so far, I'll tell you anecdotally, it's gone very well. There's been a lot of interest in it. The challenge, of course, is it's generally sold through the DME and so it will take a little bit of time to quantify it. But anecdotally, people have been very excited about basal coverage. ***In terms of capacity, when we doubled the size of the sales force, the focus was calling on high decile prescribers of all insulin, including basal. And so the inroads have been made there. So from a coverage perspective, while we may want to expand coverage a little bit from the sales force, it wouldn't be a material step change in how we're going. It'd be normal as part of our thoughts around investments. So we do have a sizable sales force.***

CAC ¶¶ 103–04 (emphasis added).

Plaintiff alleges Sylvain's claims Dexcom had made "inroads" and possessed "a sizable sales force" gave the "false impression Dexcom's existing commercial infrastructure" was adequate and prepared to handle a surge of Type 2 Basal patients. *Id.* ¶¶ 105, 112. Defendants respond the challenged statement is inactionable puffery or opinion. ECF No. 39-1 at 16–17.

Here, Sylvain's statements Dexcom possessed a "sizable" sales force and made "inroads" in the Type 2 Basal Market are too subjective to be objectively verifiable. *See City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1064 (N.D. Cal. 2012) (holding defendants' statement that company had "strong demand metrics and good momentum" was an inactionable statement of corporate optimism); *Wozniak v. Align*

*Tech.*, 850 F. Supp. 2d 1029, 1036 (N.D. Cal. 2012) (holding that "we are very pleased with our progress to date on key strategic initiatives" constituted non-actionable puffery).

Plaintiff alleges Sylvain's statements were misleading because Decom's sales force did not have a strong presence with PCPs. CAC ¶¶ 105–110. Yet Plaintiff does not adequately explain how any deficiencies in the state of Dexcom's sales force would have rendered Sylvain's statement false or misleading. *See Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001) ("Problems and difficulties are the daily work of business people. That they exist does not make a lie out of any of the alleged false statements."). Notably, in the challenged statement above, Sylvain did not make any representations regarding PCPs. Instead, he stated that when Dexcom doubled its sales force, it focused "on high decile prescribers of all insulin, including basal." CAC ¶ 104. It is not clear from the CAC how Sylvain's statement, read in full context, would have been false or misleading in the manner Plaintiff claims.

For these reasons, the Court concludes Plaintiff has failed to adequately plead falsity with respect to Statement C.

### Statement D

Statement D was made by Lawver on June 23, 2023 during the Investor Day Conference Call:

> Taken together, you can see why we're excited about our continued strong growth and leadership in the U.S. market. Dexcom delivers a leading customer experience with industry-leading loyalty and customer retention. And with G7, we have the industry's most accurate sensor that is incredibly simple to use, that is also the most covered and has the lowest out-of-pocket costs. ***We have the right commercial infrastructure for leading with the endocrinologists and expanding our leadership in primary care with the type 2 basal and severe hypoglycemia markets where coverage has just opened up in the last couple of months.*** And when we take these covered populations together, intensive insulin therapy, basal and those with severe—risk of severe hypoglycemia, the CGM market in the U.S. is only 20% penetrated. So we have significant runway ahead in the U.S.

17

CAC ¶¶ 113–14 (emphasis added).

Plaintiff alleges Lawver's claim that Dexcom had "the right commercial infrastructure for leading with endocrinologists and expanding [its] leadership in primary care with the Type 2 basal and severe hypoglycemia markets" misleadingly suggested that Dexcom held or was poised to compete for a leadership position in the Type 2 Basal market. *Id.* ¶¶ 115, 131. Defendants respond Lawver's statement was inactionable puffery or opinion. ECF No. 39-1 at 16–18.

Here, Lawver's broad statement that Dexcom possessed the "right commercial infrastructure" to "expand[]" its "leadership in primary care with the type 2 basal and severe hypoglycemia markets" is too vague and subjective to be actionable. The statement does not appear tied to any objective metrics, such as sales data, market share, or customer growth; instead, it reflects a general expression of confidence. *See Pub. Emples. Ret. Sys. v. Qualcomm, Inc.*, 773 F. App'x 987, 988 (9th Cir. 2019) (concluding "Defendants' statements regarding continued industry leadership were the sorts of 'vague, optimistic statements' that constitute nonactionable 'puffery.'"); *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1245 (N.D. Cal. 1998) (holding statement "[w]e're the leader in a rapidly growing market" was a nonactionable vague statement of optimism); *In re Caere Corp. Sec. Litig.*, 837 F. Supp. 1054, 1057 (N.D. Cal. 1993) (holding calling company a market leader in its field was inactionable).

For these reasons, the Court concludes Plaintiff has failed to adequately plead falsity with respect to Statement D.

### *Statement E*

Statement E was made by Sylvain on September 6, 2023 during the Wells Fargo Healthcare Conference:

> [Analyst]: [W]e're going to move on to basal adoption. Love to hear, Jereme from you what you're seeing with basal adoption?
>
> [Sylvain]: Yes. I'm really encouraged by it to date. And I'll kind of reference back to our last call, the PBMs and the health insurance

companies have really taken basal adoption and really aggressively approved it. And so you saw 60% of commercial lives covered as of our last call for basal and met with Medicare coverage so comes Medicare Advantage. And so now you've actually got a majority of the basal population, a significant majority of the basal population covered. ***And where there's coverage, we've always taken share, and you see us taking share in that space. So we feel pretty good about one, taking share***; two, driving adoption through the market. And again, record new patients in the second quarter, part of that as a result of some of that basal and we expect to continue to do well in that market.

CAC ¶¶ 134–35 (emphasis added).

Plaintiff alleges Sylvain's claim that "where there's coverage, we've always taken share, and you see us taking share in that space" gave investors the false impression that Dexcom was effectively competing and taking a "meaningful share" of the Type 2 Basal market away from Abbott. *Id.* ¶¶ 136, 154. Defendants respond Plaintiff fails to sufficiently allege how Sylvain's statement was false or misleading. ECF No. 39-1 at 25–26.

Here, the referenced portion of Sylvain's statement does not purport to make any representation regarding Dexcom's competitive position relative to Abbott's. Neither the analyst's question nor Sylvain's response references Abbott. *See Metzler*, 540 F.3d at 1064–65 ("[W]hile the court assumes that the facts in a complaint are true, it is not required to indulge unwarranted inferences in order to save a complaint from dismissal."); *see In re Cloudera, Inc.*, No. 19-CV-03221-LHK, 2021 WL 2115303, at *14 (N.D. Cal. May 25, 2021) (rejecting plaintiff's allegation as failing to provide a basis upon which the court could make a permissible inference of falsity).[6]

---

[6]    Plaintiff has also not proffered any legal authority suggesting that Sylvain was *required* to make such a comparison. *See In re Silicon Graphics, Inc. Sec. Litig.*, No. C 96-0393, 1996 WL 664639, at *11 (N.D. Cal. Sept. 25, 1996) ("Plaintiff's allegation that defendants withheld information that their products were not competitive with Sun Microsystems' is not actionable."); *see also In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 375 (3d Cir. 1993) ("The federal securities laws do not ordain that the issuer of a security compare itself in myriad ways to its competitors, whether favorably or unfavorably[.]").

For these reasons, the Court concludes Plaintiff has failed to adequately plead falsity with respect to Statement E.

### Statement F

Statement F was made by Sayer on October 23, 2023 on a conference call discussing Dexcom's Q3 2023 results:

> As a reminder, Medicare coverage went live in mid-April for people with type 2 diabetes using basal insulin only as well as certain non-insulin individuals that experience hypoglycemia. Collectively, these 2 populations represent nearly 7 million people in the U.S. with approximately half being of Medicare age.
>
> Encouragingly, commercial coverage continues to build for this group. We have established market-leading levels of basal-only reimbursement as payers clearly recognize the potential for better outcomes driven by DexCom. This further supports our industry low out-of-pocket cost for our customers. ***With a full quarter of broad coverage now under our belt, we continue to be very encouraged by early prescribing trends for this cohort. We noted last quarter that we experienced an immediate uptick in new patient starts once coverage went live, and we have seen a clear continuation of this trend since that time.*** In fact, we delivered another record Medicare new patient start quarter in Q3 as physicians have quickly adjusted their prescribing patterns to match the new reimbursement landscape.
>
> While early, basal adoption trends look very similar to those we previously experienced once broad coverage became available for intensively managed type 2 diabetes. We view this as a very positive sign of things to come. Importantly, when you combine this broader coverage with our leading sensor technology, we feel incredibly confident in our market position. ***Since the launch of G7, we have gained share across all reimbursed channels and patient segments in the U.S. and that trend continued this quarter.***

CAC ¶¶ 155–56 (emphasis added).

Plaintiff fails to specify which portions of Statement F are false or misleading and why. While the CAC cites three sentences, Plaintiff singles out only Sayer's reference to "early prescribing trends" and assertion that Dexcom was gaining share "across all

reimbursed channels and patient segments." CAC ¶¶ 156–57. Plaintiff alleges these portions of Sayer's statements are false or misleading because they gave investors the "impression that Dexcom was effectively capitalizing" on the Type 2 Basal market expansion. *Id.*

Turning to the specific portions Plaintiff references only, Sayer's statement that Dexcom was "very encouraged" by "early prescribing trends" is inactionable puffery. *See Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938, 956 (D. Ariz. 2007) (holding that the statement: "[w]e are encouraged that strengthening customer forecasts may partially offset the seasonal weakness typical of our first calendar quarter" was inactionable puffery); *see also Wasson v. LogMeIn, Inc.*, 496 F. Supp. 3d 612, 633 (D. Mass. 2020) (holding CFO's statements initial efforts were "encouraging" was a "textbook example[] of vague puffery"); *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 489 (S.D.N.Y. 2018) (holding statement that defendant was "encouraged" by the progress of a study design was inactionable puffery).

Plaintiff likewise fails to adequately allege how Sayer's statement that Dexcom had "gained share across all reimbursed channels and patient segments in the U.S." and this "trend" had continued was false or misleading. The CAC does not appear to allege the statement was objectively false—that is, that Dexcom had not in fact gained market share "across all reimbursed channels and patient segments in the U.S." *See Wochos v. Tesla, Inc.,* 985 F.3d 1180, 1196 (9th Cir. 2021) (holding company's remark that "great progress" was being made on battery production would be a potentially false actionable statement only if company had been "making no progress at all"). Instead, Plaintiff alleges Sayer's statement was misleading because "Dexcom lacked the commercial infrastructure to compete meaningfully with Abbott[.]" *Id.* ¶ 157. The referenced portion of Sayer's statement does not, however, indicate that he was making any representations regarding Dexcom's competitive position relative to Abbott's. *Id.* Nor has Plaintiff cited legal authority establishing that Sayer was required to.

For these reasons, the Court concludes Plaintiff has failed to adequately plead falsity with respect to Statement F.

### Statement G

Statement G was made by Sayer on January 8, 2024 during the JPMorgan Healthcare Conference:

> That number has grown monumentally this year with the recent Medicare decision to cover those who are on basal insulin and those who experience hypoglycemia. And not only has Medicare done that, but payers have followed. So this is greatly expanding. We have twice as many people that have insurance and access to CGM, who don't have it than we have ever had in our history.
>
> Our commercial strategy has also enabled us to execute on this front as well. In 2021, we made a very big decision while the rest of the world is contracting after the pandemic, we saw the mobile data and knew that this would eventually come. ***We also knew we needed a bigger presence in PCP offices, so we greatly expanded the size of our U.S. sales force. And this commercial strategy has worked wonderfully.*** As you can see for 2023, we increased our prescriber base by 40% over what it was before, and 70% of our new scripts are now written by PCPs. We will continue to invest in our commercial strategy in the U.S. to get broader and to get more places.

CAC ¶¶ 174–75 (emphasis added).

Plaintiff alleges Sayer's statement about Dexcom's 2021 sales force expansion, together with his claim that the "commercial strategy" had "worked wonderfully" was false or misleading because it overstated Dexcom's success in penetrating the Type 2 Basal market. *Id.* ¶¶ 176, 191. Defendants respond the statement is inactionable puffery or opinion. ECF No. 39-1 at 16–18.

The Court agrees Sayer's statement Dexcom's 2021 expansion strategy was "working wonderfully" is the sort of vague, generalized assertion courts routinely deem as puffery. *See In re Syntex Corp. Sec. Litig.*, 855 F. Supp. 1086, 1095 (N.D. Cal. 1994), *aff'd*, 95 F.3d 922 (9th Cir. 1996) (holding statements "we're doing well and I think we have a great future," "I am optimistic about Syntex's performance during this decade" to be

inactionable puffery).

It is also not clear how Sayer's optimistic assessment was false or misleading. Plaintiff has pleaded no facts, for example, suggesting that Dexcom did not have any share of the Type 2 Basal market. *See Wochos*, 985 F.3d at 1196. Instead, Plaintiff alleges Sayer's statement was false or misleading because it misrepresented Dexcom's competitive position relative to Abbott's. CAC at ¶ 191. Plaintiff does not make clear, however, how Sayer's statement—which does not reference Abbott—purported to make such a comparison.

For these reasons, the Court concludes Plaintiff has failed to adequately plead falsity with respect to Statement G.

### *Statement H*

Statement H was made by Sayer on January 8, 2024 during the same JPMorgan Healthcare Conference:

> [Analyst]: I know it's still only 2.5 quarters since you've gotten Medicare and then started to roll in commercial reimbursement for basal in the U.S. here. But do you have data yet on whether DexCom is winning more than your fair share in the basal category?
>
> [Sayer]: You know what, ***we are doing well in the basal category***. My fair shares is all of them. So we'd like to win more. ***We win—we do very well where we have coverage and penetration***, and we know the physicians, and we know the community. And what we are working on is broader coverage and broader efforts to make sure we can win more places. When I said we're investing on the commercial side to get broader, and that's one of the things I'm inferring that we—and we're looking for creative clever ways to do that. But we—where we have a presence, we win very much.

CAC ¶¶ 194–95 (emphasis added).

Plaintiff alleges Sayer's statement that Dexcom was: (1) "doing well in the basal category"; and (2) was winning and doing "very well" where it had coverage and penetration was false or misleading because it falsely conveyed that Dexcom was effectively competing in the Type 2 Basal market. *Id.* ¶¶ 211.

The Court does not agree. Here, Sayer's representations Dexcom was "doing well" or "very well" are subjective statements of corporate optimism that fall squarely within the category of puffery. *See Sohovich v. Avalara, Inc.*, No. 24-1646, 2025 WL 957895, at *2 (9th Cir. Mar. 31, 2025) (company's statement it was "doing well" constituted inactionable puffery); *see also In re Syntex Corp. Sec. Litig.*, 855 F. Supp. at 1095 (same).

For these reasons, the Court concludes Plaintiff has failed to adequately plead falsity with respect to Statement H.

### Statement I

Statement I was made by Sayer on January 8, 2024 during the same JPMorgan Healthcare Conference:

> [Analyst]: So record new patients in fourth quarter, again. Any way to size how much was basal versus nonbasal because our doc checks remain just so enthusiastic about CGM for these patients now with reimbursement. Any way to kind of compare the different groups?
>
> * * *
>
> [Sylvain]: Yes. So as we think about those patients, and we'll get the full final patients numbers in soon. ***We know it's trending that way. You're seeing – you're right. You're seeing a very strong adoption in the basal population, that unmet need is significant. And so you continue to see outperformance in basal***, but you're also seeing a really strong performance continuing in the intensive markets, both type 1 and type 2.

CAC ¶¶ 214–215 (emphasis added).

Plaintiff does not clearly identify which portions of Statement I are false or misleading and why. Although Plaintiff identifies three full sentences as false or misleading, the CAC focuses narrowly on Sayer's apparent confirmation of an analyst's view that CGM adoption in the Type 2 Basal market was "very strong" and the analyst

could expect to "continue to see outperformance in basal." *Id.* ¶¶ 215–16, 231, 233.[7] Plaintiff alleges these remarks misleadingly conveyed that Dexcom was experiencing "very strong" CGM adoption and outperforming in the Type 2 Basal market. *Id.* Defendants respond Sayer's statement is inactionable puffery or opinion. ECF No. 39-1 at 16–18.

Turning to the specific portions Plaintiff references only, first, it is not clear whether Sayer's reference to the "strong adoption" of CGMs "in the basal population" and continued "outperformance" was directed to Dexcom's market share, the analyst's projections, the broader market for CGMs, or something else entirely. Further, even assuming Sayer was referring to Dexcom, his alleged representation Dexcom was experiencing "very strong" CGM adoption is an inactionable statement of optimism. *See e.g.*, *Philco Invs., Ltd. v. Martin*, No. C-10-02785-CRB, 2011 WL 500694, at *6 (N.D. Cal. Feb. 9, 2011) ("[T]erms like 'strong' and 'spectacular' are not actionable under the securities laws"); *In re Rackable Sys., Inc. Sec. Litig.*, No. C09-0222CW, 2010 WL 199703, at *6 (N.D. Cal. Jan. 13, 2010) (holding defendants' statements a company's relationship with its top three customers remained "pretty strong" was an inactionable statement of optimism). Similarly, Sayer's alleged statement Dexcom would "continue to see outperformance" is too vague to induce the reliance of a reasonable investor. For example, it is not even clear what metric or benchmark Sayer was comparing against in assessing "outperformance."

For these reasons, the Court concludes Plaintiff has failed to adequately plead falsity with respect to Statement I.

///

---

[7]    For example, it is not clear if Plaintiff is alleging Sayer's representations that the "unmet need" in the Type 2 Basal Market was significant, or that Dexcom knew new patients were trending more in the Type 2 Basal Market than not, were also false or misleading. CAC ¶ 214.

*Statement J*

Statement J was made by Sylvain on February 8, 2024 during a conference call discussing Dexcom's Q4 2023 results:

> [Analyst]: Looking at the domestic performance, there's been a clear acceleration in the back half of '23 on a 2-year stacked basis. And I'm wondering specifically if that's just basal that's helping there. It looks like it's as much as 200, maybe 250 basis points of the acceleration. Is that the primary contributor to the domestic acceleration? What should we think about in terms of basal contribution to the topline this year? And are we inflecting right now as far as basal adoption goes with CGM here in the States?
>
> [Sylvain]: Yes. It's a good question. Let me maybe just give some color as to how we're thinking about the guidance. As you see the performance in the back half of the year, a lot of that has to do with being the most accurate sensor, launching with the G7 form factor and then, of course, having the basal coverage there. ***And so when you think about it, and you can see the share taking when you look at the script data, we are taking share.*** And having the sensor – the most advanced sensor on the market is the driver there. So that's taking share.
>
> Now within those spaces, ***basal is a contributor, no question. As that category expands and we take share within that category, that does contribute to the overall numbers. And so you are right, basal is a contributor, but it has as much to do with us taking share as it does with category expansion***. So think about both of those as contributors.
>
> As you think about 2024, we've talked a little bit about the adoption rate, basal in total adopting in this back half of the year around 9% to 10% per year on a per annum basis. The guide assumes about 8% there. And so I think you can assume that was the case. Our long-range plan was more like 6% to 7% per year. ***So we are seeing basal going faster than what was in our long-range plan. And what's great about that is as we continue to take share and the category grows a little faster than expected, that will help contribute over the longer haul.***

CAC ¶¶ 234–35 (emphasis added).

Plaintiff again does not clearly identify which portions of Statement J are false and misleading and why. Instead, Plaintiff identifies six full sentences as being false or

misleading, but narrowly focuses only on Sylvain's assertions Dexcom was "taking share" in the Type 2 Basal market. *Id.* ¶¶ 236, 254.

Here, turning to the specific portions Plaintiff references only, Sylvain's statement that "when you look at the script data, we are taking share" is "determinate [and] verifiable" by reference to script data. *Omnicare*, 575 U.S. at 184. According to the CAC, Abbott secured seven out of ten prescriptions in the newly covered Type 2 Basal market in January 2024, and this share remained unchanged in April 2024. *Id.* ¶ 237. For these reasons, Plaintiff has plausibly alleged that Dexcom was not in fact, "taking share" in the newly covered Type 2 Basal market via reference to prescription data at the time Sylvain made his statement.

For these reasons, the Court concludes Plaintiff has adequately alleged falsity with respect to the portion of Statement J discussed above.

### Statement K

Statement K was made by Sylvain on April 25, 2024 during a conference call discussing Dexcom's Q1 2024 results:

> [Analyst]: So wanted to ask on basal, just any visibility you can give on how that's been scaling? Obviously, a record new start quarter this quarter. I would assume basal is contributing nicely to that. But what do the sequential patterns look like the last few quarters? Is it still sequentially growing at a pretty healthy rate, I'd assume, but any color you can provide there?
>
> And also, there's been some debate, obviously, on market share within the basal population here in the U.S. Just would love kind of any insight you can provide on that front as well. Thanks.
>
> [Sylvain]: Yeah. So I can take that one. Thanks, Jeff. I think when we talked about what we expected this year, we really talked about it in the context of basal adoption across the entire population. And we talked about exiting the year right around that 15% adoption across the basal population in the US and the year moving over the course of the year to 23%. So about 8 points of penetration.

*So far through the first quarter, things are going as we expected. Record new patients, I think, helps enforce that. And you are correct, a good chunk of our new patients are coming through that basal channel, and we continue to see really well performance in that category.* So qualitatively, the things we talked about, the excitement in that channel, those still remain.

*In terms of share taking and how we look at that category, we get script data, we look at script data based on pathology. The debate – there's no debate internally to us. We know we're taking share, and we see that data. And I think a lot of you guys see that data. So for what it's worth, that data is out there, you can see the scripts continuing to come our way.*

*For the . . . purpose we talked about, when we have coverage and when we compete head-to-head, we've typically won. So I think we maybe disagree with some comments out there, but I think the data is clear. When you look at the script data, I think it will continue to demonstrate where this is going over time.* Hope that helps.

CAC ¶¶ 255–56 (emphasis added).

Plaintiff again fails to specify which portions of Statement K are allegedly false or misleading and why. Although Plaintiff identifies three full paragraphs as being false or misleading, the CAC narrowly focuses only on Sylvain's statements that: (1) "a good chunk" of Dexcom's new patients were coming through the "basal channel"; (2) that Dexcom knew it was "taking share" in that category of the market; and (3) that Dexcom "typically" won when it had coverage and competed head to head. *Id.* ¶¶ 257, 272. Plaintiff alleges these statements gave the misleading impression that Dexcom was capturing market share in the Type 2 Basal market, when in reality, Abbott was winning the majority of prescriptions. *Id.*

Here, Sylvain's statements that a "good chunk" of Dexcom's new patients were Type 2 Basal patients and that Dexcom "typically" won in circumstances where it had coverage and competed head-to-head are too vague and subjective to be actionable. Nevertheless, Sylvain's statement that Dexcom was looking at the "script data" and therefore knew that it was "taking share" in the Type 2 Basal market is "determinate [and]

28

verifiable." *Omnicare*, 575 U.S. at 184. As discussed above, Plaintiff's allegations regarding Abbott's market share of the Type 2 Basal Market between January 2024 and April 2024 plausibly suggest Sylvain's statement was false or misleading when made.

For these reasons, the Court concludes Plaintiff has adequately pleaded falsity with respect to the portion of Statement K discussed above.

### Statement L

Statement L was made by Sylvain on the same April 25, 2024 conference call on Dexcom's Q1 2024 results:

> **We still have a very strong DME business, and certainly, the DME business continues to be supported by our partners very, very well.** But what we find is as we call on more and more primary care physicians who are seeing where basal patients are seen, there is a bit of a heavier tilt towards the pharmacy channel for new patients.

CAC ¶¶ 276–77 (emphasis added).

Plaintiff alleges Sylvain's statement Dexcom possessed a "very strong DME business" and the DME business continued to be supported by its partners "very, very well" was false or misleading because it suggested Dexcom's relationship with its distributors was strong enough to capture the newly covered Type 2 Basal market. *Id.* ¶¶ 277–78. Defendants respond the challenged statement is inactionable corporate puffery. ECF No. 39-1 at 16.

The Court agrees Sylvain's statements Dexcom had a "very strong" DME business and was being supported by its DME partners "very, very well" are inactionable statements of optimism. *See Sohovich*, 2025 WL 957895, at *2; *Philco*, 2011 WL 500694, at *6; *In re Rackable Sys., Inc. Sec. Litig.*, 2010 WL 199703, at *6; *In re Syntex Corp. Sec. Litig.*, 855 F. Supp. at 1095.

For these reasons, the Court concludes Plaintiff has failed to adequately plead falsity with respect to Statement I.

///

///

### Statement M

Statement M was made by Sylvain on June 5, 2024 during the William Blair Growth Stock Conference:

> [Analyst]: So maybe walk us through why now from a commercial sale structure change and what are the reasons, comments you had on that?
>
> [Sylvain]: Yeah. ***The expansion of the sales force was really about being bullish about our future***, and it's not and by the way, ***it's one about Stelo and preparing for Stelo.*** But I think we showed you that graph in the US, we have more covered lives that are not on therapy today, even in the insulin using population than we've ever had before. And we realized to reach everybody where we want to reach them, we needed to expand the sales force so from our point of view, ***this is a bullish opportunity as we expand our sales force and we're going to call on new, some new folks where we know that there's an unmet need. Maternal health is a big one for us where gestational diabetes is a massive unmet need and we can use the sales force to call on that hospital.***
>
> ***Certainly folks are [dis]charged and have a need for CGM [at the] hospital. We're certainly going to use that as well***. And clearly, we needed more coverage on PCPs, and that's where a lot of the battle is one. So the expansion of the sales force was done with that in mind.

CAC ¶¶ 282–83 (emphasis added).

Plaintiff fails to specify which portions of Sylvain's statement are false or misleading and why. Plaintiff points to four portions of Statement M above as false or misleading, but narrowly focuses on Sylvain's statement that the expansion of Dexcom's sales force "was really about being bullish about our future." CAC ¶¶ 284, 287–88. Plaintiff alleges this statement gave the misleading impression Dexcom's sales force expansion was an elective "bullish" move, rather than a "necessary fix" to Dexcom's insufficient coverage of PCP offices. *Id.*

Turning to the specific portions Plaintiff references only, Plaintiff has not adequately explained how Sylvain's statement was false or misleading. While Sylvain did state Dexcom's sales force expansion was "about" being "bullish" about its future, Sylvain also

stated almost immediately after that Dexcom "clearly . . . needed more coverage on PCPs" and that the "expansion of the sales force was done with that in mind." *Id.* ¶ 282. Contrary to Plaintiff's allegations, Sylvain explicitly disclosed that one reason for the sales force expansion was that Dexcom needed additional coverage at PCP offices. *See Lu v. Align Tech., Inc.*, 417 F. Supp. 3d 1266, 1275–76 (N.D. Cal. 2019) (holding plaintiff had not adequately pleaded falsity where it "repeatedly ignore[d] the actual content of Defendants' statements and [drew] 'unwarranted inferences' that the Court cannot accept" by failing to address full context of statement).

For these reasons, the Court concludes Plaintiff has failed to adequately plead falsity with respect to Statement M.

### Statement N

Statement N was made by Sylvain on June 5, 2024 during the same William Blair Growth Stock Conference:

> [Analyst]: And so and maybe just to wrap all of that up, as we think about your guidance, both for the second quarter, you did have some comments. Maybe you're not specific as much as for guidance for Q2, but walk us through what you said on Q2, full year and what was contemplated in that? And then the third piece, how does that compare to the [Stelo] estimates and whether you're comfortable with it?
>
> * * *
>
> [Sylvain]: And in terms of the full year as of the last quarter, when we issued our earnings, we raised our guidance. ***And so that should give we obviously beat the street expectations in the first quarter, raised guidance and continue to do well. So I think from that point of view, I think we're happy with where we are. We're happy with our full year guidance. We don't guide to the quarters, but we were very comfortable with where folks are sitting for the quarter.***

CAC ¶¶ 289–290 (emphasis added).

Plaintiff alleges Sylvain's statement Dexcom was "happy" with its full year revenue guidance was false or misleading because it led investors to believe Dexcom was performing consistently with analyst expectations and comfortable with its raised revenue

guidance. *Id.* ¶¶ 290, 291–93, 295–26. Defendants respond Sylvain's remarks are forward-looking statements protected by the safe harbor provision of the PSLRA. ECF No. 39-1 at 18–19.

"[T]he PSLRA carves out a safe harbor for forward-looking statements." *Wochos*, 985 F.3d at 1189 (internal quotation marks omitted). Under the safe harbor provision, "a defendant will not be liable for a false or misleading statement if it is forward-looking and *either* is accompanied by cautionary language *or* is made without actual knowledge that it is false or misleading." *City of Miami v. Quality Sys. (In re Quality Sys.)*, 865 F.3d 1130, 1141 (9th Cir. 2017) (emphasis in original). "The PSLRA's safe harbor is designed to protect companies and their officials from suit when optimistic projections of growth in revenues and earnings are not borne out by events." *Id.* at 1142.

The Court first considers whether Sylvain's statement that Dexcom was "happy" with its full year revenue guidance was forward-looking. Plaintiff argues Sylvain's representation was not forward-looking because it was a statement of "present satisfaction" based on "present (and misrepresented) conditions." ECF No. 41 at 17. While the Court agrees Sylvain's statement sounded in the present tense, Sylvain's affirmation Dexcom was "happy" with its revenue guidance is nevertheless forward-looking. "[E]xamined as a whole, the challenged statement[] related to [Dexcom's] future expectations and performance." *Intuitive Surgical,* 759 F.3d at 1059; *see Lopes v. Fitbit, Inc.*, No. 18-CV-06665-JST, 2020 WL 1465932, at *7 (N.D. Cal. Mar. 23, 2020) ("Defendants' revenue guidance statements are not actionable because they fall within the PSLRA safe harbor provision."), *aff'd,* 848 F. App'x 278 (9th Cir. 2021); *In re Fusion-io, Inc. Sec. Litig.*, No. 13-CV-05368-LHK, 2015 WL 661869, at *11 (N.D. Cal. Feb. 12, 2015) ("Where, as here, company representatives make statements regarding a company's guidance for future revenue, those statements are forward-looking, and protected by the PSLRA Safe Harbor.") (internal quotation marks omitted); *Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1133 (S.D. Cal. 2012) ("Defendants' reaffirmation of the 2010 revenue guidance is certainly forward-looking.").

The Court next considers whether Sylvain's statement was accompanied by meaningful cautionary language. The record reflects that Sylvain presented audience members with a "safe harbor statement" and explained his remarks would be "aligned" with this statement. ECF Nos 39-19 at 5; 39-20 at 3.  The "safe harbor" statement itself contains the following language:

> This presentation contains "forward-looking statements" that are based on our management's beliefs and assumptions and on information available to management as of April 25, 2024 . . . .

> Forward-looking statements involve known and unknown risks, uncertainties, and other factors that may cause our actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by the forward-looking statements. We cannot guarantee that we will achieve the plans, intentions, or expectations disclosed in our forward-looking statements, and you should not place undue reliance on our forward-looking statements. We assume no obligation to update any such forward-looking statement after the date of this presentation to conform these forward-looking statements to actual results.

> The risks and uncertainties that may cause actual results to differ materially from our current expectations are more fully described in our annual report on Form 10-K for the year ended December 31, 2023, as filed with the Securities and Exchange Commission (SEC) on February 8, 2024, our most recent quarterly report on Form 10-Q for the quarter ended March 31, 2024, as filed with the SEC on April 25, 2024, and our other reports filed with the SEC.

ECF No. 39-20 at 3. In turn, Dexcom's referenced SEC filings contained cautionary language about, amongst other things, Dexcom's DME relationships, the size of its sales force, and its competitors. ECF No. 39-17 at 6 ("We operate in a highly competitive market and face competition from large, well-established companies with significant resources, and, as a result, we may not be able to compete effectively."), 11 (noting the "limited size" of Dexcom's sales force), 14 ("[O]ur sales and marketing organizations competes with the

experienced, larger and well-funded marketing and sales operations of our competitors."), 14 (stating that Dexcom could not guarantee its distribution relationships would continue).

The Ninth Circuit has held similar cautionary language to be meaningful. In *Intuitive Surgical*, a disclaimer accompanied each forward-looking statement as follows:

> Before we begin, I would like to inform you that comments mentioned on today's call may be deemed to contain forward-looking statements. Actual results may differ materially from those expressed or implied, as a result of certain risks and uncertainties. *These risks and uncertainties are described in detail in the company's [SEC] filings.* Prospective investors are cautioned not to place undue reliance on such forward-looking statements.

759 F.3d at 1059 (emphasis added). The Court of Appeals held this language sufficient to exempt certain forward-looking statements under the PSLRA's safe harbor provision. *Id.* at 1059–60; *see In re Intel Corp. Sec. Litig.*, No. 5:20-CV-05194-EJD, 2023 WL 2767779, at *13 (N.D. Cal. Mar. 31, 2023) ("[F]orward-looking oral statements receive safe harbor protection if they are accompanied by a general statement that results might differ, and an additional statement directing the audience to a readily available written document with more detailed risk factors."), *aff'd*, No. 23-15695, 2024 WL 1693340 (9th Cir. Apr. 19, 2024); *Kipling v. Flex Ltd.*, No. 18-CV-02706-LHK, 2020 WL 2793463, at *11 (N.D. Cal. May 29, 2020) (holding cautionary language accompanying oral statements satisfied PSLRA's safe harbor requirement where presentation indicated the presentation could contain forward looking statements, actual results could differ materially, and investors were cautioned to refer to SEC filings for more information on specific risk factors); *In re Fusion-io, Inc. Sec. Litig.*, 2015 WL 661869, at *13 (same).

For these reasons, the Court concludes Statement N falls under the PSLRA's "safe harbor" provision.

### Conclusion

For the reasons above, the Court holds Plaintiff has adequately alleged falsity with respect to the portions of Statements J and K discussed above.

### 2. Scienter

The Court next considers whether Plaintiff has adequately alleged scienter as to Statements J and K. Plaintiff contends Sylvain possessed contemporaneous access to data that enabled him to monitor Dexcom's share of the Type 2 Basal Market and therefore knew the challenged statements were false or misleading when made. CAC ¶¶ 253(b), 274(b).

Under Ninth Circuit precedent, "[t]he most direct way to show both that a statement was false when made and that the party making the statement knew that it was false is via contemporaneous reports or data, available to the party, which contradict the statement." *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004). Here, Sylvain's February 8, 2024 and April 25, 2024 statements explicitly reference both his ability to access and his reliance upon prescription data. CAC ¶¶ 234 ("And so when you think about it, and you can see the share taking when you look at the script data, we are taking share."); 255 ("In terms of share taking and how we look at that category, we get script data, we look at script data based on pathology. The debate—there's no debate internally to us. We know we're taking share, and we see that data.").

Under these circumstances, "[i]t is unclear what further facts plaintiff[] would need to plead to create a stronger inference that [Sylvain] had access to information [he] discussed publicly." *Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014) (holding CFO's statement referencing corrosion rate data rendered it "unlikely that she was not aware of [this data] or the concerning aspects of the company's findings."). In other words, Sylvain "bridged the scienter gap [himself] by referencing this [prescription] data directly." *Id.*; *see also Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1147 (N.D. Cal. 2017) (holding defendant CFO bridged the scienter gap where his statements strongly implied he had access to disputed information). The Court concludes that Plaintiff has sufficiently alleged facts supporting a strong inference of scienter with respect to Statements J and K.

///

///

### *Conclusion*

For the reasons above, the Court **DENIES** Defendants' motion to dismiss Plaintiff's § 10(b) and Rule 10b-5 claims with respect the portions of Statements J and K discussed above. The Court **GRANTS** Defendants' motion to dismiss with respect to all remaining statements.

### C.    Section 20(a) of the Exchange Act

Because the Court concludes that Plaintiff's underlying § 10(b) claims are subject to dismissal except as to Statements J and K, the Court also **GRANTS IN PART** and **DENIES IN PART** Defendants' motion to dismiss Plaintiff's § 20(a) claim, which may proceed only to the extent this claim is predicated on Statements J and K. *See Zucco*, 552 F.3d at 990 ("Section 20(a) claims may be dismissed summarily, however, if a plaintiff fails to adequately plead a primary violation of section 10(b).").

## IV.    LEAVE TO AMEND

Under Federal Rule of Civil Procedure 15(a)(2), the court should "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). Nevertheless, the "liberality in granting leave to amend is subject to several limitations." *Cafasso v. Gen. Dynamics C4 Sys.*, 637 F.3d 1047, 1058 (9th Cir. 2011) (internal quotation marks omitted). "The district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint." *Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir. 1989).

Here, the Court already dismissed Plaintiff's original Consolidated Complaint for failing to make clear which statements Plaintiff alleged were false and misleading and the manner in which such statements were false. *See* ECF No. 36. Plaintiff was provided an opportunity to amend its pleading. *Id.* On amendment, Plaintiff again failed in some instances to adequately identify which specific statements it alleged were false or misleading. To the extent that it did, Plaintiff nonetheless failed to adequately plead falsity as to all but Statements J and K—in most cases, because the statements were nonactionable; in others, because Plaintiff failed to articulate how the statements were false. The Court

finds further amendment would be futile and **DENIES** Plaintiff leave to amend. *See Zucco*, 552 F.3d at 1007 (holding plaintiff's failure to correct deficiencies in its second amended complaint was a "strong indication" that plaintiff had "no additional facts to plead") (internal quotation marks omitted).

## V.     CONCLUSION

For the above reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion to dismiss. Specifically, the Court **DENIES** Defendants' motion to dismiss Claims 1 and 2 with respect to the portions of Statement J and K discussed. The Court **GRANTS** Defendants' motion to dismiss Claims 1 and 2 with respect to the remainder of the challenged statements without leave to amend.

**IT IS SO ORDERED.**

Dated: September 9, 2025

_____
Hon. Robert S. Huie
United States District Judge