UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: DEXCOM, INC. CLASS ACTION SECURITIES LITIGATION | Case No.: 24-cv-1485-RSH-VET<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>[ECF Nos. 54, 63] |

Before the Court is a motion for judgment on the pleadings filed by defendants Dexcom Inc. ("Dexcom"), Kevin Sayer ("Sayer"), Jereme Sylvain ("Sylvain"), and Teri Lawver ("Lawver"). ECF No. 54. Pursuant to Local Civil Rule 7.1(d)(1), the Court finds the motion presented appropriate for resolution without oral argument. For the reasons below, the Court grants Defendants' motion.

**I.  BACKGROUND**

Lead Plaintiff National Elevator Industry Pension Fund brings this consolidated putative class action against Dexcom and its current and former senior executives—defendants Sayer (Chief Executive Officer), Sylvain (Chief Financial Officer) and Lawver (former Chief Commercial Officer)—on behalf of all persons or entities who purchased or otherwise acquired Dexcom securities between April 28, 2023 and July 25, 2024 ("Class

Period").[1]

Plaintiff's Consolidated Amended Complaint (ECF No. 37, the "CAC") alleges the Individual Defendants made fourteen statements between April 27, 2023 and June 5, 2024 that violate Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5. CAC ¶¶ 74–296.[2] Following the Court's September 9, 2025 Order on Defendants' motion to dismiss, two challenged statements remain at issue. *See* ECF No. 47. Both statements, made by defendant Sylvain, assert Dexcom was "taking share" based on "script data" in the Q4 2023 and Q1 2024-time frame. *See* ECF No. 47; CAC ¶¶ 234–35; 255–56.[3]

Statement J was made on February 8, 2024 during a conference call discussing Dexcom's Q4 2023 results:

> [Analyst]: Looking at the domestic performance, there's been a clear acceleration in the back half of '23 on a 2-year stacked basis. And I'm wondering specifically if that's just basal that's helping there. It looks like it's as much as 200, maybe 250 basis points of the acceleration. Is that the primary contributor to the domestic acceleration? What should we think about in terms of basal contribution to the topline this year? And are we inflecting right now as far as basal adoption goes with CGM here in the States?
>
> [Sylvain]: Yes. It's a good question. Let me maybe just give some color as to how we're thinking about the guidance. As you see the performance in the back half of the year, a lot of that has to do with being the most accurate sensor, launching with the G7 form factor and

---

[1] This action combines three cases: *Alonzo v. Dexcom Inc., et al.*, 24cv1485-RSH-VET, *Oakland County Employees' Retirement Systems et al. v. Dexcom Inc., et al.*, 24cv1804-RSH-VET and *Carnes v. Dexcom Inc., et al.*, 24cv1809-RSH-VET ("Related Actions").

[2] The facts as alleged in this case were set forth in the Court's prior September 9, 2025 order on Defendants' motion to dismiss Plaintiff's CAC, which the Court incorporates by reference as if fully set forth herein. ECF No. 47 at 1–4.

[3] For consistency with Plaintiff's CAC and the Court's prior Order, the Court refers to these two statements as Statements J and K.

then, of course, having the basal coverage there. ***And so when you think about it, and you can see the share taking when you look at the script data, we are taking share.*** And having the sensor – the most advanced sensor on the market is the driver there. So that's taking share.

Now within those spaces, basal is a contributor, no question. As that category expands and we take share within that category, that does contribute to the overall numbers. And so you are right, basal is a contributor, but it has as much to do with us taking share as it does with category expansion. So think about both of those as contributors.

As you think about 2024, we've talked a little bit about the adoption rate, basal in total adopting in this back half of the year around 9% to 10% per year on a per annum basis. The guide assumes about 8% there. And so I think you can assume that was the case. Our long-range plan was more like 6% to 7% per year. So we are seeing basal going faster than what was in our long-range plan. And what's great about that is as we continue to take share and the category grows a little faster than expected, that will help contribute over the longer haul.

CAC ¶¶ 234–35 (emphasis added).[4]

Statement K was made on April 25, 2024 during a conference call discussing Dexcom's Q1 2024 results:

[Analyst]: So wanted to ask on basal, just any visibility you can give on how that's been scaling? Obviously, a record new start quarter this quarter. I would assume basal is contributing nicely to that. But what do the sequential patterns look like the last few quarters? Is it still sequentially growing at a pretty healthy rate, I'd assume, but any color you can provide there?

And also, there's been some debate, obviously, on market share within the basal population here in the U.S. Just would love kind of any insight you can provide on that front as well. Thanks.

[Sylvain]: Yeah. So I can take that one. Thanks, Jeff. I think when we

---

[4] The Court emphasizes only those portions of Statements J and K that were alleged by Plaintiff to be false and misleading, excluding those portions the Court already held were not actionable. *See* CAC ¶¶ 236, 254, 257, 272; ECF No. 47 at 26–29.

> talked about what we expected this year, we really talked about it in the context of basal adoption across the entire population. And we talked about exiting the year right around that 15% adoption across the basal population in the US and the year moving over the course of the year to 23%. So about 8 points of penetration.
>
> So far through the first quarter, things are going as we expected. Record new patients, I think, helps enforce that. And you are correct, a good chunk of our new patients are coming through that basal channel, and we continue to see really well performance in that category. So qualitatively, the things we talked about, the excitement in that channel, those still remain.
>
> ***In terms of share taking and how we look at that category, we get script data, we look at script data based on pathology. The debate – there's no debate internally to us. We know we're taking share, and we see that data. And I think a lot of you guys see that data. So for what it's worth, that data is out there, you can see the scripts continuing to come our way.***
>
> For the . . . purpose we talked about, when we have coverage and when we compete head-to-head, we've typically won. So I think we maybe disagree with some comments out there, but I think the data is clear. When you look at the script data, I think it will continue to demonstrate where this is going over time. Hope that helps.

*Id.* ¶¶ 255–56 (emphasis added).

In its CAC, Plaintiff alleged Sylvain's representations Dexcom was "taking share" based on "script data" in Statements J and K were false and misleading because "[i]n reality, Dexcom was ceding the vast majority of market share to Abbott." *Id.* ¶¶ 237; 258. In support, the CAC alleged that according to Abbott-cited IQVIA data, Abbott was "winning" seven out of ten prescriptions in the "newly covered Type 2 basal population" in January 2024 and that according to this data, Abbott's market share "remained the same" in April 2024. *Id.*

In its September 9, 2025 Order, the Court held that Sylvain's statements Dexcom was looking at the "script data" and therefore knew that it was "taking share" was "not mere puffery, but a determinate, verifiable statement[.]" ECF No. 47 at 27 (quoting

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 184 (2015)). The Court then concluded Plaintiff's allegations regarding Abbott's capture of prescriptions in the newly covered Type 2 Basal Market plausibly alleged Sylvain's statements were false or misleading when made. *Id.* at 27, 29.

On October 10, 2025, Defendants filed the instant motion for judgment on the pleadings as to Statements J and K. ECF No. 54. Plaintiff filed a response, and Defendants have filed a reply. ECF Nos. 56, 59.

## II.  LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." "[A] Rule 12(c) motion is functionally identical to a Rule 12(b)(6) motion" and "the same standard of review applies to motions brought under either rule." *Gregg v. Dep't of Pub. Safety*, 870 F.3d 883, 887 (9th Cir. 2017) (internal quotation marks omitted); *see Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989) ("Because the motions are functionally identical, the same standard of review applicable to a Rule 12(b) motion applies to its Rule 12(c) analog.").

When deciding a 12(c) motion, the court "must accept all factual allegations in the complaint as true and construe them in the light most favorable to the non-moving party." *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009). The court "may also consider documents incorporated into the complaint by reference and matters of which [the court] may take judicial notice." *Health Freedom Def. Fund, Inc. v. Carvalho*, 148 F.4th 1020, 1026 (9th Cir. 2025). "Judgment on the pleadings is properly granted when there is no issue of material fact in dispute, and the moving party is entitled to judgment as a matter of law." *Id.* (internal quotation marks omitted); *see Gregg*, 870 F.3d at 887.

## III.  ANALYSIS

In the instant Motion, Defendants contend Sylvain's statements that Dexcom was "taking share" based on "script data" were not false or misleading when made. Specifically, Defendants argue Dexcom could have increased its overall market share without winning

the majority of new prescriptions in the newly covered Type 2 Basal market because market share and share of new prescriptions are different metrics. ECF No. 54-1 at 11–13.

In support, Defendants posit the example of a Type 2 Basal market consisting of 100 patients in which Abbott holds 90% of the starting market share while Dexcom holds only 10%. *Id.* at 12.[5] Defendants then assume—per the CAC's allegations—that Abbott secures seven of every ten new prescriptions in this market from at least January to April 2024. *Id.* at 12–13. Assuming that the market grows by ten new patients per month, Abbott would capture seven new patients per month to Dexcom's three.

With these assumptions, the example produces the following results:

|               | **Total Market** | **Abbott Share**              | **Dexcom Share**              |
|---------------|------------------|-------------------------------|-------------------------------|
| Start         | 100 patients     | 90 patients (90% market share) | 10 patients (10% market share) |
| January 2024  | 110 patients     | 97 patients (88% market share) | 13 patients (12% market share) |
| February 2024 | 120 patients     | 104 patients (87% market share) | 16 patients (13% market share) |
| March 2024    | 130 patients     | 111 patients (85% market share) | 19 patients (15% market share) |
| April 2024    | 140 patients     | 118 patients (84% market share) | 22 patients (16% market share) |

---

[5]   The example, while hypothetical, draws some assumptions from the CAC itself. *See* CAC ¶ 34 ("Dexcom and Abbott dominate the CGM space, effectively giving them a duopoly."); ¶ 45 (referring to Abbott's "market leadership in the Type 2 basal space"); ¶ 52 ("In contrast to Dexcom, Abbott had entrenched itself as the near unanimous CGM option for basal patients among PCP prescribers through focused marketing and sales efforts."). It also draws upon Plaintiff's prior allegation that in 2021, Abbott had stated it held a 90% share of the Type 2 market segment. ECF No. 27 ¶ 68 ("We're making great progress in penetrating the type 2 population, whether it's non-insulin users or non-intensive insulin users. We've got about a 90% market share of that segment, at least.").

As Defendants' example illustrates, starting from a 10% share, Dexcom's share of the overall market would increase if it captured 30% of new patients (three of ten) each month, even though Abbott captured the remaining 70%. Thus, Sylvain's Statements J and K about "taking share" in the Type 2 Basal market—meaning that Dexcom was increasing its share in that market—are not necessarily inconsistent with Abbott obtaining the majority of new prescriptions.

Plaintiff's theory as to why these statements are false is clear. *See e.g.*, CAC ¶¶ 236, 257 ("Sylvain's April 25, 2024 statements were materially false and misleading because they conveyed the misimpression that Dexcom was successfully capturing market share in the Type 2 basal segment and that its basal patient growth reflected effective commercial execution."). But at present, Plaintiff has not adequately pleaded facts establishing that the statements are indeed false or misleading. Sylvain's statements could have accurately reflected Dexcom's growth in overall market share even if Dexcom had failed to secure a majority of new prescriptions in the Type 2 basal segment. *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061 (9th Cir. 2014) (holding the statements in an annual report were not false or misleading when they accurately reflected the company's growth); *Menon v. Maxeon Solar Techs., Ltd.*, No. 24-CV-03869-EMC, 2025 WL 1223559, at *15 (N.D. Cal. Apr. 28, 2025) ("[A]ccurately reported historical information, such as sales and profit data, is not actionable because it is rarely subject to misinterpretation[.]") (internal quotation marks omitted); *Elec. Workers Pension Fund, Loc. 103, I.B.E.W. v. HP Inc.*, No. 20-CV-01260-SI, 2021 WL 4199273, at *4 (N.D. Cal. Sept. 15, 2021) (holding plaintiff failed to plead falsity of alleged statements that market share increased where "[m]arket shares did not decrease during the quarters when the alleged misstatements were made").

Plaintiff advances a number of arguments in response. Plaintiff first contends Sylvain's statements Dexcom was "taking share" when looking at "script data" was a reference to Dexcom's "share" of new patients and not overall market share. ECF No. 56 at 23. This construction, however, is inconsistent with the allegations in Plaintiff's CAC.

*See* CAC ¶¶ 236 ("Sylvain's February 2024 statements were materially false and misleading because they conveyed the impression that Dexcom was gaining meaningful share in the basal segment . . . . In truth, however, Dexcom was losing significant ***market share*** to Abbott.") (emphasis added); 237 ("In reality, Dexcom was ceding the vast majority of ***market share*** to Abbott.") (emphasis added); 253(b) ("Sylvain and other defendants repeatedly represented that they had access to information allowing them to track sales data, understand where their patients were coming from, and monitor the Company's ***market share in the basal market***.") (emphasis added); *see also* ¶¶ 257–58, 274(b). Plaintiff cannot amend its CAC by arguments made in opposition to a motion for judgment on the pleadings. *See CV Amalgamated LLC v. City of Chula Vista*, No. 24-CV-1348-RSH-DDL, 2025 WL 580395, at *5 (S.D. Cal. Feb. 21, 2025) (collecting cases); *Stokes v. City of Visalia*, No. 1:17-CV-01350-SAB, 2018 WL 2970765, at *11 (E.D. Cal. June 8, 2018) ("Plaintiff cannot amend her complaint by arguments made in opposition to the motion for judgment on the pleadings.").

Plaintiff next contends that Defendants' arguments improperly rely on a "manufactured" Type 2 Basal market consisting of only a hundred patients that grows by only ten patients per month. ECF No. 56 at 23–24. To the extent Plaintiff takes issue with Defendants' example because it does not accurately reflect the Type 2 Basal market's actual size and growth, this argument misses the mark. The Court does not construe Defendants' example as being historically accurate, but rather as an illustration of the point that a company in Dexcom's position might capture a minority of new prescriptions but still increase its market share.

Plaintiff also takes issue with Defendants' submission of a table consistent with "IQVIA data available to Dexcom as of the date of this filing." ECF Nos. 54-1 at 13; 56 at 24–25. This table, separate from Defendants' example, is submitted without any supporting declaration describing its source, the methodology used to generate it, or its authenticity. Plaintiff, for its part, disputes the authenticity of this data. *See* ECF No. 56 at 20–21. Under these circumstances, the Court agrees this material is not properly considered at this stage

of the proceedings. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) ("If defendants are permitted to present their own version of the facts at the pleading stage—and district courts accept those facts as uncontroverted and true—it becomes near impossible for even the most aggrieved plaintiff to demonstrate a sufficiently 'plausible' claim for relief."); *Smith v. Credit Corp Sols., Inc.*, No. 320CV01295JAHRBB, 2022 WL 959597, at *2 (S.D. Cal. Mar. 30, 2022) (holding the Court's review of documents "would be more appropriate in connection with a motion for summary judgment" where plaintiff disputed their authenticity). The Court does not consider the IQVIA data at this stage to identify the deficiency in Plaintiff's pleading.

  Finally, Plaintiff contends Defendants' argument is precluded under the law of the case doctrine. This argument is unavailing. While the Court acknowledges Defendants' argument in the instant Motion is similar to the one Defendants previously set forth, "the law of the case doctrine does not preclude a court from reassessing its own legal rulings in the same case." *Askins v. United States Dep't of Homeland Sec.*, 899 F.3d 1035, 1042 (9th Cir. 2018). Instead, "[t]he doctrine applies most clearly where an issue has been decided by a higher court; in that case, the lower court is precluded from reconsidering the issue and abuses its discretion in doing so except in the limited circumstances." *Id.*; *Hanna Boys Ctr. v. Miller*, 853 F.2d 682, 686 (9th Cir. 1988) ("The law of the case doctrine, however, is not an inexorable command.").

  Plaintiff's contention Defendant may not raise this argument in a motion for judgment on the pleadings but must do so instead in a motion for reconsideration is also unpersuasive. The Court may consider these arguments in the context of a motion for judgment on the pleadings. *See Venoco, LLC v. Plains Pipeline, L.P.*, No. CV162988PSGJEMX, 2019 WL 3308759, at *5 (C.D. Cal. Apr. 23, 2019) ("[T]he Rules, as presently written, plainly permit such successive motions."), *aff'd*, 814 F. App'x 318 (9th Cir. 2020); *Flores v. City of Phoenix*, No. CV-11-492-PHX-G24MS, 2012 WL 2369257, at *2 (D. Ariz. June 22, 2012) ("The City's failure to raise the argument in its

motion to dismiss, however, does not preclude the Court from considering this argument now.").

For these reasons, the Court concludes Plaintiff's CAC does not sufficiently allege how Statements J and K were false or misleading when made.

## IV. LEAVE TO AMEND

"A court considering a motion for judgment on the pleadings may give leave to amend and may dismiss causes of action rather than grant judgment." *Garcia v. LHO Mission Bay Rosie Resort, L.P.*, No. 20-CV-2370-DMS-MDD, 2021 WL 4145980, at *4 (S.D. Cal. Apr. 28, 2021) (internal quotation marks omitted). "Indeed, '[b]ecause motions for judgment on the pleadings under Rule 12(c) and motions to dismiss for failure to state a claim under Rule 12(b)(6) are functionally identical, . . . leave to amend should be granted unless amendment would be futile.'" *Id.* (quoting *Kemp v. Regents of Univ. of Cal.*, No. C-09-4687 PJH, 2010 WL 2889224, at *2 (N.D. Cal. July 22, 2010)); *see Knappenberger v. City of Phx.*, 566 F.3d 936, 942 (9th Cir. 2009) ("Leave to amend should be granted unless the district court determines that the pleading could not possibly be cured by the allegation of other facts.") (internal quotation marks omitted).

Here, "[t]he PSLRA has exacting requirements for pleading 'falsity.'" *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008). As currently pleaded, the CAC does not meet those exacting standards. The Court is not convinced, however, that Plaintiff *cannot* cure the defects identified herein to meet those standards via amendment. Accordingly, the Court grants Plaintiff leave to amend its allegations with respect to Sylvain's representations that Dexcom was "taking share" based on "script data" in Statements J and K only. Plaintiff may file such an amended pleading within **thirty (30) days** of the date of this order.

## V. CONCLUSION

For the above reasons, the Court **GRANTS** Defendants' motion for judgment on the pleadings as to Statements J and K [ECF No. 54] **WITH LEAVE TO AMEND** subject to

the limitations set forth above.[6] In light of the basis for the Court's ruling as set forth above, the Court **DENIES** as moot Plaintiff's motion for leave to file a second notice of supplemental authority [ECF No. 63].

**IT IS SO ORDERED.**

Dated: January 7, 2026

_____
Hon. Robert S. Huie
United States District Judge

---

[6] The Court does not at this time reach the question of whether defendant Lawver may be liable as a control person under Section 20(a).