ROBBINS GELLER RUDMAN
  & DOWD LLP
DANIEL S. DROSMAN (200643)
W. MARK CONOVER (236090)
SARAH A. FALLON (345821)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
ddrosman@rgrdlaw.com
mconover@rgrdlaw.com
sfallon@rgrdlaw.com

Lead Counsel for Lead Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| In re DEXCOM, INC. CLASS ACTION SECURITIES LITIGATION | Lead Case No. 24-cv-1485-RSH-VET |
|---|---|
| | LEAD PLAINTIFF'S SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| | DEMAND FOR JURY TRIAL |

4914-2626-0365.v1

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION .................................................................................. 1

II.   JURISDICTION AND VENUE ........................................................... 9

III.  PARTIES ............................................................................................ 10

      A.    Plaintiff ................................................................................... 10

      B.    Defendants ............................................................................. 10

IV.   BACKGROUND ................................................................................ 11

      A.    Diabetes and Its Management ................................................ 11

      B.    Continuous Glucose Monitors ............................................... 13

      C.    The CGM Market in the United States Has Been Dominated by Two Companies: Abbott and Dexcom ................................... 14

      D.    Endocrinologists and PCPs Prescribe CGMs to Different Patient Populations ................................................................ 15

      E.    CGMs Are Sold Through Two Primary Channels: Pharmacy and DME Suppliers ................................................................ 15

      F.    CGM Insurance Coverage ...................................................... 16

      G.    Prior to the Class Period, Abbott Had a Strong PCP Presence and Dominated the Uninsured Type 2 Basal Market ............. 16

      H.    Dexcom Lacked a Robust PCP Sales Force .......................... 17

      I.    In April 2023, CMS Expanded Coverage to Type 2 Basal Patients .................................................................................. 19

V.    SUMMARY OF DEFENDANTS' FRAUD ...................................... 20

      A.    At the Start of the Class Period, Defendants Misled Investors, Claiming They Were Well-Positioned to Take Advantage of the CGM Coverage Expansion ............................................... 20

      B.    Defendants Recognized They Were Losing the Basal Wars and Decided to Revamp Their Sales Force in 2023 but Continued to Mislead Investors ................................................................ 22

      C.    Defendants Knew that Dexcom Was Losing Approximately Seven Out of Ten *New* Basal Prescriptions – a Critical Metric for Evaluating Its Performance in the *New* Basal Market ................. 23

**24-cv-1485-RSH-VET**

4914-2626-0365.v1

**Page**

D.    Despite Knowing They Were "Getting Very Few Prescriptions," Defendants Falsely Claim They Were Succeeding in the Basal Space ........................................................... 25

E.    Defendants Raised Guidance and Touted the Sales Expansion ......... 27

F.    At the End of the Class Period, Investors Finally Learned that Dexcom Was Underperforming in the Type 2 Basal Market ............. 28

VI.    STATEMENTS AND OMISSIONS UNDER RULE 10b-5(b) ................... 31

A.    April 27, 2023 Q1 2023 Earnings Call ................................................. 31

B.    April 27, 2023 Q1 2023 Earnings Call ................................................. 38

C.    June 7, 2023 William Blair Growth Stock Conference ...................... 43

D.    June 23, 2023 Investor Day Conference Call ...................................... 49

E.    September 6, 2023 Wells Fargo Healthcare Conference .................... 57

F.    October 26, 2023 Q3 2023 Earnings Call ............................................ 65

G.    January 8, 2024 JPMorgan Healthcare Conference ............................ 73

H.    January 8, 2024 JPMorgan Healthcare Conference ............................ 82

I.    January 8, 2024 JPMorgan Healthcare Conference ............................ 91

J.    February 8, 2024 Q4 2023 Earnings Call .......................................... 100

K.    April 25, 2024 Q1 2024 Earnings Call .............................................. 110

L.    April 25, 2024 Q1 2024 Earnings Call .............................................. 120

M.    June 5, 2024 William Blair Growth Stock Conference .................... 124

N.    June 5, 2024 William Blair Growth Stock Conference .................... 128

VII.    DEFENDANTS STUN THE MARKET BY DISCLOSING ANEMIC PERFORMANCE IN THE TYPE 2 BASAL MARKET ......................... 134

VIII.    ADDITIONAL ALLEGATIONS OF SCIENTER .................................... 139

A.    Defendants Spoke Frequently Regarding the Impact of the Medicare Coverage Expansion on Their Core Business, Expressing Personal Involvement and Knowledge ......................... 139

B.    Defendants Admitted They Had Script-Level Data and Assured Analysts that Dexcom Was "Taking Share" in the Basal Space ...... 142

4914-2626-0365.v1

**Page**

C.    Defendants' Admissions Affirm Their Contemporaneous Knowledge of, or Deliberate Recklessness Regarding, Information Undermining Their Public Statements .......................... 144

D.    The Proximity Between Defendants' Misstatements and the Emergence of the Relevant Truth Further Establishes a Strong Inference of Scienter ................................................. 147

E.    Lawver's Suspiciously-Timed Departure Supports a Strong Inference of Her Scienter .................................................. 148

F.    Defendants Were Motivated to Mislead Investors as to Dexcom's True Prospects ................................................. 149

    1.    Defendants Had a Motive to Conceal the Bad News in the Hope that They Might Be Able to Right the Ship and Avoid Disclosure Entirely ......................................... 149

    2.    Defendants' Suspicious Insider Sales Support Scienter ......... 150

    3.    Dexcom's Incentive Pay Structure Provides Additional Motive to Inflate Dexcom's Stock Price ............................... 152

G.    Corporate Scienter ....................................................... 153

IX.    LOSS CAUSATION ....................................................... 153

X.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND THE FRAUD-ON-THE MARKET DOCTRINE ....................................... 158

XI.    NO SAFE HARBOR ....................................................... 158

XII.    CLASS ACTION ALLEGATIONS ......................................... 159

XIII.    CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ....................... 160

4914-2626-0365.v1

**24-cv-1485-RSH-VET**

Lead Plaintiff National Elevator Industry Pension Fund ("Plaintiff" or the "Pension Fund") alleges the following against Defendants (defined herein), by and through Lead Counsel, upon personal knowledge as to Plaintiff and Plaintiff's own acts and upon information and belief as to all other matters.[1]

## I.    INTRODUCTION

1.    This action exposes a calculated and brazen scheme by Dexcom and its highest-ranking executives, Chief Executive Officer ("CEO") Kevin R. Sayer ("Sayer"), Chief Financial Officer ("CFO") Jereme M. Sylvain ("Sylvain"), and former Chief Commercial Officer ("CCO") Teri Lawver ("Lawver"), to deceive investors and the financial markets concerning Dexcom's true competitive standing and operational capabilities.  The fraud centered on Dexcom's purported ability to capture the newly expanded and critically important Type 2 basal insulin continuous glucose monitor ("CGM") market.  While Defendants publicly trumpeted a narrative of robust growth, market leadership, and flawless execution throughout the period April 28, 2023 through July 25, 2024, inclusive (the "Class Period"),[2] they were simultaneously concealing a starkly different and disturbing reality: Dexcom critically

---

[1]   Plaintiff's information and belief is based on, among other things, the independent investigation of counsel, which includes, but is not limited to: (a) review of U.S. Securities and Exchange Commission ("SEC") filings by DexCom, Inc. ("Dexcom" or the "Company"); (b) review of transcripts of Dexcom's public conference calls, press releases, and other publications issued by the Company; (c) review of media reports about the Company; (d) review of public filings and court orders in other litigation against one or more defendants; (e) interviews with third parties conducted by attorneys and/or investigators retained by attorneys; (f) review of analyst reports about Dexcom; (g) review of transcripts of Dexcom senior management's conferences with investors and analysts; (h) review of market share data reported by third parties; (i) other public information and data regarding the Company; and (j) Defendants' admissions in their filings in this litigation.  Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their custody and control.  Plaintiff's investigation is ongoing and it believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

[2]   Plaintiff is mindful of the Court's September 9, 2025 Order Granting in Part and Denying in Part Defendants' Motion to Dismiss Lead Plaintiff's Consolidated Amended Complaint (ECF 47), and re-alleges and re-pleads the full Class Period only to preserve its appellate rights.

- 1 -                                              **24-cv-1485-RSH-VET**

4914-2626-0365.v1

lacked the necessary commercial infrastructure, consisting of a robust sales force presence in primary care physician ("PCP") offices and strong relationships with durable medical equipment ("DME") channel partners, to compete effectively against its primary competitor, Abbott Laboratories ("Abbott") and as a result, Dexcom was losing the vast majority of new prescriptions and trailing Abbott's total market share by a significant margin in the crucial new basal market.  Defendants also concealed their intended plan to fix the problem – a massive, undisclosed overhaul and strategic reorientation of its sales force to reach more PCPs.  This covert undertaking, by Defendants' own subsequent admissions, ***began as early as the second quarter of 2023 ("Q2 2023") or the third quarter of 2023 ("Q3 2023")*** – a period contemporaneous with their most confident and misleading pronouncements of success.  The early commencement of this frantic, behind-the-scenes scramble to fix fundamental flaws directly contradicts Defendants' public assurances and reveals that their optimistic portrayals of Dexcom's readiness to compete and successful results in the basal market were known to be false or were made with deliberate recklessness from the outset.

2.    Plaintiff, on behalf of all persons or entities who purchased or otherwise acquired the securities of Dexcom during the Class Period and were damaged thereby, brings this action for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.  Defendants' fraud was orchestrated to mislead investors about Dexcom's performance in the Type 2 basal CGM market – a segment Defendants themselves heralded as the "largest single expansion of access to CGM in our industry's history."

3.    Dexcom is a medical device company that designs, develops, and sells CGM systems.  CGMs utilize small sensors inserted just below the skin to provide regular glucose readings to a compatible mobile device or dedicated monitor.  CGMs offer many significant benefits, but they are especially critical in helping individuals

- 2 -    **24-cv-1485-RSH-VET**

with diabetes manage their blood glucose levels and prevent hyperglycemia (high blood sugar) and hypoglycemia (low blood sugar), which can have serious health consequences.

4. CGMs profoundly changed diabetes care, offering a more regular, convenient, and less painful way to measure blood glucose levels than through traditional means, such as a finger stick test. They provide a wealth of information to patients, caregivers, and healthcare providers to optimize treatment; can send alerts to ward off cases of hyperglycemia and hypoglycemia; and can be used in conjunction with insulin pumps to administer the appropriate dose of insulin.

5. Dexcom and Abbott dominate the CGM space, effectively giving them a duopoly. Dexcom's most current CGM system is known as the "G7" and Abbott's is known as "FreeStyle Libre 3." CGMs are costly, so Dexcom's patient base has historically been dependent on reimbursement from government healthcare programs (*i.e.*, Medicare), which began in 2017, and private health insurance. However, prior to April 2023, Medicare and private health insurance only covered CGMs for individuals with Type 1 or Type 2 diabetes that require insulin intensive treatment. They did not cover CGMs for Type 2 basal patients (individuals who use basal insulin – long-acting insulin typically delivered once a day to keep glucose levels steady) or others who do not take insulin but still experience hypoglycemic events.

6. Prior to the Class Period, Dexcom was intensely focused on growing its presence among Type 1 and Type 2 intensive insulin users typically treated by endocrinologists – its "heritage" business. Dexcom had also focused on making pharmacy its primary sales channel instead of DME suppliers, who serviced Medicare patients.

7. In contrast, Abbott had begun a massive effort to reach the Type 2 basal population where interest in CGMs was growing. Abbott already had a strong presence with PCPs due to its wide portfolio of consumer healthcare products, including glucometers and test strips. Thus, Abbott focused on reaching the Type 2

- 3 - **24-cv-1485-RSH-VET**

basal population with its marketing and sales efforts in PCP offices (where most of these patients were treated).  Accordingly, prior to the start of the Class Period, Type 2 non-intensive and basal patients made up 40% of Abbott's customer base.

8.    In April 2023, the Centers for Medicare & Medicaid Services ("CMS") expanded Medicare coverage for CGMs to the Type 2 basal patient population.  On April 27, 2023, the day before the start of the Class Period, and in the months that followed, Defendants heralded this expansion as the "largest expansion of coverage in our company's history" and which "expand[ed] [Dexcom's] addressable market tremendously."

9.    Throughout the Class Period, Defendants repeatedly assured investors that Dexcom was "well-positioned," "taking share," achieving record "new patient start[s]," and "doing well" in this pivotal market.  These assurances were critical to maintaining Dexcom's image as a high-growth innovator capable of dominating new CGM frontiers.  The truth, however, which Defendants actively concealed, was that Dexcom's commercial infrastructure, particularly its sales force, was woefully inadequate to address this new market.  Dexcom historically lacked a significant presence among PCPs, the predominant prescribers for Type 2 basal patients, and its existing sales force was neither sized nor focused to effectively penetrate this channel.  This deficiency was not merely a matter of scale.  Dexcom's sales force required not just an increase in numbers, but a complete ***change in its PCP approach*** to even begin to compete with Abbott, which had long cultivated strong PCP relationships.  This profound inadequacy forced Defendants into a desperate, undisclosed scramble to massively expand and fundamentally reorient Dexcom's sales operations, all while maintaining a deceptive facade of success and market leadership to the investing public.  The decision to undertake such a significant overhaul, initiated in mid-2023, underscores that Defendants recognized, far earlier than disclosed, that their initial strategy was failing and their public claims of readiness to compete with Abbott in the Type 2 basal market were baseless.

- 4 -    **24-cv-1485-RSH-VET**

4914-2626-0365.v1

10.    The crux of this amended complaint lies in the clandestine nature of Defendants' corrective measures and their concealment of the very problem they were desperate to fix: Dexcom was getting "very few prescriptions" and "simply . . . c[ould]n't win in physician offices" that its sales force was ill-equipped to call on. While investors were fed a steady diet of positive news about market penetration, robust new patient additions, and competitive wins throughout mid to late 2023 and into 2024, Defendants had already, by their own subsequent admissions, recognized their dire competitive situation.  Indeed, Defendants acknowledged "we decided back in 2023, we needed a broader sales force" and, as confirmed by a BofA Global Research analyst, following meetings with Defendants, the crucial sales force expansion and strategic reorientation "started in Q2/Q3" of 2023.  This timeframe places the commencement of these critical corrective actions squarely within the period Defendants were making some of their most confident (and misleading) public statements about their ability to compete with Abbott and their early success in the basal market.  For example:

- On April 27, 2023, almost immediately after CMS expanded CGM coverage to Type 2 basal patients, defendant Sayer claimed Dexcom was in a "great position to compete as this market develops."

- On June 23, 2023, defendant Lawver asserted Dexcom had "the right commercial infrastructure . . . [to] expand[] our leadership in primary care with the Type 2 basal."

- On September 6, 2023, defendant Sylvain assured investors, "where there's coverage, we've always taken share, and you see us taking share in th[e] [basal] space."

- On October 26, 2023, defendant Sayer claimed that "early prescribing trends for th[e] [basal] cohort" were "very encourag[ing]" and that Dexcom had "gained share across all reimbursed channels and patient segments in the U.S."

- 5 -                              **24-cv-1485-RSH-VET**

4914-2626-0365.v1

- On January 8, 2024, defendant Sayer falsely stated, "we are doing well in the basal category" and that Dexcom's "commercial strategy has worked wonderfully" to establish a significant presence at PCP offices.

- On February 8, 2024, defendant Sylvain reinforced this deception, claiming, "you can see the share taking when you look at the script data, we are taking share," and that Dexcom was seeing "outperformance in basal."

11. Defendants made these, and numerous other statements detailed herein, while they were acutely aware of their profound failings and had identified the need to implement a massive sales force overhaul designed to stanch the bleeding of market share to Abbott. The consistent pattern of positive public statements conveying Dexcom's outright success in the basal market during this period demonstrates a deliberate, ongoing effort to mislead, rather than isolated misjudgments.

12. During the Class Period, defendant Sylvain made a series of statements concerning Dexcom's competitive position in the newly-covered Type 2 basal market. Among them were statements made on February 8, 2024 and April 25, 2024, in which Sylvain assured investors that Dexcom was "taking share" in that market and expressly grounded those assurances in contemporaneous "script data." In making these statements, Sylvain did not frame his comments as aspirational or predictive. Instead, he presented them as data-driven assessments of Dexcom's current competitive performance, conveying to investors that Dexcom was successfully competing for new basal patients in the United States.

13. These statements were materially misleading half-truths. By choosing to speak about Dexcom's competitive position and by invoking real-time script data as the basis for his claims of share-taking, Sylvain was required to disclose material facts necessary to prevent his statements from misleading investors. He did not do so. Instead, he omitted that contemporaneous script-level data showed that Abbott was winning approximately seven out of ten new basal prescriptions and continuing to hold approximately 70% of total basal market share, that Dexcom was losing share in

4914-2626-0365.v1

**24-cv-1485-RSH-VET**

the critical DME channel serving Medicare basal patients, and that Dexcom lacked the sales force presence required to compete effectively among PCPs, who treated the overwhelming majority of Type 2 basal patients. Those omissions rendered his statements misleading in context, even if portions of the statements were literally true when viewed in isolation.

14. Defendants have since admitted that contemporaneous IQVIA data showed Abbott was winning approximately seven out of ten new basal prescriptions and continuing to hold approximately 70% of total basal market share during the period in which Sylvain made these statements. Although that admission postdated Plaintiff's earlier amended complaint, it confirms that the misleading nature of Statements J and K (¶¶243-244 and 252-253) did not depend on hindsight or later-developing events.[3] Rather, at the time Sylvain told investors that Dexcom was "taking share" based on "script data," he knew, or was deliberately reckless in not knowing, that the very data he cited showed Abbott capturing the substantial majority of new basal prescriptions and total basal market share – facts that directly undercut the impression he conveyed to the market.

15. Even when Defendants began to publicly acknowledge aspects of the sales force expansion in April 2024, they continued to deceive investors by mischaracterizing it as an "upgraded structure to help us better capitalize on the significant opportunities ahead" and describing that it "was really about being bullish

[3] After Plaintiff filed the consolidated amended complaint, Defendants admitted in briefing that contemporaneous IQVIA script-level data showed Abbott was winning approximately seven out of ten new basal prescriptions and continuing to hold approximately 70% of total basal market share during the relevant period. *See* Doc. No. 54-1 at 7. The Court's January 7, 2026 Order grants leave to amend only Statements J and K. Accordingly, while Plaintiff has incorporated Defendants' admission expressly in amending Statements J and K, the admission bears directly on the accuracy and misleading nature of Defendants' other Class Period statements concerning Dexcom's purported "share-taking," competitive performance, and success in the Type 2 basal market (Statements A-I and L-N). To the extent those statements (A-I and L-N) are not formally amended here, Plaintiff alleges – and Defendants have now conceded – that the same contemporaneous facts applied equally to them, and the reasons why those statements were false or misleading should be understood in that light.

**24-cv-1485-RSH-VET**

4914-2626-0365.v1

about our future." This misleadingly framed the expansion as an offensive, opportunistic move, concealing the fact that it was a defensive, remedial action that had been underway for nearly a year due to Dexcom's inability to compete with Abbott in the PCP-concentrated Type 2 basal market. At the same time, defendant Sylvain doubled down on the deception, stating on April 25, 2024, "there's no debate internally to us. We know we're taking share and we see that data," despite knowing script data showed Dexcom was losing approximately seven out of ten *new* basal prescriptions and trailing Abbott by a significant margin in total basal market share.

16. The truth began to unravel more publicly towards the end of the Class Period, culminating in a devastating announcement on July 25, 2024. On that day, Dexcom shocked the market by slashing its full-year revenue guidance by a staggering $300 million, largely attributing the miss to its profound underperformance in the Type 2 basal market and admitting it had "lost market share in the DME channel" which was directly tied to basal underperformance. Defendant Sylvain was forced to concede, "[w]e're not doing wonderful in the basal space." Defendants acknowledged the actual purpose behind its sales force overhaul, explaining, "what we've noted in our data is we obviously don't win in [PCP] offices we don't call on. And so we needed to get into those offices . . . so we can get prescriptions from those health care professionals." Dexcom's stock plummeted by more than 40% on this news, wiping out over $17 billion in market capitalization and marking the steepest decline in the Company's history. Analysts were stunned, with many highlighting the "credibility hit" to management, especially given their recent positive affirmations. One analyst noted he was "kind of in shock" over the sudden reversal, while another described "DXCM is clearly losing the basal wars right now."

17. In the aftermath, Defendants made a series of admissions that laid bare their earlier deception and confirmed their contemporaneous knowledge of the issues. For example, defendant Sayer admitted in September 2024 that "***back in 2023***, we needed a broader sales force . . . we've looked at prescribing patterns and the places

- 8 -    **24-cv-1485-RSH-VET**

where *we were not getting any traction [at] those offices where we had no salespeople*, where we weren't calling on physicians. *We're getting very few prescriptions*. We needed to broaden our reach." He further conceded in January 2025 that "*we didn't have the resources in the field to address these new markets*" and "*[q]uite simply, Dexcom can't win in physician offices where we don't have a presence. It's pretty tough*. We made the decision to expand the commercialization organization by 40%, so we could go after these opportunities." In March 2025, defendant Sylvain explained the sales force overhaul was "a jump-off point to reach more general practitioners, primary care physicians to make sure that we were able to take advantage of th[e] [basal] opportunity." These admissions, detailed extensively herein, irrefutably confirm that Defendants knew of the profound problems with their sales force and their inability to compete effectively in the basal market *throughout the Class Period*, at the very same time they were assuring investors of their success and strength. The sales force overhaul was not an "opportunistic" move as later portrayed, but a desperate and concealed attempt to fix a failing strategy and catch up to a competitor that was rapidly leaving Dexcom behind.

18.    Defendants' deception was motivated by a misguided hope that if they could only "fake it" long enough by misleading investors, they might one day "make it" and never have to reveal the adverse material facts they omitted during the Class Period. This strategy is no different – and no less illegal – than embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing.

## II.    JURISDICTION AND VENUE

19.    Jurisdiction is conferred by 28 U.S.C. §1331 and §27 of the Exchange Act, 15 U.S.C. §78aa. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

4914-2626-0365.v1

20.    Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) because Dexcom's principal executive offices are located in this District and many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this District.  Thus, substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this District.

21.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

**III.    PARTIES**

**A.    Plaintiff**

22.    Lead Plaintiff National Elevator Industry Pension Fund is a Newtown Square, Pennsylvania-based multiemployer defined benefit pension plan managing more than $4 billion in assets for the purpose of paying benefits to eligible participants and beneficiaries under the terms of the National Elevator Industry Plan of Pension Benefits.  Doc. No. 11-1 at 6.  As detailed in the Pension Fund's previously-filed certification (*see* Doc. Nos. 11-4, 11-5), the Pension Fund purchased a significant number of shares of Dexcom stock at artificially inflated prices during the Class Period and suffered damages as a result of Defendants' alleged misconduct.

**B.    Defendants**

23.    Defendant Dexcom, Inc. is a Delaware corporation with its headquarters located at 6340 Sequence Drive, San Diego, California 92121.  The Company's common stock trades on the NASDAQ Global Select Market under the symbol "DXCM."  Dexcom is a medical device company that designs, develops, and sells CGM systems.

24.    Defendant Kevin R. Sayer was, at all relevant times, and continues to be, the Executive Chairman of the Board of Directors, CEO, and President of Dexcom.

- 10 -                                    **24-cv-1485-RSH-VET**

4914-2626-0365.v1

25.    Defendant Jereme M. Sylvain was, at all relevant times, and continues to be, the Executive Vice President and CFO of Dexcom.  During the Class Period, Sylvain additionally was Dexcom's Chief Accounting Officer.

26.    Defendant Teri Lawver was, at all relevant times, the Executive Vice President and CCO of Dexcom.  She joined Dexcom in January 2023 and her departure was announced on October 25, 2024.

27.    Sayer, Sylvain, and Lawver are collectively referred to herein as the "Individual Defendants."  The Individual Defendants and Dexcom are collectively referred to herein as "Defendants."

28.    The Individual Defendants, because of their voting power and/or positions within the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.

29.    Defendants attended quarterly earnings calls and investor conference calls and had the ability and opportunity to prevent misleading statements or cause them to be corrected.  Because of their positions and access to material, non-public information ("MNPI") available to them, Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the representations that were being made were then materially false and/or misleading.  Defendants are liable for the false and misleading statements and omissions pleaded herein, which caused Dexcom securities to trade at artificially inflated prices during the Class Period.

## IV.    BACKGROUND

### A.    Diabetes and Its Management

30.    Diabetes is a disease caused by the body's inability to produce or effectively utilize the hormone insulin which prevents the body from adequately regulating blood glucose levels.  Diabetes is classified into two major types: Type 1

- 11 -                    **24-cv-1485-RSH-VET**

4914-2626-0365.v1

and Type 2. In 2021, the prevalence of diabetes in the United States was 38.4 million people of all ages, which is 11.6% of the U.S. population. In 2024, the estimated number of people with Type 1 diabetes in the United States was 2.07 million, which includes 1.79 million adults and 280,000 children. Type 2 diabetes is the most common type of diabetes in the United States accounting for between 90%-95% of all cases.

31. Type 1 diabetes is an autoimmune disorder that typically develops during childhood, in which the body's immune system destroys the insulin producing cells of the pancreas so that the body produces little to no insulin. Individuals with Type 1 diabetes require insulin therapy to regulate blood glucose levels. Individuals with Type 1 diabetes who are not using an insulin pump typically take a combination of two forms of insulin: basal and bolus. Basal insulin (known as "background insulin") is long-acting insulin typically delivered once a day to keep glucose levels steady. Bolus insulin is fast-acting insulin used to bring down high blood sugar, typically after a meal. Insulin is usually injected under the skin through a syringe, pen, or pump (a small wearable device used to deliver insulin at specific times) but can also be inhaled.

32. Type 2 diabetes is a metabolic disorder that occurs when the body is unable to produce sufficient amounts of insulin or becomes insulin resistant. Type 2 diabetes is more common in older adults. The treatment paradigm for Type 2 diabetes varies by individual. Certain individuals with Type 2 diabetes require intensive insulin therapy (which includes injections of both bolus and basal insulin), while others require only non-intensive insulin or basal therapy (taking only basal insulin ("Type 2 basal patients" or "basal patients")). Some individuals can manage their Type 2 diabetes without insulin, using some combination of oral medications, dietary and nutritional changes, and exercise.

33. Maintaining blood glucose levels within normal ranges is critical for the health of individuals with diabetes to avoid hyperglycemia (high blood sugar) and

- 12 -                **24-cv-1485-RSH-VET**

4914-2626-0365.v1

hypoglycemia (low blood sugar), both of which can have profound health consequences. As blood glucose levels can be impacted by a host of factors, glucose monitoring is critical. Traditionally, outpatient glucose monitoring involved a finger stick test, using a glucometer and test strips to collect a drop of blood through a finger prick and measure blood glucose levels. However, this method provides limited information, cannot be done during sleep, is inconvenient, difficult to use, and painful.

## B.    Continuous Glucose Monitors

34.    CGM devices, like Dexcom's, utilize small sensors inserted just below the skin in the abdomen or arm held in place with a patch that take regular glucose readings from interstitial fluid (fluid surrounding cells). The sensors send real-time glucose data to a compatible mobile device or dedicated monitor. This enables individuals, as well as their caregivers and medical providers, to see the immediate effects of food and exercise on their blood glucose levels. CGMs can also send alerts when glucose levels are too low or too high, enabling an individual to catch cases of hyperglycemia or hypoglycemia before they happen. Additionally, CGMs can also communicate with compatible insulin pumps to automatically administer the appropriate dose of insulin, mimicking how a pancreas would release insulin. This is known as a "closed loop" system.

35.    The Type 1 population was the first to adopt CGM technology, followed by individuals who have Type 2 diabetes requiring intensive insulin use. As these populations need to check glucose levels multiple times a day, CGM technology helps them lower the burden of managing their diabetes substantially. However, CGMs offer significant benefits to individuals with less severe forms of diabetes and even to individuals without diabetes. They have been adopted by a spectrum of individuals ranging in severity as follows: Type 1 (insulin-dependent); Type 2 IIT (intensive insulin therapy); Type 2 NIIT (non-intensive insulin therapy or basal); Type 2 NIT (non-insulin therapy); prediabetes (diagnosed and undiagnosed); and health and longevity (biohackers, athletes, and individuals engaged in general health monitoring).

- 13 -                                    **24-cv-1485-RSH-VET**

4914-2626-0365.v1

### C.   The CGM Market in the United States Has Been Dominated by Two Companies: Abbott and Dexcom

36.   Dexcom introduced its first sensor in 2004 and the first U.S. Food and Drug Administration ("FDA")-approved CGM for seven days of continuous use (its SEVEN system) in 2007.  Dexcom has continued to develop and advance its CGM technology, launching its newest generation CGM system (the G7) in 2023.  The Company boasts that the G7 offers enhanced features over its G6 model, including smaller size and faster warm ups.  In 2024, following FDA approval, the Company launched its Stelo Glucose Biosensor ("Stelo"), a product available without a prescription, over the counter.  Stelo is targeted for adults who have Type 2 diabetes but are not on insulin, are prediabetic, or just want to monitor their blood sugar for general health reasons.  The Company also offers Dexcom ONE internationally, a lower cost device with more limited functionality than the G series.

37.   Dexcom's key competitor in the CGM space is Abbott, whose CGM systems are known as FreeStyle Libre ("Libre").  Dexcom and Abbott dominate the CGM space, effectively giving them a duopoly.

38.   In addition to CGMs, Abbott develops, manufactures, and sells a wide range of healthcare products, including pharmaceuticals, diagnostic systems and tests, nutritional products, and medical devices.  Abbott's medical devices are used in various aspects of diabetes, cardiovascular, and neuromodulator care.  Abbott first entered the diabetes testing market in 1996 with the acquisition of Medisense Inc., a maker of kits that allowed individuals to test their blood glucose levels.  Abbott debuted its first CGM product, known as the "Navigator," in 2008.  Abbott launched its Libre CGM in Europe in 2014.  The FreeStyle Libre 3 system is Abbott's latest CGM.  The FreeStyle Libre 3 has the smallest and thinnest CGM sensor on the market as well as the longest-lasting (14 days).

**24-cv-1485-RSH-VET**

4914-2626-0365.v1

**D.    Endocrinologists and PCPs Prescribe CGMs to Different Patient Populations**

39.    Individuals with diabetes can be treated by endocrinologists, PCPs, and diabetes clinics.  These providers prescribe CGMs to patients in order to help them track their blood glucose levels in real time; determine the effect of their behaviors, lifestyle factors, meals, exercise, and treatments, among other things; and avoid hyperglycemia and hypoglycemia.

40.    Endocrinologists are doctors who specialize in the treatment of hormone-related conditions, including diabetes.  They typically treat individuals with Type 1 diabetes or Type 2 diabetes who require intensive insulin therapy, especially when multiple daily injections or insulin pumps are needed, because they can provide more specialized diabetic care.  Endocrinologists, in particular, can use CGMs to help them determine optimal insulin dosages and treatment efficacy.

41.    Patients with non-intensive Type 2 diabetes, including basal patients, are commonly treated by PCPs.  Unlike endocrinologists, PCPs are general practitioners who do not specialize in diabetes care.

**E.    CGMs Are Sold Through Two Primary Channels: Pharmacy and DME Suppliers**

42.    CGMs are sold through pharmacies and DME suppliers.  While Dexcom was historically focused on the DME channel, the Company began transitioning its business to make pharmacy its primary sales channel because it was more accessible and cost-effective, allowing greater market penetration and increased patient volumes. Dexcom believed that doctors would be much more willing to prescribe its CGMs if they were available through pharmacies because it involved less administrative burden (*i.e.*, extensive paperwork) than the DME channel and enabled patients to gain access to their CGMs in a more timely manner.  This was particularly important for PCPs who, unlike endocrinologists, treat many diverse conditions, and were less familiar with DMEs and not as well situated to handle the administrative burden they imposed.

4914-2626-0365.v1

**F.     CGM Insurance Coverage**

43.     Reimbursement for CGMs from government healthcare programs (*i.e.*, Medicare or Medicaid) was not available until 2017.  Medicare is federal health insurance coverage for adults 65 or older and younger adults with certain long term disabilities.  It includes Hospital Insurance (Part A) and Medical Insurance (Part B).  Individuals on Medicare can purchase a Medicare-approved plan from a private company that offers an alternative to Medicare for health and drug coverage, known as Medicare Advantage (Part C).

44.     In January 2017, CMS established a classification of "Therapeutic Continuous Glucose Monitors" as DME eligible for coverage under Medicare Part B.  As Medicare covers CGMs and the supplies necessary for the use of the device only as a DME benefit, Medicare Part B patients must obtain their CGM through a DME supplier.  Originally, Medicare coverage was very limited but it slowly continued to expand.  Prior to April 2023, Medicare provided coverage for CGMs only for patients who took at least three doses of insulin a day, limiting CGM reimbursement to Medicare beneficiaries with intensive Type 1 and 2 diabetes.  Medicare did not cover CGMs for Type 2 basal patients – approximately 1.5 million people under its umbrella.  Nor did it offer coverage for individuals with prediabetes or those experiencing hypoglycemic events, such as dangerously low blood glucose.

45.     By 2021, there was growing demand for CGMs among the non-intensive Type 2 basal population.  But, without federal healthcare coverage or private insurance coverage for CGMs, these individuals were forced to forego using CGMs or pay out-of-pocket for these devices, which could be costly.

**G.     Prior to the Class Period, Abbott Had a Strong PCP Presence and Dominated the Uninsured Type 2 Basal Market**

46.     Despite the fact that Medicare and commercial insurance coverage had not been established for CGM use among Type 2 basal patients, Abbott had targeted this population.  Abbott had developed a robust PCP-facing sales force.  As Abbott's

- 16 -                    **24-cv-1485-RSH-VET**

4914-2626-0365.v1

CEO described on April 19, 2023, the basal market was "an important part of [Abbott's] growth strategy" and Abbott had been investing in "building a sales force that's focused more on the primary care side."

47.    Analysts connected Abbott's sizable PCP sales force to its success in the Type 2 basal market:

> Libre momentum can be supported by *a meaningfully expanded U.S. salesforce with a specific focus on the PCP channel* where 90% of Type 2 patients are taken care of today.  Libre's U.S. install base is currently made up of more than 40% Type 2 non-intensively managed patients despite what we expect is limited payer coverage for this population . . . .

48.    Abbott's robust PCP-facing sales force, which was at least 50% larger than Dexcom's, and its longstanding prioritization of PCP prescribers gave it a significant advantage over Dexcom.[4]  Abbott also offered a viable cash pay option, a lower price tag, and a strong rebate program that made its CGMs affordable even without insurance coverage.  These focused sales and marketing efforts were designed to reach and educate PCPs and make it easier for them to prescribe Abbott's Libre to the Type 2 basal population.  Accordingly, by the start of the Class Period, Abbott had entrenched itself as the near unanimous CGM option for basal patients among PCP prescribers.   Indeed, Abbott acknowledged that prioritizing the Type 2 basal population was "our strategy from the moment we entered the market" (years before CMS approved coverage) and that its market leadership in the Type 2 basal space was "not something that[] [just] happened . . . [w]e've been focused on this, generating the clinical evidence, building the sales forces to be able to reach a primary care team, investing in direct-to-consumer advertising."

**H.    Dexcom Lacked a Robust PCP Sales Force**

49.    In contrast to Abbott, Dexcom's sales force was not positioned to succeed in the Type 2 basal market.  First, Dexcom's sales force was significantly

---

[4]  Abbott had approximately 400 diabetes sales personnel (William Blair; June 5, 2024) compared to approximately 260 for Dexcom.

4914-2626-0365.v1

smaller than Abbott's (50%).  While Dexcom had undertaken a sales force expansion in 2021, it added only approximately 130 new sales representatives, increasing Dexcom's total sales force to approximately 260 new sales representatives across 26 sales territories throughout the country (whereas there are approximately 250,000 PCPs in the United States).  Moreover, prior to insurance coverage for Type 2 basal patients, Dexcom was largely focused on its "heritage" business (Type 1 and Type 2 insulin intensive patients), rather than increasing its reach with the uninsured basal population.  As Defendants acknowledged during the Company's February 11, 2021 earnings call, the 2021 sales force expansion was specifically designed to call on providers of Type 1 and Type 2 intensive patients: "The way we structure the teams out in the field is very much based upon the number of people with diabetes and ***intensive insulin users*** that they see."  Likewise, during a February 10, 2022 earnings call for the fourth quarter of 2021, Sayer stated: "There is some limited reimbursement for basal only and some non-type 2s, but it's not a very big number . . . . ***And it's not something that – actually, we sell to or market to because [there is] just not that much of it out there***."  As a result of the limited size and narrow focus of its sales force, Dexcom was only reaching, at most, 25% of U.S. PCPs by early 2023.[5]

---

[5]  In January 2024, Dexcom disclosed that the number of healthcare providers prescribing its CGMs increased by 40% during 2023.  The following month, in response to an analyst's question, Sylvain stated that Dexcom's sales force was reaching "tens of thousands of primary care physicians and predominantly the entirety of the endocrinologist space."  If "tens of thousands" is interpreted at the high end – as 90,000 PCPs – and assuming near-total coverage of the estimated 7,000 endocrinologists, this suggests that by early 2024, approximately 97,000 physicians were prescribing Dexcom CGMs.

Thus, if the number of prescribers increased by 40% to 97,000, the total number of prescribers in early 2023 would have been roughly 69,500 (*i.e.*, a 40% increase over 69,500 yields approximately 97,000 (69,500 × 1.40 = 97,300)).  Assuming the endocrinologist base remained constant at ~7,000, the number of PCPs prescribing Dexcom CGMs in early 2023 would have been around 62,500 (69,500 - 7,000).

According to American Medical Association (AMA) Physician Professional Data, there were approximately 250,000 PCPs nationwide.  *See also* Dexcom's March 4, 2025 investor presentation ("about 250,000 primary care physicians in the United States").  Thus, Dexcom was reaching at most 25% of PCPs in early 2023.  Dexcom disclosed that it added approximately 18,000

- 18 -

**24-cv-1485-RSH-VET**

4914-2626-0365.v1

50.     However, a PCP-focused sales force was necessary to reach the Type 2 basal market because most of the Type 2 patients were being treated by PCPs.  And PCPs, who treated numerous other conditions, needed support and training on CGMs from sales representatives.  Indeed, a recent study published in the *Annals of Family Medicine*, which surveyed 656 primary care physicians nationwide, found that "primary care clinicians are open to using CGM to help their patients with diabetes, but they need resources and support," namely "consultation on insurance issues and CGM training."  In fact, most respondents indicated that they would be moderately or very likely to prescribe CGMs with CGM education training/workshops (72.3%) or consultation on insurance issues (72.0%).  The study observed the significance of reaching PCPs with this training as "most patients with diabetes do not receive their diabetes care from an endocrinologist" but rather "approximately 90% of US patients" have their diabetes managed in primary care settings.[6]

**I.     In April 2023, CMS Expanded Coverage to Type 2 Basal Patients**

51.     On March 2, 2023, CMS finalized its proposal to expand coverage for CGMs, increasing patient eligibility to include Type 2 basal patients, as well as certain non-insulin using individuals who had experienced hypoglycemic events.  This coverage expansion went into effect in April 2023 for patients receiving coverage through Medicare.  The Company estimated the Type 2 basal patient population at around three million people in the United States with around half being of Medicare age.  Combined with individuals with hypoglycemia risk, coverage was expanded to more than six million people in the United States.

---

prescribers between the first quarter of 2023 ("Q1 2023) and the third quarter of 2023 ("Q3 2023"), leaving its total PCP coverage below 33% throughout the year. Thus, even under the most Dexcom-favorable assumptions, the Company's PCP reach remained limited throughout 2023.

[6]    Tamara K. Oser MD, et al., *Continuous Glucose Monitoring in Primary Care: Understanding and Supporting Clinicians' Use to Enhance Diabetes Care,* Annals of Family Medicine (Nov. 2022), https://www.annfammed.org/content/20/6/541.full.

- 19 -                                    **24-cv-1485-RSH-VET**

4914-2626-0365.v1

## V.  SUMMARY OF DEFENDANTS' FRAUD

### A.  At the Start of the Class Period, Defendants Misled Investors, Claiming They Were Well-Positioned to Take Advantage of the CGM Coverage Expansion

52.  For Dexcom to successfully avail itself of the massive opportunity created by the CMS coverage expansion, it needed the right commercial infrastructure, which consisted of two essential components.  First, it needed a sizeable sales force positioned to call on PCPs because PCPs were the doctors who predominantly treated the newly-covered basal patients.  Second, Dexcom needed good relationships with DME distributors, because it was a critical sales channel for Medicare patients, many of whom were required to obtain their CGMs through the DME channel rather than the pharmacy channel.

53.  Soon after the announcement of expanded basal Type 2 coverage, Dexcom began a campaign to hype this new opportunity to analysts and investors.  On April 27, 2023, the day before the start of the Class Period, Sayer touted during an earnings call that the CMS's expanded coverage decision "represented the ***largest single expansion of access to CGM in our industry's history***."  As Defendants would later explain during the June 23, 2023 Investor Day, this "expand[ed] [Dexcom's] addressable market tremendously."

54.  Defendants led the market to believe that they were poised to succeed with the newly-covered population.  They repeatedly emphasized their expanded sales force and strong relationships with DME suppliers, who would be servicing the Type 2 basal Medicare population.  Sayer assured investors during the April 27, 2023 earnings call: "***We are in a great position to compete as the market develops*** . . . ."  He further emphasized that, "[o]n the basal opportunity . . . ***we have very good relationships with our distributors*** and in that channel, and we worked very hard to position them to be successful with the basal patients.  And so we're very comfortable there."

**24-cv-1485-RSH-VET**

4914-2626-0365.v1

55.    In contrast to these bullish representations, the Company was not well-positioned to capture the basal population.  Dexcom faced several key obstacles that prevented it from competing effectively against Abbott, including:

- ***Dexcom's Lack of PCP Sales Force Coverage***: Due to its limited size and focus, Dexcom's sales force lacked the necessary relationships with PCPs, who play a critical role in prescribing CGMs for the Type 2 basal patient population.  Dexcom's sales force, while effective with endocrinologists and high volume prescribers who treated intensive insulin users, was insufficiently focused on PCPs and not well poised to compete with Abbott.

- ***Abbott's strong PCP presence***: In contrast to Dexcom, Abbott had entrenched itself as the near unanimous CGM option for basal patients among PCP prescribers through focused marketing and sales efforts.  Abbott had invested in "building the sales forces to be able to reach a primary care team" and focused sales and marketing efforts that were designed to reach and educate PCPs and make it easier for them to prescribe to the Type 2 basal population.  By the start of the Class Period, basal and non-intensive patients constituted 40% of Abbott's CGM user base.

- ***Frayed DME Relationships***: Dexcom's focus on pharmacy and neglect of its DME relationships further hindered its ability to compete in the basal market.  As the Company later admitted, this caused a loss of "channel balance" putting Dexcom at a huge disadvantage with this new Medicare basal patient population, who could receive CGMs only through a DME.

56.    After falsely assuring the market of its readiness to effectively compete in the new Type 2 basal market, Dexcom continued to paint a picture of early success.  On June 23, 2023, Dexcom held its first Investor Day in over two years, where the Individual Defendants were all present and spoke during the hours-long conference.  At Investor Day, Defendants again extolled the "single largest expansion in coverage in the CGM category ever" and their ability to capture share in the basal space.

57.    Specifically, Lawver emphasized during the June 23, 2023 Investor Day that "there's coverage in place today that could allow us to ***more than quadruple our***

- 21 -                                **24-cv-1485-RSH-VET**

4914-2626-0365.v1

*U.S. customer base*, and that's before we begin to talk about the population of those not on insulin and without hypoglycemia risk." She further stated: "[w]e're also *well-positioned to extend our leadership into the type 2 basal insulin segment*." Despite Dexcom's insufficient PCP sales force, she led investors to believe Dexcom was the leader in primary care Type 2 basal patients, claiming Defendants were "*expanding [their] leadership* in primary care with the type 2 basal."

58. Defendants continued their steady drumbeat of positivity in September 2023 during the Wells Fargo Healthcare Conference, when, in response to an analyst's question about basal adoption, Sylvain reassured investors, "where there's coverage, we've always taken share, and *you see us taking share in that space. So we feel pretty good about . . . taking share* . . . ."

**B. Defendants Recognized They Were Losing the Basal Wars and Decided to Revamp Their Sales Force in 2023 but Continued to Mislead Investors**

59. Unbeknownst to investors, Dexcom was not leading, was not taking share, and, as Defendants would later admit, was "*not doing wonderful in the basal space*." In fact, Defendants recognized in 2023 that they had insufficient sales force capacity and their sales force was not in the right place to capture the basal patient market. As Defendants would later admit:

We decided back in 2023, we need a broader sales force for a number of reasons. The first reason is we've looked at prescribing patterns and the places where we *were not getting any traction are those offices where we had no salespeople*, where we weren't calling on physicians. *We're getting very few prescriptions*. We need to broaden our reach.

60. Defendants also admitted, "we came to the conclusion we didn't have the resources in the field to address these new markets that we are were going to go after. Quite simply, Dexcom can't win in physician offices where we don't have a presence."

61. To address these issues, Defendants implemented a major sales force expansion and restructuring to take place in 2024 (the "2024 sales force expansion").

- 22 -                                            **24-cv-1485-RSH-VET**

4914-2626-0365.v1

As Defendants acknowledged after the Class Period, the 2024 sales force expansion was a "jump[ing] off point" to reach a sufficient number of PCPs to take advantage of the basal opportunity: "In 2024, we expanded our sales force by 40%. And we positioned ourselves really to be a jump-off point to reach more general practitioners, primary care physicians to make sure that we were able to take advantage of this opportunity."

62. Defendants' admissions demonstrate that prior to the 2024 Sales Force Expansion, they were not well-positioned to reach a meaningful number of PCPs to capture the newly-covered basal population. Defendants later described "we needed to get into those [PCP] offices and develop relationships . . . [b]ecause what we've noted in our data is we obviously don't win in offices we don't call on."

**C.    Defendants Knew that Dexcom Was Losing Approximately Seven Out of Ten *New* Basal Prescriptions – a Critical Metric for Evaluating Its Performance in the *New* Basal Market**

63. Dexcom's share of the newly-covered Type 2 basal market was directly tied to its ability to win new basal patients (*i.e.*, new basal prescriptions), a reality Defendants themselves emphasized when describing the opportunity created by the CMS coverage expansion. As detailed above, prior to CMS's coverage expansion decision, relatively few Type 2 basal patients used CGMs. As Defendants stated, "it's not something that – actually, we sell to or market to because [there is] just not that much of it out there." That framing changed once CMS expanded coverage, which the Company deemed the "single largest expansion in coverage in the CGM category ever." The coverage expansion led to a massive influx of new basal patients into the CGM market, many of whom had not previously used CGMs but now had the coverage to do so – patients whose entry into the market would necessarily be reflected in *new* basal prescriptions. In this context, when Defendants later spoke positively about Dexcom's performance in the new basal market and grounded those statements in "script data," investors reasonably understood success to be measured by

4914-2626-0365.v1

Dexcom's ability to capture new basal prescriptions relative to Abbott.  Thus, the number of *new* basal prescriptions Dexcom was adding, and Dexcom's share of those *new* basal prescriptions in relation to Abbott, were undeniably important to the investing community in evaluating Dexcom's performance in the *new* basal market.

64.    Indeed, following the CMS basal coverage expansion, Defendants repeatedly reinforced that understanding by selectively highlighting new basal patients and new patient starts as evidence of Dexcom's purported success.  For example, in October 2023, Sayer touted an "uptick in *new patient starts* once [basal] coverage went live."  Likewise, on April 25, 2024, Sylvain highlighted "a good chunk of our *new patients* are coming through that basal channel."  By emphasizing these metrics, Defendants framed new basal patients as the lens through which investors should assess Dexcom's competitive performance.

65.    Analysts also focused on this metric and interpreted Defendants' statements accordingly.  For example, a February 8, 2024 Wells Fargo analyst report observed that "[m]anagement noted strong new patient starts in Q4 . . . including basal only." An April 25, 2024 Wells Fargo analyst report stated that Dexcom was "taking basal market share," that Defendants' "highlighted script data . . . points to continuing share growth," and observed that "[m]anagement noted strong Q1 performance with basal significantly contributing to new patient volumes."  On the same day, a Canaccord Genuity Group analyst report observed that "[m]anagement attributes new patient starts primarily to G7 users in the basal-only population."

66.    Yet, while presenting this selective and optimistic picture to the market, Dexcom was losing, not gaining, competitive share in the segment that investors and analysts viewed as indicative of success in the newly-covered basal market. Defendants had access to and reviewed IQVIA script-level data – data that Defendants admit shows that "Abbott was winning approximately seven out of ten *new* basal scripts in January and April 2024." Doc. No. 54-1 at 7.  Defendants further concede that Abbott's "share" and "win rate" of *new* basal prescriptions remained relatively

- 24 -                    **24-cv-1485-RSH-VET**

4914-2626-0365.v1

consistent throughout the January to April 2024 period. *Id.* at 13. That contemporaneous data directly undercut the positive narrative Defendants conveyed, showing that Dexcom was ceding the vast majority of new basal prescriptions to its primary competitor during the very period Defendants were assuring investors that Dexcom was "taking share" and that "script data" confirmed competitive success. By touting "share taking" while omitting that Abbott was capturing approximately seven out of ten new basal prescriptions, Defendants painted a misleading picture of Dexcom's competitive position that was materially incomplete.

67.     At the end of the Class Period, on July 25, 2024, Defendants' own admissions confirmed that new basal patient additions was a critical metric that mattered and that Dexcom had been underperforming all along. On July 25, 2024, Defendants tied the Company's disappointing second quarter of 2024 ("Q2 2024") results, in part, to poor performance with new basal patients and slashed full-year guidance. During that July 25, 2024 earnings call, Sayer emphasized: "we have seen our **share of new customers** fall short" and "[w]e're short a large number of **new patients** as to where we thought we would be at this point in time." Likewise, in response to an analyst's question regarding whether the "**new patient** shortfall" was "skewed more to Bas[a]l patients," Sylvain conceded: "to your point[,] [w]e're not doing wonderful in the basal space." *See also* Doc. No. 45 at 5 ("**new-customer** numbers lagged behind expectations"). Analysts also made this connection. For example, in a July 25, 2024 report, Piper Sandler analysts acknowledged the $300 million guide down and stated that "[l]ower than expected patient adds" was the "most worrisome dynamic to us as it implies share loss to its larger competitor Abbott." As they noted, "**DXCM is clearly losing the basal wars right now**."

**D.      Despite Knowing They Were "Getting Very Few Prescriptions," Defendants Falsely Claim They Were Succeeding in the Basal Space**

68.     Despite knowing in 2023 that Dexcom's sales force was woefully inadequate to reach PCP prescribers, they were "getting very few prescriptions," and

4914-2626-0365.v1

Abbott was capturing approximately seven out of ten *new* basal prescriptions and 70% of *total* basal market share, Defendants assured investors that they were succeeding and even outperforming in basal.  For example, Sayer assured investors during the January 8, 2024 J.P. Morgan Healthcare Conference that "we are doing well in the basal category" and "where we have a presence, *we win very much*."  Sylvain affirmed this positive message during the same conference and again during the February 8, 2024 earnings call: "*[Y]ou continue to see outperformance in basal*" and "*you can see the share taking when you look at the script data, we are taking share*."  Defendants also announced their guidance for 2024, specifically attributing it in part to "growth really across the board in basal."

69.    Analysts bought into Defendants' misleading narrative:

- BTIG analysts stated in a February 8, 2024 report: "Strength in the U.S. was attributed to share gains with G7 and greater contribution from the basal market as coverage expanded.  *Basal adoption so far is mirroring the uptake seen following broad U.S. reimbursement coverage for T2D intensive patients* . . . ."

- Piper Sandler analysts issued a report on February 8, 2024 titled "*A Bolus of Basal Patients* & Upside To Margins; Still Our Favorite Name for '24."  The report stated that "[t]he standout in the quarter was the domestic business, which delivered 27% growth (further acceleration Q/Q off a more difficult comp too).  The *big driver here is basal access alongside a quickly expanding prescribing base (they continue to take share from ABT too*)."  The Piper Sandler analysts further commented that "we see the *biggest upside to guidance coming from [the Type 2 basal] population*."

- Wells Fargo's February 8, 2024 report noted that "*G7 and Basal Continue to Outperform*" and commented that "[t]he company expects stronger US G7 patients starts, including continued *momentum in basal only*."

- Leerink Partners' February 9, 2024 report titled "*Momentum Keeps Building*, Attractive Setup for 2024" stated that "*we believe penetration into the basal-only TAM and competitive wins from*

4914-2626-0365.v1

***ABT Type 2 basal-only patients will drive better than expected revenue contribution in 2024E*.***"

- William Blair's February 9, 2024 report stated that "clearly the company is seeing ***accelerated growth and investing/preparing for increased demand from basal*** and non-insulin users. ***Based on management's commentary, we believe these opportunities should drive upside in 2024 and 2025 estimates***. On basal, ***management noted the rate of adoption is accelerating faster than the 600-700 basis points per year of U.S. adoption assumed in its 2025 LRP***."

### E. Defendants Raised Guidance and Touted the Sales Expansion

70. Despite the ongoing challenges and Abbott's capture of approximately seven out of ten new basal prescriptions and 70% of total basal market share, Dexcom raised the midpoint of its revenue guidance on April 25, 2024. Defendants noted during the Company's April 25, 2024 earnings call that they "feel much more confident about raising the base case," which took into consideration "things like competitors, things like adoption in the basal base."

71. In addition, at the same time they announced their raised guidance, Defendants discussed the massive sales force expansion they had undertaken, which they pitched as an "upgraded structure to help us better capitalize on the significant opportunities ahead." Purportedly, the expansion would allow Defendants to "optimize the structure of [their] sales team to be most effective with [their] call points." Prior to this point, Dexcom had not meaningfully expanded its sales force since 2021. In reality, this expansion, which they touted as an "opportunity," was a necessary fix because they did not have adequate resources in PCP offices.

72. During the same April 25, 2024 earnings call, Defendants continued to claim they were "taking share" in basal. And, despite knowing they were losing approximately seven out of ten ***new*** basal prescriptions and trailing Abbott by a significant margin in total basal market share (approximately a 70/30 split), when questioned by an analyst that "there's been ***some debate, obviously, on market share***

- 27 -                    **24-cv-1485-RSH-VET**

*within the basal population* here in the U.S. [and] would love kind of any insight you can provide on that front as well," Sylvain responded by touting "[r]ecord new patients" and stating: "*a good chunk of our new patients are coming through that basal channel, and we continue to see really well performance in that category*." He further confirmed, "[i]n terms of share taking and how we look at that category, *we get script data, we look at script data* based on pathology. The debate – *there's no debate internally to us. We know we're taking share and we see that data . . . you can see the scripts continuing to come our way*."

73. Defendants also informed investors that they "*still have a very strong DME business*."

74. On June 5, 2024 during the William Blair Growth Stock Conference, Defendants continued misleading investors doubling down on their raised guidance and stating:

> And in terms of the full year as of the last quarter, when we issued our earnings, we raised our guidance. And so that should give we obviously beat the street expectations in the first quarter, raised guidance and continue to do well. *So I think from that point of view, I think we're happy with where we are. We're happy with our full year guidance*. We don't guide to the quarters, but we were very comfortable with where folks are sitting for the quarter.

**F.     At the End of the Class Period, Investors Finally Learned that Dexcom Was Underperforming in the Type 2 Basal Market**

75. On July 25, 2024, Defendants shocked the market by backpedaling on their bullish representations that they confirmed *less than two months earlier*. Defendants announced disappointing results and slashed their full-year sales guidance by hundreds of millions of dollars. Central to the disappointing results and revised sales guidance was Dexcom's underperformance in the Type 2 basal market.

76. In sharp contrast to their earlier statements, Dexcom had not capitalized on the enormous opportunity of Type 2 coverage expansion, which they had described at the start of the Class Period as the "largest single expansion of access to CGM in

- 28 -                                          **24-cv-1485-RSH-VET**

4914-2626-0365.v1

our industry's history."  Instead, they were forced to admit: "*We're not doing wonderful in the basal space*."  Sayer disclosed that "we have seen our share of new customers fall short of our expectations" and described the need to "enhance our competitive position and reestablish momentum."  Sayer also admitted that "we've lost market share in the DME channel . . . and that has hurt us."  In response to an analyst's question about the dire state of the lopsided Type 2 basal market – that Abbott was "winning more share at the physician level with type two basal patients" – Sayer did not dispute the characterization: "suffice it to say we're behind."

77.     Further, Defendants were forced to admit that their 2024 sales force expansion, which they had described in glowing terms as opportunistic, was, in reality, a remedial move done to stem the loss in market share amongst the new basal population.  As Sayer stated, Dexcom's sales force "needed to get into [PCP] offices" because "we obviously don't win in offices we don't call on."  Sayer further admitted that, in contrast to their new structure, which had a sales force focused on "prospecting" and "talking to more of PCPs who don't prescribe as much product," prior to the sales force reorganization "the reps in those areas . . . their efforts were focused on those that were high, the highest prescribers in the territory."

78.     The market was shocked by this news, which contrasted sharply with the Company's earlier representations, *causing Dexcom's stock price to decline by more than 40%*.  Analysts commented on the disappointing results, noting there was "A Lot of Damage Done" and "Severe and Sudden Near-Term Challenges Derail Growth."  Analysts emphasized Dexcom's underperformance in the Type 2 basal market, stressing that "*DXCM is clearly losing the basal wars right now*" and "*the most worrisome dynamic to us as it implies share loss to its largest competitor Abbott . . . which cost DXCM a meaningful number of new patients.*"

79.     In the months that followed, Defendants acknowledged, that as of 2023, they knew based on prescribing patterns that Dexcom was "getting very few prescriptions" because they lacked a sufficient PCP sales force and had undertaken the

- 29 -                                              **24-cv-1485-RSH-VET**

massive 2024 sales force expansion and realignment to address this, which actually served as a "jump[ing] off" point to reach PCPs.

- September 4, 2024: "We decided back in 2023, we needed a broader sales force for a number of reasons. The first reason is we've looked at prescribing patterns and the places where we were not getting any traction are those offices where we had no salespeople, where we weren't calling on physicians. We're getting very few prescriptions. We needed to broaden our reach."

- January 13, 2025: "As we looked at that situation in late 2023 and early 2024, we came to the conclusion we didn't have the resources in the field to address these new markets that we were going to go after. Quite simply, Dexcom can't win in physician offices where we don't have a presence. It's pretty tough. We made the decision to expand the commercialization organization by 40%, so we could go after these opportunities."

- March 4, 2025: "In 2024, we expanded our sales force by 40%. And we positioned ourselves really to be a jump-off point to reach more general practitioners, primary care physicians to make sure that we were able to take advantage of this opportunity."

80. Moreover, the Company's problems in its DME channel were revealed to be systemic and pervasive, requiring extensive efforts by Dexcom's senior executives to repair DME relationships in order to get back on "equal foot[ing]," a process that was ongoing, not susceptible to a quick fix, and that Defendants acknowledged could "take us a while to get back to where we need to get."

81. Defendants have also since admitted that contemporaneous IQVIA script-level data shows Abbott was winning approximately seven out of ten *new* basal scripts and continued to hold approximately 70% of total basal market share in January and April 2024. *See* Doc. No. 54-1 at 7.

82. Defendants thus admitted that their rosy Class Period statements regarding their readiness to capture the newly-covered Type 2 basal population, the sufficiency of their commercial infrastructure, and their success in the basal market were materially misleading when made as detailed below.

**24-cv-1485-RSH-VET**

4914-2626-0365.v1

## VI.    STATEMENTS AND OMISSIONS UNDER RULE 10b-5(b)[7]

### A.    April 27, 2023 Q1 2023 Earnings Call

83.    On April 27, 2023, Dexcom held a conference call for analysts and investors to discuss its Q1 2023 results.

84.    **Context of Statement**.  During the Q1 2023 earnings call, Sayer stated:

> In early March, CMS finalized their proposal to expand access to include people with type 2 diabetes using basal insulin only as well as certain noninsulin-using individuals that experience hypoglycemia.  With coverage officially kicking in last week, this decision represented the largest single expansion of access to CGM in our industry's history.
>
> As a reminder, we size the basal-only type 2 population alone at around 3 million people in the U.S. with around half being of Medicare age.  We are incredibly excited to start serving this population more broadly going forward as we see a significant opportunity to help these individuals live healthier lives.
>
> Our mobile trial demonstrated meaningful improvements in timing range, A1c levels and hypoglycemic events among this population wearing DexCom sensors, as sensor engagement proved to produce behavior changes within this cohort that supported greater glycemic control.  We are in a great position to compete as this market develops as accuracy, performance and customer engagement will continue to be the defining features of delivering outcomes.

85.    **Challenged Statement Alleged to Be False and Misleading**.  "We are in a great position to compete as this market develops . . . ."

86.    **Reasons Why This Statement Was False and Misleading When Made**.  This statement was materially false and misleading because it created a deceptive picture of Dexcom's readiness to compete in the newly expanded basal Type 2 CGM market (Dexcom was in "a great position to compete as this market develops") that was materially different from the one that actually existed (Dexcom was in a poor position).  Contrary to the impression given, Dexcom was not in "a great

---

[7]    Statements A-I and L-N, identified in ¶¶84-85, 105-106, 112-113, 122-123, 143-144, 164-165, 183-184, 203-204, 223-224, 261-262, 267-268, and 274-275, were previously dismissed.  Doc. No. 47 at 12-25, 29-34.  Because the Court's Order Granting Defendants' Motion for Judgment on the Pleadings granted leave to amend only as to the Statements J and K identified in ¶¶243-244 and 252-253 (Doc. No. 66 at 10), Plaintiff re-pleads the previously dismissed statements solely to preserve appellate rights.

4914-2626-0365.v1

position" because Dexcom lacked both the PCP sales force coverage and DME channel relationships to compete with Abbott, as described below.

87. ***Dexcom Lacked a Sufficient PCP Sales Force to Compete with Abbott***. Contrary to Sayer's claim, Dexcom was not "in a great position to compete" because it lacked a sales force capable of adequately reaching the PCPs – the dominant prescriber base for Type 2 basal patients.

88. Dexcom's own statements confirm the misalignment between its sales force structure and the new Type 2 basal market. Defendants admitted that "primary care was the likely space where most basal patients were going to be seen," yet its sales force lacked both the scale and alignment required to reach 250,000 PCPs nationwide. Instead, Dexcom's sales force had historically focused on the much smaller base of 7,000 endocrinologists and other high-volume prescribers of intensive insulin patients. For example, prior to the Class Period, Defendants acknowledged, "[t]he way we structure the [sales] teams out in the field is very much based upon the number of . . . intensive insulin users that they see." Despite efforts to target a limited subset of higher-prescribing PCPs in 2023, the narrow focus and alignment of the sales force remained largely consistent until Dexcom's 2024 sales force expansion, which was designed "to reach more . . . primary care physicians to make sure that we were able to take advantage of this [basal] opportunity." Up until that point, as Defendants later admitted, Dexcom's sales force had continued to "focus[] on those that were high, the highest prescribers in the territory" rather than "prospecting" and "talking to more of PCPs who don't prescribe as much product."

89. PCPs, unlike endocrinologists, require product education and support in order to prescribe CGMs to their patients. A study in the *Annals of Family Medicine* noted that, while endocrinology has embraced CGMs, most diabetes care occurs in primary care settings ("approximately 90% of US patients whose diabetes is managed in primary care settings"), and PCPs "are open to using CGM . . . but they need resources and support." Defendants later acknowledged that physician interfacing

4914-2626-0365.v1                                                                          **24-cv-1485-RSH-VET**

was critical to adoption in the PCP segment.  For example, they conceded: "Dexcom can't win in physician offices where we don't have a presence" and that they were "getting very few prescriptions" in offices they did not call on.  Likewise, Defendants later conceded they "needed to get into those [PCP] offices and develop relationships" because "what we've noted in our data is we obviously don't win in offices we don't call on."  In fact, Defendants now concede that it is "obvious" that interfacing with and educating PCPs was critical to competing in the Type 2 basal market: "[I]t is obvious: the purpose of a sales force is to educate physicians on Dexcom's products so they know the benefits for patients.  Physicians not contacted did not receive that one-on-one education."  Doc. No. 29-1 at 29.

90.    Dexcom's sales resources were insufficient to address this reality.  Prior to the 2024 sales force expansion, Dexcom operated with only ~260 representatives across 26 territories.  Defendants had previously stated that the sales team structure was based on the volume of intensive insulin users seen, and that basal-only patients were "not something that . . . we sell to or market to."

91.    Consequently, Dexcom was only reaching, at most, approximately 25% of U.S. PCPs.  *See* n.5.  Subsequent admissions confirm the inadequacy: Dexcom "didn't have the resources in the field to address these new markets" and "needed a broader sales force."

92.    In 2024, Dexcom increased its sales force by 40% and restructured its field operations.  Defendants later described this as a "jump[ing] off point" for reaching PCPs, implicitly conceding that, prior to this expansion, Dexcom had been unable to reach a meaningful number of PCPs to effectively compete.

93.    Importantly, as later relayed by analysts following a meeting with Sylvain and Lawver, the implementation of the sales force expansion had actually "started in Q2/Q3" of 2023 – a time period that includes Sayer's challenged statements.

- 33 -                                   **24-cv-1485-RSH-VET**

94.    The rationale behind the expansion further supports falsity: Defendants acknowledged that it was driven by poor PCP prescribing patterns that emerged in 2023: "We decided back in 2023, we needed a broader sales force . . . . The first reason is we've looked at prescribing patterns . . . ." "[W]e needed to get into those [PCP] offices and develop relationships" "because what we've noted in our data is we obviously don't win in offices we don't call on."

95.    ***Abbott Was Deeply Entrenched in the Type 2 Basal Market***. In contrast to Dexcom, Abbott (its only meaningful competitor) had historically focused on the uninsured Type 2 basal market. This included a robust PCP-facing sales force that was at least 50% larger than Dexcom's. Immediately prior to the Class Period, Abbott's CEO described that the basal market was "an important part of [Abbott's] growth strategy" and stated that Abbott had been investing in "building a sales force that's focused more on the primary care side."

96.    But it was not Abbott's sales force size advantage alone; Abbott's longstanding prioritization of PCP prescribers gave it a significant advantage over Dexcom. By the start of the Class Period, Abbott had entrenched itself as the near unanimous CGM option for basal patients among PCP prescribers through focused marketing and sales efforts. Abbott acknowledged that prioritizing the Type 2 basal population was "our strategy from the moment we entered the market" (years before CMS approved coverage) and that its market leadership in the Type 2 basal space was "not something that [just] happened . . . [w]e've been focus[ed] on this, generating the clinical evidence, building the sales forces to be able to reach a primary care team, investing in direct-to-consumer advertising." Abbott also offered a viable cash pay option, a lower price tag, and a strong rebate program that made its CGMs affordable even without insurance coverage. These focused efforts were designed to reach and educate PCPs and make it easier for them to prescribe to the Type 2 basal population. By the start of the Class Period, basal and non-intensive patients constituted 40% of Abbott's CGM user base.

- 34 -                                                    **24-cv-1485-RSH-VET**

4914-2626-0365.v1

97.    A 2023 Evercore ISI report, based on a survey of physicians, found a "clear preference" among physicians for Abbott's Libre over Dexcom's CGM among Type 2 patients, driven by Abbott's better field support and sales coverage.  The Evercore ISI report concluded: "With A[bbott] having a bigger sales force and scoring better on field support metric, the data suggests A[bbott] as having an advantage in the T[ype] 2 setting."

98.    Although the market was aware of Abbott's presence in the Type 2 non-intensive market prior to the CMS coverage decision, Sayer's statement ignored or downplayed that Dexcom was "not getting any traction" and "can't win" in PCP offices they did not call on.  Sayer conveyed to investors that, with insurance coverage now in place, Dexcom was in a great position to compete with Abbott in the new Type 2 market.  Unbeknownst to investors, Abbott's strong PCP presence, coupled with Dexcom's lack of one, prevented Dexcom from effectively competing in the new Type 2 basal market.

99.    ***Dexcom's Strained DME Relationships Further Undermined Its Position***.  Dexcom's readiness was further undermined by frayed relationships in the crucial DME channel, the exclusive supplier of CGMs for Medicare basal patients following the CMS expansion.  DME remained a critical sales channel throughout the Class Period, as almost half of the total Type 2 basal population was made up of Medicare patients.

100.    Unbeknownst to investors, Dexcom's years-long push to move its business to the pharmacy channel had alienated its DME channel partners leading up to the start of the Class Period.  Notably, Dexcom's preference for fulfilling orders through the pharmacy channel had caused its proportion of sales fulfilled through DME partners to bottom out at 25% leading up to the Class Period.  Abbott, by contrast, maintained a balanced fulfillment strategy between pharmacy and DME (~50/50).  Dexcom's preference for pharmacy fulfillment led to widespread dissatisfaction among DME partners, who viewed Abbott as "channel agnostic" and

- 35 -                                        **24-cv-1485-RSH-VET**

more supportive.  As Defendants later admitted, this impacted Dexcom's ability to compete in the basal market: "we've lost market share in the DME channel . . . and that has hurt us"; "growth in the DME channel has trailed our plan"; and "[w]e're not doing wonderful in the basal space."  As analysts acknowledged following conversations with Defendants, these issues were pervasive and existed in prior quarters during the Class Period.  According to a July 31, 2024 J.P. Morgan report, "erosion in the relationship between the company and DME distributor patterns has been ongoing for some time, likely starting with the company's fanfare around pharmacy access with the launch of G7 [in early 2023]."  BofA Global Research also issued a report on August 5, 2024, stating "the issues being highlighted seem widespread across many of the DMEs."  Defendants later acknowledged that senior executives had to intervene to repair DME relationships.  Even after these efforts, they cautioned it would take time to stop losing share.

101.  ***Dexcom Created a False Narrative of Readiness***.  With an inadequate PCP sales force and frayed DME relationships, Dexcom was unable to compete with Abbott.  Defendants quickly sought to implement a sales force expansion to reach more of the critical PCP prescriber base.  For example, Sayer later admitted that Dexcom "decided back in 2023" that it "needed to broaden [its] reach" and "needed a broader sales force" for a number of reasons, including that they had "looked at prescribing patterns" and Dexcom was "getting very few prescriptions" and "not getting any traction" in "those offices where we had no salespeople."  As later relayed by analysts following a meeting with Sylvain and Lawver, the implementation of the sales force expansion had actually "started in Q2/Q3" of 2023 (the period beginning on April 1, 2023).

102.  Sayer's statement, made in the context of his discussion of the new basal opportunity, created the misimpression that Dexcom was poised to compete effectively with Abbott, its only meaningful competitor, in this massive, newly-covered Type 2 basal patient population.

4914-2626-0365.v1                                                          **24-cv-1485-RSH-VET**

103.   **Scienter**.  Sayer knew, or was deliberately reckless in not knowing, that his statement was false and misleading when made.  *See* §VIII.

(a)   ***Core Operations and Strategic Importance***: The expansion of CGM coverage to Type 2 basal patients was, by Sayer's own admission, the "largest single expansion of access to CGM in our industry's history."  Its strategic importance meant Defendants closely monitored all aspects of this market, including Dexcom's competitive positioning, sales force capabilities, and market share relative to Abbott.  Given this, Sayer's assertion of being in "a great position" would only be credible if based on a thorough understanding of these monitored factors.  It would be absurd to suggest that Sayer – Dexcom's CEO – would not be aware of deficiencies in Dexcom's commercial infrastructure that prevented Dexcom from meaningfully competing for this critical market.  This is particularly true where Sayer repeatedly discussed, answered analysts' questions on, and professed knowledge of the Company's competitive position in the Type 2 basal market, including its sales force coverage, DME relationships, and market share.

(b)   ***Access to Real-Time Data***: Sayer and other defendants repeatedly represented that they had access to information allowing them to track sales data, understand where their patients were coming from, and monitor the Company's market share in the basal market, showing Sayer possessed data undermining his Class Period statements.  For instance, in January 2023, Sayer stated: "We have the data capabilities to show what outcomes we're going to generate within this population . . . .  We can download the data we get from those patients and present a very strong case to those payers."

(c)   ***Subsequent Admissions***: In September 2024, Sayer admitted: "We decided back in 2023, we needed a broader sales force . . . we've looked at prescribing patterns and the places where we were not getting any traction are those offices where we had no salespeople."  The 40% expansion and field reorganization launched in Q2/Q3 2023 confirm Sayer's contemporaneous awareness.

- 37 -                               **24-cv-1485-RSH-VET**

(d)    ***DME Channel Awareness***: Similarly, Defendants admitted post-Class Period that DME performance had fallen short and hurt Dexcom's basal business, saying: "we've lost market share in the DME channel . . . and that has hurt us"; "growth in the DME channel has trailed our plan"; "you'd probably imagine if we're not doing well in the DME it gets back to your point.  We're not doing wonderful in the basal space."  Analysts reported that these issues had persisted in prior quarters.  This directly contradicts Sayer's April 2023 assertion that Dexcom was "in a great position to compete" in the Type 2 basal market.

(e)    ***Motive***: In addition to his knowledge and/or reckless disregard of the misleading nature of his statement, Sayer was also motivated to mislead investors, as set forth below in §VIII.F.

104.    **Conclusion**.  Sayer's statement created the false impression that Dexcom was commercially prepared to compete in the largest CGM market expansion in industry history.  In fact, Dexcom lacked both the sales force coverage and channel relationships to reach the newly-covered basal population, and Defendants knew this.  The statement materially misrepresented Dexcom's competitive position and misled investors.

**B.    April 27, 2023 Q1 2023 Earnings Call**

105.    **Context of Statement**.  During the Q1 2023 earnings call, an analyst asked Sayer "how much of the basal opportunity [Dexcom] can garner," noting the new Medicare coverage and Dexcom's comment about having more pharmacy coverage than its competitor.  In response, Sayer emphasized Dexcom's confidence in its DME channel, stating that Dexcom has "very good relationships with [its] distributors" and had positioned itself for success with basal patients, concluding "we're very comfortable there":

> [Analyst:] So I wanted to ask you one about just how quickly the coverage has been established in the DME and the pharmacy channel.  I thought it was an interesting comment that you made that you think you have more coverage in pharmacy than your competitor.  Maybe you

4914-2626-0365.v1

could compare that and talk about what that means for ultimately how much of the basal opportunity you think you can garner?

. . . [Sayer:] On the basal opportunity, remember, Medicare sales process is durable medical equipment, and we have very good relationships with our distributors and in that channel, and we worked very hard to position them to be successful with the basal patients. And so we're very comfortable there.

106. **<u>Challenged Statement Alleged to Be False and Misleading</u>**. "[W]e have very good relationships with our distributors and in that channel, and we worked very hard to position them to be successful with the basal patients. And so we're very comfortable there."

107. **<u>Reasons Why This Statement Was False and Misleading When Made</u>**. Sayer's statement created a materially false impression of Dexcom's readiness in the critical DME sales channel. It suggested Dexcom's distributor relationships and support infrastructure were strong enough to capture the newly-covered basal insulin patient market, when in fact the opposite was true. Contrary to Sayer's assurances, Dexcom had alienated its DME distributors, which severely undermined its ability to compete with Abbott for Type 2 basal patients.

108. ***Dexcom's DME Channel Was Critical – and Severely Impaired***. The DME sales channel was the only way newly-covered Medicare basal patients could obtain CGMs at the start of the Class Period, since Medicare is serviced exclusively through DME. Even after commercial insurers followed Medicare's lead, nearly half of the basal opportunity comprised Medicare patients, so the DME channel remained critical. Unbeknownst to investors, Dexcom's years-long push to shift sales to the pharmacy channel had frayed its DME relationships leading up to the Class Period. By early 2023, Dexcom's DME partners handled only ~25% of Dexcom's total sales – a drastic decline that left many DME distributors feeling sidelined. Meanwhile, Abbott (Dexcom's only meaningful CGM competitor) maintained roughly a 50/50 balance between pharmacy and DME fulfillment, which led DME representatives to view Abbott as "channel agnostic" and more committed to the DME channel. As a

- 39 -  **24-cv-1485-RSH-VET**

4914-2626-0365.v1

result, DME distributors favored Abbott's Libre over Dexcom's G7, steering new basal patients toward Abbott. This had a materially negative impact on Dexcom's ability to secure prescriptions from the newly-covered basal population. At the end of the Class Period, Defendants admitted "we've lost market share in the DME channel . . . and that has hurt us," and that "growth in the DME channel has trailed our plan" such that Dexcom "need[ed] to refocus on those relationships." Analysts later confirmed that these DME issues were "widespread across many of the DMEs" and had been "present in prior quarters," underscoring that Dexcom's DME business was weakened well before Sayer's statement. Far from having "very good" DME relationships or support, Dexcom's bond with its key DME partners was so damaged that senior management had to become "fully involved in rehabilitating" those relationships – a stark contrast to the confidence Sayer projected.

109. ***Dexcom's Overall Competitive Position in the Basal Market Was Poor***. Sayer's response to the analyst's question about how large a share of the basal opportunity Dexcom could garner was misleading because Dexcom critically lacked a PCP-focused sales force to drive CGM adoption among basal prescribers. Dexcom had historically concentrated its sales efforts on endocrinologists treating intensive insulin users, not on the far more numerous PCPs who treat basal insulin patients. Thus, Dexcom entered the basal market with an undersized and misaligned sales force that left most PCP offices uncovered, whereas Abbott had invested early in a robust PCP-facing sales team. These dual deficiencies – alienation of DME distributors and inadequate PCP sales coverage – meant that Dexcom was not in a position to garner meaningful basal market share, despite Sayer's assurances to the contrary. In reality, as soon as CMS's coverage expansion took effect in April 2023, Dexcom quickly lost ground to Abbott in the Type 2 basal segment. By the end of Q2 2024, Defendants conceded the inevitable: "We're not doing wonderful in the basal space." Sayer's April 2023 pronouncement gave investors the false impression that Dexcom's

4914-2626-0365.v1

commercial infrastructure was up to the task of capturing the basal opportunity, when in truth Dexcom was poorly positioned and already falling behind its rival.

110.   **Scienter**.  Sayer knew, or was deliberately reckless in not knowing, that his statement was false and misleading when made.  *See* §VIII.

(a)   ***Core Operations and Strategic Importance***: The expansion of CGM coverage to basal-only Type 2 patients was, by Sayer's own description, the "largest single expansion of access to CGM in our industry's history."  Capturing these newly-covered patients was of paramount importance to Dexcom's growth (CGMs being its sole product line).  It would be absurd to suggest that Sayer – Dexcom's CEO – was unaware of major impediments in the only channel that could fulfill Medicare basal prescriptions.  Indeed, Sayer himself and other executives repeatedly discussed and fielded questions about Dexcom's sales channels and competitive positioning during this period.  Given the strategic importance of the basal market, Sayer plainly understood that alienating the very distributors necessary to reach new basal patients (*i.e.*, the DME partners) had left Dexcom at a significant disadvantage.

(b)   ***Access to Real-Time Data***: Both before and during the Class Period, Defendants admitted to having access to granular, real-time sales and market data.  Sayer assured investors in January 2023: "We have the data capabilities to show what outcomes we're going to generate within this population, and we'll do that.  We can download the data we get from those patients and present a very strong case to those payers."  Defendants tracked where new patients were coming from and how Dexcom's market share in the basal segment was progressing.  Sayer's claim of being "very comfortable" with Dexcom's DME position was contradicted by the data available to him, which showed sagging DME order volumes and Abbott's mounting share of new basal patient prescriptions.  In short, Sayer either knew or recklessly ignored that Dexcom's internal data did not support his public portrayal.

4914-2626-0365.v1

(c) ***Subsequent Admissions***: Subsequent revelations confirm that Sayer was aware of these problems at the time. After the Class Period, Defendants admitted that Dexcom's aggressive shift to the pharmacy channel over prior years had indeed alienated its DME distributors and hurt its basal performance, saying: "we've lost market share in the DME channel . . . and that has hurt us"; "growth in the DME channel has trailed our plan"; "you'd probably imagine if we're not doing well in the DME it gets back to your point. We're not doing wonderful in the basal space." Sayer and others later acknowledged that Dexcom's DME channel had been losing market share and required a concerted effort to repair. Tellingly, as summarized by analysts relaying Defendants' description of the sales force and DME issues, "most of the above issues have been present in prior quarters." These later admissions directly undermine Sayer's April 2023 assurances, indicating he was aware (or recklessly disregarded) that Dexcom did not "have very good relationships with" its DME distributors and had not "worked very hard to position them to be successful with the basal patients" at the time he made the statement.

**(d)** ***Motive***: In addition to his knowledge and/or reckless disregard of the misleading nature of his statement, Sayer was also motivated to mislead investors, as set forth below in §VIII.F.

111. **<u>Conclusion</u>**. Sayer's assertion that Dexcom had "very good relationships" with its DME distributors and was "very comfortable" serving the basal population created the false impression that the Company's DME infrastructure was intact and well-positioned to capture newly-covered basal patients. In truth, Dexcom had spent years deprioritizing the DME channel in favor of pharmacy fulfillment, a strategic shift that had alienated key DME partners and impaired Dexcom's access to the Medicare basal market – the very population for whom DME was the sole access pathway. The omission gave investors a distorted view of the Company's true commercial posture in a market it had deemed foundational to future growth.

**24-cv-1485-RSH-VET**

4914-2626-0365.v1

**C.    June 7, 2023 William Blair Growth Stock Conference**

112.   **Context of Statements**.   During the William Blair Growth Stock Conference on June 7, 2023, the following exchange occurred between an analyst and Sylvain:

> [Analyst:] So I think the first question is you guys just got basal reimbursement for CMS at mid-April. I'm not sure if you're going to be willing to talk about how that is so far. But I guess just bigger picture, do you guys have the capacity to bring on a significant number of those patients if you haven't maybe added reps in a period of time? And how do you do so?

> [Sylvain:] Yes. So great question. And so far, I'll tell you anecdotally, it's gone very well. There's been a lot of interest in it. The challenge, of course, is it's generally sold through the DME and so it will take a little bit of time to quantify it. But anecdotally, people have been very excited about basal coverage.

> In terms of capacity, when we doubled the size of the sales force, the focus was calling on high decile prescribers of all insulin, including basal. And so the inroads have been made there. So from a coverage perspective, while we may want to expand coverage a little bit from the sales force, it wouldn't be a material step change in how we're going. It'd be normal as part of our thoughts around investments. So we do have a sizable sales force.

113.   **Challenged Statements Alleged to Be False and Misleading.**

- "In terms of capacity, when we doubled the size of the sales force, the focus was calling on high decile prescribers of all insulin, including basal. And so the inroads have been made there."

- "So from a coverage perspective, while we may want to expand coverage a little bit from the sales force, it wouldn't be a material step change in how we're going. It'd be normal as part of our thoughts around investments. So we do have a sizable sales force."

114.   **Reasons Why These Statements Were False and Misleading When Made**. Sylvain's statements conveyed a materially false impression that Dexcom's existing commercial infrastructure was adequate – even well-prepared – to handle a surge of Type 2 basal patients. He suggested that Dexcom had already made "inroads" with basal prescribers and possessed a "sizable sales force" needing only minor adjustments. In truth, Dexcom's sales force and commercial reach were critically deficient for penetrating the PCP-driven basal insulin market, especially

- 43 -                                    **24-cv-1485-RSH-VET**

4914-2626-0365.v1

against Abbott's formidable presence. Sylvain failed to disclose that Dexcom lacked a sufficient primary care sales force and that its distribution network was impaired – deficiencies that left Dexcom unable to effectively compete for the very basal patients he claimed to be successfully onboarding.

115. ***Dexcom's Prior Sales Expansion Had Not Addressed the Basal Market's Needs***. Sylvain's reference to having "doubled" the sales force with a focus on all insulin prescribers "including basal" was misleading. In reality, Dexcom's earlier sales force expansions (such as in 2021) were geared toward reinforcing its reach among high-prescribing endocrinologists, not the vast base of PCPs. Prior to the Class Period, Defendants had acknowledged that "[t]he way we structure the [sales] teams . . . is very much based upon the number of . . . intensive insulin users that [physicians] see," conceding that "basal only. . . [is] not something that . . . we sell to or market to." In other words, prior to 2023, Dexcom's sales organization was not targeting PCPs who treat basal insulin patients. In fact, despite efforts to target a limited subset of higher-prescribing PCPs in 2023, the narrow focus and alignment of the sales force remained largely consistent until Dexcom's 2024 sales force expansion, which was designed "to reach more . . . primary care physicians to make sure that we were able to take advantage of this [basal] opportunity." Up until that point, as Defendants later admitted, Dexcom's sales force had continued to "focus[] on those that were high, the highest prescribers in the territory" rather than "prospecting" and "talking to more of PCPs who don't prescribe as much product." Thus, contrary to Sylvain's implication, the earlier doubling of the sales force did not create meaningful "inroads" with PCPs. Most of Dexcom's sales representatives continued to call on endocrinologists and other specialists managing intensive insulin users, leaving the majority of PCPs – who manage basal insulin users – largely untouched by Dexcom's outreach.

116. ***A Robust PCP-Facing Sales Force Was Absolutely Critical for the Basal Market – and Dexcom Did Not Have One***. The new basal opportunity required

4914-2626-0365.v1

Dexcom to engage with PCPs who historically had little exposure to CGM technology. Unlike the relatively small universe of ~7,000 U.S. endocrinologists (whom Dexcom's team already covered almost entirely), there are roughly 250,000 PCPs nationwide. These primary care doctors treat the bulk of Type 2 diabetics, including basal insulin users, and many are unfamiliar with CGMs. Defendants themselves recognized in early 2023 that "primary care was the likely space where most basal patients were going to be seen . . . . That's where our basal population is seen." Educating and regularly visiting these PCPs was essential to drive adoption. Indeed, Defendants later conceded that it is "obvious" the purpose of a sales force is to educate physicians about Dexcom's products, and that "[p]hysicians not contacted did not receive that one-on-one education." Doc. No. 29-1 at 29. Yet, at the start of the basal coverage expansion, Dexcom's sales force simply did not have the bandwidth or orientation to reach most PCP offices. Sylvain's claim that only a slight expansion (not a "material step change") might be needed wildly understated the problem. In reality, Dexcom needed a massive increase in sales personnel focused on PCPs, because without face-to-face education most PCPs were defaulting to Abbott's Libre for their basal patients.

117. ***Dexcom's Sales Force Was Too Small and Too Narrowly Focused to Compete for Basal Patients***. Far from having excess capacity, Dexcom was covering only a fraction of the PCP landscape. Prior to a major expansion undertaken after this conference, Dexcom had roughly 260 sales representatives across 26 territories. This headcount only allowed Dexcom to call on less than 30% of U.S. PCPs. The majority of primary care doctors – tens of thousands of potential prescribers – had no Dexcom representative visiting their offices at all. This glaring gap had direct competitive consequences. As Defendants later admitted, Dexcom "didn't have the resources in the field to address these new markets" and "needed a broader sales force." They acknowledged that "Dexcom can't win in physician offices where we don't have a presence," it was "not getting any traction [at] those offices where [it] had no

4914-2626-0365.v1

salespeople," and it was "getting very few prescriptions." Likewise, Defendants later conceded they "needed to get into those [PCP] offices and develop relationships" because "what we've noted in our data is we obviously don't win in offices we don't call on." In short, Dexcom was effectively absent from the very primary care offices it needed to penetrate, and the predictable result was that those physicians overwhelmingly prescribed Abbott's Libre to basal patients. Sylvain's assurance that Dexcom's sales force was "sizable" enough to capture the new basal population was thus misleading. In truth, Dexcom's basal uptake was severely limited by its anemic reach in primary care.

118. ***Dexcom Was Already Scrambling Behind the Scenes to Fix These Deficiencies (Proving the Existing Sales Force Was Inadequate)***. Unbeknownst to investors, at the very time Sylvain was downplaying the need for a "material step change" in sales force size, Dexcom's management had internally concluded the opposite. In 2023, Dexcom decided it had to dramatically expand its sales force to exploit the basal opportunity. In the months following Sylvain's statements, Dexcom announced a massive sales force expansion – a 40% increase in rep count – along with a complete commercial reorganization to improve its primary care reach. Defendants later described the 2024 sales force expansion as a "jump[ing] off point" necessary to reach enough PCPs to capitalize on the basal market, tacitly admitting that, prior to this expansion Dexcom was not "in a great position" to do so. Importantly, as later relayed by analysts following a meeting with Sylvain and Lawver, the implementation of the sales force expansion had actually "started in Q2/Q3" of 2023. This means that, by the time of the June 7, 2023 conference, Dexcom was already in the process of adding representatives – an effort directly at odds with Sylvain's suggestion that only minimal tweaks were needed. Defendants also revealed after the Class Period that one of the driving reasons for the expansion was the basal prescribing patterns they were witnessing in 2023: Dexcom was "getting very few prescriptions" in offices with no sales representatives. Likewise, Defendants later conceded they "needed to get into

- 46 -

**24-cv-1485-RSH-VET**

4914-2626-0365.v1

those [PCP] offices and develop relationships" because "what we've noted in our data is we obviously don't win in offices we don't call on." In sum, Sylvain's positive assessment concealed an urgent course correction underway – a material fact for investors evaluating Dexcom's capacity to capture the basal market.

119. In sum, Sylvain's statements – delivered in the context of discussing Dexcom's ability to handle the basal opportunity – misled investors to believe that Dexcom had the appropriate sales infrastructure in place and was already successfully competing in the Type 2 basal population. The reality was that Dexcom's deficient PCP coverage and strained DME channel left it far behind Abbott, and any early basal demand was overwhelmingly being captured by Abbott's Libre. Sylvain's upbeat commentary obscured that Dexcom was, in fact, ill-prepared and struggling to gain traction in this massive new market.

120. **<u>Scienter</u>**. Sylvain knew, or was deliberately reckless in not knowing, that his statement was false and misleading when made. *See* §VIII.

(a) ***Core Operations and Strategic Importance***: The expansion of CGM coverage to basal-only Type 2 patients was, as Defendants described, the "largest single expansion of access to CGM in [the] industry's history." As CFO, Sylvain had a central role in forecasting and monitoring Dexcom's performance in this new market. It is inconceivable that he would not be intimately aware of any shortcomings in Dexcom's commercial infrastructure that could impede capturing basal patients. By June 2023, Sylvain was well aware (or reckless in not knowing) that Dexcom's sales force was not effectively reaching PCPs and that this would directly limit basal sales. Indeed, on the very topic of sales capacity for basal patients, Sylvain chose his words to reassure investors, indicating he understood the concern. Given the known importance of primary care outreach – something Defendants openly discussed in early 2023 – Sylvain either knew his depiction of "a sizable sales force" was wrong or, at best, had no reasonable basis to believe it was true.

- 47 -                    **24-cv-1485-RSH-VET**

(b)   ***Access to Real-Time Data***: Sylvain and other defendants repeatedly represented that they had access to information allowing them to track sales data, understand where their patients were coming from, and monitor the Company's market share in the basal market, showing Sylvain possessed data undermining his Class Period statements.  He later admitted, for example, that Dexcom "get[s] script data . . . based on pathology" to gauge performance in the basal cohort.

(c)   ***Subsequent Admissions***: Subsequent events underscore Sylvain's knowledge of these problems.  After the Class Period, Defendants were candid about their 2023 failures: they confessed that they "didn't have the resources in the field" for the basal market and that they "decided back in 2023" to broaden the sales force upon seeing the poor prescribing trends – though Sylvain claimed only minor tweaks would be needed, if any.  They further acknowledged that Dexcom was "not getting any traction" in offices with no representatives and was "getting very few prescriptions." Tellingly, as summarized by analysts relaying Defendants' description of the sales force and DME issues, "most of the above issues have been present in prior quarters." These later statements confirm that Sylvain knew (or was reckless in not knowing) the sales force was inadequate and that Dexcom had not made "inroads" with prescribers in the basal segment as of June 2023.

(d)   ***Motive***: In addition to his knowledge and/or reckless disregard of the misleading nature of his statement, Sylvain was also motivated to mislead investors, as set forth below in §VIII.F.

121.  **Conclusion**.   Sylvain's June 7, 2023 statements were materially misleading because, by claiming that Dexcom had already made "inroads" with basal prescribers and possessed "a sizable sales force" and any expansion "wouldn't be a material step change in how we're going," Sylvain gave the false impression that Dexcom's commercial infrastructure was largely in place and effective.  In reality, Dexcom lacked a dedicated PCP sales force, leaving the vast majority of basal prescribers untouched.  At the time of his remarks, Dexcom had already begun

- 48 -                                    **24-cv-1485-RSH-VET**

4914-2626-0365.v1

expanding its sales team and restructuring its field operations precisely because the existing sales footprint was insufficient.  Sylvain's omission of these facts – while simultaneously asserting that demand was strong and capacity was adequate – misled investors into believing Dexcom was well-positioned to compete, when in fact the Company was being outpaced by Abbott and scrambling internally to course-correct. The divergence between Sylvain's public assurances and Dexcom's private actions rendered his statements materially misleading.

### D.      June 23, 2023 Investor Day Conference Call

122.   **Context of Statement**.  On the June 23, 2023 Investor Day conference call, Lawver stated:

> Taken together, you can see why we're excited about our continued strong growth and leadership in the U.S. market.  Dexcom delivers a leading customer experience with industry-leading loyalty and customer retention.  And with G7, we have the industry's most accurate sensor that is incredibly simple to use, that is also the most covered and has the lowest out-of-pocket costs.  We have the right commercial infrastructure for leading with the endocrinologists and expanding our leadership in primary care with the type 2 basal and severe hypoglycemia markets where coverage has just opened up in the last couple of months.  And when we take these covered populations together, intensive insulin therapy, basal and those with severe – risk of severe hypoglycemia, the CGM market in the U.S. is only 20% penetrated.  So we have significant runway ahead in the U.S.

123.   **Challenged Statement Alleged to Be False and Misleading**. "We have the right commercial infrastructure for leading with the endocrinologists and expanding our leadership in primary care with the type 2 basal and severe hypoglycemia markets where coverage has just opened up in the last couple of months."

124.   **Reasons Why This Statement Was False and Misleading When Made**.  This statement was materially false and misleading because it created a deceptive picture that Dexcom expanded the leadership position it held in the intensive insulin market into the Type 2 basal market, which was materially different from the one that actually existed.  Contrary to the impression given, Dexcom did not have "the right commercial infrastructure" for "expanding [its] leadership in primary

4914-2626-0365.v1

care with the type 2 basal" market because Dexcom lacked both the PCP sales force coverage and DME channel relationships to compete with Abbott, as described below. In fact, by touting an opportunity to "expand[] [its] leadership" into the Type 2 basal market, Lawver misleadingly suggested that Dexcom was leading with PCPs.

125. ***Dexcom Lacked a Sufficient PCP Sales Force to Compete with Abbott***. Contrary to Lawver's claim, Dexcom was not positioned to "expand[] [its] leadership" into the Type 2 basal market because it lacked a sales force capable of adequately reaching the PCPs – the dominant prescriber base for Type 2 basal patients.

126. Dexcom's own statements confirm the misalignment between its sales force structure and the new Type 2 basal market. Defendants admitted that "primary care was the likely space where most basal patients were going to be seen," yet Dexcom's sales force lacked both the scale and alignment required to reach 250,000 PCPs nationwide. Instead, Dexcom's sales force had historically focused on the much smaller base of 7,000 endocrinologists and other high-volume prescribers of intensive insulin patients. For example, prior to the Class Period, Defendants acknowledged "[t]he way we structure the [sales] teams out in the field is very much based upon the number of . . . intensive insulin users that they see." Despite efforts to target a limited subset of higher-prescribing PCPs in 2023, the narrow focus and alignment of the sales force remained largely consistent until Dexcom's 2024 sales force expansion, which was designed "to reach more . . . primary care physicians to make sure that we were able to take advantage of this [basal] opportunity." Up until that point, as Defendants later admitted, Dexcom's sales force had continued to "focus[] on those that were high, the highest prescribers in the territory" rather than "prospecting" and "talking to more of PCPs who don't prescribe as much product."

127. PCPs, unlike endocrinologists, require product education and support in order to prescribe CGMs to their patients. A study in the *Annals of Family Medicine* noted that, while endocrinology has embraced CGM, most diabetes care occurs in primary care settings ("approximately 90% of US patients whose diabetes is managed

4914-2626-0365.v1

in primary care settings"), and PCPs "are open to using CGM . . . but they need resources and support." Defendants later acknowledged that physician interfacing was critical to adoption in the PCP segment. For example, they conceded: "Dexcom can't win in physician offices where we don't have a presence" and that they were "getting very few prescriptions." Likewise, Defendants later conceded they "needed to get into those [PCP] offices and develop relationships" because "what we've noted in our data is we obviously don't win in offices we don't call on." In fact, Defendants now concede that it is "obvious" that interfacing with and educating PCPs was critical to competing in the Type 2 basal market: "[I]t is obvious: the purpose of a sales force is to educate physicians on Dexcom's products so they know the benefits for patients. Physicians not contacted did not receive that one-on-one education." Doc. No. 29-1 at 29.

128. Dexcom's sales force was insufficient to address this reality. Prior to the 2024 sales force expansion, Dexcom operated with only ~260 representatives across 26 territories. Defendants had previously stated that the sales team structure was based on the volume of intensive insulin users seen, and that basal-only patients were "not something that . . . we sell to or market to."

129. Consequently, Dexcom was only reaching, at most, approximately 25% of U.S. PCPs. *See* n.5. Subsequent admissions confirm the inadequacy: Dexcom "didn't have the resources in the field to address these new markets" and "needed a broader sales force."

130. In 2024, Dexcom increased its sales force by 40% and restructured its field operations. Defendants later described this as a "jump[ing] off point" for reaching PCPs, implicitly conceding that, prior to this expansion, Dexcom had been unable to reach a meaningful number of PCPs to effectively compete.

131. Importantly, as later relayed by analysts following a meeting with Sylvain and Lawver, the implementation of the sales force expansion had actually

4914-2626-0365.v1

"started in Q2/Q3" of 2023 – a timeframe that includes the date of Lawver's challenged statements.

132. The rationale behind the expansion further supports falsity: Defendants acknowledged that it was driven by poor PCP prescribing patterns that emerged in 2023: "We decided back in 2023, we needed a broader sales force . . . . The first reason is we've looked at prescribing patterns . . . ." "[W]e needed to get into those [PCP] offices and develop relationships" "because what we've noted in our data is we obviously don't win in offices we don't call on."

133. ***Abbott Was Deeply Entrenched in the Type 2 Basal Market***. In contrast to Dexcom, Abbott (its only meaningful competitor) had historically focused on the uninsured Type 2 basal market. This included a robust PCP-facing sales force that was at least 50% larger than Dexcom's. Immediately prior to the Class Period, Abbott's CEO described that the basal market was "an important part of [Abbott's] growth strategy" and stated that Abbott had been investing in "building a sales force that's focused more on the primary care side."

134. But it was not Abbott's sales force size advantage alone; Abbott's longstanding prioritization of PCP prescribers gave it a significant advantage over Dexcom. By the start of the Class Period, Abbott had entrenched itself as the near unanimous CGM option for basal patients among PCP prescribers through focused marketing and sales efforts. Abbott acknowledged that prioritizing the Type 2 basal population was "our strategy from the moment we entered the market" (years before CMS approved coverage) and that its market leadership in the Type 2 basal space was "not something that [just] happened . . . [w]e've been focus[ed] on this, generating the clinical evidence, building the sales forces to be able to reach a primary care team, investing in direct-to-consumer advertising." Abbott also offered a viable cash pay option, a lower price tag, and a strong rebate program that made its CGMs affordable even without insurance coverage. These focused efforts were designed to reach and educate PCPs and make it easier for them to prescribe to the Type 2 basal population.

- 52 -                                                                **24-cv-1485-RSH-VET**

4914-2626-0365.v1

135.    A 2023 Evercore ISI report, based on a survey of physicians, found a "clear preference" among physicians for Abbott's product Libre over Dexcom's CGM among Type 2 patients, driven by Abbott's better field support and sales coverage. The Evercore ISI report concluded: "With A[bbott] having a bigger sales force and scoring better on field support metric, the data suggests A[bbott] as having an advantage in the T[ype]2 setting."

136.    Although the market was aware of Abbott's presence in the Type 2 non-intensive market prior to the CMS coverage decision, Lawver's statement ignored or downplayed that Dexcom was "not getting any traction" and "can't win" in PCP offices they did not call on.  Lawver assured investors that, with insurance coverage now in place, Dexcom was in a great position to not only compete with Abbott but "expand[] [its] leadership" into the new Type 2 basal market.  Unbeknownst to investors, Abbott's strong PCP presence, coupled with Dexcom's lack of one, prevented Dexcom from effectively competing in the new Type 2 basal market.

137.    ***Dexcom's Strained DME Relationships Further Undermined Its Position***.  Dexcom's readiness was further undermined by frayed relationships in the crucial DME channel, the exclusive supplier of CGMs for Medicare basal patients following the CMS expansion.  DME remained a critical sales channel throughout the Class Period, as almost half of the total Type 2 basal population was made up of Medicare patients.

138.    Unbeknownst to investors, Dexcom's years-long push to move its business to the pharmacy channel had alienated its DME channel partners leading up to the start of the Class Period.  Notably, Dexcom's preference for fulfilling orders through the pharmacy channel had caused its proportion of sales fulfilled through DME partners to bottom out at 25% leading up to the Class Period.  Abbott, by contrast, maintained a balanced fulfillment strategy between pharmacy and DME (~50/50).  Dexcom's preference for pharmacy fulfillment led to widespread dissatisfaction among DME partners, who viewed Abbott as "channel agnostic" and

4914-2626-0365.v1

more supportive.  As Defendants later admitted, this impacted Dexcom's ability to compete in the basal market: "we've lost market share in the DME channel . . . and that has hurt us"; "growth in the DME channel has trailed our plan"; and "[w]e're not doing wonderful in the basal space."   As analysts acknowledged following conversations with Defendants, these issues were pervasive and existed in prior quarters during the Class Period.  According to a July 31, 2024 J.P. Morgan report, "erosion in the relationship between the company and DME distributor patterns has been ongoing for some time, likely starting with the company's fanfare around pharmacy access with the launch of G7 [in early 2023]."  BofA Global Research also issued a report on August 5, 2024, stating "the issues being highlighted seem widespread across many of the DMEs."  Defendants later acknowledged that senior executives had to intervene to repair DME relationships.  Even after these efforts, they cautioned it would take time to stop losing share.

139.  ***Dexcom Created a False Narrative of Readiness***.  With an inadequate PCP sales force and frayed DME relationships, Dexcom was unable to compete with Abbott.  Defendants quickly sought to implement a sales force expansion to reach more of the critical PCP prescriber base.  For example, Sayer later admitted that Dexcom "decided back in 2023" that it "needed to broaden [its] reach" and "needed a broader sales force" for a number of reasons, including that they had "looked at prescribing patterns" and Dexcom was "getting very few prescriptions" and "not getting any traction" in "those offices where we had no salespeople."  Likewise, Defendants later conceded they "needed to get into those [PCP] offices and develop relationships" because "what we've noted in our data is we obviously don't win in offices we don't call on."  As later relayed by analysts following a meeting with Sylvain and Lawver, the implementation of the sales force expansion had actually "started in Q2/Q3" of 2023 (the period beginning on April 1, 2023).

140.  Lawver's statement, made in the context of her discussion of the new basal opportunity, created the misimpression that Dexcom was poised to compete

4914-2626-0365.v1

effectively with Abbott, its only meaningful competitor, in this massive, newly-covered Type 2 basal patient population.

141. **Scienter**. Lawver knew, or was deliberately reckless in not knowing, that her statement was false and misleading when made. *See* §VIII.

(a) ***Core Operations and Strategic Importance***: The expansion of CGM coverage to Type 2 basal patients was, by Defendants' own admission, the "largest single expansion of access to CGM in our industry's history." Its strategic importance meant Defendants closely monitored all aspects of this market, including Dexcom's competitive positioning, sales force capabilities, and market share relative to Abbott. Given this, Lawver's assertion that Dexcom was "expanding [its] leadership" into the Type 2 basal market would only be credible if based on a thorough understanding of these monitored factors. It would be absurd to suggest that Lawver – Dexcom's CCO – would not be aware of deficiencies in Dexcom's commercial infrastructure that prevented Dexcom from meaningfully competing for this critical market. This is particularly true where before, during, and after the Class Period, Defendants repeatedly discussed, answered analysts' questions on, and professed knowledge of the Company's competitive position in the Type 2 basal market, including its sales force coverage, DME relationships, and market share.

(b) ***Access to Real-Time Data***: Lawver and other defendants repeatedly represented that they had access to information allowing them to track sales data, understand where their patients were coming from, and monitor the Company's market share in the basal market, showing Lawver possessed data undermining her Class Period statement. For instance, in January 2023, Sayer stated: "We have the data capabilities to show what outcomes we're going to generate within this population . . . . We can download the data we get from those patients and present a very strong case to those payers."

(c) ***Subsequent Admissions***: In September 2024, Sayer admitted: "We decided back in 2023, we needed a broader sales force . . . we've looked at prescribing

- 55 -                                                          **24-cv-1485-RSH-VET**

patterns and the places where we were not getting any traction are those offices where we had no salespeople." The 40% expansion and field reorganization launched in Q2/Q3 2023 confirm Lawver's contemporaneous awareness.

(d)    ***DME Channel Awareness***: Similarly, Defendants admitted post-Class Period that DME performance had fallen short and hurt their basal business, saying: "we've lost market share in the DME channel . . . and that has hurt us"; "growth in the DME channel has trailed our plan"; "you'd probably imagine if we're not doing well in the DME it gets back to your point. We're not doing wonderful in the basal space." Analysts reported that these issues had persisted in prior quarters. This directly contradicts Lawver's June 2023 assertion that Dexcom was positioned to "expand[] [its] leadership" in the Type 2 basal market.

(e)    ***Suspiciously-Timed Departure***: Lawver's sudden departure from Dexcom following the Company's July 25, 2024 revelations evidences her knowledge of, or reckless disregard for, the Company's sales force issues and inability to gain market share in the newly-covered Type 2 basal population.

(f)    ***Motive***: In addition to her knowledge and/or reckless disregard of the misleading nature of her statement, Lawver was also motivated to mislead investors, as set forth below in §VIII.F.

142.    **Conclusion**.    Lawver's June 23, 2023 statement was materially misleading because it created a false impression of operational readiness and competitive strength in the newly-covered Type 2 basal market. By claiming Dexcom had "the right commercial infrastructure for leading with the endocrinologists and expanding [its] leadership in primary care," Lawver suggested that Dexcom was already well-positioned to extend its leadership in the intensive insulin market into this critical new segment. In reality, Dexcom lacked both the primary care sales force coverage and the DME channel support necessary to succeed. Lawver's statement was particularly misleading given that, at the time, Dexcom had already begun implementing a major sales force expansion and was internally responding to poor

4914-2626-0365.v1

basal prescribing patterns and market share losses – facts that directly contradicted the notion of Dexcom's existing "leadership" or infrastructure sufficiency.  Lawver framed the basal opportunity as one Dexcom was poised to dominate, misleading investors about the Company's actual commercial posture and downplaying the substantial structural disadvantages that were, in truth, frustrating Dexcom's ability to compete with Abbott.

**E.      September 6, 2023 Wells Fargo Healthcare Conference**

143.    **Context of Statement**.  On September 6, 2023, Defendants presented at the Wells Fargo Healthcare Conference, and the following exchange occurred between an analyst and Sylvain:

> [Analyst:] [W]e're going to move on to basal adoption.  Love to hear, Jereme from you what you're seeing with basal adoption?
>
> [Sylvain:] Yes.  I'm really encouraged by it to date.  And I'll kind of reference back to our last call, the PBMs and the health insurance companies have really taken basal adoption and really aggressively approved it.  And so you saw 60% of commercial lives covered as of our last call for basal and met with Medicare coverage so comes Medicare Advantage.
>
> And so now you've actually got a majority of the basal population, a significant majority of the basal population covered.  And where there's coverage, we've always taken share, and you see us taking share in that space.  So we feel pretty good about one, taking share; two, driving adoption through the market.  And again, record new patients in the second quarter, part of that as a result of some of that basal and we expect to continue to do well in that market.

144.    **Challenged Statement Alleged to Be False and Misleading**.  "And where there's coverage, we've always taken share, and you see us taking share in that space.  So we feel pretty good about one, taking share . . . ."

145.    **Reasons Why This Statement Was False and Misleading When Made**.    Sylvain's statement was materially misleading because it painted an inaccurate picture of Dexcom's competitive position in the newly-covered Type 2 basal market.  By claiming that Dexcom was "taking share" wherever there was coverage, Sylvain implied that the Company's commercial infrastructure was effectively converting reimbursement into prescriptions.  In truth, Dexcom was not

**24-cv-1485-RSH-VET**

taking meaningful share from Abbott – its sole competitor – but was instead losing ground due to systemic commercial deficiencies that rendered it unprepared to capitalize on the basal opportunity. As detailed below, internal data, contemporaneous planning, and subsequent admissions all contradict the notion that Dexcom was successfully gaining share in this segment at the time Sylvain made his statement.

146. ***Dexcom Lacked a Sufficient PCP Sales Force to Compete with Abbott***. Contrary to Sylvain's claim, Dexcom was not "taking share" in the Type 2 basal market because it lacked a sales force capable of adequately reaching the PCPs – the dominant prescriber base for Type 2 basal patients.

147. Dexcom's own statements confirm the misalignment between its sales force structure and the new Type 2 basal market. Defendants admitted that "primary care was the likely space where most basal patients were going to be seen," yet its sales force lacked both the scale and alignment required to reach 250,000 PCPs nationwide. Instead, Dexcom's sales force had historically focused on the much smaller base of 7,000 endocrinologists and other high-volume prescribers of intensive insulin patients. For example, prior to the Class Period, Defendants acknowledged "[t]he way we structure the [sales] teams out in the field is very much based upon the number of . . . intensive insulin users that they see." Despite efforts to target a limited subset of higher-prescribing PCPs in 2023, the narrow focus and alignment of the sales force remained largely consistent until Dexcom's 2024 sales force expansion, which was designed "to reach more . . . primary care physicians to make sure that we were able to take advantage of this [basal] opportunity." Up until that point, as Defendants later admitted, Dexcom's sales force had continued to "focus[] on those that were high, the highest prescribers in the territory" rather than "prospecting" and "talking to more of PCPs who don't prescribe as much product."

148. PCPs, unlike endocrinologists, require product education and support in order to prescribe CGMs to their patients. A study in the *Annals of Family Medicine*

- 58 -
**24-cv-1485-RSH-VET**

4914-2626-0365.v1

noted that, while endocrinology has embraced CGMs, most diabetes care occurs in primary care settings ("approximately 90% of US patients whose diabetes is managed in primary care settings"), and PCPs "are open to using CGM . . . but they need resources and support." Defendants later acknowledged that physician interfacing was critical to adoption in the PCP segment. For example, they conceded: "Dexcom can't win in physician offices where we don't have a presence" and that they were "getting very few prescriptions" in offices they did not call on. Likewise, Defendants later conceded they "needed to get into those [PCP] offices and develop relationships" because "what we've noted in our data is we obviously don't win in offices we don't call on." In fact, Defendants now concede that it is "obvious" that interfacing with and educating PCPs was critical to competing in the Type 2 basal market: "[I]t is obvious: the purpose of a sales force is to educate physicians on Dexcom's products so they know the benefits for patients. Physicians not contacted did not receive that one-on-one education." Doc. No. 29-1 at 29.

149. Dexcom's sales resources were insufficient to address this reality. Prior to the 2024 sales force expansion, Dexcom operated with only ~260 representatives across 26 territories. Defendants had previously stated that the sales team structure was based on the volume of intensive insulin users seen, and that basal-only patients were "not something that . . . we sell to or market to."

150. Consequently, Dexcom was only reaching, at most, approximately 25% of U.S. PCPs. *See* n.5. Subsequent admissions confirm the inadequacy: Dexcom "didn't have the resources in the field to address these new markets" and "needed a broader sales force."

151. In 2024, Dexcom increased its sales force by 40% and restructured its field operations. Defendants later described this as a "jump[ing] off point" for reaching PCPs, implicitly conceding that, prior to this expansion, Dexcom had been unable to reach a meaningful number of PCPs to effectively compete.

- 59 -                                          **24-cv-1485-RSH-VET**

152. Importantly, as later relayed by analysts following a meeting with Sylvain and Lawver, the implementation of the sales force expansion had actually "started in Q2/Q3" of 2023 – a timeframe that includes the date of Sylvain's challenged statements.

153. The rationale behind the expansion further supports falsity: Defendants acknowledged that it was driven by poor PCP prescribing patterns that emerged in 2023: "We decided back in 2023, we needed a broader sales force . . . . The first reason is we've looked at prescribing patterns . . . ." "[W]e needed to get into those [PCP] offices and develop relationships" "because what we've noted in our data is we obviously don't win in offices we don't call on."

154. ***Abbott Was Deeply Entrenched in the Type 2 Basal Market***. In contrast to Dexcom, Abbott (its only meaningful competitor) had historically focused on the uninsured Type 2 basal market. This included a robust PCP-facing sales force that was at least 50% larger than Dexcom's. Immediately prior to the Class Period, Abbott's CEO described that the basal market was "an important part of [Abbott's] growth strategy" and stated that Abbott had been investing in "building a sales force that's focused more on the primary care side."

155. But it was not Abbott's sales force size advantage alone; Abbott's longstanding prioritization of PCP prescribers gave it a significant advantage over Dexcom. By the start of the Class Period, Abbott had entrenched itself as the near unanimous CGM option for basal patients among PCP prescribers through focused marketing and sales efforts. Abbott acknowledged that prioritizing the Type 2 basal population was "our strategy from the moment we entered the market" (years before CMS approved coverage) and that its market leadership in the Type 2 basal space was "not something that [just] happened . . . [w]e've been focus[ed] on this, generating the clinical evidence, building the sales forces to be able to reach a primary care team, investing in direct-to-consumer advertising." Abbott also offered a viable cash pay option, a lower price tag, and a strong rebate program that made its CGMs affordable

4914-2626-0365.v1

even without insurance coverage.  These focused efforts were designed to reach and educate PCPs and make it easier for them to prescribe to the Type 2 basal population.  By the start of the Class Period, basal and non-intensive patients constituted 40% of Abbott's CGM user base.

156.    A 2023 Evercore ISI report, based on a survey of physicians, found a "clear preference" among physicians for Abbott's Libre over Dexcom's CGM among Type 2 patients, driven by Abbott's better field support and sales coverage.  The Evercore ISI report concluded: "With A[bbott] having a bigger sales force and scoring better on field support metric, the data suggests A[bbott] as having an advantage in the T[ype]2 setting."

157.    Although the market was aware of Abbott's presence in the Type 2 non-intensive market prior to the CMS coverage decision, Sylvain's statement ignored or downplayed that Dexcom was "not getting any traction" and "can't win" in PCP offices they did not call on.  Sylvain assured investors that, with insurance coverage now in place, Dexcom was in a great position to not only compete with Abbott but was "taking share" in the new Type 2 basal market.  Unbeknownst to investors, Abbott's strong PCP presence, coupled with Dexcom's lack of one, prevented Dexcom from effectively competing – let alone "taking share" – in the new Type 2 basal market.

158.    ***Dexcom's Strained DME Relationships Further Undermined Its Position***.  Dexcom's readiness was further undermined by frayed relationships in the crucial DME channel, the exclusive supplier of CGMs for Medicare basal patients following the CMS expansion.  DME remained a critical sales channel throughout the Class Period, as almost half of the total Type 2 basal population was made up of Medicare patients.

159.    Unbeknownst to investors, Dexcom's years-long push to move its business to the pharmacy channel had alienated its DME channel partners leading up to the start of the Class Period.  Notably, Dexcom's preference for fulfilling orders

- 61 -                                              **24-cv-1485-RSH-VET**

through the pharmacy channel had caused its proportion of sales fulfilled through DME partners to bottom out at 25% leading up to the Class Period.  Abbott, by contrast, maintained a balanced fulfillment strategy between pharmacy and DME (~50/50).    Dexcom's preference for pharmacy fulfillment led to widespread dissatisfaction among DME partners, who viewed Abbott as "channel agnostic" and more supportive.  As Defendants later admitted, this impacted Dexcom's ability to compete in the basal market: "we've lost market share in the DME channel . . . and that has hurt us"; "growth in the DME channel has trailed our plan"; and "[w]e're not doing wonderful in the basal space."    As analysts acknowledged following conversations with Defendants, these issues were pervasive and existed in prior quarters during the Class Period.  According to a July 31, 2024 J.P. Morgan report, "erosion in the relationship between the company and DME distributor patterns has been ongoing for some time, likely starting with the company's fanfare around pharmacy access with the launch of G7 [in early 2023]."  BofA Global Research also issued a report on August 5, 2024, stating "the issues being highlighted seem widespread across many of the DMEs."  Defendants later acknowledged that senior executives had to intervene to repair DME relationships.  Even after these efforts, they cautioned it would take time to stop losing share.

160.  ***Dexcom Created a False Narrative of Readiness***.  With an inadequate PCP sales force and frayed DME relationships, Dexcom was unable to compete with Abbott.  Defendants quickly sought to implement a sales force expansion to reach more of the critical PCP prescriber base.  For example, Sayer later admitted that Dexcom "decided back in 2023" that it "needed to broaden [its] reach" and "needed a broader sales force" for a number of reasons, including that they had "looked at prescribing patterns" and Dexcom was "getting very few prescriptions" and "not getting any traction" in "those offices where we had no salespeople."  As later relayed by analysts following a meeting with Sylvain and Lawver, the implementation of the

4914-2626-0365.v1

sales force expansion had actually "started in Q2/Q3" of 2023 (the period beginning on April 1, 2023).

161. Sylvain's statement, made in the context of his discussion of the new basal opportunity, created the misimpression that Dexcom was effectively competing with Abbott ("taking share"), in this massive, newly-covered Type 2 basal patient population.

162. **Scienter**. Sylvain knew, or was deliberately reckless in not knowing, that his statement was false and misleading when made. *See* §VIII.

(a) ***Core Operations and Strategic Importance***: The expansion of CGM coverage to Type 2 basal patients was, by Defendants' own admission, the "largest single expansion of access to CGM in our industry's history." Its strategic importance meant Defendants closely monitored all aspects of this market, including Dexcom's competitive positioning, sales force capabilities, and market share relative to Abbott. Given this, Sylvain's assertion that Dexcom was "taking share" in the Type 2 basal market would only be credible if based on a thorough understanding of these monitored factors. It would be absurd to suggest that Sylvain – Dexcom's CFO – would not be aware of deficiencies in Dexcom's commercial infrastructure that prevented Dexcom from meaningfully competing for this critical market. This is particularly true where Sylvain repeatedly discussed, answered analysts' questions on, and professed knowledge of the Company's competitive position in the Type 2 basal market, including its sales force coverage, DME relationships, and market share.

(b) ***Access to Real-Time Data***: Sylvain and other defendants repeatedly represented that they had access to information allowing them to track sales data, understand where their patients were coming from, and monitor the Company's market share in the basal market, showing Sylvain possessed data undermining his Class Period statements. He later admitted, for example, that Dexcom "get[s] script data . . . based on pathology" to gauge performance in the basal cohort.

4914-2626-0365.v1

(c)     ***Subsequent Admissions***: In September 2024, Sayer admitted: "We decided back in 2023, we needed a broader sales force . . . we've looked at prescribing patterns and the places where we were not getting any traction are those offices where we had no salespeople."  The 40% expansion and field reorganization launched in Q2/Q3 2023 confirm Sylvain's contemporaneous awareness.

(d)     ***DME Channel Awareness***: Similarly, Defendants admitted post-Class Period that DME performance had fallen short and hurt their basal business, saying: "we've lost market share in the DME channel . . . and that has hurt us"; "growth in the DME channel has trailed our plan"; "you'd probably imagine if we're not doing well in the DME it gets back to your point.  We're not doing wonderful in the basal space."  Analysts reported that these issues had persisted in prior quarters.  This directly contradicts Sylvain's September 2023 assertion that Dexcom was "taking share" in the Type 2 basal market.

(e)     ***Motive***: In addition to his knowledge and/or reckless disregard of the misleading nature of his statement, Sylvain was also motivated to mislead investors, as set forth below in §VIII.F.

163.  **Conclusion**.  By asserting that Dexcom was gaining market share "where there's coverage," Sylvain gave the false impression that Dexcom was effectively competing with Abbott in the Type 2 basal market.  In reality, Dexcom's deficient PCP sales force and impaired DME relationships left it unable to convert coverage into prescriptions.  Internally, Dexcom had already begun expanding its field presence precisely because it was ***not*** gaining traction – let alone share – in the basal market.  Sylvain's omission of these structural obstacles, and his failure to disclose that Dexcom's basal underperformance had triggered a major sales force expansion, rendered his upbeat depiction materially misleading.  Investors were led to believe that Dexcom was capitalizing on the newly expanded coverage when, in truth, the Company was falling further behind Abbott.

4914-2626-0365.v1

**F.    October 26, 2023 Q3 2023 Earnings Call**

164.    **Context of Statements**.    On October 26, 2023, Dexcom held a conference call for analysts and investors to discuss its Q3 2023 results.  During the Q3 2023 earnings call, Sayer stated:

> As a reminder, Medicare coverage went live in mid-April for people with type 2 diabetes using basal insulin only as well as certain non-insulin individuals that experience hypoglycemia.  Collectively, these 2 populations represent nearly 7 million people in the U.S. with approximately half being of Medicare age.
>
> Encouragingly, commercial coverage continues to build for this group.  We have established market-leading levels of basal-only reimbursement as payers clearly recognize the potential for better outcomes driven by DexCom.  This further supports our industry low out-of-pocket cost for our customers.  With a full quarter of broad coverage now under our belt, we continue to be very encouraged by early prescribing trends for this cohort.  We noted last quarter that we experienced an immediate uptick in new patient starts once coverage went live, and we have seen a clear continuation of this trend since that time.  In fact, we delivered another record Medicare new patient start quarter in Q3 as physicians have quickly adjusted their prescribing patterns to match the new reimbursement landscape.
>
> While early, basal adoption trends look very similar to those we previously experienced once broad coverage became available for intensively managed type 2 diabetes.  We view this as a very positive sign of things to come.  Importantly, when you combine this broader coverage with our leading sensor technology, we feel incredibly confident in our market position.  Since the launch of G7, we have gained share across all reimbursed channels and patient segments in the U.S. and that trend continued this quarter.

165.    **Challenged Statements Alleged to Be False and Misleading.**

- "With a full quarter of broad coverage now under our belt, we continue to be very encouraged by early prescribing trends for this cohort.  We noted last quarter that we experienced an immediate uptick in new patient starts once coverage went live, and we have seen a clear continuation of this trend since that time."

- "Since the launch of G7, we have gained share across all reimbursed channels and patient segments in the U.S. and that trend continued this quarter."

4914-2626-0365.v1

166.    **Reasons Why These Statements Were False and Misleading When Made**.  Sayer's October 2023 statements were materially misleading because they presented a false narrative of growth and competitive success in the newly-covered Type 2 basal market.  By highlighting "early prescribing trends" and asserting that Dexcom was gaining share "across all reimbursed channels and patient segments," Sayer gave investors the misleading impression that Dexcom was effectively capitalizing on the basal coverage expansion.  In reality, Dexcom lacked the commercial infrastructure to compete meaningfully with Abbott – its only major rival – in this segment.  As detailed below, internal data, contemporaneous planning, and subsequent admissions all confirm that Dexcom was struggling to gain traction, not gaining share.

167.    *Dexcom Was Implementing a Major Sales Force Restructuring to Fix Its Commercial Infrastructure*.  Unbeknownst to investors, at the time of Sayer's statement describing Dexcom's purported success in the Type 2 basal market, and the effectiveness of its commercial infrastructure, Defendants were in the midst of implementing a material sales force expansion and realignment because, as Defendants would later admit, "we were not getting any traction [at] those [PCP] offices where we had no salespeople, where we weren't calling on physicians. We're getting very few prescriptions."  Less than two months later, Dexcom announced the significant sales force expansion (40% increase) which they later acknowledged, after the Class Period, as a "jump[ing] off point" to reach a sufficient number of PCPs to take advantage of the basal opportunity, an acknowledgement that prior to this expansion, they were not well-positioned to reach a meaningful number of PCPs to capture the newly-covered basal population.  ("In 2024, we expanded our sales force by 40%.  And we positioned ourselves really to be a jump-off point to reach more general practitioners, primary care physicians to make sure that we were able to take advantage of this opportunity.").  It was also revealed after the Class Period that the implementation of the sales force expansion had actually "started in Q2/Q3" of 2023

- 66 -                                    **24-cv-1485-RSH-VET**

(a period beginning on April 1, 2023) and that the primary reason behind the sales force expansion was the PCP prescribing patterns Defendants were witnessing at the time. ("We decided back in 2023, we needed a broader sales force for a number of reasons. The first reason is we've looked at prescribing patterns . . . ."). Defendants later acknowledged that the sales force expansion and realignment was necessary because "[q]uite simply, Dexcom can't win in physician offices where we don't have a presence" and that "we needed to get into those [PCP] offices and develop relationships" because "what we've noted in our data is we obviously don't win in offices we don't call on."

168. ***Dexcom Lacked a Sufficient PCP Sales Force to Compete with Abbott***. Contrary to Sayer's claim, Dexcom was not gaining share in the Type 2 basal market because it lacked a sales force capable of adequately reaching the PCPs – the dominant prescriber base for Type 2 basal patients.

169. Dexcom's own statements confirm the misalignment between its sales force structure and the new Type 2 basal market. Defendants admitted that "primary care was the likely space where most basal patients were going to be seen," yet its sales force lacked both the scale and alignment required to reach 250,000 PCPs nationwide. Instead, Dexcom's sales force had historically focused on the much smaller base of 7,000 endocrinologists and other high-volume prescribers of intensive insulin patients. For example, prior to the Class Period, Defendants acknowledged "[t]he way we structure the [sales] teams out in the field is very much based upon the number of . . . intensive insulin users that they see." Despite efforts to target a limited subset of higher-prescribing PCPs in 2023, the narrow focus and alignment of the sales force remained largely consistent until Dexcom's 2024 sales force expansion, which was designed "to reach more . . . primary care physicians to make sure that we were able to take advantage of this [basal] opportunity." Up until that point, as Defendants later admitted, Dexcom's sales force had continued to "focus[] on those

**24-cv-1485-RSH-VET**

that were high, the highest prescribers in the territory" rather than "prospecting" and "talking to more of PCPs who don't prescribe as much product."

170. PCPs, unlike endocrinologists, require product education and support in order to prescribe CGMs to their patients. A study in the *Annals of Family Medicine* noted that, while endocrinology has embraced CGMs, most diabetes care occurs in primary care settings ("approximately 90% of US patients whose diabetes is managed in primary care settings"), and PCPs "are open to using CGM . . . but they need resources and support." Defendants later acknowledged that physician interfacing was critical to adoption in the PCP segment. For example, they conceded: "Dexcom can't win in physician offices where we don't have a presence" and that they were "getting very few prescriptions" in offices they did not call on. Likewise, Defendants later conceded they "needed to get into those [PCP] offices and develop relationships" because "what we've noted in our data is we obviously don't win in offices we don't call on." In fact, Defendants now concede that it is "obvious" that interfacing with and educating PCPs was critical to competing in the Type 2 basal market: "[I]t is obvious: the purpose of a sales force is to educate physicians on Dexcom's products so they know the benefits for patients. Physicians not contacted did not receive that one-on-one education." Doc. No. 29-1 at 29.

171. Dexcom's sales resources were insufficient to address this reality. Prior to the 2024 sales force expansion, Dexcom operated with only ~260 representatives across 26 territories. Defendants had previously stated that the sales team structure was based on the volume of intensive insulin users seen, and that basal-only patients were "not something that . . . we sell to or market to."

172. Consequently, Dexcom was only reaching, at most, approximately 30% of U.S. PCPs. *See* n.5. Subsequent admissions confirm the inadequacy: Dexcom "didn't have the resources in the field to address these new markets" and "needed a broader sales force."

**24-cv-1485-RSH-VET**

4914-2626-0365.v1

173. ***Abbott Was Deeply Entrenched in the Type 2 Basal Market***. In contrast to Dexcom, Abbott (its only meaningful competitor) had historically focused on the uninsured Type 2 basal market. This included a robust PCP-facing sales force that was at least 50% larger than Dexcom's. Immediately prior to the Class Period, Abbott's CEO described that the basal market was "an important part of [Abbott's] growth strategy" and stated that Abbott had been investing in "building a sales force that's focused more on the primary care side."

174. But it was not Abbott's sales force size advantage alone; Abbott's longstanding prioritization of PCP prescribers gave it a significant advantage over Dexcom. By the start of the Class Period, Abbott had entrenched itself as the near unanimous CGM option for basal patients among PCP prescribers through focused marketing and sales efforts. Abbott acknowledged that prioritizing the Type 2 basal population was "our strategy from the moment we entered the market" (years before CMS approved coverage) and that its market leadership in the Type 2 basal space was "not something that [just] happened . . . [w]e've been focus[ed] on this, generating the clinical evidence, building the sales forces to be able to reach a primary care team, investing in direct-to-consumer advertising." Abbott also offered a viable cash pay option, a lower price tag, and a strong rebate program that made its CGMs affordable even without insurance coverage. These focused efforts were designed to reach and educate PCPs and make it easier for them to prescribe to the Type 2 basal population. By the start of the Class Period, basal and non-intensive patients constituted 40% of Abbott's CGM user base.

175. A 2023 Evercore ISI report, based on a survey of physicians, found a "clear preference" among physicians for Abbott's Libre over Dexcom's CGM among Type 2 patients, driven by Abbott's better field support and sales coverage. The Evercore ISI report concluded: "With A[bbott] having a bigger sales force and scoring better on field support metric, the data suggests A[bbott] as having an advantage in the T[ype]2 setting."

- 69 -                                    **24-cv-1485-RSH-VET**

4914-2626-0365.v1

176. Although the market was aware of Abbott's presence in the Type 2 non-intensive market prior to the CMS coverage decision, Sayer's statement ignored or downplayed that Dexcom was "not getting any traction" and "can't win" in PCP offices they did not call on. Sayer assured investors that, with insurance coverage now in place, Dexcom was in a great position to not only compete with Abbott but was gaining share in the new Type 2 basal market. Unbeknownst to investors, Abbott's strong PCP presence, coupled with Dexcom's lack of one, prevented Dexcom from effectively competing – let alone gaining share – in the new Type 2 basal market.

177. ***Dexcom's Strained DME Relationships Further Undermined Its Position***. Dexcom's readiness was further undermined by frayed relationships in the crucial DME channel, the exclusive supplier of CGMs for Medicare basal patients following the CMS expansion. DME remained a critical sales channel throughout the Class Period, as almost half of the total Type 2 basal population was made up of Medicare patients.

178. Unbeknownst to investors, Dexcom's years-long push to move its business to the pharmacy channel had alienated its DME channel partners leading up to the start of the Class Period. Notably, Dexcom's preference for fulfilling orders through the pharmacy channel had caused its proportion of sales fulfilled through DME partners to bottom out at 25% leading up to the Class Period. Abbott, by contrast, maintained a balanced fulfillment strategy between pharmacy and DME (~50/50). Dexcom's preference for pharmacy fulfillment led to widespread dissatisfaction among DME partners, who viewed Abbott as "channel agnostic" and more supportive. As Defendants later admitted, this impacted Dexcom's ability to compete in the basal market: "we've lost market share in the DME channel . . . and that has hurt us"; "growth in the DME channel has trailed our plan"; and "[w]e're not doing wonderful in the basal space." As analysts acknowledged following conversations with Defendants, these issues were pervasive and existed in prior

4914-2626-0365.v1

quarters during the Class Period.  According to a July 31, 2024 J.P. Morgan report, "erosion in the relationship between the company and DME distributor patterns has been ongoing for some time, likely starting with the company's fanfare around pharmacy access with the launch of G7 [in early 2023]."  BofA Global Research also issued a report on August 5, 2024, stating "the issues being highlighted seem widespread across many of the DMEs."  Defendants later acknowledged that senior executives had to intervene to repair DME relationships.  Even after these efforts, they cautioned it would take time to stop losing share.

179.  ***Dexcom Created a False Narrative of Readiness***.  With an inadequate PCP sales force and frayed DME relationships, Dexcom was unable to compete with Abbott.  Defendants quickly sought to implement a sales force expansion to reach more of the critical PCP prescriber base.  For example, Sayer later admitted that Dexcom "decided back in 2023" that it "needed to broaden [its] reach" and "needed a broader sales force" for a number of reasons, including that they had "looked at prescribing patterns" and Dexcom was "getting very few prescriptions" and "not getting any traction" in "those offices where we had no salespeople."  As later relayed by analysts following a meeting with Sylvain and Lawver, the implementation of the sales force expansion had actually "started in Q2/Q3" of 2023 (the period beginning on April 1, 2023).

180.  Sayer's statement, made in the context of his discussion of the new basal opportunity, created the misimpression that Dexcom was effectively competing with Abbott, its only meaningful competitor, in this massive, newly-covered Type 2 basal patient population.

181.  **Scienter**.  Sayer knew, or was deliberately reckless in not knowing, that his statements were false and misleading when made.  *See* §VIII.

(a)  ***Core Operations and Strategic Importance***: The expansion of CGM coverage to Type 2 basal patients was, by Sayer's own admission, the "largest single expansion of access to CGM in our industry's history."  Its strategic importance

4914-2626-0365.v1   **24-cv-1485-RSH-VET**

meant Defendants closely monitored all aspects of this market, including Dexcom's competitive positioning, sales force capabilities, and market share relative to Abbott. Given this, Sayer's assertion that Dexcom was gaining share in the Type 2 basal market would only be credible if based on a thorough understanding of these monitored factors.  It would be absurd to suggest that Sayer – Dexcom's CEO – would not be aware of deficiencies in Dexcom's commercial infrastructure that prevented Dexcom from meaningfully competing for this critical market.  This is particularly true where Sayer repeatedly discussed, answered analysts' questions on, and professed knowledge of the Company's competitive position in the Type 2 basal market, including its sales force coverage, DME relationships, and market share.

(b)      *Access to Real-Time Data*: Sayer and other defendants repeatedly represented that they had access to information allowing them to track sales data, understand where their patients were coming from, and monitor the Company's market share in the basal market, showing Sayer possessed data undermining his Class Period statements.  For instance, in January 2023, Sayer stated: "We have the data capabilities to show what outcomes we're going to generate within this population . . . .  We can download the data we get from those patients and present a very strong case to those payers."

(c)      *Subsequent Admissions*: In September 2024, Sayer admitted: "We decided back in 2023, we needed a broader sales force . . . we've looked at prescribing patterns and the places where we were not getting any traction are those offices where we had no salespeople."  The 40% expansion and field reorganization launched in Q2/Q3 2023 confirm Sayer's contemporaneous awareness.

(d)      *DME Channel Awareness*: Similarly, Defendants admitted post-Class Period that DME performance had fallen short and hurt their basal business, saying: "we've lost market share in the DME channel . . . and that has hurt us"; "growth in the DME channel has trailed our plan"; "you'd probably imagine if we're not doing well in the DME it gets back to your point.  We're not doing wonderful in

4914-2626-0365.v1

the basal space."  Analysts reported that these issues had persisted in prior quarters. This directly contradicts Sayer's October 2023 assertion that Dexcom was gaining share in the Type 2 basal market.

(e)    *Motive*: In addition to his knowledge and/or reckless disregard of the misleading nature of his statement, Sayer was also motivated to mislead investors, as set forth below in §VIII.F.

182.    **Conclusion**.  Sayer's October 26, 2023 statements were materially misleading because they conveyed the false impression that Dexcom was successfully gaining market share across all reimbursed segments – including the newly-covered Type 2 basal market – when, in truth, Dexcom's commercial infrastructure was fundamentally unprepared to support such growth.  By pointing to "early prescribing trends", and share gains "across all reimbursed channels and patient segments," Sayer failed to disclose that Dexcom lacked the sales force capacity and DME channel strength necessary to gain prescribing traction in the basal segment.  Internally, Dexcom had already initiated a sweeping sales force expansion to remedy its lack of PCP coverage and was actively working to repair frayed DME relationships – efforts that directly contradicted the Company's public claims of momentum and share gains. These omissions painted a materially deceptive picture of Dexcom's market position, misleading investors into believing the Company was on track to capitalize on the largest access expansion in its history, when in fact it was falling further behind its sole competitor, Abbott.

**G.    January 8, 2024 JPMorgan Healthcare Conference**

183.    **Context of Statement**.  On January 8, 2024, during the JPMorgan Healthcare Conference, Sayer stated:

> That number has grown monumentally this year with the recent Medicare decision to cover those who are on basal insulin and those who experience hypoglycemia.  And not only has Medicare done that, but payers have followed.  So this is greatly expanding.  We have twice as many people that have insurance and access to CGM, who don't have it than we have ever had in our history.

- 73 -    **24-cv-1485-RSH-VET**

Our commercial strategy has also enabled us to execute on this front as well. In 2021, we made a very big decision while the rest of the world is contracting after the pandemic, we saw the mobile data and knew that this would eventually come. We also knew we needed a bigger presence in PCP offices, so we greatly expanded the size of our U.S. sales force. And this commercial strategy has worked wonderfully. As you can see for 2023, we increased our prescriber base by 40% over what it was before, and 70% of our new scripts are now written by PCPs. We will continue to invest in our commercial strategy in the U.S. to get broader and to get more places.

184. **Challenged Statement Alleged to Be False and Misleading**. "We also knew we needed a bigger presence in PCP offices, so we greatly expanded the size of our U.S. sales force. And this commercial strategy has worked wonderfully."

185. **Reasons Why This Statement Was False and Misleading**. Sayer's statement was materially misleading because it painted a false picture of Dexcom's commercial success in penetrating the Type 2 basal market. By touting the Company's 2021 expansion of its sales force and that this strategy had "worked wonderfully," Sayer conveyed that the Company's commercial infrastructure was effectively executing against the basal opportunity. In truth, Dexcom's sales organization lacked the scale, orientation, and field coverage necessary to reach PCPs driving prescriptions in this segment. Internally, Dexcom was already implementing a major sales force expansion to address these very deficiencies – efforts that directly contradicted Sayer's upbeat assessment.

186. *Dexcom Was Implementing a Major Sales Force Restructuring to Fix Its Commercial Infrastructure*. Unbeknownst to investors, at the time of Sayer's statement describing Dexcom's purported success in the Type 2 basal market, and the effectiveness of its commercial infrastructure, Defendants were in the midst of implementing a material sales force expansion and realignment because, as Defendants would later admit, "we were not getting any traction [at] those [PCP] offices where we had no salespeople, where we weren't calling on physicians. We're getting very few prescriptions." Less than two months later, Dexcom announced the significant sales force expansion (40% increase) which they later acknowledged, after

- 74 -                                                    **24-cv-1485-RSH-VET**

the Class Period, as a "jump[ing] off point" to reach a sufficient number of PCPs to take advantage of the basal opportunity, an acknowledgement that prior to this expansion, they were not well-positioned to reach a meaningful number of PCPs to capture the newly-covered basal population. ("In 2024, we expanded our sales force by 40%. And we positioned ourselves really to be a jump-off point to reach more general practitioners, primary care physicians to make sure that we were able to take advantage of this opportunity."). It was also revealed after the Class Period that the implementation of the sales force expansion had actually "started in Q2/Q3" of 2023 (a period beginning on April 1, 2023) and that the primary reason behind the sales force expansion was the PCP prescribing patterns Defendants were witnessing at the time. ("We decided back in 2023, we needed a broader sales force for a number of reasons. The first reason is we've looked at prescribing patterns . . . ."). Defendants later acknowledged that the sales force expansion and realignment was necessary because "[q]uite simply, Dexcom can't win in physician offices where we don't have a presence" and that "we needed to get into those [PCP] offices and develop relationships" because "what we've noted in our data is we obviously don't win in offices we don't call on."

187. **Dexcom Was Losing the Basal Market to Abbott**. Dexcom's commercial strategy to compete with Abbott in the newly expanded Type 2 basal CGM market was ineffective. In reality, Dexcom was ceding the vast majority of market share to Abbott. IQVIA data cited by Abbott showed Abbott was winning seven of ten of the scripts in the newly-covered Type 2 basal population in January 2024.[8]

---

[8] IQVIA is a private, third-party company that, among other things, sells healthcare data and analytics services. IQVIA data is regularly used within the pharmaceutical and medical device industries as a useful indicator of market trends – including by Defendants themselves, who relied on IQVIA data in their presentations to investors. For example, during a call on September 14, 2022, Sylvain stated, "so you can kind of get a barometer of how the market is moving, the IQVIA data that's out there, script data remains strong. And so that's an indicator that the market continues to

4914-2626-0365.v1                                                        **24-cv-1485-RSH-VET**

188.  ***Dexcom Lacked a Sufficient PCP Sales Force to Compete with Abbott***. Contrary to Sayer's claim, Dexcom's commercial strategy was not succeeding in the Type 2 basal market because Dexcom lacked a sales force capable of adequately reaching the PCPs – the dominant prescriber base for Type 2 basal patients.

189.  Dexcom's own statements confirm the misalignment between its sales force structure and the new Type 2 basal market.  Defendants admitted that "primary care was the likely space where most basal patients were going to be seen," yet its sales force lacked both the scale and alignment required to reach 250,000 PCPs nationwide.  Instead, Dexcom's sales force had historically focused on the much smaller base of 7,000 endocrinologists and other high-volume prescribers of intensive insulin patients.  For example, prior to the Class Period, Defendants acknowledged "[t]he way we structure the [sales] teams out in the field is very much based upon the number of . . . intensive insulin users that they see."  Despite efforts to target a limited subset of higher-prescribing PCPs in 2023, the narrow focus and alignment of the sales force remained largely consistent until Dexcom's 2024 sales force expansion, which was designed "to reach more . . . primary care physicians to make sure that we were able to take advantage of this [basal] opportunity."  Up until that point, as Defendants later admitted, Dexcom's sales force had continued to "focus[] on those that were high, the highest prescribers in the territory" rather than "prospecting" and "talking to more of PCPs who don't prescribe as much product."

190.  PCPs, unlike endocrinologists, require product education and support in order to prescribe CGMs to their patients.  A study in the *Annals of Family Medicine* noted that, while endocrinology has embraced CGMs, most diabetes care occurs in primary care settings ("approximately 90% of US patients whose diabetes is managed in primary care settings"), and PCPs "are open to using CGM . . . but they need resources and support."  Defendants later acknowledged that physician interfacing

prescribe."  Similarly, Dexcom's June 2023 investor day presentation repeatedly cited IQVIA data as a source.

- 76 -                                                  **24-cv-1485-RSH-VET**

was critical to adoption in the PCP segment.  For example, they conceded: "Dexcom can't win in physician offices where we don't have a presence" and that they were "getting very few prescriptions" in offices they did not call on.  Likewise, Defendants later conceded they "needed to get into those [PCP] offices and develop relationships" because "what we've noted in our data is we obviously don't win in offices we don't call on."  In fact, Defendants now concede that it is "obvious" that interfacing with and educating PCPs was critical to competing in the Type 2 basal market: "[I]t is obvious: the purpose of a sales force is to educate physicians on Dexcom's products so they know the benefits for patients.  Physicians not contacted did not receive that one-on-one education."  Doc. No. 29-1 at 29.

191.    Dexcom's sales resources were insufficient to address this reality.  Prior to the 2024 sales force expansion, Dexcom operated with only ~260 representatives across 26 territories.  Defendants had previously stated that the sales team structure was based on the volume of intensive insulin users seen, and that basal-only patients were "not something that . . . we sell to or market to."

192.    Consequently, Dexcom was only reaching, at most, approximately 30% of U.S. PCPs.  *See* n.5.  Subsequent admissions confirm the inadequacy: Dexcom "didn't have the resources in the field to address these new markets" and "needed a broader sales force."

193.    ***Abbott Was Deeply Entrenched in the Type 2 Basal Market***.  In contrast to Dexcom, Abbott (its only meaningful competitor) had historically focused on the uninsured Type 2 basal market.  This included a robust PCP-facing sales force that was at least 50% larger than Dexcom's.  Immediately prior to the Class Period, Abbott's CEO described that the basal market was "an important part of [Abbott's] growth strategy" and stated that Abbott had been investing in "building a sales force that's focused more on the primary care side."

194.    But it was not Abbott's sales force size advantage alone; Abbott's longstanding prioritization of PCP prescribers gave it a significant advantage over

4914-2626-0365.v1

Dexcom. By the start of the Class Period, Abbott had entrenched itself as the near unanimous CGM option for basal patients among PCP prescribers through focused marketing and sales efforts. Abbott acknowledged that prioritizing the Type 2 basal population was "our strategy from the moment we entered the market" (years before CMS approved coverage) and that its market leadership in the Type 2 basal space was "not something that [just] happened . . . [w]e've been focus[ed] on this, generating the clinical evidence, building the sales forces to be able to reach a primary care team, investing in direct-to-consumer advertising." Abbott also offered a viable cash pay option, a lower price tag, and a strong rebate program that made its CGMs affordable even without insurance coverage. These focused efforts were designed to reach and educate PCPs and make it easier for them to prescribe to the Type 2 basal population. By the start of the Class Period, basal and non-intensive patients constituted 40% of Abbott's CGM user base.

195.   A 2023 Evercore ISI report, based on a survey of physicians, found a "clear preference" among physicians for Abbott's Libre over Dexcom's CGM among Type 2 patients, driven by Abbott's better field support and sales coverage. The Evercore ISI report concluded: "With A[bbott] having a bigger sales force and scoring better on field support metric, the data suggests A[bbott] as having an advantage in the T[ype]2 setting."

196.   Although the market was aware of Abbott's presence in the Type 2 non-intensive market prior to the CMS coverage decision, Sayer's statement ignored or downplayed that Dexcom was "not getting any traction" and "can't win" in PCP offices they did not call on. Sayer assured investors that Dexcom's 2021 sales force expansion enabled it to compete with Abbott. Unbeknownst to investors, however, Abbott's strong PCP presence, coupled with Dexcom's lack of one, prevented Dexcom from effectively competing in the new Type 2 basal market – exactly the opposite of what Sayer told investors.

4914-2626-0365.v1

197. ***Dexcom's Strained DME Relationships Further Undermined Its Position***. Dexcom's readiness was further undermined by frayed relationships in the crucial DME channel, the exclusive supplier of CGMs for Medicare basal patients following the CMS expansion. DME remained a critical sales channel throughout the Class Period, as almost half of the total Type 2 basal population was made up of Medicare patients.

198. Unbeknownst to investors, Dexcom's years-long push to move its business to the pharmacy channel had alienated its DME channel partners leading up to the start of the Class Period. Notably, Dexcom's preference for fulfilling orders through the pharmacy channel had caused its proportion of sales fulfilled through DME partners to bottom out at 25% leading up to the Class Period. Abbott, by contrast, maintained a balanced fulfillment strategy between pharmacy and DME (~50/50). Dexcom's preference for pharmacy fulfillment led to widespread dissatisfaction among DME partners, who viewed Abbott as "channel agnostic" and more supportive. As Defendants later admitted, this impacted Dexcom's ability to compete in the basal market: "we've lost market share in the DME channel . . . and that has hurt us"; "growth in the DME channel has trailed our plan"; and "[w]e're not doing wonderful in the basal space." As analysts acknowledged following conversations with Defendants, these issues were pervasive and existed in prior quarters during the Class Period. According to a July 31, 2024 J.P. Morgan report, "erosion in the relationship between the company and DME distributor patterns has been ongoing for some time, likely starting with the company's fanfare around pharmacy access with the launch of G7 [in early 2023]." BofA Global Research also issued a report on August 5, 2024, stating "the issues being highlighted seem widespread across many of the DMEs." Defendants later acknowledged that senior executives had to intervene to repair DME relationships. Even after these efforts, they cautioned it would take time to stop losing share.

4914-2626-0365.v1

199.   ***Dexcom Created a False Narrative of Readiness***.  With an inadequate PCP sales force and frayed DME relationships, Dexcom was unable to compete with Abbott.  Defendants quickly sought to implement a sales force expansion to reach more of the critical PCP prescriber base.  For example, Sayer later admitted that Dexcom "decided back in 2023" that it "needed to broaden [its] reach" and "needed a broader sales force" for a number of reasons, including that they had "looked at prescribing patterns" and Dexcom was "getting very few prescriptions" and "not getting any traction" in "those offices where we had no salespeople."  As later relayed by analysts following a meeting with Sylvain and Lawver, the implementation of the sales force expansion had actually "started in Q2/Q3" of 2023 (before Sayer's January 8, 2024 statement).

200.   Sayer's statement, made in the context of his discussion of the new basal opportunity, created the misimpression that Dexcom was effectively competing with Abbott, its only meaningful competitor, in this massive, newly-covered Type 2 basal patient population.

201.   **Scienter**.  Sayer knew, or was deliberately reckless in not knowing, that his statements were false and misleading when made.  *See* §VIII.

(a)   ***Core Operations and Strategic Importance***: The expansion of CGM coverage to Type 2 basal patients was, by Sayer's own admission, the "largest single expansion of access to CGM in our industry's history."  Its strategic importance meant Defendants closely monitored all aspects of this market, including Dexcom's competitive positioning, sales force capabilities, and market share relative to Abbott.  Given this, Sayer's assertion that Dexcom was gaining share in the Type 2 basal market would only be credible if based on a thorough understanding of these monitored factors.  It would be absurd to suggest that Sayer – Dexcom's CEO – would not be aware of deficiencies in Dexcom's commercial infrastructure that prevented Dexcom from meaningfully competing for this critical market.  This is particularly true where Sayer repeatedly discussed, answered analysts' questions on, and professed

4914-2626-0365.v1

knowledge of the Company's competitive position in the Type 2 basal market, including its sales force coverage, DME relationships, and market share.

(b)    ***Access to Real-Time Data***: Sayer and other defendants repeatedly represented that they had access to information allowing them to track sales data, understand where their patients were coming from, and monitor the Company's market share in the basal market, showing Sayer possessed data undermining his Class Period statements.  For instance, in January 2023, Sayer stated: "We have the data capabilities to show what outcomes we're going to generate within this population . . . .  We can download the data we get from those patients and present a very strong case to those payers."

(c)    ***Subsequent Admissions***: In September 2024, Sayer admitted: "We decided back in 2023, we needed a broader sales force . . . we've looked at prescribing patterns and the places where we were not getting any traction are those offices where we had no salespeople."  The 40% expansion and field reorganization launched in Q2/Q3 2023 confirm Sayer's contemporaneous awareness.

(d)    ***DME Channel Awareness***: Similarly, Defendants admitted post-Class Period that DME performance had fallen short and hurt their basal business, saying: "we've lost market share in the DME channel . . . and that has hurt us"; "growth in the DME channel has trailed our plan"; "you'd probably imagine if we're not doing well in the DME it gets back to your point.  We're not doing wonderful in the basal space."  Analysts reported that these issues had persisted in prior quarters.  This directly contradicts Sayer's January 2024 assertion that Dexcom's commercial strategy enabled it to compete in the Type 2 basal market.

(e)    ***Motive***: In addition to his knowledge and/or reckless disregard of the misleading nature of his statements, Sayer was also motivated to mislead investors, as set forth below in §VIII.F.  Notably, Sayer sold $4.6 million in stock at artificially inflated prices just eight days after making these statements.

- 81 -    **24-cv-1485-RSH-VET**

202. **Conclusion**.    Sayer's January 8, 2024 statement was materially misleading because it gave investors the false impression that Dexcom's commercial strategy had already achieved success in the newly-covered Type 2 basal segment.  In reality, Dexcom was struggling to compete, losing significant market share to Abbott due to an insufficient PCP-facing sales force and deteriorating DME relationships. Sayer's reference to the 2021 sales force expansion in assuring that the Company had already "greatly expanded" its sales team and that this strategy was "work[ing] wonderfully" omitted material facts – most notably, that Dexcom was still mid-course in rolling out a large-scale sales force expansion it had initiated the prior year in response to alarming basal prescribing trends.   These omissions obscured the structural shortcomings limiting Dexcom's market penetration and left investors with a materially distorted understanding of the Company's readiness and performance in its most strategically significant growth segment.

**H.    January 8, 2024 JPMorgan Healthcare Conference**

203. **Context of Statement**.   During the same January 8, 2024 call, the following exchange occurred between an analyst and Sayer:

> [Analyst:] I know it's still only 2.5 quarters since you've gotten Medicare and then started to roll in commercial reimbursement for basal in the U.S. here.  But do you have data yet on whether DexCom is winning more than your fair share in the basal category?

> [Sayer:] You know what, we are doing well in the basal category. My fair shares is all of them.  So we'd like to win more.  We win – we do very well where we have coverage and penetration, and we know the physicians, and we know the community.  And what we are working on is broader coverage and broader efforts to make sure we can win more places.  When I said we're investing on the commercial side to get broader, and that's one of the things I'm inferring that we – and we're looking for creative clever ways to do that.  But we – where we have a presence, we win very much.

204. **Challenged Statements Alleged to Be False and Misleading.**

- "[W]e are doing well in the basal category."

- "We win – we do very well where we have coverage and penetration . . . ."

**24-cv-1485-RSH-VET**

4914-2626-0365.v1

205.    **<u>Reasons Why These Statements Are False and Misleading</u>**.  Sayer's statements were materially false and misleading because they conveyed the impression that Dexcom's commercial strategy – particularly its PCP-facing sales execution – had positioned the Company to successfully compete with Abbott in the newly expanded Type 2 basal market.  These statements suggested that Dexcom was gaining meaningful traction and "doing well" where it had coverage and presence.  In reality, Dexcom's infrastructure was insufficient to support such claims: its sales force lacked the reach and alignment to penetrate primary care settings, and its strained DME relationships further hampered its ability to convert coverage into prescriptions.  As described below, contemporaneous internal data, admissions, and subsequent remedial actions contradict Sayer's assurances and underscore the misleading nature of the statements.

206.    ***Dexcom Was Losing the Basal Market to Abbott***.    Dexcom's commercial strategy to compete with Abbott in the newly expanded Type 2 basal CGM market was ineffective.  In reality, Dexcom was ceding the vast majority of market share to Abbott.  IQVIA data cited by Abbott showed Abbott was winning seven of ten of the scripts in the newly-covered Type 2 basal population in January 2024.

207.    ***Dexcom Was Implementing a Major Sales Force Restructuring to Fix Its Commercial Infrastructure***.  Unbeknownst to investors, at the time of Sayer's statement describing Dexcom's purported success in the Type 2 basal market, Defendants were in the midst of implementing a material sales force expansion and realignment because, as Defendants would later admit, "we were not getting any traction [at] those [PCP] offices where we had no salespeople, where we weren't calling on physicians.  We're getting very few prescriptions."  Less than two months later, Dexcom announced the significant sales force expansion (40% increase) which they later acknowledged, after the Class Period, as a "jump[ing] off point" to reach a sufficient number of PCPs to take advantage of the basal opportunity, an

- 83 -                                    **24-cv-1485-RSH-VET**

acknowledgement that prior to this expansion, they were not well-positioned to reach a meaningful number of PCPs to capture the newly-covered basal population. ("In 2024, we expanded our sales force by 40%. And we positioned ourselves really to be a jump-off point to reach more general practitioners, primary care physicians to make sure that we were able to take advantage of this opportunity."). It was also revealed after the Class Period that the implementation of the sales force expansion had actually "started in Q2/Q3" of 2023 (a period beginning on April 1, 2023) and that the primary reason behind the sales force expansion was the PCP prescribing patterns Defendants were witnessing at the time. ("We decided back in 2023, we needed a broader sales force for a number of reasons. The first reason is we've looked at prescribing patterns . . . ."). Defendants later acknowledged that the sales force expansion and realignment was necessary because "[q]uite simply, Dexcom can't win in physician offices where we don't have a presence" and that "we needed to get into those [PCP] offices and develop relationships" because "what we've noted in our data is we obviously don't win in offices we don't call on."

208. ***Dexcom Lacked a Sufficient PCP Sales Force to Compete with Abbott***. Contrary to Sayer's claim, Dexcom's commercial strategy was not succeeding in the Type 2 basal market because Dexcom lacked a sales force capable of adequately reaching the PCPs – the dominant prescriber base for Type 2 basal patients.

209. Dexcom's own statements confirm the misalignment between its sales force structure and the new Type 2 basal market. Defendants admitted that "primary care was the likely space where most basal patients were going to be seen," yet its sales force lacked both the scale and alignment required to reach 250,000 PCPs nationwide. Instead, Dexcom's sales force had historically focused on the much smaller base of 7,000 endocrinologists and other high-volume prescribers of intensive insulin patients. For example, prior to the Class Period, Defendants acknowledged "[t]he way we structure the [sales] teams out in the field is very much based upon the number of . . . intensive insulin users that they see." Despite efforts to target a limited

- 84 -          **24-cv-1485-RSH-VET**

subset of higher-prescribing PCPs in 2023, the narrow focus and alignment of the sales force remained largely consistent until Dexcom's 2024 sales force expansion, which was designed "to reach more . . . primary care physicians to make sure that we were able to take advantage of this [basal] opportunity." Up until that point, as Defendants later admitted, Dexcom's sales force had continued to "focus[] on those that were high, the highest prescribers in the territory" rather than "prospecting" and "talking to more of PCPs who don't prescribe as much product."

210. PCPs, unlike endocrinologists, require product education and support in order to prescribe CGMs to their patients. A study in the *Annals of Family Medicine* noted that, while endocrinology has embraced CGMs, most diabetes care occurs in primary care settings ("approximately 90% of US patients whose diabetes is managed in primary care settings"), and PCPs "are open to using CGM . . . but they need resources and support." Defendants later acknowledged that physician interfacing was critical to adoption in the PCP segment. For example, they admitted: "Dexcom can't win in physician offices where we don't have a presence" and that they were "getting very few prescriptions" in offices they did not call on. Likewise, Defendants later acknowledged that they "needed to get into those [PCP] offices and develop relationships" because "what we've noted in our data is we obviously don't win in offices we don't call on." In fact, Defendants now concede that it is "obvious" that interfacing with and educating PCPs was critical to competing in the Type 2 basal market: "[I]t is obvious: the purpose of a sales force is to educate physicians on Dexcom's products so they know the benefits for patients. Physicians not contacted did not receive that one-on-one education." Doc. No. 29-1 at 29.

211. Dexcom's sales resources were insufficient to address this reality. Prior to the 2024 sales force expansion, Dexcom operated with only ~260 representatives across 26 territories. Defendants had previously stated that the sales team structure was based on the volume of intensive insulin users seen, and that basal-only patients were "not something that . . . we sell to or market to."

4914-2626-0365.v1

212.    Consequently, Dexcom was only reaching, at most, approximately 30% of U.S. PCPs.  *See* n.5.  Subsequent admissions confirm the inadequacy: Dexcom "didn't have the resources in the field to address these new markets" and "needed a broader sales force."

213.    ***Abbott Was Deeply Entrenched in the Type 2 Basal Market***.  In contrast to Dexcom, Abbott (its only meaningful competitor) had historically focused on the uninsured Type 2 basal market.  This included a robust PCP-facing sales force that was at least 50% larger than Dexcom's.  Immediately prior to the Class Period, Abbott's CEO described that the basal market was "an important part of [Abbott's] growth strategy" and stated that Abbott had been investing in "building a sales force that's focused more on the primary care side."

214.    But it was not Abbott's sales force size advantage alone; Abbott's longstanding prioritization of PCP prescribers gave it a significant advantage over Dexcom.  By the start of the Class Period, Abbott had entrenched itself as the near unanimous CGM option for basal patients among PCP prescribers through focused marketing and sales efforts.  Abbott acknowledged that prioritizing the Type 2 basal population was "our strategy from the moment we entered the market" (years before CMS approved coverage) and that its market leadership in the Type 2 basal space was "not something that [just] happened . . . [w]e've been focus[ed] on this, generating the clinical evidence, building the sales forces to be able to reach a primary care team, investing in direct-to-consumer advertising."  Abbott also offered a viable cash pay option, a lower price tag, and a strong rebate program that made its CGMs affordable even without insurance coverage.  These focused efforts were designed to reach and educate PCPs and make it easier for them to prescribe to the Type 2 basal population.  By the start of the Class Period, basal and non-intensive patients constituted 40% of Abbott's CGM user base.

215.    A 2023 Evercore ISI report, based on a survey of physicians, found a "clear preference" among physicians for Abbott's Libre over Dexcom's CGM among

4914-2626-0365.v1

Type 2 patients, driven by Abbott's better field support and sales coverage. The Evercore ISI report concluded: "With A[bbott] having a bigger sales force and scoring better on field support metric, the data suggests A[bbott] as having an advantage in the T[ype]2 setting."

216.    Although the market was aware of Abbott's presence in the Type 2 non-intensive market prior to the CMS coverage decision, Sayer's statement ignored or downplayed that Dexcom was "not getting any traction" and "can't win" in PCP offices they did not call on. Sayer assured investors that Dexcom was "doing well" in the basal category and "win[ning]" wherever it had coverage and penetration – statements that conveyed the impression that Dexcom's commercial strategy had positioned it to compete effectively with Abbott. In reality, however, Abbott's entrenched PCP-facing infrastructure, combined with Dexcom's lack of field coverage and poor traction with PCPs, meant that Dexcom was losing significant market share in the newly-covered Type 2 basal segment – precisely the opposite of what Sayer led investors to believe.

217.    ***Dexcom's Strained DME Relationships Further Undermined Its Position***. Dexcom's readiness was further undermined by frayed relationships in the crucial DME channel, the exclusive supplier of CGMs for Medicare basal patients following the CMS expansion. DME remained a critical sales channel throughout the Class Period, as almost half of the total Type 2 basal population was made up of Medicare patients.

218.    Unbeknownst to investors, Dexcom's years-long push to move its business to the pharmacy channel had alienated its DME channel partners leading up to the start of the Class Period. Notably, Dexcom's preference for fulfilling orders through the pharmacy channel had caused its proportion of sales fulfilled through DME partners to bottom out at 25% leading up to the Class Period. Abbott, by contrast, maintained a balanced fulfillment strategy between pharmacy and DME (~50/50). Dexcom's preference for pharmacy fulfillment led to widespread

- 87 -                                              **24-cv-1485-RSH-VET**

dissatisfaction among DME partners, who viewed Abbott as "channel agnostic" and more supportive.  As Defendants later admitted, this impacted Dexcom's ability to compete in the basal market: "we've lost market share in the DME channel . . . and that has hurt us"; "growth in the DME channel has trailed our plan"; and "[w]e're not doing wonderful in the basal space."  As analysts acknowledged following conversations with Defendants, these issues were pervasive and existed in prior quarters during the Class Period.  According to a July 31, 2024 J.P. Morgan report, "erosion in the relationship between the company and DME distributor patterns has been ongoing for some time, likely starting with the company's fanfare around pharmacy access with the launch of G7 [in early 2023]."  BofA Global Research also issued a report on August 5, 2024, stating "the issues being highlighted seem widespread across many of the DMEs."  Defendants later acknowledged that senior executives had to intervene to repair DME relationships.  Even after these efforts, they cautioned it would take time to stop losing share.

219.   ***Dexcom Created a False Narrative of Readiness***.  With an inadequate PCP sales force and frayed DME relationships, Dexcom was unable to compete with Abbott.  Defendants quickly sought to implement a sales force expansion to reach more of the critical PCP prescriber base.  For example, Sayer later admitted that Dexcom "decided back in 2023" that it "needed to broaden [its] reach" and "needed a broader sales force" for a number of reasons, including that they had "looked at prescribing patterns" and Dexcom was "getting very few prescriptions" and "not getting any traction" in "those offices where we had no salespeople."  As later relayed by analysts following a meeting with Sylvain and Lawver, the implementation of the sales force expansion had actually "started in Q2/Q3" of 2023 (before Sayer's January 8, 2024 statement).

220.   Sayer's statements, made in response to a direct question about whether Dexcom was "winning" in the basal category, falsely conveyed that the Company was effectively competing in that market and had achieved traction commensurate with its

- 88 -                                        **24-cv-1485-RSH-VET**

commercial strategy.   By asserting that Dexcom was "doing well in the basal category" and that "where we have coverage and penetration" "we win," Sayer created the misimpression that Dexcom's commercial execution – particularly its expanded sales force – was successfully enabling it to compete with Abbott in the newly-covered Type 2 basal segment.  In truth, Dexcom was not winning in the basal market: Abbott was capturing the overwhelming majority of prescriptions due to its superior PCP-facing infrastructure, while Dexcom's own lack of primary care coverage and frayed DME relationships left it unable to convert expanded coverage into actual prescribing gains.  Sayer's assurances were therefore materially misleading, as they obscured the Company's competitive struggles and painted a falsely optimistic picture of its performance in a critical new growth segment.

221.  **Scienter**.  Sayer knew, or was deliberately reckless in not knowing, that his statements were false and misleading when made.  *See* §VIII.

(a)     ***Core Operations and Strategic Importance***: The expansion of CGM coverage to Type 2 basal patients was, by Sayer's own admission, the "largest single expansion of access to CGM in our industry's history."  Its strategic importance meant Defendants closely monitored all aspects of this market, including Dexcom's competitive positioning, sales force capabilities, and market share relative to Abbott.  Given this, Sayer's assertion that Dexcom was "doing well in the basal category" and that "where we have coverage and penetration" "we win" would only be credible if based on a thorough understanding of these monitored factors.  It would be absurd to suggest that Sayer – Dexcom's CEO – would not be aware of deficiencies in Dexcom's commercial infrastructure that prevented Dexcom from meaningfully competing for this critical market.  This is particularly true where Sayer repeatedly discussed, answered analysts' questions on, and professed knowledge of the Company's competitive position in the Type 2 basal market, including its sales force coverage, DME relationships, and market share.

- 89 -                                   **24-cv-1485-RSH-VET**

(b) ***Access to Real-Time Data***: Sayer and other defendants repeatedly represented that they had access to information allowing them to track sales data, understand where their patients were coming from, and monitor the Company's market share in the basal market, showing Sayer possessed data undermining his Class Period statements. For instance, in January 2023, Sayer stated: "We have the data capabilities to show what outcomes we're going to generate within this population . . . . We can download the data we get from those patients and present a very strong case to those payers."

(c) ***Subsequent Admissions***: In September 2024, Sayer admitted: "We decided back in 2023, we needed a broader sales force . . . we've looked at prescribing patterns and the places where we were not getting any traction are those offices where we had no salespeople." The 40% expansion and field reorganization launched in Q2/Q3 2023 confirm Sayer's contemporaneous awareness.

(d) ***DME Channel Awareness***: Similarly, Defendants admitted post-Class Period that DME performance had fallen short and hurt their basal business, saying: "we've lost market share in the DME channel . . . and that has hurt us"; "growth in the DME channel has trailed our plan"; "you'd probably imagine if we're not doing well in the DME it gets back to your point. We're not doing wonderful in the basal space." Analysts reported that these issues had persisted in prior quarters. This directly contradicts Sayer's January 2024 assertion that Dexcom was successfully competing in the Type 2 basal market.

(e) ***Motive***: In addition to his knowledge and/or reckless disregard of the misleading nature of his statements, Sayer was also motivated to mislead investors, as set forth below in §VIII.F. Notably, Sayer sold $4.6 million in stock at artificially inflated prices just eight days after making these statements.

222. **Conclusion**. Sayer's statements misled investors by portraying Dexcom as competitively strong in the Type 2 basal market when, in fact, it was losing significant share to Abbott due to structural deficiencies in sales force coverage and

4914-2626-0365.v1

DME execution.  By claiming that Dexcom was "doing well" and "win[ning]" where it had coverage, Sayer obscured the Company's lack of field presence in the primary care channel and the strategic expansion it had already undertaken to address underperformance.   These omissions and mischaracterizations gave investors a materially distorted view of Dexcom's competitive position and commercial readiness in what Defendants themselves described as the largest market access expansion in industry history.

**I.      January 8, 2024 JPMorgan Healthcare Conference**

223.   **Context of Statement**.  Also during the January 8, 2024 JPMorgan Healthcare Conference the following exchange occurred between an analyst and Sylvain:

> [Analyst:] So record new patients in fourth quarter, again.  Any way to size how much was basal versus nonbasal because our doc checks remain just so enthusiastic about CGM for these patients now with reimbursement.  Any way to kind of compare the different groups?
>
> *      *           *
>
> [Sylvain:] Yes.  So as we think about those patients, and we'll get the full final patients numbers in soon.  We know it's trending that way.  You're seeing – you're right.  You're seeing a very strong adoption in the basal population, that unmet need is significant.  And so you continue to see outperformance in basal, but you're also seeing a really strong performance continuing in the intensive markets, both type 1 and type 2.

224.   **Challenged Statement Alleged to Be False and Misleading**.  "We know it's trending that way.  You're seeing – you're right.  You're seeing a very strong adoption in the basal population, that unmet need is significant.  And so you continue to see outperformance in basal . . . ."

225.   **Reasons Why This Statement Is False and Misleading**.  Sylvain's statement was materially false and misleading because it conveyed the impression that Dexcom was experiencing strong adoption and outperforming in the basal segment – particularly in light of recent coverage expansions.  These remarks suggested that Dexcom was gaining meaningful traction in the Type 2 basal market and was effectively converting access into prescriptions.  In reality, however, Dexcom was not

**24-cv-1485-RSH-VET**

4914-2626-0365.v1

experiencing "outperformance" in that market; it was ceding significant share to Abbott due to persistent commercial deficiencies. Specifically, Dexcom's sales force lacked sufficient reach into primary care – the dominant prescriber base for Type 2 basal patients – and the Company's strained DME relationships further undermined its ability to serve Medicare beneficiaries. Internal data, contemporaneous admissions, and the Company's ongoing efforts to restructure its sales operations all confirm that, contrary to Sylvain's assurances, Dexcom was underperforming in the basal category during this period.

226. ***Dexcom Was Losing the Basal Market to Abbott***. Dexcom's commercial strategy to compete with Abbott in the newly expanded Type 2 basal CGM market was ineffective. In reality, Dexcom was ceding the vast majority of market share to Abbott. IQVIA data cited by Abbott showed Abbott was winning seven of ten of the scripts in the newly-covered Type 2 basal population in January 2024.

227. ***Dexcom Was Implementing a Major Sales Force Restructuring to Fix Its Commercial Infrastructure***. Unbeknownst to investors, at the time of Sayer's statement describing Dexcom's purported success in the Type 2 basal market, Defendants were in the midst of implementing a material sales force expansion and realignment because, as Defendants would later admit, "we were not getting any traction [at] those [PCP] offices where we had no salespeople, where we weren't calling on physicians. We're getting very few prescriptions." Less than two months later, Dexcom announced the significant sales force expansion (40% increase) which they later acknowledged, after the Class Period, as a "jump[ing] off point" to reach a sufficient number of PCPs to take advantage of the basal opportunity, an acknowledgement that prior to this expansion, they were not well-positioned to reach a meaningful number of PCPs to capture the newly-covered basal population. ("In 2024, we expanded our sales force by 40%. And we positioned ourselves really to be a jump-off point to reach more general practitioners, primary care physicians to make

4914-2626-0365.v1

sure that we were able to take advantage of this opportunity.").  It was also revealed after the Class Period that the implementation of the sales force expansion had actually "started in Q2/Q3" of 2023 (a period beginning on April 1, 2023) and that the primary reason behind the sales force expansion was the PCP prescribing patterns Defendants were witnessing at the time.  ("We decided back in 2023, we needed a broader sales force for a number of reasons.  The first reason is we've looked at prescribing patterns . . . .").  Defendants later acknowledged that the sales force expansion and realignment was necessary because "[q]uite simply, Dexcom can't win in physician offices where we don't have a presence" and that "we needed to get into those [PCP] offices and develop relationships" because "what we've noted in our data is we obviously don't win in offices we don't call on."

228.  ***Dexcom Lacked a Sufficient PCP Sales Force to Compete with Abbott.***  Contrary to Sylvain's claim of "very strong adoption" and "outperformance in basal," Dexcom was not succeeding in the Type 2 basal market because it lacked a sales force capable of adequately reaching PCPs – the prescriber base responsible for the vast majority of basal patient prescriptions.  The Company's limited primary care coverage meant it was unable to capitalize on newly expanded coverage.  As a result, Dexcom was not gaining share but was instead losing ground to Abbott, whose larger and better-aligned PCP-facing sales force had already entrenched its CGM product as the default option for basal patients.

229.  Dexcom's own statements confirm the misalignment between its sales force structure and the new Type 2 basal market.  Defendants admitted that "primary care was the likely space where most basal patients were going to be seen," yet its sales force lacked both the scale and alignment required to reach 250,000 PCPs nationwide.  Instead, Dexcom's sales force had historically focused on the much smaller base of 7,000 endocrinologists and other high-volume prescribers of intensive insulin patients.  For example, prior to the Class Period, Defendants acknowledged "[t]he way we structure the [sales] teams out in the field is very much based upon the

4914-2626-0365.v1

**24-cv-1485-RSH-VET**

number of . . . intensive insulin users that they see." Despite efforts to target a limited subset of higher-prescribing PCPs in 2023, the narrow focus and alignment of the sales force remained largely consistent until Dexcom's 2024 sales force expansion, which was designed "to reach more . . . primary care physicians to make sure that we were able to take advantage of this [basal] opportunity." Up until that point, as Defendants later admitted, Dexcom's sales force had continued to "focus[] on those that were high, the highest prescribers in the territory" rather than "prospecting" and "talking to more of PCPs who don't prescribe as much product."

230. PCPs, unlike endocrinologists, require product education and support in order to prescribe CGMs to their patients. A study in the *Annals of Family Medicine* noted that, while endocrinology has embraced CGMs, most diabetes care occurs in primary care settings ("approximately 90% of US patients whose diabetes is managed in primary care settings"), and PCPs "are open to using CGM . . . but they need resources and support." Defendants later acknowledged that physician interfacing was critical to adoption in the PCP segment. For example, they conceded: "Dexcom can't win in physician offices where we don't have a presence" and that they were "getting very few prescriptions" in offices they did not call on. Likewise, Defendants later conceded they "needed to get into those [PCP] offices and develop relationships" because "what we've noted in our data is we obviously don't win in offices we don't call on." In fact, Defendants now concede that it is "obvious" that interfacing with and educating PCPs was critical to competing in the Type 2 basal market: "[I]t is obvious: the purpose of a sales force is to educate physicians on Dexcom's products so they know the benefits for patients. Physicians not contacted did not receive that one-on-one education." Doc. No. 29-1 at 29.

231. Dexcom's sales resources were insufficient to address this reality. Prior to the 2024 sales force expansion, Dexcom operated with only ~260 representatives across 26 territories. Defendants had previously stated that the sales team structure

4914-2626-0365.v1

was based on the volume of intensive insulin users seen, and that basal-only patients were "not something that . . . we sell to or market to."

232.    Consequently, Dexcom was only reaching, at most, approximately 30% of U.S. PCPs. *See* n.5.  Subsequent admissions confirm the inadequacy: Dexcom "didn't have the resources in the field to address these new markets" and "needed a broader sales force."

233.    ***Abbott Was Deeply Entrenched in the Type 2 Basal Market***. In contrast to Dexcom, Abbott (its only meaningful competitor) had historically focused on the uninsured Type 2 basal market.  This included a robust PCP-facing sales force that was at least 50% larger than Dexcom's.  Immediately prior to the Class Period, Abbott's CEO described that the basal market was "an important part of [Abbott's] growth strategy" and stated that Abbott had been investing in "building a sales force that's focused more on the primary care side."

234.    But it was not Abbott's sales force size advantage alone; Abbott's longstanding prioritization of PCP prescribers gave it a significant advantage over Dexcom.  By the start of the Class Period, Abbott had entrenched itself as the near unanimous CGM option for basal patients among PCP prescribers through focused marketing and sales efforts.  Abbott acknowledged that prioritizing the Type 2 basal population was "our strategy from the moment we entered the market" (years before CMS approved coverage) and that its market leadership in the Type 2 basal space was "not something that [just] happened . . . [w]e've been focus[ed] on this, generating the clinical evidence, building the sales forces to be able to reach a primary care team, investing in direct-to-consumer advertising."  Abbott also offered a viable cash pay option, a lower price tag, and a strong rebate program that made its CGMs affordable even without insurance coverage.  These focused efforts were designed to reach and educate PCPs and make it easier for them to prescribe to the Type 2 basal population.  By the start of the Class Period, basal and non-intensive patients constituted 40% of Abbott's CGM user base.

4914-2626-0365.v1

235. A 2023 Evercore ISI report, based on a survey of physicians, found a "clear preference" among physicians for Abbott's Libre over Dexcom's CGM among Type 2 patients, driven by Abbott's better field support and sales coverage. The Evercore ISI report concluded: "With A[bbott] having a bigger sales force and scoring better on field support metric, the data suggests A[bbott] as having an advantage in the T[ype]2 setting."

236. Although the market was generally aware of Abbott's historical presence in the Type 2 non-intensive segment, Sylvain's statement ignored or downplayed the reality that Dexcom was not achieving meaningful traction in the newly-covered basal population. By stating that Dexcom was experiencing "very strong adoption" and "outperformance in basal," Sylvain conveyed the false impression that the Company was successfully competing with Abbott. In truth, Abbott's dominant PCP infrastructure, combined with Dexcom's limited primary care reach and lack of presence in many prescribing offices, left Dexcom unable to convert coverage gains into real prescribing momentum. Sylvain's remarks, thus, materially misrepresented the Company's competitive standing and obscured the structural disadvantages that were, at the time, driving significant share loss in the basal market.

237. ***Dexcom's Strained DME Relationships Further Undermined Its Position***. Dexcom's readiness was further undermined by frayed relationships in the crucial DME channel, the exclusive supplier of CGMs for Medicare basal patients following the CMS expansion. DME remained a critical sales channel throughout the Class Period, as almost half of the total Type 2 basal population was made up of Medicare patients.

238. Unbeknownst to investors, Dexcom's years-long push to move its business to the pharmacy channel had alienated its DME channel partners leading up to the start of the Class Period. Notably, Dexcom's preference for fulfilling orders through the pharmacy channel had caused its proportion of sales fulfilled through DME partners to bottom out at 25% leading up to the Class Period. Abbott, by

- 96 -                                                    **24-cv-1485-RSH-VET**

contrast, maintained a balanced fulfillment strategy between pharmacy and DME (~50/50). Dexcom's preference for pharmacy fulfillment led to widespread dissatisfaction among DME partners, who viewed Abbott as "channel agnostic" and more supportive. As Defendants later admitted, this impacted Dexcom's ability to compete in the basal market: "we've lost market share in the DME channel . . . and that has hurt us"; "growth in the DME channel has trailed our plan"; and "[w]e're not doing wonderful in the basal space." As analysts acknowledged following conversations with Defendants, these issues were pervasive and existed in prior quarters during the Class Period. According to a July 31, 2024 J.P. Morgan report, "erosion in the relationship between the company and DME distributor patterns has been ongoing for some time, likely starting with the company's fanfare around pharmacy access with the launch of G7 [in early 2023]." BofA Global Research also issued a report on August 5, 2024, stating "the issues being highlighted seem widespread across many of the DMEs." Defendants later acknowledged that senior executives had to intervene to repair DME relationships. Even after these efforts, they cautioned it would take time to stop losing share.

239. ***Dexcom Created a False Narrative of Readiness***. With an inadequate PCP sales force and frayed DME relationships, Dexcom was unable to compete with Abbott. Defendants quickly sought to implement a sales force expansion to reach more of the critical PCP prescriber base. For example, Sayer later admitted that Dexcom "decided back in 2023" that it "needed to broaden [its] reach" and "needed a broader sales force" for a number of reasons, including that they had "looked at prescribing patterns" and Dexcom was "getting very few prescriptions" and "not getting any traction" in "those offices where we had no salespeople." As later relayed by analysts following a meeting with Sylvain and Lawver, the implementation of the sales force expansion had actually "started in Q2/Q3" of 2023 (before Sylvain's January 8, 2024 statement).

- 97 -                **24-cv-1485-RSH-VET**

240.    Sylvain's statement, made in response to an analyst's question about patient trends and the impact of reimbursement, falsely conveyed that Dexcom was achieving strong performance and competitive traction in the newly-covered Type 2 basal segment.  By asserting that Dexcom was seeing "very strong adoption" and "outperformance in basal," Sylvain created the misleading impression that the Company's commercial infrastructure – particularly its PCP-facing sales force – was enabling Dexcom to compete effectively with Abbott.  In reality, Abbott was securing the overwhelming majority of prescriptions in the basal market due to its entrenched PCP presence, while Dexcom's limited primary care coverage and frayed DME channel relationships left it unable to translate coverage into real-world adoption. Sylvain's optimistic depiction obscured these structural deficiencies and misled investors into believing that Dexcom's commercial execution was delivering competitive success when, in fact, the Company was falling further behind its only meaningful rival.

241.    **Scienter**.  Sylvain knew, or was deliberately reckless in not knowing, that his statement was false and misleading when made.  *See* §VIII.

(a)    ***Core Operations and Strategic Importance***: The expansion of CGM coverage to Type 2 basal patients was, by Defendants' own admission, the "largest single expansion of access to CGM in our industry's history."  Its strategic importance meant Defendants closely monitored all aspects of this market, including Dexcom's competitive positioning, sales force capabilities, and market share relative to Abbott.  Given this, Sylvain's assertion that Dexcom was seeing "outperformance in basal" would only be credible if based on a thorough understanding of these monitored factors.  It would be absurd to suggest that Sylvain – Dexcom's CFO – would not be aware of deficiencies in Dexcom's commercial infrastructure that prevented Dexcom from meaningfully competing for this critical market.  This is particularly true where Sylvain repeatedly discussed, answered analysts' questions on,

4914-2626-0365.v1

and professed knowledge of the Company's competitive position in the Type 2 basal market, including its sales force coverage, DME relationships, and market share.

(b) *Access to Real-Time Data*: Sylvain and other defendants repeatedly represented that they had access to information allowing them to track sales data, understand where their patients were coming from, and monitor the Company's market share in the basal market, showing Sylvain possessed data undermining his Class Period statements. He later admitted, for example, that Dexcom "get[s] script data . . . based on pathology" to gauge performance in the basal cohort.

(c) *Subsequent Admissions*: In September 2024, Sayer admitted: "We decided back in 2023, we needed a broader sales force . . . we've looked at prescribing patterns and the places where we were not getting any traction are those offices where we had no salespeople." The 40% expansion and field reorganization launched in Q2/Q3 2023 confirm Sylvain's contemporaneous awareness.

(d) *DME Channel Awareness*: Similarly, Defendants admitted post-Class Period that DME performance had fallen short and hurt their basal business, saying "we've lost market share in the DME channel . . . and that has hurt us"; "growth in the DME channel has trailed our plan"; "you'd probably imagine if we're not doing well in the DME it gets back to your point. We're not doing wonderful in the basal space." Analysts reported that these issues had persisted in prior quarters. This directly contradicts Sylvain's January 2024 assertion that Dexcom was outperforming in the Type 2 basal market.

(e) *Motive*: In addition to his knowledge and/or reckless disregard of the misleading nature of his statement, Sylvain was also motivated to mislead investors, as set forth below in §VIII.F. In particular, Sylvain sold $338,004 in stock at artificially inflated prices eight days after making this statement.

242. **Conclusion**. Sylvain's statement misled investors by portraying Dexcom as experiencing "very strong adoption" and "outperformance" in the basal segment, when in reality the Company was losing meaningful share to Abbott due to well-

**24-cv-1485-RSH-VET**

4914-2626-0365.v1

known commercial shortcomings.  By highlighting supposed momentum in the Type 2 basal market without disclosing Dexcom's lack of PCP sales coverage and impaired DME relationships, Sylvain gave investors a materially distorted picture of the Company's performance and readiness in a strategically critical growth category. These omissions were especially misleading given that, at the time, Dexcom had already begun implementing a major sales force expansion precisely because it was not seeing the traction Sylvain claimed.

**J.      February 8, 2024 Q4 2023 Earnings Call**

243.  **Context of Statement**.  On February 8, 2024, Dexcom held a conference call for analysts and investors to discuss its fourth quarter of 2023 ("Q4 2023") results.   In response to a question specifically focused on whether accelerating domestic performance was being driven by basal adoption and whether Dexcom was gaining meaningful traction in the Type 2 basal market, Sylvain told investors that Dexcom was "taking share" based on contemporaneous "script data," and attributed Dexcom's growth in significant part to competitive share gains in the newly-covered basal segment:

> [Analyst:] Looking at the domestic performance, there's been a clear acceleration in the back half of '23 on a 2-year stacked basis.  And I'm wondering specifically if that's just basal that's helping there.  It looks like it's as much as 200, maybe 250 basis points of the acceleration.   Is that the primary contributor to the domestic acceleration?  What should we think about in terms of basal contribution to the topline this year?  And are we inflecting right now as far as basal adoption goes with CGM here in the States?

> [Sylvain:] Yes.  It's a good question.  Let me maybe just give some color as to how we're thinking about the guidance.  As you see the performance in the back half of the year, a lot of that has to do with being the most accurate sensor, launching with the G7 form factor and then, of course, having the basal coverage there.  And so when you think about it, and you can see the share taking when you look at the script data, *we are taking share*.  And having the sensor – the most advanced sensor on the market is the driver there.  So that's taking share.

- 100 -                                    **24-cv-1485-RSH-VET**

Now within those spaces, basal is a contributor, no question. As that category expands and *we take share within that category*, that does contribute to the overall numbers. And so you are right, basal is a contributor, but it has as much to do with *us taking share* as it does with category expansion. So think about both of those as contributors.

As you think about 2024, we've talked a little bit about the adoption rate, basal in total adopting in this back half of the year around 9% to 10% per year on a per annum basis. The guide assumes about 8% there. And so I think you can assume that was the case. Our long-range plan was more like 6% to 7% per year. So we are seeing basal going faster than what was in our long-range plan. And what's great about that is as *we continue to take share* and the category grows a little faster than expected, that will help contribute over the longer haul.

244. **Challenged Statements Alleged to Be False and Misleading.**

- "[Y]ou can see the share taking when you look at the script data, *we are taking share*."

- "[B]asal is a contributor, no question. As that category expands and *we take share within that category*, that does contribute to the overall numbers."

- "And so you are right, basal is a contributor, but it has as much to do with *us taking share* as it does with category expansion."

- "So we are seeing basal going faster than what was in our long-range plan. And what's great about that is as *we continue to take share* and the category grows a little faster than expected, that will help contribute over the longer haul."

245. **Reasons Why These Statements Are False and Misleading**. Sylvain's February 8, 2024 statements about Dexcom "taking share" were materially misleading and created a misimpression when made because they were materially incomplete half-truths. Sylvain affirmatively represented that Dexcom was "taking share" in the Type 2 basal market and expressly grounded that claim in contemporaneous "script data," while omitting known adverse facts that rendered that positive message

4914-2626-0365.v1

**24-cv-1485-RSH-VET**

misleading in the specific competitive context he chose to address. Defendants have admitted:

- Dexcom was losing approximately seven out of ten *new* basal prescriptions to Abbott;

- Dexcom remained decisively behind Abbott in the total basal market, with Abbott commanding approximately 70% of market share – more than double Dexcom's roughly 30% share;

- Dexcom was losing basal market share to Abbott in the critical DME channel; and

- Dexcom was losing to Abbott among PCP prescribers who overwhelmingly treated Type 2 basal patients.

246. ***Defendants Admit Dexcom Was Losing the Vast Majority of New Basal Prescriptions to Abbott and Continued to Trail Abbott in Total Basal Market Share***. Sylvain's statements about "taking share" in the newly-covered Type 2 basal market were misleading because, as Defendants admitted, they were losing the vast majority of *new* basal prescriptions and continued to trail Abbott by a significant margin in *total* basal market share at the time he made these statements. Doc. No. 54-1 at 7. As detailed in §V.C. above, Dexcom's performance in the newly-covered Type 2 basal market was a focal point for investors and analysts because it represented the "single largest expansion in coverage in the CGM category ever." The number of *new* basal patients Dexcom was adding, and Dexcom's share of new basal patients relative to Abbott, were crucial metrics to analysts and investors because success in this newly-covered market was measured by Dexcom's ability to capture new basal patient starts. Yet, as Defendants knew but failed to disclose to investors when touting the Company's share-taking and competitive wins, they were: (i) losing approximately seven out of ten *new prescriptions* to Abbott; and (ii) trailing Abbott by a wide margin in *total* basal market share, with Abbott holding approximately 70% share and Dexcom only about 30%. In light of these facts, Sylvain's statements about the

4914-2626-0365.v1

Company's performance in the basal segment, including its purported share-taking based on "script data," were materially misleading not because Dexcom failed to benefit from overall category expansion, but because he affirmatively attributed that growth to competitive share gains while omitting that contemporaneous script-level data showed Dexcom was losing the core competitive battle for new basal starts and *total* basal market share.

(a)    ***Dexcom Admits that It Was Losing Approximately Seven Out of Ten New Basal Prescriptions to Abbott***.  As Defendants now admit, but which Sylvain affirmatively concealed when he cited "script data" as evidence of share-taking, "IQVIA data shows *Abbott was winning approximately seven out of ten new basal scripts in January and April 2024*."  Doc. No. 54-1 at 7.  Defendants further concede that Abbott's "share" and "win rate" of *new* basal prescriptions remained relatively consistent throughout the January to April 2024 period, which includes the February 8, 2024 earnings call.  *Id.* at 13.  Moreover, Defendants admit that Sylvain had access to, and reviewed, IQVIA script-level data.  For all these reasons, when Sylvain claimed that Dexcom was "taking share" based on "script data," the statement was, at a minimum, a misleading half-truth because he knowingly failed to disclose that the very "script data" he referenced showed Dexcom's principal competitor was winning approximately seven out of ten new basal prescriptions, a material fact that undercuts the impression that Dexcom was gaining competitive share in the newly-covered basal market.

(b)    ***Dexcom Admits that It Continued to Trail Abbott by a Significant Margin in Total Basal Market Share, with Abbott Holding Approximately 70% Share and Dexcom Holding Only Approximately 30%***.  In addition, Defendants have admitted that IQVIA script-level data showed that, during the January through April 2024 period, Dexcom's total basal market share was no higher than 30.2%, while Abbott's share was no lower than 69.8%.  Doc. No. 54-1 at 7.  Moreover, Defendants admit that Sylvain had access to, and reviewed, this IQVIA script-level data.

- 103 -    **24-cv-1485-RSH-VET**

4914-2626-0365.v1

Accordingly, when Sylvain claimed that Dexcom was "taking share" based on "script data," the statement was, at a minimum, a misleading half-truth because he knowingly failed to disclose that the very "script data" he invoked showed Dexcom's principal competitor continued to control approximately 70% of **total basal market share**, a material fact that undercut the impression that Dexcom was gaining competitive share in the newly-covered basal market.

247. ***Defendants Admit Dexcom Was Losing Market Share in the Critical DME Channel***. Sylvain's statements about "taking share" in the newly-covered Type 2 basal market were also misleading because, as Defendants admitted shortly thereafter and based on conditions that existed at the time of the February 8, 2024 statements, Dexcom was "not doing wonderful in the basal space" in part because they had already "lost market share in the DME channel . . . and that has hurt us." As detailed above in ¶¶42-44 and 303-304, DMEs supplied CGMs for Medicare basal patients following the CMS coverage expansion and therefore represented a critical competitive battleground in the newly-covered basal market, as almost half of the total Type 2 basal population was made up of Medicare patients. In this context, Dexcom's loss of share in the DME channel rendered Sylvain's statement that Dexcom was "taking share" in the basal segment misleading absent disclosure of the Company's contemporaneous competitive losses in that critical channel. But, as Sylvain failed to disclose, Dexcom's years-long push to shift its business to the pharmacy channel had already alienated its DME channel partners, who viewed Abbott as "channel agnostic" and more supportive, resulting in Dexcom's contemporaneous loss of competitive positioning and prescription volume in the DME channel following the coverage expansion. The Company's problems in its DME channel were systemic and pervasive, requiring extensive rehabilitation. *See, e.g.*, ¶¶287-289 (analysts acknowledging following their conversations with Defendants that DME issues existed during prior quarters in the Class Period); ¶291 (Defendants acknowledging that their senior executives had to intervene to repair DME relationships to get back

- 104 -                                    **24-cv-1485-RSH-VET**

4914-2626-0365.v1

on "equal foot[ing]," a process that was ongoing, not susceptible to a quick fix, and that could "take us a while to get back to where we need to get").

248. ***Defendants Admit Dexcom Was Losing to Abbott Among PCP Prescribers, Who Treated the Vast Majority of Basal Patients***.  Sylvain's statements about "taking share" in the Type 2 basal market were also misleading because, as detailed herein (¶¶42, 46-50, 301-302), although Defendants knew that "primary care was the likely space where most basal patients were going to be seen," they were not competitively positioned at the time of the February 8, 2024 statements to win prescriptions from those providers.  As Defendants later admitted, "we were not getting any traction [at] those [PCP] offices where we had no salespeople, where we weren't calling on physicians[,] [w]e're getting very few prescriptions"; "[q]uite simply, Dexcom can't win in physician offices where we don't have a presence"; "we needed to get into those [PCP] offices and develop relationships" because "what we've noted in our data is we obviously don't win in offices we don't call on."  Likewise, only a few months later, in response to an analyst's question about the dire state of the lopsided Type 2 basal market where Abbott was "winning more share at the physician level with type two basal patients" and held a "70% share in that channel in that population" – Sayer did not dispute the analyst's characterization, conceding "suffice it to say we're behind."  Because PCPs treated the vast majority of Type 2 basal patients, Dexcom's inability to compete effectively in PCP offices meant it was losing, not gaining, competitive share in the most important prescriber segment in the newly-covered basal market.  Dexcom's sales force lacked both the scale and alignment required to reach 250,000 PCPs nationwide and could not effectively compete with Abbott's sales force, which was deeply entrenched in the offices of PCPs who treated Type 2 basal patients.  Indeed, at the time of Sylvain's statements, unbeknownst to investors, Dexcom was already preparing a major sales force expansion (40% increase in its sales representatives) and restructuring because Defendants knew their existing sales infrastructure was insufficient to compete with

4914-2626-0365.v1

Abbott for basal prescriptions among PCPs. After the Class Period, Defendants acknowledged the sales force expansion was designed as a "jump[ing] off point" to "reach more general practitioners, primary care physicians to make sure that we were able to take advantage of this opportunity," confirming that, when Sylvain told investors Dexcom was "taking share," Defendants internally recognized that the Company was not positioned to do so in the PCP segment that drove basal adoption.

249. **Sylvain's February 8, 2024 Statements Created a Misimpression**. By choosing to tout positive information to the market – namely, Dexcom's purported share-taking in the Type 2 basal market and expressly grounding that claim in contemporaneous "script data" in response to a question about basal adoption and competitive performance – Defendants assumed a duty to speak completely and accurately. Having chosen to speak, Defendants were required to disclose material adverse facts that undermined the positive impression they conveyed, including that Abbott was winning approximately seven out of ten new basal prescriptions and continued to hold 70% of total basal market share, Dexcom was "los[ing] market share in the DME channel," and Dexcom was losing to and unable to compete with Abbott among PCP prescribers who treated Type 2 basal patients. As a result, Defendants' statements were materially incomplete and misleading half-truths because they conveyed to the market that Dexcom's competitive position in the newly-covered Type 2 basal segment was strengthening and that the "script data" showed Dexcom was winning competitive share from Abbott, while omitting contemporaneous facts showing the opposite. Defendants' statements thus created a misleading impression that Dexcom was successfully competing with Abbott in the newly-covered Type 2 basal market and that contemporaneous script data demonstrated that Dexcom was "taking share." That impression differed in a material way from the reality that actually existed, namely that Dexcom was unable to effectively compete with Abbott in the Type 2 basal market, was ceding the vast majority of new basal patients to Abbott (approximately seven out of ten), was continuing to trail Abbott by a

4914-2626-0365.v1

significant margin in total basal market share, was losing market share in the DME channel, and was losing to Abbott among PCP prescribers who overwhelmingly treated Type 2 basal patients, culminating in analysts concluding only a few months later that Dexcom was "losing the basal wars" to Abbott.

250. **Analysts' Reaction Confirms the Misimpression Created by Defendants' Statements**. Analyst commentary following this earnings call confirms that the market was misled by Defendants' February 8, 2024 statements and, critically, that reasonable market participants understood Sylvain's "taking share" claim, based on "script data," to mean competitive wins from Abbott in the Type 2 basal segment. For example:

(a) Piper Sandler analysts – including the very analyst who asked Sylvain the question in ¶243 above about basal's contribution to topline – issued a report on February 8, 2024 titled "A Bolus of Basal Patients & Upside To Margins; Still Our Favorite Name for '24." That report stated that "[t]he big driver here is basal access alongside a quickly expanding prescribing base (they continue to take share from ABT too)" and that "we see the biggest upside to guidance coming from [the Type 2 basal] population."

(b) A February 9, 2024 Leerink Partners report stated that "we believe penetration into the basal-only TAM and competitive wins from ABT Type 2 basal-only patients will drive better than expected revenue contribution in 2024E."

(c) A February 8, 2024 Wells Fargo report observed that "[m]anagement noted strong new patient starts in Q4 . . . including basal only" reflecting the market's understanding that Sylvain's comments were speaking to new-start momentum in basal.

(d) William Blair issued a February 9, 2024 report stating that "clearly the company is seeing accelerated growth and investing/preparing for increased demand from basal and non-insulin users," consistent with the market's takeaway that Dexcom was competitively capturing the newly-covered basal opportunity.

- 107 -                                    **24-cv-1485-RSH-VET**

251. **Scienter**. Sylvain knew, or was deliberately reckless in not knowing, that his February 2024 statements were materially misleading when made. *See* §VIII. At the time, Dexcom was losing approximately seven out of ten ***new*** basal prescriptions and continued to trail Abbott by a significant margin in ***total*** basal market share (an approximately 70/30 split), and had already begun implementing a major sales force expansion to remedy its inability to gain traction in the basal market. Internally, the Company had diagnosed poor PCP prescribing patterns and admitted it was "not getting any traction" in offices without sales coverage. Rather than disclose these adverse facts, Sylvain assured investors that Dexcom was "taking share" and framed basal growth as a function of both market expansion and competitive success. By touting selective positive information while omitting known adverse facts, these statements were inconsistent with internal knowledge, prescribing data, and operational changes already underway – facts squarely within Sylvain's responsibilities as CFO.

(a) ***Core Operations and Strategic Importance***: The expansion of CGM coverage to the Type 2 basal population was the largest addressable market expansion in Dexcom's history. Given its importance, senior executives – including Sylvain – monitored market share performance, prescribing data, and field sales effectiveness in this segment. As CFO, Sylvain had access to real-time financial and operational metrics, including script-level data, that directly bore on whether Dexcom was gaining or losing competitive share in the newly-covered basal market, and which reflected that Dexcom was badly losing new basal patients to Abbott and trailing Abbott by a significant margin in total basal market share. Indeed, the very need for the Company's sales force expansion – being planned and executed at the time – was based on awareness of these deficiencies. Accordingly, Sylvain's statements about Dexcom "taking share" and attributing basal growth to competitive success omitted facts that he knew rendered those statements misleading.

4914-2626-0365.v1

**24-cv-1485-RSH-VET**

(b)    ***Admitted Access to and Review of Real-Time Data***: Sylvain and other defendants repeatedly represented that they had access to information allowing them to track sales data, understand where their patients were coming from, and monitor the Company's market share in the basal market, demonstrating that Sylvain possessed contemporaneous data undermining the positive impression created by his statements. Sylvain admitted, for example, that Dexcom "get[s] script data . . . based on pathology" to gauge performance in the basal cohort. Defendants have also admitted that Sylvain had access to, and reviewed IQVIA script-level data and that IQVIA data shows Abbott was winning approximately seven out of ten ***new*** basal scripts and continued to hold approximately 70% of total basal market share in January and April 2024. *See* Doc. No. 54-1 at 7. Thus, when Sylvain cited "script data" as evidence of share-taking, he knew that the very data he referenced contradicted his statements.

(c)    ***Contemporaneous Knowledge of Sales Force Inadequacies***: In September 2024, Sayer admitted: "We decided back in 2023, we needed a broader sales force . . . we've looked at prescribing patterns and the places where we were not getting any traction are those offices where we had no salespeople." The 40% expansion and field reorganization launched in Q2/Q3 2023 corroborate that Defendants, including Sylvain, were contemporaneously aware that Dexcom lacked the sales infrastructure necessary to compete effectively for basal prescriptions, notwithstanding Sylvain's February 2024 statements suggesting competitive share gains.

(d)    ***DME Channel Awareness***: Similarly, Defendants admitted post-Class Period that DME performance had fallen short and hurt their basal business, saying "we've lost market share in the DME channel . . . and that has hurt us"; "growth in the DME channel has trailed our plan"; "you'd probably imagine if we're not doing well in the DME it gets back to your point. We're not doing wonderful in the basal space." Analysts reported that these issues had persisted in prior quarters.

- 109 -    **24-cv-1485-RSH-VET**

These admissions confirm that, at the time of the February 2024 statements, Sylvain was aware of adverse competitive dynamics in a critical channel that rendered his statements about "taking share" misleading absent disclosure.

(e)    *Motive*: In addition to his knowledge and/or reckless disregard of the misleading nature of his statements, Sylvain was also motivated to mislead investors, as set forth below in §VIII.F.  In particular, Sylvain sold $392,562 in stock at artificially inflated prices 12 days after making this statement and another $1.5 million a month later, further supporting a strong inference of scienter when viewed alongside his access to contrary internal data and operational realities.

**K.    April 25, 2024 Q1 2024 Earnings Call**

252.  **Context of Statement**.  On April 25, 2024, Dexcom held a conference call for analysts and investors to discuss its first quarter of 2024 ("Q1 2024") results. During the Q1 2024 earnings call, Defendants were asked to provide visibility into whether Dexcom's record new patient starts were being driven by accelerating adoption in the Type 2 basal population.  Defendants were also specifically asked to address the ongoing debate regarding Dexcom's competitive market share within the U.S. basal segment and to provide insight into how Dexcom was performing relative to competitors in that population:

> [Analyst:] So wanted to ask on basal, just any visibility you can give on how that's been scaling?  Obviously, a record new start quarter this quarter.  I would assume basal is contributing nicely to that.  But what do the sequential patterns look like the last few quarters?  Is it still sequentially growing at a pretty healthy rate, I'd assume, but any color you can provide there?
>
> And also, there's been some debate, obviously, on market share within the basal population here in the U.S.  Just would love kind of any insight you can provide on that front as well.  Thanks.
>
> [Sylvain:] Yeah.  So I can take that one.  Thanks, Jeff.  I think when we talked about what we expected this year, we really talked about it in the context of basal adoption across the entire population.  And we talked about exiting the year right around that 15% adoption across the

4914-2626-0365.v1

basal population in the US and the year moving over the course of the year to 23%. So about 8 points of penetration.

So far through the first quarter, things are going as we expected. Record new patients, I think, helps enforce that. And you are correct, a good chunk of our new patients are coming through that basal channel, and we continue to see really well performance in that category. So qualitatively, the things we talked about, the excitement in that channel, those still remain.

In terms of share taking and how we look at that category, we get script data, we look at script data based on pathology. The debate – there's no debate internally to us. We know we're taking share, and we see that data. And I think a lot of you guys see that data. So for what it's worth, that data is out there, you can see the scripts continuing to come our way.

For the . . . purpose we talked about, when we have coverage and when we compete head-to-head, we've typically won. So I think we maybe disagree with some comments out there, but I think the data is clear. When you look at the script data, I think it will continue to demonstrate where this is going over time. Hope that helps.

253.    Challenged Statements Alleged to Be False and Misleading.

- "So far through the first quarter, things are going as we expected. Record new patients, I think, helps enforce that. And you are correct, a good chunk of our new patients are coming through that basal channel, and we continue to see really well performance in that category."

- "In terms of share taking and how we look at that category, we get script data, we look at script data based on pathology. The debate – there's no debate internally to us. We know we're taking share, and we see that data. And I think a lot of you guys see that data. So for what it's worth, that data is out there, you can see the scripts continuing to come our way."

- "For the . . . purpose we talked about, when we have coverage and when we compete head-to-head, we've typically won. So I think we maybe disagree with some comments out there, but I think the data is clear. When you look at the script data, I think it will continue to demonstrate where this is going over time."

- 111 -                                    **24-cv-1485-RSH-VET**

4914-2626-0365.v1

254. **<u>Reasons Why These Statements Are False and Misleading</u>**. Sylvain's April 25, 2024 statements about "taking share" were materially misleading and created a misimpression when made because they were materially incomplete half-truths. Sylvain affirmatively grounded his "taking share" claim in contemporaneous "script data" and asserted there was "no debate" internally and that Dexcom "continue[d] to" win head-to-head, while omitting known adverse facts that rendered that positive message misleading. Defendants have admitted:

- Dexcom was losing approximately seven out of ten *new* basal prescriptions to Abbott;

- Dexcom remained decisively behind Abbott in the total basal market, with Abbott commanding approximately 70% of market share – more than double Dexcom's roughly 30% share;

- Dexcom was losing basal market share to Abbott in the critical DME channel; and

- Dexcom was losing to Abbott among PCP prescribers who overwhelmingly treated Type 2 basal patients.

255. ***Defendants Admit Dexcom Was Losing the Vast Majority of New Basal Prescriptions to Abbott and Continued to Trail Abbott in Total Basal Market Share.*** Sylvain's statements about "taking share" in the newly-covered Type 2 basal market were materially misleading because, as Defendants have admitted, Dexcom was losing the vast majority of *new* basal prescriptions and continued to trail Abbott by a significant margin in total basal market share at the time he made these statements. Doc. No. 54-1 at 7. As detailed in §V.C. above, Dexcom's performance in the newly-covered Type 2 basal market was a focal point for investors and analysts because it represented the "single largest expansion in coverage in the CGM category ever." The number of new basal patients Dexcom was adding, and Dexcom's share of new basal patients relative to Abbott, were crucial metrics to analysts and investors because success in this newly-covered market was measured by Dexcom's ability to capture new basal patient starts. Yet, as Defendants knew but failed to disclose to investors when touting the Company's share-taking and competitive wins, they were: (i) losing

4914-2626-0365.v1

approximately seven out of ten new prescriptions to Abbott; and (ii) trailing Abbott by a significant margin in total basal market share, with Abbott holding approximately 70% share and Dexcom holding only approximately 30%.  In light of these facts, Sylvain's statements about taking share in the basal segment based on script data and competitive wins (*i.e.*, asserting that "[t]he debate – there's no debate internally to us[,] [w]e know we're taking share, and we see that data. . . you can see the scripts continuing to come our way" and "when we compete head-to-head, we've typically won") were materially misleading because he omitted that contemporaneous script-level data showed Dexcom was losing the core competitive battle for new basal starts and total basal market share.

(a)    ***Dexcom Admits that It Was Losing Approximately Seven Out of Ten New Basal Prescriptions to Abbott***.  As Defendants now admit, but which Sylvain affirmatively concealed when he cited "script data" as evidence of share-taking, "IQVIA data shows *Abbott was winning approximately seven out of ten new basal scripts in January and April 2024*."  Doc. No. 54-1 at 7.  Defendants further concede that Abbott's "share" and "win rate" of new basal prescriptions remained relatively consistent throughout the January to April 2024 period, which includes the April 25, 2024 earnings call. *Id.* at 13.  Moreover, Defendants admit that Sylvain had access to, and reviewed, IQVIA script-level data.  For all these reasons, when Sylvain claimed that Dexcom was "taking share" based on "script data," the statement was, at a minimum, a misleading half-truth because he knowingly failed to disclose that the very "script data" he referenced showed Dexcom's principal competitor was winning approximately seven out of ten new basal prescriptions, a material fact that undercut the impression that Dexcom was gaining competitive share in the newly-covered basal market.

(b)    ***Dexcom Admits that It Continued to Trail Abbott by a Significant Margin in Total Basal Market Share, with Abbott Holding Approximately 70% Share and Dexcom Holding Only Approximately 30%***.  In addition, Defendants have

- 113 -    **24-cv-1485-RSH-VET**

4914-2626-0365.v1

admitted that IQVIA script-level data shows that, during the January through April 2024 period, Dexcom's total basal market share was not higher than 30.2% and Abbott's was not lower than 69.8%. Doc. No. 54-1 at 7. Moreover, Defendants admit that Sylvain had access to, and reviewed, IQVIA script-level data. Accordingly, when Sylvain claimed that Dexcom was "taking share" based on "script data," the statement was, at a minimum, a misleading half-truth because he knowingly failed to disclose that the very "script data" he referenced showed Dexcom's principal competitor continued to hold approximately 70% of total basal market share, a material fact that undercut the impression that Dexcom was gaining competitive share in the newly-covered basal market.

256. ***Defendants Admit Dexcom Was Losing Market Share in the Critical DME Channel***. Sylvain's statements about "taking share" in the newly-covered Type 2 basal market were also misleading because, as Defendants admitted shortly thereafter and based on conditions that existed at the time of the April 25, 2024 statements, Dexcom was "not doing wonderful in the basal space" in part because they had already "lost market share in the DME channel . . . and that has hurt us." As detailed above in ¶¶42-44 and 303-304, DMEs supplied CGMs for Medicare basal patients following the CMS coverage expansion and therefore represented a critical competitive battleground in the newly-covered basal market, as almost half of the total Type 2 basal population was made up of Medicare patients. In this context, Dexcom's loss of share in the DME channel rendered Sylvain's statement that Dexcom was "taking share" in the basal segment misleading absent disclosure of the Company's contemporaneous competitive losses in that critical channel. But, as Sylvain failed to disclose, Dexcom's years-long push to shift its business to the pharmacy channel had already alienated its DME channel partners, who viewed Abbott as "channel agnostic" and more supportive, resulting in Dexcom's contemporaneous loss of competitive positioning and prescription volume in the DME channel following the coverage expansion. The Company's problems in its DME channel were systemic and

- 114 -                                    **24-cv-1485-RSH-VET**

pervasive, requiring extensive rehabilitation. *See, e.g.*, ¶¶287-289 (analysts acknowledging following their conversations with Defendants that DME issues existed during prior quarters in the Class Period); ¶291 (Defendants acknowledging that their senior executives had to intervene to repair DME relationships to get back on "equal foot[ing]," a process that was ongoing, not susceptible to a quick fix, and that could "take us a while to get back to where we need to get").

257. ***Defendants Admit Dexcom Was Losing to Abbott Among PCP Prescribers, Who Treated the Vast Majority of Basal Patients***. Sylvain's statements about "taking share" in the Type 2 basal market were also misleading because, as detailed herein (¶¶42, 46-50, 301-302), although Defendants knew that "primary care was the likely space where most basal patients were going to be seen," they were not competitively positioned at the time of the April 25, 2024 statements to win prescriptions from those providers. As Defendants later admitted, "we were not getting any traction [at] those [PCP] offices where we had no salespeople, where we weren't calling on physicians[,] [w]e're getting very few prescriptions"; "[q]uite simply, Dexcom can't win in physician offices where we don't have a presence"; "we needed to get into those [PCP] offices and develop relationships" because "what we've noted in our data is we obviously don't win in offices we don't call on." Likewise, only a few months later, in response to an analyst's question about the dire state of the lopsided Type 2 basal market where Abbott was "winning more share at the physician level with type two basal patients" and held a "70% share in that channel in that population" – Sayer did not dispute the analyst's characterization, conceding "suffice it to say we're behind." Because PCPs treated the vast majority of Type 2 basal patients, Dexcom's inability to compete effectively in PCP offices meant it was losing, not gaining, competitive share in the most important prescriber segment in the newly-covered basal market. Dexcom's sales force lacked both the scale and alignment required to reach 250,000 PCPs nationwide and could not effectively compete with Abbott's sales force, which was deeply entrenched in the offices of

- 115 -

**24-cv-1485-RSH-VET**

PCPs who treated Type 2 basal patients. Indeed, at the time of Sylvain's statements, unbeknownst to investors, Dexcom was already implementing a major sales force expansion (40% increase in its sales representatives) and restructuring because Defendants knew their existing sales infrastructure was insufficient to compete with Abbott for basal prescriptions among PCPs. After the Class Period, Defendants acknowledged the sales force expansion was designed as a "jump[ing] off point" to "reach more general practitioners, primary care physicians to make sure that we were able to take advantage of this opportunity," confirming that, when Sylvain told investors Dexcom was "taking share," Defendants internally recognized that the Company was not positioned to do so in the PCP segment that drove basal adoption.

258. **Sylvain's April 25, 2024 Statements Created a Misimpression**. By choosing to tout positive information to the market – namely, Dexcom's purported share-taking in the Type 2 basal market and expressly grounding that claim in contemporaneous "script data" in response to a question about its performance relative to competitors, Defendants assumed a duty to speak completely and accurately. Having chosen to speak, Defendants were required to disclose material adverse facts that undermined the positive impression they conveyed, including that Abbott was winning approximately seven out of ten *new* basal prescriptions and continued to hold approximately 70% of *total* basal market share, Dexcom was "los[ing] market share in the DME channel," and Dexcom was losing to and unable to compete with Abbott among PCP prescribers who treated Type 2 basal patients. As a result, Defendants' statements were materially incomplete and misleading half-truths because they conveyed to the market that Dexcom's competitive position in the newly-covered Type 2 basal segment was strengthening and that the "script data" showed Dexcom was winning competitive share from Abbott, while omitting contemporaneous facts showing the opposite. Defendants' statements thus created a misleading impression that Dexcom was successfully competing with Abbott in the newly-covered Type 2 basal market and that contemporaneous script data demonstrated that Dexcom was

4914-2626-0365.v1

"taking share." That impression differed in a material way from the reality that actually existed, namely that Dexcom was unable to effectively compete with Abbott in the Type 2 basal market, was ceding the vast majority of new basal patients to Abbott (approximately seven out of ten), was continuing to trail Abbott by a significant margin in total basal market share, was losing market share in the DME channel, and was losing to Abbott among PCP prescribers who overwhelmingly treated Type 2 basal patients, culminating in analysts concluding only a few months later that Dexcom was "losing the basal wars" to Abbott.

259. **Analysts' Reactions Confirm the Misimpression Created by Defendants' Statements**. Analyst commentary following this earnings call demonstrates that the market was misled and that reasonable analysts understood Sylvain's "taking share" statements – grounded in "script data" and "head-to-head" competition – to mean Dexcom was achieving competitive share gains in the U.S. Type 2 basal segment. For example:

(a) An April 25, 2024 Wells Fargo analyst report stated that Dexcom was "taking basal market share," that Defendants' "highlighted script data . . . points to continuing share growth," and observed that "[m]anagement noted strong Q1 performance with basal significantly contributing to new patient volumes," confirming that the market interpreted Defendants' statements as evidence of competitive share gains reflected in contemporaneous scripts and new starts.

(b) An April 25, 2024 Leerink Partners analyst report stated that there was "[s]olid commercial execution in 1Q24" and noted: "DXCM achieving another record quarter of new patient starts and gaining market share . . . . DXCM continued to see strong growth from basal-only patients . . . ." Moreover, it stated that "we believe penetration into the basal-only TAM and competitive wins from ABT Type 2 basal-only patients will drive better than expected revenue contribution in 2024E," demonstrating that analysts took Sylvain's remarks to mean Dexcom was winning competitive share from Abbott in the basal-only population.

- 117 -                                                        **24-cv-1485-RSH-VET**

(c)    Canaccord Genuity analysts, on April 25, 2024, also noted with respect to "record patient starts," that "[m]anagement attributes new patient starts primarily to G7 users in the basal-only population," reinforcing that the market understood Defendants to be attributing Dexcom's record starts to success in capturing the newly-covered basal opportunity.

260.    **Scienter**. Sylvain knew, or was deliberately reckless in not knowing, that his April 2024 statements were materially misleading when made. *See* §VIII. At the time, Dexcom was losing approximately seven out of ten *new* basal prescriptions and continued to trail Abbott by a significant margin in *total* basal market share (an approximately 70/30 split), and had already begun implementing a major sales force expansion to remedy its inability to gain traction in the basal market. Internally, the Company had diagnosed poor PCP prescribing patterns and admitted it was "not getting any traction" in offices without sales coverage. Rather than disclose these adverse facts, Sylvain assured investors that Dexcom was "taking share" and competing effectively in the basal category. By touting selective positive information while omitting known adverse facts, these statements were inconsistent with internal knowledge, prescribing data, and operational changes already underway – facts squarely within Sylvain's responsibilities as CFO.

(a)    ***Core Operations and Strategic Importance***: The expansion of CGM coverage to the Type 2 basal population was the largest addressable market expansion in Dexcom's history. Given its importance, senior executives – including Sylvain – monitored market share performance, prescribing data, and field sales effectiveness in this segment. As CFO, Sylvain had access to real-time financial and operational metrics, including script-level data, that directly bore on whether Dexcom was gaining or losing competitive share in the newly-covered basal market, and which reflected that Dexcom was badly losing new basal patients to Abbott and trailing Abbott by a significant margin in total basal market share. Indeed, the very need for the Company's sales force expansion – being planned and executed at the time – was

- 118 -                                    **24-cv-1485-RSH-VET**

based on awareness of these deficiencies. Accordingly, Sylvain's statements about "taking share" and competitive wins omitted facts that he knew rendered those statements misleading.

(b)   ***Admitted Access to and Review of Real-Time Data***: Sylvain and other defendants repeatedly represented that they had access to information allowing them to track sales data, understand where their patients were coming from, and monitor the Company's market share in the basal market, demonstrating that Sylvain possessed contemporaneous data undermining the positive impression created by his statements. Sylvain admitted, for example, that Dexcom "get[s] script data . . . based on pathology" to gauge performance in the basal cohort. Defendants have also admitted that Sylvain had access to, and reviewed, IQVIA script-level data and that IQVIA data shows Abbott was winning approximately seven out of ten ***new*** basal scripts and continued to hold approximately 70% of total basal market share in January and April 2024. *See* Doc. No. 54-1 at 7. Thus, when Sylvain cited "script data" as evidence of share-taking, he knew that the very data he referenced contradicted his statements.

(c)   ***Temporal Proximity***: Sylvain's knowledge and deliberate recklessness as to the falsity of his statements is supported by the fact that these bullish representations about taking share were made on April 25, 2024 – only three months before Defendants finally disclosed their dismal performance in the basal space on July 25, 2024 (slashing Dexcom's full year guidance by $300 million). Indeed, in sharp contrast to these statements, on July 25, 2024, Sylvain stated: "we have seen our share of new customers fall short of our expectations" and "[w]e're not doing wonderful in the basal space." The temporal proximity between these statements and his contradictory disclosures just three months later supports scienter.

(d)   ***Contemporaneous Knowledge of Sales Force Inadequacies***: In September 2024, Sayer admitted: "We decided back in 2023, we needed a broader sales force . . . [W]e've looked at prescribing patterns and the places where we were

- 119 -                                    **24-cv-1485-RSH-VET**

4914-2626-0365.v1

not getting any traction are those offices where we had no salespeople . . . ." The 40% expansion and field reorganization launched in Q2/Q3 2023 corroborate that Defendants, including Sylvain, were contemporaneously aware that Dexcom lacked the sales infrastructure necessary to compete effectively for basal prescriptions, notwithstanding Sylvain's April 2024 statements suggesting competitive share gains. Moreover, on July 25, 2024, Defendants admitted that they witnessed a significant shortfall in expected new customer additions "at the beginning of the [second] quarter," which put Dexcom "a quarter behind" where they "expect[ed] to be" – *i.e.*, the quarter that had begun on April 1, 2024, almost a month before Sylvain's statements.

(e) *DME Channel Awareness*: Similarly, Defendants admitted post-Class Period that DME performance had fallen short and hurt their basal business, saying "we've lost market share in the DME channel . . . and that has hurt us"; "growth in the DME channel has trailed our plan"; "you'd probably imagine if we're not doing well in the DME it gets back to your point. We're not doing wonderful in the basal space." Analysts reported that these issues had persisted in prior quarters. These admissions confirm that, at the time of the April 2024 statements, Sylvain was aware of adverse competitive dynamics in a critical channel that rendered his statements about "taking share" misleading absent disclosure.

(f) *Motive*: In addition to his knowledge and/or reckless disregard of the misleading nature of his statement, Sylvain was also motivated to mislead investors, as set forth below in §VIII.F, further supporting a strong inference of scienter when viewed alongside his access to contrary internal data and operational realities.

## L. April 25, 2024 Q1 2024 Earnings Call

261. **Context of Statement**. Also during the Q1 2024 earnings call, Sylvain made the following statement:

4914-2626-0365.v1

We still have a very strong DME business, and certainly, the DME business continues to be supported by our partners very, very well. But what we find is as we call on more and more primary care physicians who are seeing where basal patients are seen, there is a bit of a heavier tilt towards the pharmacy channel for new patients.

262. **Challenged Statement Alleged to Be False and Misleading**. "We still have a very strong DME business, and certainly, the DME business continues to be supported by our partners very, very well."

263. **Reasons Why the Statement Is False and Misleading**. Sylvain's statement created a materially false impression of Dexcom's relationships in the critical DME sales channel. It suggested Dexcom's distributor relationships and support infrastructure were strong enough to capture the newly-covered basal insulin patient market, when in fact the opposite was true. Contrary to Sylvain's assurances, Dexcom had alienated its DME distributors, which severely undermined its ability to compete with Abbott for Type 2 basal patients.

264. *Dexcom's DME Channel Was Critical – and Severely Impaired*. The DME sales channel was the only way newly-covered Medicare basal patients could obtain CGMs at the start of the Class Period, since the CMS expansion initially covered CGMs as a DME benefit only. Even after commercial insurers followed Medicare's lead, nearly half of the basal opportunity comprised Medicare patients, so the DME channel remained critical. Indeed, Sylvain later admitted that the basal market was "a big piece of the DME, certainly DME, Medicare and the patient base that they service." Unbeknownst to investors, Dexcom's years-long push to shift sales to the pharmacy channel had frayed its DME relationships leading up to the Class Period. By early 2023, Dexcom's DME partners handled only ~25% of Dexcom's total sales – a significant decline that left many DME distributors feeling sidelined. Meanwhile, Abbott (Dexcom's only meaningful CGM competitor) maintained roughly a 50/50 balance between pharmacy and DME fulfillment. Dexcom's intentional shift in its business model alienated the DME suppliers and their sales representatives, who felt that the Company was steering business away from them.

- 121 -                                        **24-cv-1485-RSH-VET**

4914-2626-0365.v1

Meanwhile, Abbott was viewed as "channel agnostic" by DME sales representatives and remained on much better footing with the DME suppliers. Indeed, a J.P. Morgan analyst commented at the end of the Class Period: There is a "perception amongst DME reps that Abbott is channel agnostic vs. Dexcom preferential to the pharmacy." That same analyst observed, the "erosion in the relationship between the company and DME distributor[s] . . . likely alienated many of the DME partners who felt that the company was steering business away from them. This could have led to some preferential treatment for Abbott specifically in the newly eligible Medicare basal population." As a result, DME distributors favored Abbott's CGMs over Dexcom's CGMs, steering PCPs toward Abbott. This had a materially negative impact on Dexcom's ability to secure prescriptions from the newly-covered basal population. J.P. Morgan also noted: "~7/10 new patients likely going to Abbott today in the DME, the vast majority of whom are Medicare basal fee for service patients." Less than three months later, at the end of the Class Period, Defendants would admit that its DME business had significantly deteriorated and its relationships with DME suppliers were impaired. Sylvain and Sayer admitted on July 25, 2024, that "we're not doing well in the DME," that "we've lost market share in the DME channel . . . and that has hurt us" and that "growth in the DME channel has trailed our plan" such that Dexcom "need[ed] to refocus on those relationships." Analysts later confirmed that these DME issues were "widespread across many of the DMEs" and had been "present in prior quarters," underscoring that Dexcom's DME business was weakened well before Sylvain's statement. Far from having a "very strong DME business" and supporting its DME partners "very, very well," Dexcom's relationship with its key DME partners was so damaged that senior management had to become "fully involved in rehabilitating" those relationships – a stark contrast to the confidence Sylvain projected.

265. **Scienter**. Sylvain knew, or was deliberately reckless in not knowing, that his statement was false and misleading when made. *See* §VIII.

- 122 -

**24-cv-1485-RSH-VET**

(a)    ***Core Operations and Strategic Importance***: The expansion of CGM coverage to basal-only Type 2 patients was, by Defendants' own description, the "largest single expansion of access to CGM in our industry's history."  Capturing these newly-covered patients was of paramount importance to Dexcom's growth (CGMs being its sole product line).  It would be absurd to suggest that Sylvain – Dexcom's CFO – was unaware of major impediments in the only channel that could fulfill Medicare basal prescriptions.  Indeed, Sylvain himself and other executives repeatedly discussed and fielded questions about Dexcom's sales channels and competitive positioning during this period.  Given the strategic importance of the basal market, Sylvain plainly understood that alienating the very distributors necessary to reach new basal patients (*i.e.*, the DME partners) had left Dexcom at a significant disadvantage.

(b)    ***Access to Real-Time Data***: Both before and during the Class Period, Defendants admitted to having access to granular, real-time sales and market data.  Sylvain later admitted, for example, that Dexcom "get[s] script data . . . based on pathology" to gauge performance in the basal cohort.  Defendants tracked where new patients were coming from and how Dexcom's market share in the basal segment was progressing.  Sylvain's claim that Dexcom "still ha[d] a very strong DME business" that was "supported by [its] partners very, very well" was contradicted by the data available to him, which showed sagging DME order volumes and Abbott's mounting share of new basal patient prescriptions.  In short, Sylvain either knew or recklessly ignored that Dexcom's internal data did not support his public portrayal.

(c)    ***Subsequent Admissions***: Subsequent revelations confirm that Sylvain was aware of these problems at the time.  After the Class Period, Defendants admitted that Dexcom's aggressive shift to the pharmacy channel over prior years had indeed alienated its DME distributors and hurt its basal performance, saying:  "we've lost market share in the DME channel . . . and that has hurt us"; "growth in the DME channel has trailed our plan"; "you'd probably imagine if we're not doing well in the

4914-2626-0365.v1                                                            **24-cv-1485-RSH-VET**

DME it gets back to your point.  We're not doing wonderful in the basal space." Sylvain and others later acknowledged that Dexcom's DME channel had been losing market share and required a concerted effort to repair.  Tellingly, as summarized by analysts relaying Defendants' description of the sales force and DME issues, "most of the above issues have been present in prior quarters."  These later admissions directly undermine Sylvain's April 2024 assurances, indicating he was aware (or recklessly disregarded) that Dexcom's DME business was not "very strong" or "supported . . . very, very well" at the time he made the statement.

**(d)** *Motive*: In addition to his knowledge and/or reckless disregard of the misleading nature of his statement, Sylvain was also motivated to mislead investors, as set forth below in §VIII.F.

266.  **Conclusion**.  Sylvain's assertion that Dexcom had a "very strong DME business" and was supported by its DME partners "very, very well" created the false impression that the Company's DME infrastructure was intact and well-positioned to capture newly-covered basal patients.  In truth, Dexcom had spent years deprioritizing the DME channel in favor of pharmacy fulfillment, a strategic shift that had alienated key DME partners and impaired Dexcom's access to the Medicare basal market – the very population for whom DME was the sole access pathway.  The omission gave investors a distorted view of the Company's true commercial posture in a market it had deemed foundational to future growth.

**M.    June 5, 2024 William Blair Growth Stock Conference**

267.  **Context of Statement**: On June 5, 2024, during the William Blair Growth Stock Conference, Defendants were asked about the reason behind Dexcom's recently announced sales force expansion.  Sylvain and an analyst engaged in the following colloquy:

> [Analyst:] So maybe walk us through why now from a commercial sale structure change and what are the reasons, comments you had on that?
>
> [Sylvain:] Yeah.  The expansion of the sales force was really about being bullish about our future, and it's not and by the way, it's one

- 124 -                    **24-cv-1485-RSH-VET**

about Stelo and preparing for Stelo.  But I think we showed you that graph in the US, we have more covered lives that are not on therapy today, even in the insulin using population than we've ever had before.

And we realized to reach everybody where we want to reach them, we needed to expand the sales force so from our point of view, this is a bullish opportunity as we expand our sales force and we're going to call on new, some new folks where we know that there's an unmet need. Maternal health is a big one for us where gestational diabetes is a massive unmet need and we can use the sales force to call on that hospital.

Certainly folks are [dis]charged and have a need for CGM [at the] hospital.  We're certainly going to use that as well.  And clearly, we needed more coverage on PCPs, and that's where a lot of the battle is one.  So the expansion of the sales force was done with that in mind.

268.  **Challenged Statements Alleged to Be False and Misleading.**

- "The expansion of the sales force was really about being bullish about our future . . . ."

- "[I]t's one about Stelo and preparing for Stelo."

- "[T]his is a bullish opportunity as we expand our sales force and we're going to call on new, some new folks where we know that there's an unmet need.  Maternal health is a big one for us where gestational diabetes is a massive unmet need and we can use the sales force to call on that hospital."

- "Certainly folks are [dis]charged and have a need for CGM [at the] hospital.  We're certainly going to use that as well."

269.  **Reasons Why These Statements Are False and Misleading**. Sylvain's statement created a materially false impression of the purpose behind Dexcom's massive sales force expansion and concealed the Company's insufficient PCP-facing sales force.  It suggested Dexcom's sales force expansion was an elective bullish move to capitalize on new patient groups, when in fact it was a necessary fix to an insufficient PCP sales force that was unable to compete with Abbott in the Type 2 basal market.  Contrary to Sylvain's statement, Dexcom was expanding its sales force because Defendants knew they "can't win in physician offices where we don't have a presence" and they "needed to get into those offices and develop relationships."

270.  ***Dexcom's Sales Force Expansion Was Done to Address Its Insufficient PCP Sales Force***.  Less than two months after Sylvain's statements, Dexcom

- 125 -

**24-cv-1485-RSH-VET**

4914-2626-0365.v1

disclosed the actual purpose behind its sales force expansion and complete reorganization. The primary reason for the change was not driven by a bullish view about the future and did not center on expounding to new markets such as Stelo, gestational diabetes, and/or discharged hospital patients. Defendants admitted the massive 40% sales force expansion and complete realignment was necessary because "we were not getting any traction [at] those [PCP] offices where we had no salespeople, where we weren't calling on physicians." Defendants acknowledged, "[w]e're getting very few prescriptions. We needed to broaden our reach." Defendants explained the sales force expansion and realignment was necessary because "we needed to get into those [PCP] offices and develop relationships" and "begin[] to develop and cultivate those relationships . . . [s]o we can get prescriptions from those healthcare professionals." The true purpose of the sales force expansion was clear, as Defendants admitted: "Quite simply, Dexcom can't win in physician offices where we don't have a presence."

271. Analysts bought into Defendants' misleading narrative. For example in its June 17, 2024 report titled "No Red Flags; Excitement Builds Around Stelo, Coverage Expansion, Margin Oppys," Jefferies emphasized that the sales force expansion was "to expand ahead of big new oppys like Stelo." The report further expressed that "DXCM believes it is roughly splitting the basal oppy noting ABT (Hold) disclosures (7/10 Rx for Basal) are based on old data and recent trends are closer to 50/50."

272. **Scienter**. Sylvain knew his June 2024 statements were materially false and misleading. *See* §VIII. At the time he claimed Dexcom's sales force expansion "was really about being bullish about [its] future" and "one about Stelo and preparing for Stelo," Sylvain knew that Dexcom did not have an adequate sales force to address the primary care segment, which was preventing Dexcom from capturing share in the Type 2 basal market despite expanded coverage. Thus, as Sylvain knew, Defendants

4914-2626-0365.v1

had decided to expand Dexcom's sales force in 2023 to attempt to catch up to Abbott in the Type 2 basal market.

(a)  ***Admissions Showing Contemporaneous Knowledge***: Sylvain made these statements as to the Company's Q2 2024 results and affirming annual guidance on June 5, 2024 – more than two months through Q2 2024 and only weeks before the truth was revealed on July 25, 2024, when Defendants slashed their full year guidance by $300 million.  On July 25, 2024, Defendants disclosed that they had witnessed a significant shortfall in expected new customer additions "at the beginning of the [second] quarter" (*i.e.*, the quarter beginning more than two months before Sylvain's statement), which put Dexcom "a quarter behind" where they "expect[ed] to be."  Thus, at this time, Sylvain knew about, or recklessly disregarded, Dexcom's significant underperformance in the Type 2 basal space that was materially negatively impacting Dexcom's Q2 2024 earnings and its ability to achieve its full year 2024 ("FY 2024") results.  Further, the temporal proximity between Sylvain's statements touting the sales force expansion as an opportunity and the disclosures confirming that it was done because, as Defendants admitted, they "were not getting any traction [at] those [PCP] offices where we had no salespeople" supports a finding of actual knowledge.

(b)  ***Access to Real-Time Data***: Sylvain and other defendants repeatedly admitted they had access to information that they used to track sales data, understand where their patients were coming from, and understand the Company's market share in the basal market, showing Sylvain possessed data undermining his Class Period statements.  Sylvain admitted, for example, that Dexcom "get[s] script data . . . based on pathology" to gauge performance in the basal cohort.

(c)  ***Core Operations and Strategic Importance***: The expansion of CGM coverage to Type 2 basal patients was described by Defendants as the "largest single expansion of access to CGM in our industry's history," making performance in this segment a core operational focus.  As CFO, Sylvain was directly responsible for

- 127 -                                        **24-cv-1485-RSH-VET**

4914-2626-0365.v1

interpreting financial performance and would necessarily have monitored adoption trends, market share data, and prescribing behavior. His statements professing the sales force expansion as an opportunity would only be credible if grounded in actual data showing the success of Dexcom's existing infrastructure in current markets. But internal tracking revealed the opposite: Dexcom had already seen lower than expected new customer additions and was, as of the beginning of this quarter, a quarter behind where it expected to be, necessitating the sales force expansion to fill gaps. That Sylvain omitted these facts underscores his awareness – or deliberate disregard – of Dexcom's commercial shortcomings.

(d)    *Motive*: In addition to his knowledge and/or reckless disregard of the misleading nature of his statement, Sylvain was also motivated to mislead investors, as set forth below in §VIII.F. In particular, Sylvain sold $85,712 in stock at artificially inflated prices just five days after making this statement.

273. **Conclusion**. Sylvain's assertion created the false impression that Dexcom's massive sales force expansion and realignment was elective, bullish, and designed to capitalize on new market opportunities. In truth, it was a necessary fix to an insufficient PCP sales force that was unable to compete with Abbott in the Type 2 basal market because Defendants knew "we can't win in physician offices where we don't have a presence." The omission gave investors a distorted view of the Company's true commercial posture in a market it had deemed foundational to future growth.

**N.    June 5, 2024 William Blair Growth Stock Conference**

274. **Context of Statement**. Also during the June 5, 2024 investor presentation, the following exchange occurred between an analyst and Sylvain:

> [Analyst:] And so and maybe just to wrap all of that up, as we think about your guidance, both for the second quarter, you did have some comments. Maybe you're not specific as much as for guidance for Q2, but walk us through what you said on Q2, full year and what was contemplated in that? And then the third piece, how does that compare to the [Stelo] estimates and whether you're comfortable with it?

**24-cv-1485-RSH-VET**

4914-2626-0365.v1

\* \* \*

[Sylvain:] And in terms of the full year as of the last quarter, when we issued our earnings, we raised our guidance. And so that should give we obviously beat the street expectations in the first quarter, raised guidance and continue to do well. So I think from that point of view, I think we're happy with where we are. We're happy with our full year guidance. We don't guide to the quarters, but we were very comfortable with where folks are sitting for the quarter.

275. **Challenged Statements Alleged to Be False and Misleading.**

- "And so that should give we obviously beat the street expectations in the first quarter, raised guidance and continue to do well. So I think from that point of view, I think we're happy with where we are. We're happy with our full year guidance."

- "We don't guide to the quarters, but we were very comfortable with where folks are sitting for the quarter."

276. **Reasons Why These Statements Are False and Misleading.** These statements were materially false and misleading because they led the market to believe that the Company was currently performing in line with analysts' consensus expectations for Dexcom's Q2 2024, and that, based on its current performance, its raised annual guidance was reasonable, supported, and achievable. In reality, Defendants were underperforming in the Type 2 basal market, and there was no reasonable basis for these statements, as detailed below.

277. ***Weeks Later, Defendants Slashed Their Annual Guidance***. When Sylvain reaffirmed Dexcom's FY 2024 guidance ("[w]e're happy with our full year guidance") on June 5, 2024, Sylvain knew, or was reckless in not knowing, that: (i) there was no reasonable basis for Dexcom's full-year financial guidance; and (ii) Dexcom's guidance projections were impossible to meet, in light of the numerous difficulties Dexcom would reveal just weeks later, including Dexcom's massive underperformance in the Type 2 basal market. Indeed, on July 25, 2024, Defendants shocked the market by announcing disastrous Q2 results and slashing Dexcom's full-year sales guidance by hundreds of millions of dollars. Defendants explained the issues that impacted the Company's quarterly revenue and 2024 sales forecast, including Sayer's admission that "we've lost market share . . . and that . . . has hurt

- 129 -                    **24-cv-1485-RSH-VET**

4914-2626-0365.v1

us," while Sylvain admitted "[w]e're not doing wonderful in the basal space," and Sayer confirming that "we've lost market share in the DME channel." Defendants conceded that they were aware of the significant underperformance that would impact Dexcom's Q2 and FY 2024 results weeks before they spoke on June 5, 2024. In particular, Defendants admitted that they witnessed a significant shortfall in expected new customer additions "at the beginning of the [second] quarter" (Dexcom's second quarter ran from April 1 through June 30). According to Defendants, the significant shortfall in expected new customer additions put Dexcom "a quarter behind" where they "expect[ed] to be." Defendants also knew the shortfall could not be quickly remedied but rather, being "a quarter behind" would necessarily impact the remainder of the year, and thus its full year guidance, because of the "compounding effect of our slower than expected new customer growth." Thus, because Sylvain was aware of these adverse circumstances at the time he made the statement, he was aware that the Company's full year guidance lacked a reasonable basis and would be impossible to achieve.

278. Defendants badly missed analysts' Q2 2024 estimates. When Sylvain confirmed analysts' consensus expectations for Dexcom's Q2 2024 results ("we were very comfortable with where folks are sitting for the quarter"), on June 5, 2024, Sylvain knew, or was reckless in not knowing, that: (i) there was no reasonable basis for analysts' consensus expectations for Dexcom's Q2 2024 results; and (ii) the analysts' consensus expectations were impossible to meet, in light of the numerous difficulties Dexcom would reveal just weeks later, including Dexcom's massive underperformance in the Type 2 basal market. Indeed, at the time Sylvain spoke, Dexcom was only 25 days from the end of the disastrous second quarter for which it was confirming analysts' expectations. As detailed above, Defendants admitted that they were aware of the significant underperformance that would impact Dexcom's Q2 results weeks before they spoke on June 5, 2024. In particular, Defendants admitted that they witnessed a significant shortfall in expected new customer additions "at the

- 130 -                    **24-cv-1485-RSH-VET**

beginning of the [second] quarter" which put Dexcom "a quarter behind" where they "expect[ed] to be." Defendants also knew the shortfall could not be quickly remedied but rather, being "a quarter behind" would necessarily impact the remainder of the second quarter because of the "compounding effect of our slower than expected new customer growth." Thus, because Sylvain was aware of these adverse circumstances at the time he made the statement, he was aware that analysts' consensus expectations for Dexcom's Q2 2024 results lacked a reasonable basis and would be impossible to achieve.

279. ***Analysts' Reactions Confirms the Misleading Nature of Sylvain's Commentary***. Following the release of Q2 results just weeks later, analysts were shocked, given Defendants' positive statements to the market just the month prior. For example, on July 26, 2024, Bernstein analysts reported on the "[d]isastrous revenue miss and guidance cut" and commented that "DXCM credibility is damaged after June 5th comments that management was 'happy with full year guidance' and 'very comfortable with where folks are sitting in the quarter.'"

280. __Scienter__. Sylvain knew his June 2025 statements were materially false and misleading. *See* §VIII. At the time he misleadingly claimed Dexcom was "happy with [its] full year guidance" and comfortable with consensus expectations for the quarter, Sylvain had access to internal sales data and market analyses showing otherwise. As CFO, Sylvain was directly responsible for the Company's financial results and would have been intimately familiar with Dexcom's sales and financial performance.

(a) ***Admissions Showing Contemporaneous Knowledge***: Sylvain made these statements as to the Company's Q2 2024 results and affirming annual guidance on June 5, 2024 – more than two months through Q2 2024 and less than two months before the truth was revealed on July 25, 2024, when Defendants slashed their full year guidance by $300 million. Among other admissions on July 25, 2024, Defendants disclosed that they had witnessed a significant shortfall in expected new

- 131 -                                                           **24-cv-1485-RSH-VET**

customer additions "at the beginning of the [second] quarter" (*i.e.*, the quarter beginning more than two months before Sylvain's statement), which put Dexcom "a quarter behind" where they "expect[ed] to be." Defendants further admitted that they experienced this shortfall "particularly in the DME channel." Even crediting Defendants' "four to six week delay" in receiving DME data, the DME shortfall would have been evident no later than the end of May 2024 – four to six weeks after the significant sales force disruption at the beginning of the second quarter. This admission shows that, at this time, Sylvain had actual knowledge of the adverse facts regarding Dexcom's significant underperformance in the Type 2 basal space that was materially negatively impacting Dexcom's Q2 2024 earnings and its ability to achieve its FY 2024 results. Further, the temporal proximity between the misstatement and the contradictory disclosures supports a finding of actual knowledge.

(b) ***Access to Real-Time Data***: Sylvain and other defendants repeatedly admitted they had access to information that they used to track sales data, understand where their patients were coming from, and understand the Company's market share in the basal market, showing Sylvain possessed data undermining his Class Period statements. Sylvain admitted, for example, that Dexcom "get[s] script data . . . based on pathology" to gauge performance in the basal cohort.

(c) ***Temporal Proximity***: Sylvain's knowledge as to the falsity of his statements is supported by the fact that less than two months after making these statements, Defendants finally disclosed their dismal performance in the basal space on July 25, 2024. Indeed, revoking the confidence in Dexcom's full year guidance in his June 2024 statements, on July 25, 2024, Sylvain announced a $300 million cut to Dexcom's full year guidance and stated "[w]e're not doing well in the basal space."

(d) ***DME Channel Awareness***: Similarly, Defendants admitted post-Class Period that DME performance had fallen short and hurt their basal business, saying: "we've lost market share in the DME channel . . . and that has hurt us"; "growth in the DME channel has trailed our plan"; "you'd probably imagine if we're

4914-2626-0365.v1

not doing well in the DME it gets back to your point.  We're not doing wonderful in the basal space."  Analysts reported that these issues had persisted in prior quarters.  This directly contradicts Sylvain's April 2024 assertion that Dexcom was successfully competing in the Type 2 basal market.

(e)   ***Core Operations and Strategic Importance***: The expansion of CGM coverage to Type 2 basal patients was described by Defendants as the "largest single expansion of access to CGM in our industry's history," making performance in this segment a core operational focus.  As CFO, Sylvain was directly responsible for the Company's financial results and would necessarily and would necessarily have monitored adoption trends, market share data, and prescribing behavior.   His statements confirming guidance would only be credible if grounded in actual data showing Dexcom's performance to expectations.  But internal tracking revealed the opposite: Dexcom had already seen lower than expected new customer additions and was, as of the beginning of this quarter, a quarter behind where it expected to be.  That Sylvain omitted these facts underscores his awareness – or deliberate disregard – of Dexcom's commercial shortcomings.

(f)   ***Motive***: Finally, in addition to his knowledge and/or reckless disregard of the misleading nature of his statement, Sylvain was also motivated to mislead investors, as set forth below in §VIII.F.  In particular, Sylvain sold $85,712 in stock at artificially inflated prices just five days after making this statement.

281.  **Conclusion**.  In responding to an analyst's question about the Company's Q2 2024 and full year guidance, Sylvain's statements professing confidence as the Company's current performance (*i.e.*, "we . . . continue to do well," "we're happy with where we are," "very comfortable with where folks are sitting the quarter") and doubling down on the Company's raised guidance ("[w]e're happy with our full year guidance") created a misleading picture of the Company's financial performance and success in the "basal wars."  At the time Sylvain answered this question, he knew but omitted that Dexcom, had witnessed a shortfall of new customers at the beginning of

4914-2626-0365.v1

the quarter, its sales force was not successfully gaining traction with PCP prescribers despite undertaking a massive expansion and reorganization, its DME relationships had disintegrated, it was badly losing share to Abbott, and its Q2 2024 results were abysmal. Yet, Sylvain gave investors a materially distorted picture of the Company's performance, indicating that Dexcom's financial results were as strong as ever. The glaring nature of Sylvain's omissions is evidenced by the Company's subsequent revelations on July 25, 2024 as to its dismal Q2 2024 results, massive $300 million slash to guidance, loss of market share in basal, poor DME performance due to strained relationships, and inadequate sales force.

## VII.   DEFENDANTS STUN THE MARKET BY DISCLOSING ANEMIC PERFORMANCE IN THE TYPE 2 BASAL MARKET

282.   Less than two months after Defendants had confirmed their bullish outlook and reiterated Dexcom's FY 2024 sales guidance on the heels of what they claimed was continued momentum in the Type 2 basal space, Defendants shocked the market on July 25, 2024, by announcing disastrous Q2 2024 results and slashing Dexcom's full-year sales guidance by hundreds of millions of dollars.

283.   In sharp contrast to their earlier statements, Defendants revealed that Dexcom had not, in fact, capitalized on the enormous opportunity of Type 2 coverage expansion, which they had described at the start of the Class Period as the "largest single expansion of access to CGM in our industry's history." Instead, Sylvain was forced to admit: "*We're not doing wonderful in the basal space*." Sayer leveled with analysts, admitting for the first time that *"we've lost market share in the DME channel . . . and that has hurt us."* In his prepared remarks, Sayer disclosed that "*we have seen our share of new customers fall short of our expectations*" and described the need to "enhance our competitive position and reestablish momentum."

284.   Further, Defendants were forced to admit that their recent PCP sales force expansion, which they had described in glowing terms as opportunistic just months earlier was, in reality, a reactionary move done to stem the loss in market

- 134 -                                                 **24-cv-1485-RSH-VET**

share to Abbott amongst the new basal population.  As Sayer stated, Dexcom's sales force "needed to get into [PCP] offices" because "we obviously don't win in offices we don't call on."  Sayer further admitted that, in contrast to their new structure, which had a sales force focused on "prospecting" and "talking to more of PCPs who don't prescribe as much product," prior to the sales force reorganization "the reps in those areas . . . their efforts were focused on those that were high, the highest prescribers in the territory."

285.   The market was shocked by this news, ***causing Dexcom's stock price to decline by more than 40%***, the worst day on record for Dexcom's shares since the Company's initial public offering in April 2005. *CNBC* reported that "Dexcom shares sank more than 40% on Friday, ***their steepest decline ever . . . wiping out more than $17 billion in market cap***."  Analysts commented on the disappointing results, stressing that there was "***A Lot of Damage Done***" and "***Severe and Sudden Near-Term Challenges Derail Growth***."  Analysts highlighted Dexcom's underperformance in the Type 2 basal market, noting "***DXCM is clearly losing the basal wars right now***" and "***the most worrisome dynamic to us as it implies share loss to its largest competitor Abbott . . . which cost DXCM a meaningful number of new patients***."

286.  Analysts were particularly stunned – and frustrated – in light of Defendants' positive statements to the market just the month prior.  For example, one Bernstein analyst reported on the "[d]isastrous revenue miss and guidance cut" and commented that "***DXCM credibility is damaged after June 5th comments that management was 'happy with full year guidance' and 'very comfortable with where folks are sitting in the quarter***.'"  J.P. Morgan analysts similarly remarked that "***investor faith in management has been severely shaken, especially following reiterated guidance at a June competitor conference***."  BofA Global Research's July 26, 2024 report likewise commented that "***[t]his is a credibility hit for DXCM and it will take time to earn that back, especially given DXCM blessed consensus***

- 135 -                    **24-cv-1485-RSH-VET**

*revenue in early June*." J.P. Morgan analysts estimated "~7/10 new patients likely going to Abbott today in the DME, the vast majority of whom are Medicare basal fee for service patients" and observed that there was a "perception amongst DME reps that Abbott is channel agnostic vs. Dexcom preferential to the pharmacy."

287. In the weeks and months that followed the end of the Class Period, Defendants made further revelations contradicting their positive statements during the Class Period regarding the Company's performance in the Type 2 basal market and the strength of Dexcom's DME business. For example, on July 28, 2024, Wolfe Research analysts issued a report that summarized their Q&A call back with Sayer and Dexcom's head of Investor Relations, Sean Christensen, following Defendants' July 25, 2024 disclosures. The focus of the Wolfe Research analysts' call back was "'what went wrong.'" The Wolfe Research analysts reported on the issues that Dexcom was facing, divulging that "[b]luntly, DXCM acknowledged share loss in DME and said ABT doing a better job there." Wolfe Research reported that "***DXCM suggests most of the above issues have been present in prior quarters***."

288. Similarly, J.P. Morgan analysts issued a report on July 31, 2024 after they "caught up with management earlier this week to better understand the headwinds" revealed on the July 25, 2024 call. The analysts reported that "we suspect an ***erosion in the relationship between the company and DME distributor [partners] has been ongoing for some time, likely starting with the company's fanfare around pharmacy access with the launch of G7 [in February 2023]***."

289. On August 5, 2024, following conversations with Defendants, BofA Global Research analysts noted: "DXCM said there wasn't just one big major DME that suddenly shifted away this quarter but ***instead the issues being highlighted seem widespread across many of the DMEs***." On August 28, 2024, William Blair analysts, following a meeting with management, revealed: "Management walked through DME dynamics that led to share loss during the quarter, with its 'top-to-top' discussions suggesting that a handful of DMEs felt DexCom may have been 'working against

- 136 -

**24-cv-1485-RSH-VET**

them' as it shifted focus to the pharmacy channel." The analysts further noted, "DexCom's senior leadership team is now fully involved in *rehabilitating its DME relationships*."

290. Then, during the September 4, 2024 Wells Fargo Healthcare Conference, Sayer acknowledged "suffice it to say we're behind" in response to an analyst's dire characterization of the lopsided Type 2 basal market – Abbott was "winning more share at the physician level with type two basal patients" and had a "70% share in that channel in that population." Sayer also admitted that Defendants were aware, in 2023, that they did not have the sales force to acquire potential new basal customers and had been falling behind:

> We decided back in 2023, we needed a broader sales force for a number of reasons. The first reason is we've looked at prescribing patterns and the places where *we were not getting any traction are those offices where we had no salespeople, where we weren't calling on physicians. We're getting very few prescriptions*. We needed to broaden our reach.

291. During the same September 4, 2024 call, Sayer discussed Dexcom's extensive efforts to repair Dexcom's relationships with DME distributors, which included "top-to-top meetings throughout the organization," and Sayer "personally having phone calls with the CEOs of our top distributors," which would "continue on a regular basis to make sure we're doing what we need to in that channel to get back on the solid ground and then eventually get back to the place where we're on equal foot and where . . . we're supposed to be." Sayer also stated that Dexcom's "commercial leadership team is having face-to-face meetings, head-to-head meetings locally in all of them at their headquarters, hearing their concerns" and that they had "retrained" the sales force and "encouraged our reps go get those relationships that you need with the local DME rep." But despite these extensive efforts, Sayer acknowledged that "it's going to take us some time," and "[t]his is not something we're going to fix in . . . 2 weeks, it can take us a while to get back to where we need to get." Consistent with that assessment, Sylvain told analysts that, for guidance purposes, Dexcom assumed it would "lose share" in the DME channel during the third

4914-2626-0365.v1

quarter of 2024 ("Q3 2024") and stated: "I don't know that we're going to be completely out of it and taking share back by the fourth quarter, certainly in the DME channel."

292.   On September 24, 2024, Piper Sandler analysts noted: "Now to the bigger issue, **DexCom cannot compete against Abbott for basal patients**.  DexCom talked about their DME share declining, which makes sense as this would be the company missing out on many of the Medicare basal patients."

293.   On October 24, 2024, during Dexcom's Q3 2024 earnings call, in response to an analyst's question about full year 2025 guidance, Sylvain stated that "[i]t . . . assumes stable, not necessarily winning share back, but stable trends through the DME."

294.   On January 13, 2025, at the JP Morgan Healthcare Conference, Sayer confirmed that Defendants knew, by late 2023, that they were losing significant share to Abbott among PCPs who treated Type 2 basal patients:

> *As we looked at that situation in late 2023 and early 2024, we came to the conclusion we didn't have the resources in the field to address these new markets that we were going to go after.*
>
> *Quite simply, Dexcom can't win in physician offices where we don't have a presence.  It's pretty tough*.  We made the decision to expand the commercialization organization by 40%, so we could go after these opportunities.

295.   During the same call, Sayer highlighted the fact that Dexcom had "added 50,000 new prescribers in 2024."

296.   On February 13, 2025, during Dexcom's fourth quarter of 2024 earnings call, an analyst asked for further details on the assumptions underlying Dexcom's projected 2025 growth rate, noting that "I don't think you see DME share gains, you're assuming it to be flat."  Sylvain reaffirmed this expectation during Dexcom's first quarter of 2025 earnings call, stating that "our expectation is having stable share as we move through the course of 2025."  In other words, Dexcom had merely

4914-2626-0365.v1

stopped the slide – it has not taken back the share it lost, nor does it expect to do so during 2025.

297.   On March 4, 2025, during the Raymond James Institutional Investors Conference, Sylvain stated: "In 2024, we expanded our sales force by 40%.  And we positioned ourselves really to be a jump-off point to reach more general practitioners, primary care physicians to make sure that we were able to take advantage of this opportunity."   In doing so, Sylvain admitted that Dexcom's sales force was not sufficient or well-positioned prior to the "jump-off point" created in "2024" by the massive sales force expansion.

## VIII.   ADDITIONAL ALLEGATIONS OF SCIENTER

### A.   Defendants Spoke Frequently Regarding the Impact of the Medicare Coverage Expansion on Their Core Business, Expressing Personal Involvement and Knowledge

298.   Throughout the Class Period, Sayer, Sylvain, and Lawver served as CEO, CFO, and CCO, respectively, occupying top leadership positions at Dexcom.  By virtue of their management and/or control of the Company's operations and their access to confidential proprietary information concerning the Company's operations and financial results, Defendants either knew or recklessly disregarded the omitted information which rendered their statements materially misleading.

299.   Dexcom has **only one core product** – CGMs.  The Company's focus is the design, development, and commercialization of CGMs, and its stated "objective is to remain a leading provider of CGM systems and related products."  The Company has explained that reimbursement from government healthcare programs and third-party payers "is an important element of our success."  Accordingly, the Company's ability to capture patients newly-covered by the CMS coverage expansion in April 2023 was of critical importance to its growth.  In its 2024 Proxy statement, Dexcom described it as the "largest expansion of coverage in our company's history" and noted it as one of its three strategic achievements for 2023.  As Defendants made clear, the

4914-2626-0365.v1

newly-covered expansion opportunity represented "nearly 7 million people in the U.S. with approximately half being of Medicare age."

300.    Defendants repeatedly acknowledged the importance of the Medicare coverage expansion to Dexcom's business:

- **February 9, 2023**: Sayer encouraged investors, asserting that the expansion "has the potential to nearly double [Dexcom's] addressable reimbursed market in the United States."

- **April 27, 2023**: Sayer again underscored that "this decision represented the largest single expansion of access to CGM in our industry's history."

- **June 23, 2023**: Lawver boasted: "We have the right commercial infrastructure for leading with the endocrinologists and expanding our leadership in primary care with the Type 2 basal and severe hypoglycemia markets where coverage has just opened up in the last couple of months."

- **July 27, 2023**: Sylvain emphasized that the "expanded coverage that we've worked on for years and years and years, and that really we've led."

- **October 26, 2023**: Sayer stressed: "Our latest product cycle has also coincided with the largest expansion of coverage in our company's history, with significant reimbursement now established beyond intensive insulin use.  There are more people with covered access to DexCom CGM than ever before.  As a reminder, Medicare coverage went live in mid-April for people with Type 2 diabetes using basal insulin only as well as certain non-insulin individuals that experience hypobychemia [sic]. Collectively, these 2 populations represent nearly 7 million people in the U.S. with approximately half being of Medicare age."

301.    Defendants also understood the importance of the newly-covered basal patient population and touted the Company's ability to address it.  In fact, Defendants heralded the role that the Company played in CMS's decision to expand coverage. Sayer stated during the February 9, 2023 earnings call that CMS's coverage determination was "led by the publication of Dexcom's MOBILE study."[9]  Sylvain also highlighted the Company's advanced knowledge of Type 2 basal coverage because of its MOBILE study and, correspondingly, its anticipatory sales force

---

[9]    Dexcom's MOBILE study was an eight-month study of 175 diverse adults across 15 clinical sites with Type 2 diabetes, age 30 years or older that the Company used to show the benefits of CGM use in Type 2 basal patients.

**24-cv-1485-RSH-VET**

expansion in his prepared remarks during the William Blair Growth Stock Conference on June 7, 2023.

302. Defendants' statements show that they understood that a large, PCP-focused sales force would be necessary to capture newly-covered Type 2 basal patients. For instance, during the same June 7, 2023 call, Sylvain discussed the CMS coverage expansion and the actions Dexcom had taken to address it:

> We've doubled the size of our sales force. **Because we knew it was coming, and we knew primary care was the likely space where most basal patients were going to be seen, we doubled the sales force.** And in doing so, we've been making inroads into that primary care space to the point where we've doubled our primary care base and over 75% of our calls at this point are the primary care physicians, no longer endocrinologists. That's just important. That's where our basal population is seen.

303. In addition, Defendants professed knowledge of the Company's strong relationships with DME suppliers, who would service the new Medicare population, and emphasized the efforts Dexcom undertook with them to meet demand from the newly-covered Type 2 basal group. For example, on the April 27, 2023 earnings call, Sayer stated: "On the basal opportunity, remember, Medicare sales process is durable medical equipment, and we *have very good relationships with our distributors and in that channel, and we worked very hard to position them to be successful with the basal patients. And so we're very comfortable there*."

304. During the same call, Sayer reiterated:

> We do see pent-up demand, and we do see people very excited for this opportunity. We've got to get – as I said earlier, *we worked very hard with our channel partners to prepare and so we're ready for that with our DME distributors to handle the influx of users that will come through that.*
>
> With respect to pricing [in models] . . . this is the same Medicare pricing that we have in our Medicare business for those who are on intensive insulin therapy. So the only thing that would change is a larger portion of our patients could become Medicare patients and subject to Medicare reimbursement. And on an overall basis, Medicare is very favorable for us. *So we're in a very good position there with these patients*.

4914-2626-0365.v1

305.    As detailed above in §VI and herein, on nearly *every* earnings call and analyst-hosted conference call during the Class Period, Defendants consistently discussed and professed knowledge about the importance of the basal coverage expansion and the Company's purported success in taking share in this newly-covered population.  Moreover, analysts frequently questioned Defendants on their sales force coverage, their market share, or Dexcom's position vis-á-vis its key competitor Abbott.  Despite knowing that the Company was losing approximately seven out of ten new basal prescriptions and trailing Abbott by a significant margin in total basal market share (approximately a 70/30 split) due to the impediments the Company faced, Defendants diverted investors' attention to other, more favorable topics, omitted critical facts, and expressly misled investors.  Indeed, as detailed below, even after possessing months of data demonstrating their loss of the vast majority of new basal prescriptions and Abbott's continued dominance of the total basal market and having to reconfigure the Company's flailing sales force, Defendants still falsely assured the market that they were "taking share."  These false assurances, especially in response to pointed questions, further demonstrate Defendants' fraudulent intent and knowledge.

**B.    Defendants Admitted They Had Script-Level Data and Assured Analysts that Dexcom Was "Taking Share" in the Basal Space**

306.    In addition, Defendants repeatedly admitted to having access to and tracking script and coverage data, which informed them in real time of the struggles Dexcom was facing in reaching the newly-covered basal population.  Indeed, just prior to the start of the Class Period, on January 9, 2023, at the JP Morgan Healthcare Conference, Sayer bragged:

> Almost half of the basal population is a Medicare patient.  So we're going to be able to address the majority of those people very quickly.  We have the data capabilities to show what outcomes we're going to generate within this population, and we'll do that.  We can download the data we get from those patients and present a very strong case to those payers.

- 142 -                                              **24-cv-1485-RSH-VET**

4914-2626-0365.v1

307. And, after coverage for the basal population was initiated, Lawver described Defendants' visibility into, and tracking of, basal patient uptake of Dexcom's CGMs. During the October 26, 2023 earnings call, answering a question regarding "color [Defendants] can give on how these basal patients are adopting technology" because they "should have had some reorders by now," Lawver stated: "The trends, as Kevin referenced, that we see in [basal] in terms of uptake and intention to prescribe from physicians mirror what we've seen in other segments of the marketplace. And the coverage is certainly a big driver of that. ***We track coverage very closely for DexCom for the industry***."

308. Likewise, on November 29, 2023, in response to an analyst's question during the Piper Sandler Healthcare Conference about whether new basal patient additions were coming from Medicare or private insurance, Sylvain said, "***[w]e know exactly*** where the patients are coming from." And, on January 8, 2024, Sylvain confirmed "we'll get the full final patients numbers in soon."

309. And, on the February 8, 2024 Q4 2023 earnings call, a Piper Sandler analyst asked, "[w]hat should we think about in terms of basal contribution to the topline this year? And are we inflecting right now as far as basal adoption goes with CGM here in the States?" Sylvain's response underscored his reliance on script data: "***And so when you think about it, and you can see the share taking when you look at the script data, we are taking share***."

310. Moreover, Sylvain specifically admitted his own access to and review of data in response to an analyst's question regarding "market share within the basal population" during the April 25, 2024 earnings call, saying: "***In terms of share taking and how we look at that category, we get script data, we look at script data based on pathology. The debate – there's no debate internally to us. We know we're taking share and we see that data***."

311. Defendants have also admitted that Sylvain had access to, and reviewed, IQVIA script-level data and that IQVIA data shows Abbott was winning

- 143 -                                    **24-cv-1485-RSH-VET**

approximately seven out of ten **new** basal scripts and continuing to hold approximately 70% of total basal market share in January and April 2024. *See* Doc. No. 54-1 at 7. Thus, when Sylvain touted "outperformance in basal" or "share taking" and cited "script data" as evidence of share-taking, he knew that the very data he referenced contradicted his statements – rendering his statements materially misleading absent disclosure.

312. Defendants' assertions made clear that they had access to and did in fact review and analyze real time data on uptake of Dexcom's CGM among basal patients at the time they made the false and misleading Class Period statements set forth above.

### C. Defendants' Admissions Affirm Their Contemporaneous Knowledge of, or Deliberate Recklessness Regarding, Information Undermining Their Public Statements

313. Defendants' admissions at the end of the Class Period and in the months that followed confirm that the facts they concealed from investors were **known** to them **at the time** they made false and misleading statements during the Class Period.

314. First, on July 25, 2024, Defendants admitted that the sales force expansion they had previously touted on April 25, 2024, as an "upgraded structure to help us better capitalize on the significant opportunities ahead" was actually a "reorganization" that was "much different than what we've done in the past." While they had previously stated that the purpose of their sales expansion and repositioning was "to be most effective with our call points," they now revealed that this expansion was really an effort to stem the loss in market share they were experiencing amongst the new basal population. As Sayer conceded, they "needed to get into [PCP] offices and develop relationships" because "what we've noted in our data is we obviously don't win in offices we don't call on."

315. Defendants continued to affirm their knowledge of the falsity of their statements during the July 25, 2024 call. First, Sayer confessed that their sales force reorganization led "**to a lot of disruption, particularly at the beginning of the**

- 144 -						**24-cv-1485-RSH-VET**

*quarter*." Defendants blamed the purported "disruption" for the significant shortfall in expected new basal patient additions that occurred during the quarter. Thus, Defendants, *by their own admission*, witnessed disappointing new basal patient additions beginning at the same time as the "disruption" – "at the beginning of the quarter" in April 2024. Sylvain continued, specifying that "*the disruption [was] bigger than we would have anticipated*" and, in fact, was not one from which they could recover. In responding to an analyst's question about loss of new customers, Sylvain explained that "*when the disruption is bigger than anticipated, even as you have some of that recovery, again, you were a quarter behind where you'd expect to be*." Thus, Defendants' admissions confirm that Defendants knew at the beginning of the second quarter in April 2024 that they "were a quarter behind" in new customer additions. As Sylvain explained, it was apparent that the shortfall would necessarily affect the rest of the year, resulting in lowered guidance, because of the "compounding effect of our slower than expected new customer growth."

316. Second, Sylvain expressly connected the purported sales force disruption with a loss of new customer additions in DME, stating: "we experienced lower than expected new customer starts *in conjunction with our sales force expansion and realignment, particularly in the DME channel*." Given their recognition that the sales force disruption was most impactful at the beginning of the quarter (*i.e.*, during April 2024), they knew about the corresponding impact on DME customer losses at that same time. Defendants claimed they did not see DME customer losses in real time because DME data lags behind other sales data. But even crediting their "four to six week delay," this suggests they had parallel DME information no later than the end of May – four to six weeks after the sales force disruption at the beginning of the quarter caused DME customer losses. Thus, even using a conservative calculation, by the time Defendants spoke in June, they knew that they were falling behind in all sales channels and could not catch up.

4914-2626-0365.v1

317. During the September 4, 2024 Wells Fargo Healthcare Conference, Sayer also admitted that Defendants were aware, in 2023, that they did not have the sales force to acquire potential new basal customers and had been falling behind:

> We decided **back in 2023**, we needed a broader sales force for a number of reasons. The first reason is **we've looked at prescribing patterns** and the places where **we were not getting any traction are those offices where we had no salespeople, where we weren't calling on physicians. We're getting very few prescriptions**. We needed to broaden our reach.

318. A June 24, 2024 report from BofA Global Research further confirms Defendants' awareness of the sales force problems in 2023. The analysts, following their call with Dexcom's management, relayed that "DXCM said it was going do sales force expansion, a 50% increase in US sales force," and that "it's something started **in Q2/Q3 last year**" – *i.e.* 2023 – demonstrating that Defendants had, internally, recognized the need to dramatically expand Dexcom's sales force in mid-2023.

319. Moreover, as Sayer conceded at the JP Morgan Healthcare Conference on January 13, 2025, Defendants knew by late 2023 that they did not have the sales force necessary to acquire new basal patients and had been falling behind:

> On top of that, we knew the Stelo launch was coming and was going to be an opportunity for Type 2 diabetes, prediabetes, and metabolic health. **As we looked at that situation in late 2023 and early 2024, we came to the conclusion we didn't have the resources in the field to address these new markets that we were going to go after**.
>
> Quite simply, Dexcom can't win in physician offices where we don't have a presence. It's pretty tough. We made the decision to expand the commercialization organization by 40%, so we could go after these opportunities.

320. During a call on March 4, 2025, Sylvain stated: "In 2024, we expanded our sales force by 40%. And we positioned ourselves really to be a jump-off point to reach more general practitioners, primary care physicians to make sure that we were able to take advantage of this opportunity." Thus, rather than capturing some additional or incremental opportunity, Sylvain confirmed the sales force expansion was creating a "jump-off point" – reaching a baseline level of adequacy in reaching PCPs.

4914-2626-0365.v1

321. And, as detailed above, Defendants have also admitted that IQVIA script-level data shows Abbott was winning approximately seven out of ten *new* basal scripts and continuing to hold approximately 70% of total basal market share in January and April 2024. *See* Doc. No. 54-1 at 7.

322. Defendants' admissions demonstrate that they had knowledge of facts that contradicted their Class Period statements but withheld them to paint a misleading impression of what they described as their "outperformance" in the new basal market.

**D.    The Proximity Between Defendants' Misstatements and the Emergence of the Relevant Truth Further Establishes a Strong Inference of Scienter**

323. As detailed above, Defendants knew of the systemic problems the Company was facing that were negatively impacting its ability to take share in the new basal patient population, even admitting that they "came to the conclusion" by "late 2023 and early 2024," that Dexcom "didn't have the resources in the field to address these new markets that we were going to go after."  Despite this, Defendants continued to mislead investors, even raising the midpoint of full-year 2024 guidance on April 25, 2024, touting organic revenue growth of 17%-21% and telling investors, "[w]e know we're taking share and we see that data" and "[w]e still have a very strong DME business."  Then, on June 5, 2024, in response to an analyst's question as to their comfort with this guidance, Defendants doubled down on their raised guidance, stating as follows:

> And in terms of the full year as of the last quarter, *when we issued our earnings, we raised our guidance*.  And so that should give we obviously beat the street expectations in the first quarter, *raised guidance and continue to do well*.  So I think from that point of view, I think *we're happy with where we are.  We're happy with our full year guidance*.  We don't guide to the quarters, but we *were very comfortable with where folks are sitting for the quarter*.

324. Yet, *less than two months later*, on July 25, 2024, the Company did an about-face, disclosing disappointing results and announcing that it was now *reducing* its full-year guidance by *$300 million* and that they now expected organic growth of only 11%-13% for the year.  Sylvain described this "growth number" as "*lower than*

4914-2626-0365.v1

*we've historically seen*."  In sharp contrast to their statements one quarter earlier, Defendants blamed these results, in part, on lower than expected new customer additions because of issues in their DME channel.

325.  The magnitude of this abrupt revision to guidance was staggering, causing the stock price to plummet by more than 40% – *the steepest decline in Dexcom's history* – leading analysts to question management's credibility.  *See* §IX. This dramatic reversal from Defendants' representations just a few weeks earlier demonstrates that Defendants knowingly misled investors or, at a minimum, were deliberately reckless in ignoring material facts in their possession (*i.e.*, shattered DME relationships and lack of resources in the field to capture new basal population) when making public statements.

**E.    Lawver's Suspiciously-Timed Departure Supports a Strong Inference of Her Scienter**

326.  As CCO, Lawver's role encompassed the oversight of the global commercial organization with responsibility for global sales, marketing, and customer experience.  She was responsible for leading Dexcom's worldwide commercial teams. Lawver started as CCO in January 2023 just as the Company was admittedly positioning its sales force to capture the basal patients that would acquire insurance coverage through the CMS expansion decision.  Sayer explained that Lawver's new role would entail "'lead[ing] Dexcom's worldwide commercial teams as we build from a position of strength and look to bring Dexcom CGM to millions of additional people around the world who can benefit from our technology.'"  As CCO, she had responsibility over the Company's commercial strategy and sales efforts, which the Company ultimately admitted were deficient on July 25, 2024.

327.  Just one quarter later, on October 24, 2024, Dexcom announced that Lawver would "retire" at the end of the year.  The Company disclosed that she would stay on as a "special advisor" in early 2025 but would be replaced by Sayer as the Company searched for a new CCO.  Lawver's departure, which came on the heels of

4914-2626-0365.v1

the Company's disappointing news in July 2024, is circumstantial evidence that Lawver had knowledge of and responsibility for the Company's sales force issues and its poor performance in the newly-covered basal patient population. There is a strong inference that Lawver's sudden exit is an attempt by Lawver to distance herself from potential legal liability and suggests a conscious effort to avoid the consequences of the misconduct.

### F. Defendants Were Motivated to Mislead Investors as to Dexcom's True Prospects

#### 1. Defendants Had a Motive to Conceal the Bad News in the Hope that They Might Be Able to Right the Ship and Avoid Disclosure Entirely

328.    Defendants were motivated to make the false and misleading statements and omissions alleged herein in order to maintain the public perception that they were competitive with Abbott in the CGM space, which was crucial to the Company's commercial prospects. Winning the "basal wars" and being able to capture market share in what Defendants described as the "***largest single expansion of access to CGM in our industry's history***" was also critical to Dexcom's ability to persuade investors that they could achieve the growth they had conditioned the market to expect. Defendants were motivated to mislead investors while simultaneously hoping that they might ultimately be able to "right the ship" and avoid having to disclose negative news to the public. After all, Defendants desperately expanded their sales force in an effort to stem the loss of new basal patients to Abbott. The fact that a gamble – concealing bad news in the hope that it will be overtaken by good news – fails is not inconsistent with scienter. It is like embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing.

4914-2626-0365.v1

**2. Defendants' Suspicious Insider Sales Support Scienter**

329. Defendants were also motivated to engage in the fraud alleged herein to prop up Dexcom's stock price in order to profit from their sales of nearly $25.8 million in Dexcom common stock.

330. During the Class Period, while in possession of the MNPI described above, Sayer sold a total of 167,965 shares at prices as high as $138.70 for total proceeds of $22.3 million. These sales amounted to 43% of his total ownership and *nearly 20 times* the amount he made from his salary in 2023. Sayer began selling stock on January 16, 2024 – a week after he touted "where we have a presence, we win very much" – at prices exceeding $120 per share with a sale of $4.6 million in stock. He sold another $10.8 million on March 12, 2024, and, on April 8, 2024, he made his final sale of $6.9 million near Class-Period high prices. Sayer made these sales despite knowing, as he later admitted, that in "late 2023 and early 2024, . . . we didn't have the resources in the field to address these new markets." Notably, this final sale came less than two weeks before the first corrective disclosure on April 25, 2024, when Dexcom's stock price began to drop.

331. Sylvain also profited from the fraud. He sold a total of 22,747 shares during the Class Period for total proceeds of nearly $2.9 million. These sales amounted to 41% of his total ownership and *more than five times* the amount he made from his salary in 2023. In contrast, in the 15 months leading up to the Class Period, Sylvain sold just 6,000 shares for less than $1 million in proceeds – one quarter as many shares as he sold during the Class Period.

332. Sylvain began selling on May 22, 2023 with a sale of 2,400 shares for $282,192 and another sale on August 22, 2023 of 1,844 shares for $192,477. He continued selling in 2024, despite knowing that Dexcom was losing approximately seven out of ten new basal prescriptions and trailing Abbott by a significant margin in total basal market share, and despite awareness of Dexcom's increasingly deficient sales force, with sales on January 16, 2024 and February 20, 2024 – less than two

- 150 -

**24-cv-1485-RSH-VET**

weeks after he touted to investors that "you can see the share taking when you look at the script data, we are taking share" – for a total of $730,567.  Sylvain made an outsized sale on March 12, 2024 as a last-ditch effort to profit before the Company began to issue corrective disclosures.  He sold 11,661 shares at a per-share price of $134.41 for proceeds of nearly $1.6 million.  Immediately after he reaffirmed guidance on June 5, 2024, Sylvain made one final sale of 745 shares on June 10, 2024 for $85,712.

333.   Lawver sold 4,764 shares of Dexcom stock for proceeds of $640,329 on March 12, 2024, just a little over a month before the relevant truth began to be revealed.  These sales amounted to 42% of her total ownership and 118% the amount she made from her salary in 2023.  In contrast, she did not sell a single share in the 15 months leading up to the Class Period.

334.   Although Sayer and Sylvain each had a 10b5-1 trading plan in place during the Class Period, they manipulated those plans while in possession of MNPI, which further supports a strong inference of scienter.  Indeed, during the Class Period, Sayer and Sylvain each adopted *new* 10b5-1 plans – on December 12, 2023 and November 21, 2023, respectively – prior to making the vast majority of their trades.  These plan adoptions occurred at the same time that Defendants knew about Dexcom's deficient sales force and its diminishing share in the basal space.  Thus, at every point that Defendants made the decision to trade, they were in possession of MNPI.

335.   The short period between Sayer's and Sylvain's adoption of their 10b5-1 plans and their first trade is a bright red flag.  Rule 10b5-1 was intended to provide a mechanism for insiders to sell while not in possession of MNPI.  By attempting to commit insiders to a predetermined plan, it moves the relevant date at which the insider possessed material information from the date of the trade to the date when the trade was planned.  However, this purpose has frequently been circumvented.  A January 19, 2021 Stanford study, entitled "Gaming the System: Three 'Red Flags' of

4914-2626-0365.v1

Potential 10b5-1 Abuse," that examined over 20,000 10b5-1 plans between January 2016 and May 2020 found that a 10b5-1 plan would perform demonstrably better than its counterparts when it had shorter periods between adoption or modification and the first trade, which allows insiders to "systematically avoid losses." The Stanford study concluded that shorter periods between adoption or modification and the first trade were red flags of an insider abusing his 10b5-1 plan. Additionally, in a June 29, 2022 article entitled "CEO Stock Sales Raise Questions About Insider Trading," *The Wall Street Journal* analyzed 75,000 sales by corporate insiders from 2016 through 2021 and found that "insiders who sold within 60 days [of plan adoption] reaped $500 million more in profits than they would have if they sold three months later."

336.    This manipulation, which defeats the purpose of a trading plan, has prompted the SEC and the U.S. Department of Justice ("DOJ") to take recent action. For example, in a March 1, 2023 DOJ press release, entitled "CEO of Publicly Traded Health Care Company Charged for Insider Trading Scheme," the DOJ indicted a CEO for insider trading "exclusively on [his] use of Rule 10b5-1 trading plans," explaining it "'will not allow corrupt executives to misuse 10b5-1 plans as a shield for insider trading.'" Further, in a February 13, 2023 article, entitled "New SEC Rules Target Corporate Insider Trading: Loopholes will close for executives selling company stock," *The Wall Street Journal* reported that the SEC effectively amended the Rule on February 26, 2023 to "target corporate insider trading" and "remove many of the loopholes that allowed corporate insiders to hide behind these trading plans."

337.    Because Sayer and Sylvain manipulated their 10b5-1 plans to defeat the very purpose of Rule 10b5-1, their plans provide even further evidence of an already compelling inference of scienter.

### 3.    Dexcom's Incentive Pay Structure Provides Additional Motive to Inflate Dexcom's Stock Price

338.    Sayer and Sylvain were further incentivized to inflate the Company's stock price because Dexcom's stock price was a significant input to their incentive

- 152 -                                                    **24-cv-1485-RSH-VET**

compensation.   In discussing executive compensation, the Company's Proxy statements noted "the direct relationship between the value of our equity awards and the fair market value of our common stock."

339.   The stock price not only determined the value of any shares received or sold but also the number of shares awarded.  Specifically, performance stock units ("PSUs") were calculated and awarded based on a formula in which the Company's stock performance was a decisive factor.   Notably, if Dexcom's stock price underperformed, the number of PSUs would decrease dramatically or even fall to zero.

340.   Dexcom targeted PSU awards constituting 43% of Sayer's compensation and, on average, 11% of other executives' compensation.   In comparison, the Company targeted Sayer's base salary at 7% of his total compensation and other executives' base salaries at 11% of their total compensation.  Given that a significant portion of their compensation depended on maintaining or increasing Dexcom's stock price, Sayer and Sylvain were further motivated to continue their fraud.

**G.    Corporate Scienter**

341.   The allegations above also establish a strong inference that Dexcom acted with corporate scienter throughout the Class Period as Defendants and Dexcom's officers, management, and agents had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were known or available to them.  Such material misrepresentations and/or omissions were made knowingly or recklessly, and without a reasonable basis.  By concealing these material facts from investors, Dexcom maintained and/or increased its artificially inflated securities prices throughout the Class Period.

**IX.    LOSS CAUSATION**

342. Defendants' wrongful conduct, as alleged herein, directly and proximately caused Plaintiff's and members of the Class (defined below) economic

- 153 -                **24-cv-1485-RSH-VET**

4914-2626-0365.v1

loss. Plaintiff's claims for securities fraud are asserted under the fraud-on-the-market and *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), theories of reliance. The markets for Dexcom's stock were open, well-developed, and efficient at all relevant times. During the Class Period, as detailed herein, Defendants made materially misleading statements and omissions. Defendants' conduct artificially inflated the price of Dexcom stock and operated as a fraud or deceit on the Class.

343. The Class Period inflation in Dexcom's stock price was removed when information concealed by Defendants' misleading statements and omissions was revealed to the market. The information was disseminated through partial disclosures that revealed the nature and effect of Defendants' alleged misconduct. These disclosures, as more particularly described below, removed artificial inflation from Dexcom's stock price, causing economic injury to Plaintiff and other members of the Class.

344. The corrective impact of the partial disclosures during the Class Period alleged herein, however, was tempered by Defendants' continued misleading statements and omissions that continued to conceal the true nature of Defendants' fraud. Each partial disclosure did not on its own fully remove the inflation from Dexcom's stock price, because it only partially revealed the nature and ramifications of Defendants' previously misrepresented and concealed conduct. Defendants' continued misrepresentations and omissions maintained the price of Dexcom securities at a level that was inflated by fraud and induced members of the Class to continue purchasing shares in Dexcom even after Defendants' partial disclosures.

345. The disclosures that corrected the market price to reduce the inflation maintained by Defendants' fraud are detailed below. These stock price declines were due to firm-specific, fraud-related disclosures and were not the result of market, industry, or firm-specific, non-fraud factors. The following partial disclosures, resulting in stock price declines, and descriptions thereof are not necessarily comprehensive because fact and expert discovery are not complete.

- 154 -                                                              **24-cv-1485-RSH-VET**

346. On April 25, 2024, after the market closed, Dexcom reported its Q1 2024 results, including U.S. revenue of $653 million, and updated its FY 2024 revenue guidance to a range of $4.20 billion-$4.35 billion, from a range of $4.15 billion-$4.25 billion.

347. On this news, Dexcom's stock price fell $13.67, or 9.9%, to close at $124.34 per share on April 26, 2024. In contrast to the 9.9% decline in Dexcom stock, the Standard & Poor's Composite Stock Index ("S&P 500") increased by 1% during this period, the S&P Health Care Equipment Select Industry Index ("S&P Health Care Equipment") increased by 0.8%, and the Nasdaq Composite Index ("Nasdaq") increased by 2.0%.[10]

348. Analysts commented on the news and attributed Dexcom's stock price decline to Dexcom's lower-than-expected Q1 2024 U.S. revenue growth and sales outlook for the remainder of the year. For example, on April 25, 2024, J.P. Morgan analysts noted: "we're not surprised to see shares indicating down in after-market trading as sales of $921M (+25% organic) missed the buy-side expectations." A Jefferies analyst report noted: "investors [were] looking for a stronger US [revenue] beat." Likewise, a Morgan Stanley report attributed the "tough[] stock reaction" to the fact "the US sequentially slowed a touch."

349. This partial disclosure did not on its own fully remove the inflation from Dexcom's stock price because it only partially revealed the nature and extent of Defendants' previously misrepresented and concealed conduct. Defendants also falsely reassured the market. For example, in an April 25, 2024 Form 8-K, Sayer stated: "'Dexcom is off to a great start in 2024, delivering another quarter of strong financial results while advancing several key strategic initiatives . . . .'" During the earnings call on the same day, Sylvain stated: "[w]e still have a very strong DME

---

[10] For purposes of comparing its stock price performance vis-à-vis its peers and the relevant market, Dexcom referred investors to the S&P 500, the S&P Health Care Equipment, and the Nasdaq.

**24-cv-1485-RSH-VET**

4914-2626-0365.v1

business, and certainly, the DME business continues to be supported by our partners very, very well." Accordingly, the price of Dexcom's stock remained artificially inflated.

350. After the market closed on July 25, 2024, Defendants issued disappointing financial results for the Q2 2024, and slashed their full-year guidance by $300 million to a range of $4.00 billion-$4.05 billion, representing organic growth of only 11%-13% for the year. In the related earnings call held the same day, Defendants explained the issues that impacted its quarterly revenue and 2024 sales forecast. In his prepared remarks, Sayer disclosed that "*we have seen our share of new customers fall short of our expectations*" and described the need to "enhance our competitive position and reestablish momentum." Sayer also admitted that "*we've lost market share in the DME channel . . . and that has hurt us*." In his prepared remarks, Sylvain stated that Dexcom's customer growth had "decelerated slightly." Sylvain also admitted that "*we experienced lower than expected new customer star*ts" and that "[w]e're not doing wonderful in the basal space."

351. On this news, Dexcom's stock price *plummeted by $43.85, or 40.7%*, to close at $64.00 per share on July 26, 2024. In comparison, the S&P 500 increased by 1.1%, the S&P Health Care Equipment declined by just 0.9%, and the Nasdaq increased by 1.0%. Media and analysts reported extensively on this corrective disclosure. For example, in a July 26, 2024 article titled "Dexcom shares plunge more than 40% for worst day on record," *CNBC* reported that "Dexcom shares sank more than 40% on Friday, *their steepest decline ever*, after the diabetes management company reported disappointing revenue for the second quarter and offered weak guidance." *CNBC* further reported that "[t]he stock fell $43.85 to close at $64, *wiping out more than $17 billion in market cap*."

352. Analysts were stunned. For example, Wolfe Research analysts issued a report on July 25, 2024 with a headline that stated: "DXCM: *Wow. Ugh. Sigh. . . . Cliché but . . . 'Didn't see That Coming*.'" On July 25, 2024 UBS analysts wrote:

- 156 -                                    **24-cv-1485-RSH-VET**

"*2Q24: Sales Miss and Guide Lower a Major Surprise*" and noted that "this *comes as quite a surprise to us* given our view that CGM (Continuous Glucose Monitoring) broadly is in the midst of an adoption inflection as basal ramps." Raymond James similarly issued a report on July 26, 2024 that described Defendants' news as "*[a] Painful (and Puzzling) Reset*" and commented that "[w]e are obviously frustrated with 2Q results and the associated estimate revision" and "*[a]dmittedly these dynamics are puzzling.*" Barclays analysts similarly reported that "*Mgmt surprised investors with slower Q2 sales, particularly surprising given the company's reputation for consistent beats and raises and DD growth end markets.*" BofA Global Research's July 26, 2024 report commented: "*A rare, shocking (and confusing) DXCM miss/lower.*" The report further stated:

> *But still many more questions than answers[.]*
>
> *We still do not fully understand how a business that should be predictable with recurring revenue could see such an outsized surprise in a single quarter. The pieces of the puzzle DXCM gave on the call just do not make sense to us* especially when Libre still looks normal. DXCM admittedly does not even fully understand why the share loss in DME happened – saying it still needs to unpack what happened in DME over the course of the year.

353. On July 25, 2024, Piper Sandler analysts stated that "[i]t goes without saying the main topic of the call today was the Q2 miss and FY guide down (the guide down was ~$300M for the year in total)" and that "[t]he share loss in DME is worrisome (*DXCM is clearly losing the basal wars right now*)," and additionally commented that "*[t]omorrow will likely be a painful day for DXCM shares.*" They also noted that "[l]ower than expected patient adds" was the "most worrisome dynamic to us as it implies share loss to its larger competitor Abbott."

354. Analysts were also surprised with Defendants' disclosures given their positive statements to the market just the month prior. For example, on July 26, 2024, Bernstein analysts reported on the "[d]isastrous revenue miss and guidance cut" and commented that "*DXCM credibility is damaged after June 5th comments that*

*management was 'happy with full year guidance' and 'very comfortable with where folks are sitting in the quarter*.'"

355.   In sum, both of the corrective disclosures listed above – April 25 and July 25, 2024 – served to remove the artificial inflation from the price of Dexcom's securities, and were direct and foreseeable consequences of the disclosure of the relevant truth concealed by Defendants.

## X.   APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND THE FRAUD-ON-THE MARKET DOCTRINE

356.   Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that: (i) Defendants made public misrepresentations or failed to disclose material facts during the Class Period; (ii) the omissions and misrepresentations were material; (iii) Dexcom securities were traded in an efficient market; (iv) the Company's securities are liquid and were heavily traded during the Class Period; (v) the Company's securities were traded on the Nasdaq and were covered by multiple analysts; and (vi) Plaintiff and members of the Class purchased, acquired, and/or sold Dexcom securities between the time Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

357.   Based upon the foregoing, Plaintiff and members of the Class are entitled to a presumption of reliance upon the integrity of the market.

358.   Plaintiff and members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute*, 406 U.S. at 128, as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## XI.   NO SAFE HARBOR

359.   Many (if not all) of Defendants' false and misleading statements and omissions during the Class Period were not forward-looking statements ("FLS")

- 158 -                                              **24-cv-1485-RSH-VET**

and/or identified as such by Defendants, and thus did not fall within any "Safe Harbor."

360. Defendants' verbal "Safe Harbor" warnings accompanying its oral FLS issued during the Class Period were ineffective to shield those statements from liability.

361. Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Dexcom who knew that the FLS was false or misleading. Further, none of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made.

## XII.   CLASS ACTION ALLEGATIONS

362. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class, consisting of all those who purchased or otherwise acquired Dexcom securities during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

363. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Dexcom securities were actively traded on the Nasdaq. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Dexcom or its transfer agents and may be notified of the pendency of this action by

- 159 -                                          **24-cv-1485-RSH-VET**

4914-2626-0365.v1

mail, using the form of notice similar to that customarily used in securities class actions.

364.   Common questions of law and fact predominate and include: (i) whether Defendants' acts violated the federal securities laws; (ii) whether the Individual Defendants omitted and/or misrepresented material facts; (iii) whether Defendants acted knowingly or recklessly disregarded the truth; (iv) whether the prices of Dexcom securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and (vi) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

365.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

366.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

367.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small per Class member, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XIII.  CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I:
### Violations of §10(b) of the Exchange Act and Rule
### 10b-5 Promulgated Thereunder Against All Defendants

368.   Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

4914-2626-0365.v1

369. This Count is based upon §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and SEC Rule 10b-5 promulgated thereunder.

370. During the Class Period, Defendants made various untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in connection with the purchase and sale of Dexcom securities. Defendants' statements were intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Dexcom securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Dexcom securities at artificially inflated prices. In furtherance of this unlawful course of conduct, Defendants, and each of them, took the actions set forth herein.

371. Pursuant to the above wrongful course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual earnings releases and conference calls, press releases, and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Dexcom securities. Such statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Dexcom's finances and business prospects.

372. By virtue of their ownership and/or positions at Dexcom, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the false and misleading nature of the statements made, although such facts

- 161 -

4914-2626-0365.v1

**24-cv-1485-RSH-VET**

were readily available to Defendants.  Said acts and omissions were committed willfully or with reckless disregard for the truth.

373.   Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As executive officers and/or directors of Dexcom, Defendants had knowledge of the details of Dexcom's internal affairs.

374.   Defendants are directly and indirectly liable for the wrongs complained of herein.  Because of their positions of control and authority, Defendants were able to and did, directly or indirectly, control the content of the statements of Dexcom.  As officers and/or directors of a publicly held company, Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Dexcom's businesses, operations, future financial condition, and future prospects.  As a result of Defendants' misconduct, the market price of Dexcom's securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Dexcom's business and financial condition which were concealed by the Individual Defendants, Plaintiff and other members of the Class purchased or otherwise acquired Dexcom securities at artificially inflated prices and in doing so relied upon the price of the securities, the integrity of the market for the securities, and/or upon statements disseminated by the Individual Defendants, and were damaged thereby.

375.   During the Class Period, Dexcom securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired Dexcom securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value

4914-2626-0365.v1

of Dexcom securities was substantially lower than the prices paid by members of the Class. The market price of Dexcom securities declined upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

376. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

377. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and/or sales of Dexcom securities during the Class Period, as the truth about Dexcom's operations and prospects began to be disclosed to the investing public.

## COUNT II:
### Violations of §20(a) of the Exchange Act Against All Defendants

378. Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

379. During the Class Period, the Individual Defendants participated in and oversaw the operation and management of Dexcom, and conducted and participated, directly and indirectly, in the conduct of Dexcom's business affairs.

380. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Dexcom's financial condition and results of operations, and to correct promptly any public statements issued by Dexcom which had become materially false or misleading.

381. Each of the Individual Defendants, therefore, acted as a controlling person of Dexcom. By reason of their senior management positions as officers and/or directors of Dexcom, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Dexcom to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised

- 163 -                                                    **24-cv-1485-RSH-VET**

control over Dexcom's operations and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Dexcom to engage in the wrongful acts complained of herein.  The Individual Defendants, therefore, were "controlling persons" of Dexcom within the meaning of §20(a) of the Exchange Act.

382. Dexcom had the power to control and influence the Individual Defendants, and other Company executives through its power to hire, fire, supervise, and otherwise control the actions of its employees and their salaries, bonuses, incentive compensation, and other employment considerations.  By virtue of the foregoing, Dexcom had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Individual Defendants, including the content of their public statements.

383. By reason of the above conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act for the violations committed by Dexcom.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Declaring this action to be a class action properly maintained pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and certifying Plaintiff as Class Representative and Robbins Geller Rudman & Dowd LLP as Class Counsel;

B. Awarding compensatory damages in favor of Plaintiff and other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class rescission or a rescissory measure of damages;

4914-2626-0365.v1

D.  Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including reasonable attorneys' fees, accountants' fees, and experts' fees, and other costs and disbursements; and

E.  Awarding Plaintiff and other members of the Class such other injunctive or equitable relief, including disgorgement and/or the imposition of a constructive trust, that may be deemed just and proper by the Court.

**DEMAND FOR TRIAL BY JURY**

Plaintiff demands a trial by jury.

DATED:  February 6, 2026

ROBBINS GELLER RUDMAN
  & DOWD LLP
DANIEL S. DROSMAN
W. MARK CONOVER
SARAH A. FALLON

s/ Daniel S. Drosman
DANIEL S. DROSMAN

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
ddrosman@rgrdlaw.com
mconover@rgrdlaw.com
sfallon@rgrdlaw.com
ROBBINS GELLER RUDMAN
  & DOWD LLP
ELIZABETH A. SHONSON
(admitted *pro hac vice*)
LUKE GOVEAS
(admitted *pro hac vice*)
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL  33432
Telephone:  561/750-3000
eshonson@rgrdlaw.com
lgoveas@rgrdlaw.com
Lead Counsel for Lead Plaintiff

4914-2626-0365.v1

- 165 -                                **24-cv-1485-RSH-VET**

O'DONOGHUE & O'DONOGHUE LLP
JOHN M. McINTIRE
5301 Wisconsin Avenue, N.W., Suite 800
Washington, DC  20015
Telephone:  202/362-0041
jmcintire@odonoghuelaw.com
Additional Counsel

**24-cv-1485-RSH-VET**

4914-2626-0365.v1