ROBBINS GELLER RUDMAN
  & DOWD LLP
DANIEL S. DROSMAN (200643)
W. MARK CONOVER (236090)
SARAH A. FALLON (345821)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
ddrosman@rgrdlaw.com
mconover@rgrdlaw.com
sfallon@rgrdlaw.com

Lead Counsel for Lead Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re DEXCOM, INC. CLASS ACTION SECURITIES LITIGATION | Lead Case No. 24-cv-1485-RSH-VET |
| | LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| | DATE:      March 27, 2026<br>CTRM:      3B, 3rd Floor<br>JUDGE:     Honorable Robert S. Huie |

4916-6191-4775.v1

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................... 1

II.   BACKGROUND ............................................................................................ 3

    A.    Statement of Facts........................................................................... 3

    B.    Procedural Background.................................................................... 5

        1.    The Court Sustains the FAC as to Statements J and K ................ 5

        2.    Defendants' Motion for Judgment on the Pleadings.................... 5

III.  LEGAL STANDARDS ON A MOTION TO DISMISS ................................. 8

IV.   ARGUMENT ................................................................................................. 9

    A.    The SAC's Allegations Cure the Defect Identified by the Court............. 9

    B.    Statements J and K Were False and Misleading When Made ............... 11

        1.    Statements J and K Falsely Conveyed Competitive Success in the Basal Market......................................................................... 11

        2.    Defendants' Claims of Success Are Belied by Their Admissions and Market Reaction to Learning the Truth ............ 14

        3.    Literal Truth Is Not a Defense: Defendants' Half-Truths Are Actionable............................................................................. 16

        4.    Defendants' Preferred Interpretation of Their Statements Cannot Be Credited................................................................... 17

        5.    Statements J and K Omitted Material Facts About Dexcom's Losses in the DME Channel and with PCPs.............. 19

    C.    The SAC Pleads a Strong Inference of Scienter.................................. 20

        1.    The Court's Prior Scienter Determination Controls, and Defendants Offer No Basis to Disturb It ................................... 21

        2.    Numerous Other Compelling Facts Support Scienter................. 23

    D.    Lawver Is Liable Under §20(a) as a Control Person of Dexcom........... 24

V.    CONCLUSION............................................................................................ 25

4916-6191-4775.v1

**TABLE OF AUTHORITIES**

**Page**

CASES

*Askins v. U.S. Dep't of Homeland Sec.*,
899 F.3d 1035 (9th Cir. 2018).............................................................................10

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008)...............................................................................17

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002)...............................................................................12

*City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*,
2023 WL 1769810 (S.D. Cal. 2023) ...............................................................19, 20

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
880 F. Supp. 2d 1045 (N.D. Cal. 2012) ..............................................................25

*Crews v. Rivian Auto., Inc.*,
2023 WL 4361098 (C.D. Cal. 2023)....................................................................25

*Elec. Workers Pension Fund, Loc. 103, I.B.E.W. v. HP Inc.*,
2021 WL 1056549 (N.D. Cal. 2021).....................................................................24

*Elec. Workers Pension Fund, Loc. 103, I.B.E.W. v. HP Inc.*,
2021 WL 4199273 (N.D. Cal. 2021).....................................................................14

*ESG Cap. Partners, LP v. Stratos*,
828 F.3d 1023 (9th Cir. 2016).............................................................................20

*Est. of Saunders v. Comm'r of Internal Revenue*,
745 F.3d 953 (9th Cir. 2014)...............................................................................15

*Evanston Police Pension Fund v. McKesson Corp.*,
411 F. Supp. 3d 580 (N.D. Cal. 2019)..................................................................21

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
63 F.4th 747 (9th Cir. 2023)................................................................................19

*Hoang v. ContextLogic, Inc.*,
2023 WL 6536162 (N.D. Cal. 2023)......................................................................22

4916-6191-4775.v1

**Page**

*Homyk v. ChemoCentryx, Inc.*,
  2023 WL 3579440 (N.D. Cal. 2023) .................................................................... 20

*Howard v. Everex Sys., Inc.*,
  228 F.3d 1057 (9th Cir. 2000) ............................................................................. 25

*In re Alphabet, Inc. Sec. Litig.*,
  1 F.4th 687 (9th Cir. 2021) ............................................................. 13, 16, 23, 24

*In re Apple Inc. Sec. Litig.*,
  2020 WL 6482014 (N.D. Cal. 2020) .................................................................. 23

*In re BioVie Inc. Sec. Litig.*,
  2025 WL 947667 (D. Nev. 2025) ....................................................................... 11

*In re Coinstar Inc. Sec. Litig.*,
  2011 WL 4712206 (W.D. Wash. 2011) .............................................................. 25

*In re Dermtech, Inc. Sec. Litig.*,
  2025 WL 1618193 (S.D. Cal. 2025) ................................................................... 17

*In re Energy Recovery Inc. Sec. Litig.*,
  2016 WL 324150 (N.D. Cal. 2016) .................................................................... 25

*In re Facebook, Inc. Sec. Litig.*,
  87 F.4th 934 (9th Cir. 2023) ........................................................................ 12, 14

*In re Galena Biopharma, Inc. Sec. Litig.*,
  117 F. Supp. 3d 1145 (D. Or. 2015) .................................................................. 24

*In re Gilead Scis. Sec. Litig.*,
  536 F.3d 1049 (9th Cir. 2008) ........................................................................ 8, 9

*In re Rigel Pharms., Inc. Sec. Litig.*,
  697 F.3d 869 (9th Cir. 2012) ............................................................................. 23

*In re UTStarcom, Inc. Sec. Litig.*,
  617 F. Supp. 2d 964 (N.D. Cal. 2009) ............................................................... 24

24-cv-1485-RSH-VET

4916-6191-4775.v1

**Page**

*In re Vantive Corp. Sec. Litig.*,
283 F.3d 1079 (9th Cir. 2002)................................................................24

*Jackson v. Loews Hotels. Inc.*,
2019 WL 6721637 (C.D. Cal. 2019)..................................................... 10

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018).........................................................*passim*

*Leventhal v. Chegg, Inc.*,
721 F. Supp. 3d 1003 (N.D. Cal. 2024) ................................................25

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016)...............................................................16

*Macquarie Infrastructure Corp. v. Moab Partners, L. P.*,
601 U.S. 257 (2024) ...............................................................................16

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
513 F.3d 702 (7th Cir. 2008)..................................................................24

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011) .................................................................................17

*Menon v. Maxeon Solar Techs., Ltd.*,
2025 WL 1223559 (N.D. Cal. 2025)..................................................... 14

*Miller v. Thane Int'l, Inc.*,
519 F.3d 879 (9th Cir. 2008)..................................................................16

*No. 84 Emp.-Teamster Joint Council Pension
Tr. Fund v. Am. W. Holding Corp.*,
320 F.3d 920 (9th Cir. 2003)..................................................................24

*Omnicare, Inc. v. Laborers Dist. Council
Constr. Indus. Pension Fund*,
575 U.S. 175 (2015) ...............................................................................16

*PAE Gov't Servs., Inc. v. MPRI, Inc.*,
514 F.3d 856 (9th Cir. 2007)..................................................................10

- iv -                                    24-cv-1485-RSH-VET

**Page**

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
2012 WL 1868874 (N.D. Cal. 2012)................................................................22

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014)........................................................................ 14

*Provenz v. Miller*,
102 F.3d 1478 (9th Cir. 1996)........................................................................ 20

*Reese v. Malone*,
747 F.3d 557 (9th Cir. 2014),
*overruled on other grounds by*
*City of Dearborn Heights Act 345 Police &*
*Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017).................................................................21, 22, 23

*Rumbaugh v. Harley*,
2018 WL 4002854 (E.D. Cal. 2018) ...............................................................11

*Salzman v. ImmunityBio, Inc.*,
753 F. Supp. 3d 1050 (S.D. Cal. 2024) ............................................................11

*Schueneman v. Arena Pharms., Inc.*,
840 F.3d 698 (9th Cir. 2016)................................................................12, 13, 14

*Shenwick v. Twitter*,
282 F. Supp. 3d 1115 (N.D. Cal. 2017) ......................................................21, 23

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007) .........................................................................8, 9, 20, 24

*York Cnty. ex rel. Cnty. of York Ret. Fund v. HP, Inc.*,
65 F.4th 459 (9th Cir. 2023)...........................................................................22

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009)..........................................................................22

4916-6191-4775.v1

**Page**

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C.
§78j(b)  ..............................................................................................................25
§78t(a)  ..........................................................................................................24, 25
§78u-4(b)(2)......................................................................................................20

Federal Rules of Civil Procedure
Rule 12(b)(6) ......................................................................................................8

4916-6191-4775.v1

Lead Plaintiff National Elevator Industry Pension Fund ("Plaintiff") respectfully submits this memorandum of law in opposition to Defendants' Motion.[1]

## I.    INTRODUCTION

This case is about a simple proposition: a company cannot invoke contemporaneous data to assure investors that it is "taking share," while that same data shows it is significantly trailing its primary competitor in the very segment it claims to be winning.

In early 2023, Dexcom stood at what it described as the largest coverage expansion in the Company's history.  The newly-covered Type 2 basal market represented millions of potential patients in a duopoly industry.  Competitive success would be measured by one metric above all others: new basal prescriptions.  Against that backdrop, Sylvain repeatedly told investors that Dexcom was "taking share" and that contemporaneous "script data" proved it.  He further assured the market that there was "no debate internally" because "we see that data."

The data did not show competitive success.

As Defendants now admit, during the very period in which Sylvain invoked script data to proclaim share-taking, Abbott was winning approximately seven out of ten new basal prescriptions and maintaining roughly 70% total basal market share.  Dexcom trailed with approximately 30%.  At the same time, Dexcom was losing share in the DME channel and failing to gain traction among PCP prescribers – the very channels responsible for generating new basal scripts.

Defendants nevertheless reinforced their narrative, raised guidance, and

---

[1]  "Motion" refers to the Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss Lead Plaintiff's Second Amended Consolidated Complaint for Violations of the Federal Securities Laws (Doc. No. 70-1).  In accordance with the Court's Civil Pretrial and Trial Procedures, pinpoint cites to the Motion are to the ECF-generated page number.  Capitalized terms not defined herein have the meaning ascribed in Lead Plaintiff's Second Amended Consolidated Complaint for Violations of the Federal Securities Laws (Doc. No. 68) ("SAC").  Unless otherwise noted, all "¶__" or "¶¶_" references are to the SAC, emphasis is added, and citations are omitted.

- 1 -                    24-cv-1485-RSH-VET

4916-6191-4775.v1

reaffirmed that guidance.  Then, on July 25, 2024, the truth emerged.  After the market closed, Defendants admitted Dexcom was "not doing wonderful in the basal space," that its share of new customers had "fall[en] short," and slashed guidance by $300 million.  The following day, Dexcom's stock price collapsed by more than 40% – the steepest single-day decline in the Company's history – erasing over $17 billion in market capitalization.  Analysts described Dexcom as "clearly losing the basal wars" and characterized the disclosure as a "credibility hit."

The sequence of events is stark. Defendants' assurances of share-taking, the contemporaneous data they invoked, and the market's ultimate reaction are illustrated in the chart below, which is attached to the Declaration of Daniel S. Drosman in a larger format as Exhibit A:



The chart underscores what the SAC alleges in detail: while Defendants were telling investors that script data showed competitive gains, Dexcom was losing the core battle for new basal starts.  And when that reality was finally disclosed, the market responded accordingly.

4916-6191-4775.v1                                                    24-cv-1485-RSH-VET

This Court previously sustained Statements J and K, holding that Plaintiff plausibly alleged Dexcom was not, in fact, "taking share" via reference to prescription data. The Court's subsequent order granting judgment on the pleadings did not hold the statements were true; it held only that the first amended complaint (Doc. No. 37) ("FAC") permitted an alternative interpretation of "taking share." The SAC cures that pleading defect by incorporating Defendants' own admissions regarding the IQVIA data and by pleading with precision that Sylvain's script-data assurances conveyed a materially misleading impression of competitive success.

Defendants now attempt to repackage their falsity arguments as arithmetic, semantics, and post-hoc reinterpretation. But the law does not permit a defendant to isolate phrases, invoke selective metrics, or rely on technical "basis point" movements to defeat a well-pleaded misimpression theory. Nor does it allow a company to highlight favorable data while withholding adverse realities that render its statements misleading.

The SAC alleges a coherent, data-driven theory of falsity, supported by Defendants' own admissions and confirmed by the market's reaction. At the pleading stage, that is more than sufficient. Defendants' Motion should be denied.

## II.   BACKGROUND

### A.   Statement of Facts

In April 2023, the Medicare coverage expansion created a once-in-a-generation inflection point for the CGM industry, which Dexcom itself described as the "largest single expansion of access to CGM in our industry's history" and as "expand[ing] [Dexcom's] addressable market tremendously." ¶¶53, 57. Dexcom estimated that the newly-covered Type 2 basal population alone comprised approximately three million patients. ¶¶51, 84. Because CGM was effectively a duopoly, Dexcom and Abbott were the only meaningful competitors for these prescriptions, and investors focused on who was winning the "basal wars," measured primarily by new basal prescriptions and resulting market share. ¶¶37, 65, 69, 72, 250, 259.

4916-6191-4775.v1

Following the coverage expansion, Defendants assured investors throughout 2023 and early 2024 that Dexcom was winning in basal, emphasizing sales force strength, PCP coverage, DME relationships, and "outperformance in basal." *See, e.g.*, ¶¶53-54, 56-58, 68.

On February 8, 2024, Sylvain told investors that Dexcom was taking share, explicitly pointing to contemporaneous script data: "you can see the share taking when you look at the script data, we are taking share." ¶¶243-244. On April 25, 2024, when an analyst sought "visibility" into competitive share and new patient starts, Sylvain again invoked "script data," stating "there's no debate internally to us. We know we're taking share and we see that data." ¶¶252-253.

The contemporaneous data showed the opposite. As Defendants now admit, IQVIA script-level data reflected Abbott winning approximately seven out of ten new basal prescriptions and maintaining roughly 70% total basal market share, leaving Dexcom at approximately 30% and short of its basal plan. ¶¶66, 245-246, 254-255; Doc. No. 39-1 at 8. Dexcom was also "los[ing] market share in the DME channel," and lacked sufficient sales coverage to gain traction in PCP offices. *See, e.g.*, ¶¶247-248, 256-257.

Despite these realities, Defendants raised guidance in April 2024 and reaffirmed it in June 2024. ¶¶70, 74. Then, after the market closed on July 25, 2024, Defendants slashed guidance by $300 million, admitting that Dexcom had "seen our share of new customers fall short," "experienced lower than expected new customer starts," "lost market share in the DME channel," and was "not doing wonderful in the basal space." ¶¶324, 350.

The market reaction was immediate. On July 26, 2024, Dexcom's stock price plummeted by more than 40% – the steepest single-day decline in the Company's history – wiping out over $17 billion in market capitalization in a single day. ¶¶325, 351. Analysts expressed shock and questioned management's credibility in light of the abrupt reversal from Defendants' repeated assurances of share taking. ¶¶352-354.

24-cv-1485-RSH-VET

4916-6191-4775.v1

## B.   Procedural Background

### 1.   The Court Sustains the FAC as to Statements J and K

On September 9, 2025, the Court issued an Order granting in part and denying in part Defendants' motion to dismiss the FAC.  Doc. No. 47.  The Court sustained Statements J and K, holding that "Plaintiff has plausibly alleged that Dexcom was not in fact, 'taking share' in the newly covered Type 2 basal market via reference to prescription data at the time Sylvain made his statement."  *Id.* at 27, 29.  The Court further held that Plaintiff had adequately alleged a strong inference of scienter with respect to Statements J and K, emphasizing Sylvain's invocation of contemporaneous prescription data as the basis for his "taking share" claims.  *Id.* at 35.[2]

### 2.   Defendants' Motion for Judgment on the Pleadings

Thereafter, Defendants filed their Answer and moved for judgment on the pleadings, attempting to re-litigate falsity by reframing the meaning of "taking share." Doc. Nos. 52, 54-1.  In their Answer and motion, Defendants made selective factual admissions concerning IQVIA data and advanced a hypothetical designed to show that Dexcom could increase overall market share while still losing most new basal prescriptions to Abbott.  *See, e.g.*, Doc. No. 52, ¶¶56, 237, 253, 258, 274; Doc. No. 54-1 at 12-13.  According to Defendants, Dexcom's overall share ***could*** rise even if Abbott captured the "vast majority" of new scripts.  *See* Doc. No. 54-1 at 12-13.

Plaintiff opposed that argument on two principal grounds.  First, Defendants relied on their own presentation of IQVIA data (based on undisclosed definitions and calculations) to argue that Statements J and K were technically true.  Doc. No. 54-1 at 6-7, 13.  Plaintiff objected because Defendants sought to use selectively-framed data to contradict well-pleaded allegations, precisely the misuse of incorporation-by-reference cautioned against in *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999, 1003 (9th

---

[2]   Defendants did not previously challenge the reliance, in connection with, or loss causation elements and do not do so here.  *See generally* Doc. Nos. 29-1, 39-1, 54-1, 70-1.

24-cv-1485-RSH-VET

4916-6191-4775.v1

Cir. 2018).  Doc. No. 56 at 17-21.  Even accepting Defendants' cited figures, Plaintiff demonstrated that the data confirmed Abbott's dominance – ~70% total basal share versus Dexcom's ~30% – thus reinforcing the allegations.  *See id.* at 25.

Second, Defendants' hypothetical rested on assumptions untethered to real-world conditions and mischaracterized prior allegations, including that the total basal market consisted of 100 patients, grew evenly by ten patients per month, and that Abbott held 90% of the basal market share and Dexcom held 10% during the Class Period. Doc. No. 54-1 at 12; Doc. No. 56 at 23-24.  The model thus did not test the accuracy of Statements J and K; it constructed a theoretical model divorced from the pleaded facts.

On January 7, 2026, the Court granted Defendants' motion (the "January 7 Order").  Doc. No. 66.  The Court adopted Defendants' hypothetical and charted results suggesting Dexcom's share could have increased from 12% in January 2024 to 16% in April 2024.  But as illustrated in the chart below, these purely hypothetical results, which the Court acknowledged are not "historically accurate," do not align with the facts alleged or even Defendants' own admissions:



***First***, the total market was not "110 patients" in January 2024. Dexcom had "size[d] the basal-only type 2 population . . . at around 3 million people in the U.S.," and, as of January 2024, Dexcom had estimated a 15% adoption rate (the % of total basal patients using CGM).  *See* ¶¶84, 252.  Thus, as reflected in **Table 1**, the total basal market in January 2024 was approximately 450,000 patients.

***Second***, Abbott did not hold "90% market share" immediately prior to the January to April 2024 timeframe.  As the Court observed, Plaintiffs allege only that "in 2021, Abbott . . . held a 90% share of the Type 2 market segment."  *See* Doc. No. 66 at 6 n.5.  This basal market, which existed three years prior to the relevant 2024 timeframe, consisted of a very small patient population without any insurance coverage that Dexcom did not "sell to or market to" because there was "just not that much of it out there."  *See* ¶49.

***Third***, Dexcom's share in January 2024 was not "12% market share."  As reflected in **Table 1**, Defendants admit that Dexcom's share was 28.8% in January 2024. *See* Doc. No. 70-1 at 19

***Fourth***, the total market was not expanding by ten patients per month during the relevant timeframe. Dexcom estimated an incremental 8% adoption rate over the course of 2024.  *See* ¶243, 252.  Thus, as reflected in **Table 1**, the total basal market was increasing by approximately 20,000 patients per month in early 2024.

|  | Total Market | Abbott Share | Dexcom Share |
|---|---|---|---|
| Start | 100 patients | 90 patients (90% market share) | 10 patients (10% market share) |
| January 2024 | 110 patients | 97 patients (88% market share) | 13 patients (12% market share) |
| February 2024 | 120 patients | 104 patients (87% market share) | 16 patients (13% market share) |
| March 2024 | 130 patients | 111 patients (85% market share) | 19 patients (15% market share) |
| April 2024 | 140 patients | 118 patients (84% market share) | 22 patients (16% market share) |

24-cv-1485-RSH-VET

4916-6191-4775.v1

In fact, Table 1 below, a realistic hypothetical using Dexcom's own representations regarding the state of the basal market supports Plaintiff's allegations that Dexcom's market share had indeed stalled, rendering Statements J and K misleading. The methodologies Plaintiff uses are consistent with the methodologies the Court used in its hypothetical whereby a set amount of new patients were added to the total market each month during the relevant period, and Abbott's and Dexcom's share of those additional patients were 70% and 30%, respectively.

**Table 1**

| | Total Market[3] | Abbott Share[4] | Dexcom Share[5] |
|---|---|---|---|
| January 2024 | 450,000 | 320,400 (71.2% market share) | 129,600 (28.8% market share) |
| February 2024 | 470,000 | 334,400 (71.1% market share) | 135,600 (28.9% market share) |
| March 2024 | 490,000 | 348,400 (71.1% market share) | 141,600 (28.9% market share) |
| April 2024 | 510,000 | 362,400 (71.1% market share) | 147,600 (28.9% market share) |

[3]   Dexcom "size[d] the basal-only type 2 population . . . at around 3 million people in the U.S." and as of January 2024, Dexcom had estimated a 15% adoption rate (the percentage of total basal patients using CGM). *See* ¶¶84, 252. Thus, the total basal market as of January 2024 was approximately 450,000 patients (3,000,000 * 15%). Dexcom estimated an incremental 8% adoption rate over the course of 2024. *See* ¶¶243, 252. Thus, the total basal market was increasing by approximately 20,000 patients per month in early 2024 (3,000,000 * 8% = 240,000 patients added in 2024; 240,000/12 months = 20,000 patients added per month).

[4]   According to Defendants' own representations, Abbott held 71.2% of total basal market share in January 2024. *See* Doc. No. 70-1 at 19. Thus, for purposes of the hypothetical, Abbott had 320,400 patients as of January 2024 (450,000 * 71.2%). Defendants also admit that Abbott was winning seven out of ten new basal prescriptions in the January to April 2024 timeframe (¶¶66, 245-246, 254-255). Thus, the hypothetical assumes Abbott was adding 14,000 of the 20,000 new basal patients each month (20,000 * 7/10). Each month, Abbott's market share is calculated by taking Abbott's new total basal patient count divided by the total basal market.

[5]   According to Defendants' own representations, Dexcom held 28.8% of total basal market share in January 2024. *See* Doc. No. 70-1 at 19. Thus, for purposes of the hypothetical, Dexcom had 129,600 patients as of January 2024 (450,000 * 28.8%). Defendants also admit that Abbott was winning seven out of ten new basal prescriptions in the January to April 2024 timeframe (¶¶66, 245-246, 254-255). Thus, the hypothetical assumes Dexcom was adding 6,000 of the 20,000 new basal patients each month (20,000 * 3/10). Each month, Dexcom's market share is calculated by taking Dexcom's new total basal patient count divided by the total basal market.

- 7 -                                              24-cv-1485-RSH-VET

4916-6191-4775.v1

Based on its hypothetical, the Court concluded that Sylvain's statements about "'taking share' in the Type 2 basal market – meaning that Dexcom was increasing its share in that market – are not necessarily inconsistent with Abbott obtaining the majority of new prescriptions." Doc. No. 66 at 7. The Court held that Plaintiff had not adequately established falsity because the allegations could be read as referring to overall share rather than share of new prescriptions. *Id.*

Critically, the Court did ***not*** hold that Statements J and K were true. Nor did it reject Plaintiff's script data theory. *Id.* at 7-8. Instead, it found that "***[a]s currently pleaded***," the allegations were insufficient and granted leave to amend "with respect to Sylvain's representations that Dexcom was 'taking share' based on 'script data' in Statements J and K only." *Id.* at 10. The Court stated it was "not convinced . . . that Plaintiff ***cannot*** cure the defects identified herein . . . via amendment." *Id.* (emphasis in original). In accordance with that directive, Plaintiff filed the SAC on February 6, 2026. Doc. No. 68.

## III.    LEGAL STANDARDS ON A MOTION TO DISMISS[6]

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the pleadings – not the merits. The Court must "accept all factual allegations in the complaint as true" and draw all reasonable inferences in Plaintiff's favor. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). The question is not whether Defendants' competing interpretation is plausible but whether Plaintiff has alleged a plausible theory of liability. *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

In Private Securities Litigation Reform Act of 1995 ("PSLRA") cases, the

---

[6]   Defendants have renewed their request for judicial notice and incorporation by reference as to a subset of the documents they previously submitted. *See* Doc. No. 70-1 at 8 n.2. It is well-settled that judicial notice is limited to matters that are "'not subject to reasonable dispute'" and that "it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint." *Khoja*, 899 F.3d at 999, 1003. The Court previously recognized these principles in holding that, while some documents submitted by Defendants were subject to judicial notice, the Court would not consider them for the truth of their contents. *See*

- 8 -                    24-cv-1485-RSH-VET

4916-6191-4775.v1

Court must assess the complaint "holistically." *Tellabs*, 551 U.S. at 326. The question is whether all the facts alleged, taken collectively, give rise to a plausible claim and, where scienter is at issue, to an inference that is at least as compelling as any opposing innocent inference. *Id.* Courts may not parse allegations in isolation, resolve factual disputes, adopt Defendants' alternative characterizations of the facts, or credit mathematical hypotheticals over contemporaneous data and admissions. *See id.*; *Gilead*, 536 F.3d at 1057.

Dismissal is therefore inappropriate where, as here, the SAC pleads a coherent theory that Defendants' statements were materially misleading in light of contemporaneous data and facts. At this stage, the Court determines plausibility, not which side's interpretation ultimately prevails.

## IV.   ARGUMENT

### A.   The SAC's Allegations Cure the Defect Identified by the Court

The SAC directly addresses the Court's January 7 Order. It does not merely repeat prior allegations but incorporates Defendants' own binding admissions that Abbott was winning approximately seven out of ten new basal prescriptions and maintained roughly a 70/30 total basal market share split during the relevant period – admissions that did not exist in the FAC and materially strengthen the falsity allegations. *See* ¶¶63-67, 245-246, 254-255.

The SAC further clarifies that Statements J and K were misleading because Sylvain expressly grounded his "taking share" claims in contemporaneous "script data," thereby conveying that Dexcom was winning competitive share in the newly-covered basal segment. Specifically, the SAC pleads with particularity that: (1) new basal

---

Doc. No. 47 at 10-11. The same principle applies here. To the extent the Court takes judicial notice of any of these documents, it should enforce the same limitation. Further, Defendants' claim that "Plaintiff did not previously oppose consideration of the remaining Exhibits 1-4, 6-7, 9-10, 12-13" (Doc. No. 70-1 at 8 n.2) mischaracterizes Plaintiff's prior position. Plaintiff did, in fact, oppose the consideration of those exhibits to the extent they were used for the truth of their contents, to create a factual counter-narrative, or to dispute the allegations – just as it does here. *See* Doc. No. 42 at 2-4, 8.

4916-6191-4775.v1

prescriptions were the key competitive metric in the newly-covered market (¶¶63-67); (2) Defendants have admitted IQVIA data showed Abbott winning roughly seven out of ten new basal prescriptions while maintaining approximately 70% total basal market share (¶¶66, 245-246, 254-255); and (3) Dexcom was losing share in the DME channel and lacked traction among PCP prescribers, who treated the vast majority of basal patients (¶¶247-248, 256-257, 259-262).

The SAC thus alleges that, when Sylvain represented that Dexcom was "taking share" and expressly cited "script data," he omitted material facts showing that the very data he invoked reflected competitive underperformance – not success. *See, e.g.*, ¶¶245, 254. By pleading that Defendants selectively referenced favorable metrics while omitting contemporaneous adverse script-level facts, the SAC cures the pleading defect identified in the January 7 Order and eliminates the linguistic "inconsisten[cies]" that the Court expressly granted Plaintiff leave to cure. *See* Doc. No. 66 at 7-8, 10.

Defendants mischaracterize these amendments. They contend that the SAC merely deletes language from the FAC and attempts to avoid the January 7 Order through artful editing. Doc. No. 70-1 at 17-18. That assertion is incorrect. The SAC contains targeted amendments that incorporate newly-admitted facts and clarify the script-level data theory the Court invited Plaintiff to refine.

Defendants' suggestion that the Court must evaluate superseded FAC language is legally untenable. Once amended, a complaint supersedes the prior pleading in its entirety. *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1043 (9th Cir. 2018). The FAC is no longer operative, and Defendants cannot resurrect prior language to manufacture inconsistency.[7]

---

[7] Defendants' reliance on *Jackson v. Loews Hotels. Inc.*, 2019 WL 6721637, at *3 (C.D. Cal. 2019), is unavailing. The SAC's allegations are not inconsistent with Plaintiff' prior allegations; they merely provide greater detail. Regardless, *Jackson* noted that the Ninth Circuit has held that "'there is nothing in the Federal Rules of Civil Procedure to prevent a party from filing successive pleadings that make inconsistent or even contradictory allegations.'" *Id.* (quoting *PAE Gov't Servs., Inc. v. MPRI, Inc.*, 514 F.3d 856, 860 (9th Cir. 2007)).

- 10 -                                   24-cv-1485-RSH-VET

Defendants wrongly contend that by referencing IQVIA data, the SAC "incorporates" Defendants' entire submission and adopts their calculations. *See* Doc. No. 70-1 at 7, 15, 18-19. The SAC relies only on Defendants' binding admissions regarding Dexcom's loss rate and approximate basal market share between January and April 2024. *See* ¶¶63-67, 245-246, 254-255. A party's admissions bind that party, not its adversary, and reference to a document does not constitute adoption of all factual assertions within it. *See, e.g.*, *Rumbaugh v. Harley*, 2018 WL 4002854, at *3 (E.D. Cal. 2018). Plaintiff is entitled to rely on Defendants' admissions without incorporating Defendants' selective framing of the data. Those admissions showing Abbott's ~70% share and Dexcom's ~30% share reinforce the SAC's allegations.

In short, the SAC does exactly what the Court permitted: it refines the falsity theory, incorporates newly admitted facts, and pleads with greater precision that Defendants' "script data" assertions were misleading in context. Defendants' attempt to characterize the SAC as a cosmetic revision is inaccurate and legally irrelevant.

**B.      Statements J and K Were False and Misleading When Made**

**1.      Statements J and K Falsely Conveyed Competitive Success in the Basal Market**

The SAC pleads with particularity that Statements J and K were false and misleading because they affirmatively conveyed competitive success in the newly-covered Type 2 basal market while contemporaneous data – and Defendants' own admissions – showed competitive failure.

Defendants attempt to isolate the phrase "taking share" and evaluate it in a vacuum. Doc. No. 70-1 at 16-17. But challenged statements must be read in context. *See In re BioVie Inc. Sec. Litig.*, 2025 WL 947667, at *13 (D. Nev. 2025); *Salzman v. ImmunityBio, Inc.*, 753 F. Supp. 3d 1050, 1062 (S.D. Cal. 2024). Here, the context included analyst questions about competitive traction, Defendants' months-long narrative of basal success, and Sylvain's express reliance on contemporaneous "script data" to resolve a "debate" about Dexcom's competitive standing.

4916-6191-4775.v1

Under Ninth Circuit law, a statement is actionable if it "' directly contradict[s] what the defendant knew at that time,'" or "'create[s] an impression of a state of affairs that differs in a material way from the one that actually exists.'" *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 948 (9th Cir. 2023) (quoting *Khoja*, 899 F.3d at 1008; *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)).  Moreover, once a defendant chooses to tout positive information, it must do so without omitting adverse facts that render the statement misleading.  *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705-06 (9th Cir. 2016).

When read in context, Statements J and K satisfy both of these standards.  For nearly a year preceding February and April 2024, Defendants assured investors that Dexcom was positioned to win the "basal wars," touting "outperformance in basal" and success in the DME and PCP channels.  *See, e.g.*, ¶¶143-144, 164-165, 203-204, 223-224.  Sylvain's February 8 and April 25 statements reinforced that narrative.

***Statement J***: On February 8, 2024, in response to questions about basal traction, Sylvain told investors – no fewer than ***four*** separate times – that Dexcom was "taking share," expressly grounding that claim in contemporaneous "script data."  ¶¶243-244. This conveyed that script-level data confirmed competitive gains in the newly-covered basal segment and that share-taking was driving performance.

But Defendants now admit that the very IQVIA data Sylvain referenced showed Abbott winning approximately seven out of ten new basal prescriptions, maintaining ~70% total basal market share – more than double Dexcom's ~30% share – and consistently outperforming Dexcom during the January-April 2024 period.  ¶¶245-246. Defendants further admit that Dexcom was losing basal market share to Abbott in the critical DME channel and among PCP prescribers who overwhelmingly treated basal patients.  ¶¶247-248.  In light of these known facts, telling investors that script data showed Dexcom was "taking share" created an impression of competitive gains that directly contradicted reality.  *See, e.g.*, ¶¶249-250.

***Statement K***: On April 25, 2024, after analysts raised a "debate" about Dexcom's

4916-6191-4775.v1

competitive share in basal and sought "visibility" into performance relative to Abbott, Sylvain responded: "[T]here's no debate internally to us. We know we're taking share, and we see that data." ¶¶252-253. He added that Dexcom "typically won" head-to-head. *Id.* This was a direct rebuttal to market skepticism and an unequivocal assertion that contemporaneous script data confirmed competitive wins.

Yet at the time, Abbott controlled approximately 70% of total basal market share, Dexcom was losing share in the DME channel serving Medicare basal patients, and Dexcom lacked traction among PCP prescribers. ¶254. Rather than provide the requested "visibility," Sylvain invoked script data while omitting those adverse facts.

Analyst commentary confirms how investors understood these statements. Following the February 8 call, analysts reported "competitive wins from ABT Type 2 basal-only patients" and that Dexcom "continue[d] to take share from ABT." *See* ¶250. After the April 25 call, analysts described Dexcom as "taking basal market share" and interpreted management's script-data commentary as evidence of continued share growth. ¶259. Investors understood these statements as representations of competitive wins – not mere category expansion.

The July 25, 2024 disclosure confirms the materiality of Defendants' omissions. After the market closed that day, Defendants admitted that Dexcom was "not doing wonderful in the basal space" and that its share of new customers had "fall[en] short," and they slashed guidance by $300 million. ¶283. Analysts reacted with shock, describing Dexcom as "clearly losing the basal wars." ¶¶285-286; *see In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703 (9th Cir. 2021) (finding that negative market reaction "support[ed] the materiality of the misleading omission").

In sum, Statements J and K were affirmative, data-backed representations that Dexcom was competitively gaining share in the newly-covered Type 2 basal market. At the time, Defendants knew that Abbott was winning approximately seven out of ten new basal prescriptions and controlling roughly 70% of total basal market share, and that Dexcom was losing traction in critical DME and PCP channels. By invoking

- 13 -                                        24-cv-1485-RSH-VET

4916-6191-4775.v1

"script data" as proof of success while omitting those contemporaneous adverse facts, Defendants created a materially false impression of Dexcom's competitive position. That is precisely the type of misleading half-truth the federal securities laws prohibit.[8] *See Facebook*, 87 F.4th at 948; *Schueneman*, 840 F.3d at 705-06; *Khoja*, 899 F.3d at 1008-09.

### 2. Defendants' Claims of Success Are Belied by Their Admissions and Market Reaction to Learning the Truth

Defendants do not meaningfully confront the core problem: their statements created a false narrative of competitive success in the basal market that contemporaneous data and their own admissions contradicted. Instead, they argue that Sylvain was free to tell investors Dexcom was "taking share" because, under their calculations, Dexcom gained "140 basis points of market-share growth" over four months. Doc. No. 70-1 at 18-19. Recasting a marginal change into "basis points" does not transform competitive underperformance into success. A basis point is one-hundredth of a percent. Thus, the "140 basis points" Defendants emphasize is simply a 1.4% total change over four months, assuming their selective calculations are accurate, which Plaintiff does not concede.[9]

---

[8] Defendants' cited authorities are inapposite. Doc. No. 71-1 at 19-20; *see Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061 (9th Cir. 2014) (finding no actionable omission where plaintiff acknowledged the statements were factually accurate but demanded a more fulsome annual report); *Menon v. Maxeon Solar Techs., Ltd.*, 2025 WL 1223559, at *15 n.8 (N.D. Cal. 2025) (addressing only "accurately reported historical information, such as sales and profit data . . . 'rarely subject to misinterpretation'"); *Elec. Workers Pension Fund, Loc. 103, I.B.E.W. v. HP Inc.*, 2021 WL 4199273, at *4 (N.D. Cal. 2021) (finding plaintiff failed to plead that defendants had a duty to disclose how market share was calculated).

[9] Defendants' 140-basis-point framing amounts to monthly increases of 0.5%, 0.5%, and 0.4% – a marginal crawl, not meaningful competitive acceleration. Doc. No. 70-1 at 19 n.6. Their attempt to bolster that figure by citing an analyst's reference to 200-250 basis points of acceleration in domestic revenue growth is inapt. The fact that two metrics are expressed in basis points does not render them comparable. The analyst was discussing revenue growth, not basal market share. Notably, at the time of Statement J in February 2024, Dexcom's alleged "share growth" was only 50 basis points month-over-month. By the end of the Class Period, that same analyst described Dexcom's basal performance as "worrisome" and stated that "DXCM is clearly losing the basal wars." ¶285.

- 14 -    24-cv-1485-RSH-VET

4916-6191-4775.v1

The issue is not whether Dexcom's total share ticked upward. The issue is whether Sylvain's statements that Dexcom was "taking share" and that contemporaneous "script data" created a materially misleading impression of competitive success in the newly-covered basal market. Even accepting Defendants' framing, a roughly 1.4% movement over four months – while losing approximately seven out of ten new basal prescriptions and trailing Abbott by roughly 70/30 in total share – does not support the sweeping narrative that Sylvain conveyed.

Notably, Defendants address Plaintiff's misimpression allegations only in a footnote and fail to confront their substance. Doc. No. 70-1 at 17 n.5. This footnoted argument is waived. *See Est. of Saunders v. Comm'r of Internal Revenue*, 745 F.3d 953, 963 n.8 (9th Cir. 2014). Defendants' failure to engage the core misimpression theory underscores that they cannot reconcile Sylvain's data-backed assurances with the competitive realities reflected in the same data.

Defendants' own subsequent admissions render their litigation theory untenable. On July 25, 2024, they abandoned the narrative of competitive strength, slashed guidance by $300 million, and acknowledged that Dexcom had "seen our share of new customers fall short," "experienced lower than expected new customer starts," "lost market share in the DME channel," and was "not doing wonderful in the basal space." ¶350. They further conceded that Dexcom failed to achieve its basal plan. *See* Doc. No. 39-1 at 8 ("No one was more disappointed than Dexcom over the failure to achieve its ambitious plan . . . .").

These admissions fatally undercut Defendants' litigation claim that a marginal basis-point shift constituted competitive success. If Dexcom had truly been gaining meaningful share, there would have been no need to slash guidance by hundreds of millions of dollars and publicly acknowledge failure in the basal segment.

The market's reaction confirms the point. When Defendants revealed the truth, Dexcom's stock fell approximately 40% (the steepest single-day decline in its history) erasing more than $17 billion in market capitalization. ¶285. Analysts described the

- 15 -                                24-cv-1485-RSH-VET

4916-6191-4775.v1

disclosure as a "credibility hit" and acknowledged that Dexcom was "losing the basal wars."  ¶¶285-286; *see Alphabet*, 1 F.4th at 703.

Defendants cannot now recast marginal share movement as "success" when they themselves characterized the same performance as a failure once the truth was disclosed.  Their admissions and the market's reaction confirm that the narrative of competitive share-taking conveyed in Statements J and K was materially misleading.

### 3. Literal Truth Is Not a Defense: Defendants' Half-Truths Are Actionable

Even if Dexcom's total share ticked up marginally over four months, that does not insulate Statements J and K.  When Sylvain told investors that Dexcom was "taking share" and that "script data" proved it, he omitted material facts showing that the same data reflected competitive underperformance – Abbott winning roughly seven out of ten new basal prescriptions, maintaining approximately 70% total basal share, and Dexcom losing traction in critical DME and PCP channels.  Those omissions rendered the statements materially misleading.

The law is clear that literal accuracy does not cure a misleading half-truth.  The Supreme Court has reaffirmed that "'representations that state the truth only so far as it goes, while omitting critical qualifying information,'" are actionable.  *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 263, 266 (2024).  As the Court explained in *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 192 (2015), "literal accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another."  The Ninth Circuit also holds that disclosure is measured not by literal truth, but by whether it accurately informs rather than misleads.  *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008); *see also Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016); *Khoja*, 899 F.3d at 1008-09.

That is precisely what occurred here.  By invoking "script data" as proof of competitive success while withholding that the same data showed Abbott's dominance

4916-6191-4775.v1

- 16 -                    24-cv-1485-RSH-VET

and Dexcom's channel losses, Defendants conveyed a distorted picture of competitive strength.  Even accepting Defendants' arithmetic, Statements J and K communicated a materially misleading narrative of share gains while omitting facts that made that narrative untrue in substance.  Literal truth is no defense.

**4.    Defendants' Preferred Interpretation of Their Statements Cannot Be Credited**

Defendants attempt to salvage Statements J and K by recasting what Sylvain meant when he told investors Dexcom was "taking share."  They argue that he referred only to total basal market share – not share of new basal prescriptions – and that adverse facts about new scripts are therefore irrelevant.  Doc. No. 70-1 at 18.  This post-hoc reinterpretation cannot be credited at the pleading stage.

Where competing interpretations are plausible, the Court must credit Plaintiff's reasonable interpretation.  *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 986 (9th Cir. 2008); *see also In re Dermtech, Inc. Sec. Litig.*, 2025 WL 1618193, at *4 (S.D. Cal. 2025) (where "the parties both put forth plausible theories about how a reasonable investor would interpret" a statement, plaintiff adequately alleges falsity).  A statement's truthfulness turns on the total impression it conveys to a reasonable investor in light of the "total mix" of information.  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011).

Defendants' proposed interpretation is undercut by the record and context. Neither Sylvain nor any other speaker on the February 8 and April 25 calls limited the "taking share" statements to total market share.  Defendants manufacture that limitation by pointing to the analyst phrases such as "Type 2 basal market" and "market share within the basal population," arguing that those words necessarily mean total share rather than new scripts.  Doc. No. 70-1 at 18.  But in an expanding market driven by newly-eligible patients, competitive success was measured by new basal starts.  ¶¶63-65.

Defendants themselves admit that Abbott was winning approximately seven out

- 17 -                              24-cv-1485-RSH-VET

4916-6191-4775.v1

of ten new basal prescriptions while holding roughly 70% of total basal market share. *See, e.g.*, ¶¶66, 246, 255. In such a market, share of new prescriptions and overall competitive standing were inextricably linked. It is therefore artificial to separate "total share" from new prescription performance.

The language Sylvain used confirms that his statements were tied to new patient performance. On February 8, he referenced the "expand[ing]" basal category and told investors that "you can see the share taking when you look at the script data." *See* ¶¶243-244. On April 25, in response to a question about a "record new start quarter," he emphasized that "a good chunk of our new patients are coming through that basal channel," and again grounded his claim in script data, stating, "[w]e know we're taking share, and we see that data," and "you can see the scripts continuing to come our way." ¶¶252-253. The statements were explicitly tied to new prescriptions.

Defendants' own corrective disclosure further undermines their litigation position. At the end of the Class Period, they attributed basal underperformance to shortfalls in new customers and new patient starts, admitting they had "seen **our share of new customers** fall short," and "experienced **lower than expected new customer starts**." ¶350. Having tied basal performance to new customer share, Defendants cannot now insist that Statements J and K concerned only some abstract measure of total market share divorced from new scripts.

The way analysts understood the statements reinforces this conclusion. Following the February and April calls, analysts described Dexcom as taking share from Abbott in basal and cited script-level data as evidence of competitive wins. ¶¶250, 259 (analysts interpreting the comments as evidence of "strong new patient starts in Q4 . . . including basal only" and noting that management attributed new patient growth to the basal-only population). After the July disclosure, analysts described Dexcom as "losing the basal wars." ¶78 ("the most worrisome dynamic to us as it implies share loss to its largest competitor Abbott . . . which cost DXCM a meaningful number of new patients"). Investors did not interpret Sylvain's remarks as a technical commentary

4916-6191-4775.v1

24-cv-1485-RSH-VET

about total share divorced from new prescriptions; they understood them as representations of competitive traction in new basal patients.

Defendants' effort to recast their statements is thus a merits argument disguised as a pleading challenge.  At this stage, the Court evaluates the statements as a reasonable investor would have understood them in context, not as Defendants now wish they had been understood.

### 5.     Statements J and K Omitted Material Facts About Dexcom's Losses in the DME Channel and with PCPs

Defendants argue that Statements J and K cannot be misleading because the statements do not expressly mention DME or the sales force.  *See* Doc. No. 70-1 at 20-21.  This argument misstates the law.  When a company chooses to speak about competitive success, it must disclose material adverse facts that render its statements misleading.  *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 768, 770 (9th Cir. 2023) (statements touting strength were misleading where they "'contravened the unflattering facts in [defendant's] possession'").  Here, Defendants touted Dexcom's share-taking while omitting known facts that undermined that narrative – specifically, losses in the DME channel and failure to gain traction among PCP prescribers, both critical drivers of new basal prescriptions.

With respect to DME, the Company admitted that its poor performance in basal was linked to the fact that "we've lost market share in the DME channel . . . and that has hurt us."  ¶¶283, 350.  Likewise, Defendants admitted that Dexcom was losing to Abbott among PCPs, who treated the vast majority of basal patients, resulting in Dexcom "getting very few prescriptions."  *See* ¶248.  These were not peripheral operational details; they went directly to Dexcom's ability to generate new scripts and gain market share.

Defendants' suggestion that they "fully disclosed" these issues is a premature truth-on-the-market defense.  Doc. No. 70-1 at 20-21.  Such a defense is "'intensely fact-specific'" and cannot be resolved on pleadings.  *City of Birmingham Relief & Ret.*

4916-6191-4775.v1

*Sys. v. Acadia Pharms., Inc.*, 2023 WL 1769810, at \*6 (S.D. Cal. 2023). To prevail at this stage, Defendants would have to show that any allegedly omitted information was transmitted to the market """with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression."""" *Id*. at \*5 (quoting *Provenz v. Miller*, 102 F.3d 1478, 1492-93 (9th Cir. 1996)). They cannot do so.

None of the disclosures that Defendants identify informed investors that Dexcom's sales force expansion and restructuring – an approximately 40% increase – were undertaken because Dexcom was "getting very few prescriptions" and "not getting any traction" in uncovered PCP offices. ¶¶248, 257. Nor did Defendants disclose that DME share losses were materially impairing basal growth. Whether those disclosures were adequate is a factual question not suitable for resolution at this stage. *See* Doc. No. 70-1 at 20-21; *Homyk v. ChemoCentryx, Inc.*, 2023 WL 3579440, at \*12 (N.D. Cal. 2023) ("Because the adequacy of Defendants' disclosures is not obvious . . . [it] is a factual issue that the Court may not resolve at this [pleading] stage.").

Having chosen to tout competitive share-taking, Defendants were required to disclose the adverse channel-level realities that rendered that narrative misleading. They did not.

### C.     The SAC Pleads a Strong Inference of Scienter

To survive dismissal, Plaintiff must plead particularized facts giving rise to a "strong inference" that Defendants acted with an intent to deceive or with deliberate recklessness. 15 U.S.C. §78u-4(b)(2); *Tellabs*, 551 U.S. at 322-24. The inference need only be "'cogent and ***at least as compelling*** as any opposing inference.'" *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1033 (9th Cir. 2016) (emphasis in original). Here, scienter is not a close call – especially given this Court's prior ruling. Defendants' scienter arguments largely repackage their falsity theories and ignore that the Court already held Plaintiff pleaded a strong inference of scienter as to Statements J and K based on Sylvain's access to and reliance on prescription data.

4916-6191-4775.v1

### 1. The Court's Prior Scienter Determination Controls, and Defendants Offer No Basis to Disturb It

This Court has already determined that Plaintiff alleged a strong inference of scienter with respect to Statements J and K. In its Order on Defendants' motion to dismiss the FAC, the Court held that "Plaintiff has sufficiently alleged facts supporting a strong inference of scienter with respect to Statements J and K," based on Sylvain's "ability to access and his reliance upon prescription data." Doc. No. 47 at 35. That holding was not revisited in the Court's order on Defendants' motion for judgment on the pleadings, which addressed falsity, not scienter. Doc. No. 66. Defendants offer no legitimate basis to relitigate a settled issue on a record that is, if anything, stronger.[10]

The SAC repeats the same core allegations the Court relied on – namely, that Sylvain himself "'bridge[d] the [scienter] gap'" by directly invoking the very data at issue. *Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017). Sylvain stated that he "get[s] script data" and "look[s] at script data," that "you can see the share taking when you look at the script data," and that there was "no debate internally" about Dexcom "taking share." ¶¶309-311; Doc. No. 47 at 35 (quoting the same statements from the consolidated amended complaint and finding scienter). Under controlling Ninth Circuit law, when an executive affirmatively ties his public statements to specific internal (or accessed) metrics, the most compelling inference is that he knew what those metrics showed and spoke with that knowledge. *Reese*, 747 F.3d at 572 (holding CFO's statement referencing corrosion rate data "render[ed] it unlikely that she was not aware of [this data] or the concerning aspects of the company's findings"); *see also Shenwick v. Twitter*, 282 F. Supp. 3d 1115, 1147

---

[10] *See Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 607 (N.D. Cal. 2019) ("[Defendant] is of course entitled to disagree with the Court's [scienter] conclusions. But such disagreement does not warrant a motion for reconsideration that rehashes arguments the Court has already rejected or which fail to undermine the Court's analysis.").

24-cv-1485-RSH-VET

4916-6191-4775.v1

(N.D. Cal. 2017).[11]

The SAC further strengthens scienter by pleading Defendants' admissions (made in this litigation) that Sylvain had access to, and reviewed, IQVIA script-level data. *See* Doc. No. 52, ¶¶253, 274; Doc. No. 54-1 at 7; ¶311. Where Defendants "disclosed information about [the omitted or disputed topic] that contradicted [their] own internal data," a strong inference arises that they "'knowingly misled'" the market. *York Cnty. ex rel. Cnty. of York Ret. Fund v. HP, Inc.*, 65 F.4th 459, 467-68 (9th Cir. 2023). Put simply, once Sylvain publicly represented that his "taking share" claim was grounded in "script data" he was reviewing, it is "unclear what further facts plaintiff[] would need to plead . . . a stronger inference" that he knew what the data showed when he made the statements. *Reese*, 747 F.3d at 572.

Defendants' effort to reframe this issue fails. They contend that the IQVIA data "refutes" scienter because it purportedly shows Dexcom was gaining basal market share between January and April 2024. Doc. No. 70-1 at 22-23. That is not a scienter argument at all; it is a falsity merits dispute. Scienter asks whether Defendants spoke with knowledge (or deliberate recklessness) that their statements were misleading in context – not whether Defendants can now litigate a "literal truth" defense on a selective reading of market-share metrics. In any event, Defendants' position only underscores scienter: by their own telling, Sylvain had and reviewed the IQVIA data, and he chose to tout "taking share" while omitting the contemporaneous adverse facts Plaintiff pleads about Dexcom's real-world underperformance in critical prescribing channels

---

[11] Defendants' scienter authorities are inapposite. Unlike here, where Defendants admit Sylvain reviewed script-level data and the SAC pleads the contents of that data (Dexcom's market share and Abbott's 7-of-10 win rate), the cases they cite involved vague "reports" or generalized allegations without particularized facts showing defendants reviewed the data or knew its contents. *See, e.g.*, *Hoang v. ContextLogic, Inc.*, 2023 WL 6536162, at *22 (N.D. Cal. 2023) (no scienter where no allegation that defendants reviewed the data or what it showed); *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1001 (9th Cir. 2009) (no particularized facts showing defendants' awareness of falsity); *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 2012 WL 1868874, at *19 (N.D. Cal. 2012) (no specific internal tracking data alleged).

24-cv-1485-RSH-VET

4916-6191-4775.v1

(including PCP access and DME execution). Defendants later conceded these same facts impacted results. That is precisely the type of knowing half-truth the PSLRA is designed to reach.

### 2. Numerous Other Compelling Facts Support Scienter

Although scienter is established by Defendants' admissions that Sylvain accessed and relied on script data, additional indicia reinforce that inference.

***Core Operations***. The newly-expanded basal market was described as the "largest expansion of coverage in [the] company's history" and a linchpin of Dexcom's future growth. ¶299; *see also* ¶¶251(a), 260(a).[12] It would be implausible for the CFO – who expressly tracked script data – to be unaware of the Company's performance in that segment. *See Alphabet*, 1 F.4th at 706; *Shenwick*, 282 F. Supp. 3d at 1145-46.

***Temporal Proximity***. Within approximately three months of touting share-taking based on script data and raising guidance, Dexcom announced a $300 million guidance reduction and admitted it was "not doing wonderful in the basal space." ¶¶260(c), 323-325. Such a compressed timeline supports the inference that the adverse facts were known when the earlier statements were made. *See Reese*, 747 F.3d at 575 (three to six months between statements and disclosure supports scienter).

***Post-Class Period Admissions***. Defendants later acknowledged sales force inadequacies, inability to reach PCPs, and DME share losses – precisely the operational weaknesses Plaintiff alleges were concealed while Defendants touted competitive strength. ¶¶251(c)-(d), 260(d)-(e), 316-317. Courts recognize that such admissions can corroborate contemporaneous knowledge. *See In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *10 (N.D. Cal. 2020).

---

[12] This was not a "routine corporate objective[]" of the type the Ninth Circuit found insufficient to support scienter in *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 884 (9th Cir. 2012). There, the alleged objective was part of ordinary business operations. Here, by contrast, the basal expansion was described as the largest coverage expansion in Dexcom's history and a central driver of future growth. ¶¶251(a), 260(a), 328.

- 23 -                                                      24-cv-1485-RSH-VET

***Motive***.  While not required, motive further supports scienter.  *See Tellabs*, 551 U.S. at 325.  Defendants were incentivized to sustain the basal-growth narrative in hopes that performance "would right itself."  *See Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008).  Plaintiff also pleads substantial insider sales.[13] Indeed, Defendants sold millions of dollars while they had access to script data reflecting competitive weakness.  ¶¶330-333; *see In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1203 (D. Or. 2015).[14]  Sylvain's incentive compensation was likewise tied to stock performance.  ¶¶338-340; *see No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003).

\*     \*     \*

Viewed holistically, the SAC alleges that Sylvain knew – based on script data and prescribing trends – that Dexcom was "not doing wonderful in the basal space," yet continued to portray competitive success.  ¶¶260(c), 309-311.[15]  Defendants' alternative inference of an innocent misunderstanding ignores Sylvain's admitted data access and corrective disclosure that followed.  Doc. No. 70-1 at 25-26.  It is not more compelling. *Tellabs*, 551 U.S. at 325.

### D.     Lawver Is Liable Under §20(a) as a Control Person of Dexcom

Defendants' argument that Lawver is not a control person fails for the reasons

---

[13]  Defendants' reliance on Rule 10b5-1 trading plans raises an affirmative defense not properly resolved at the pleading stage.  *See In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 n.16 (N.D. Cal. 2009).  Even Defendants' authority recognizes that pre-planned sales may rebut scienter only after factual development.  *See Elec. Workers Pension Fund, Loc. 103, I.B.E.W. v. HP Inc.*, 2021 WL 1056549, at \*7 (N.D. Cal. 2021).

[14]  Unlike in *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092 (9th Cir. 2002), where insider sales were found not suspicious because they were consistent with prior trading patterns and occurred while the company's reported performance remained strong, Dexcom's insiders sold while contemporaneous script data reflected competitive weakness that culminated in a $300 million guidance cut and a 40% stock collapse.  *See* ¶332 (alleging Sylvain's 2024 sales of $730,567, $1.6 million, and $85,712).

[15]  Because Plaintiff adequately alleges Sylvain's scienter, Dexcom's scienter is likewise established.  *See* ¶341; *Alphabet*, 1 F.4th at 706 (executive scienter "imputed to" the corporation).

- 24 -                               24-cv-1485-RSH-VET

4916-6191-4775.v1

set forth in Plaintiff's opposition to Defendants' motion for judgment on the pleadings. *See* Doc. No. 56 at 27-32.[16]  In the Ninth Circuit, a plaintiff need not show that the §20(a) defendant was a primary violator or exercised actual day-to-day control; it is enough to allege that the defendant had the power to influence or direct the primary violator. *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).  At the pleading stage, the existence of a primary violation and the defendant's power to control the corporation suffices. *Leventhal v. Chegg, Inc.*, 721 F. Supp. 3d 1003, 1018 (N.D. Cal. 2024).

The SAC satisfies this standard.  It alleges a primary violation by Dexcom and pleads that Lawver, as Dexcom's Chief Commercial Officer, exercised operational command over the Company's worldwide commercial organization, including its sales strategy for the newly-expanded basal market.  ¶¶26, 326.  It further alleges her responsibility for Dexcom's commercial strategy and her public-facing authority at the Company's 2023 Investor Day.  ¶¶122, 326.

Defendants simply recycle meritless arguments from their motion for judgment on the pleadings, which do not alter the governing standard or negate the SAC's specific allegations of Lawver's authority and control.  *Compare* Doc. No. 70-1 at 26-27, *with* Doc. No. 54-1 at 8-10.  Lawver's §20(a) liability is adequately pleaded.[17]

## V.    CONCLUSION

For the foregoing reasons, this Court should deny Defendants' Motion.

---

[16]  Defendants do not challenge control as to any other individual defendant.  Because the SAC adequately alleges a primary violation, §20(a) liability is sufficiently pleaded as to Dexcom, Sayer, and Sylvain. *See Crews v. Rivian Auto., Inc.*, 2023 WL 4361098, at *14 (C.D. Cal. 2023).

[17]  Defendants' authorities are inapposite. *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1070-71 (N.D. Cal. 2012), addressed only §10(b) "maker" liability and found no primary violation. *In re Coinstar Inc. Sec. Litig.*, 2011 WL 4712206, at *11 (W.D. Wash. 2011), confirms that control over the company satisfies §20(a).  And in *In re Energy Recovery Inc. Sec. Litig.*, 2016 WL 324150, at *25-*26 (N.D. Cal. 2016), the court declined to find control as to a CMO who "did not speak on the Company's behalf during earnings conference calls," but found control for the executive who "ran the day-to-day operations."  The SAC alleges Lawver both spoke publicly and ran Dexcom's day-to-day commercial operations.  ¶¶26, 122, 326.

- 25 -    24-cv-1485-RSH-VET

4916-6191-4775.v1

DATED: March 13, 2026

Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
DANIEL S. DROSMAN
W. MARK CONOVER
SARAH A. FALLON


s/ Daniel S. Drosman
DANIEL S. DROSMAN

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
ddrosman@rgrdlaw.com
mconover@rgrdlaw.com
sfallon@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
ELIZABETH A. SHONSON
(admitted *pro hac vice*)
LUKE GOVEAS
(admitted *pro hac vice*)
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL  33432
Telephone:  561/750-3000
eshonson@rgrdlaw.com
lgoveas@rgrdlaw.com

Lead Counsel for Lead Plaintiff

O'DONOGHUE & O'DONOGHUE LLP
JOHN M. McINTIRE
5301 Wisconsin Avenue, N.W., Suite 800
Washington, DC  20015
Telephone:  202/362-0041
imcintire@odonoghuelaw.com

Additional Counsel

4916-6191-4775.v1